Allan Miller
3385 Claudia Drive
Concord, CA  94519
650-468-7387
allan.miller@alumni.stanford.edu
Pro Se Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| ALLAN MILLER<br><br>        Plaintiff,<br><br>vs.<br><br>HFN, INC., a Delaware Corporation, d/b/a as<br>NANOHEAL BY HFN INC.,<br>KALAARI CAPITAL ADVISORS<br>PRIVATE LIMITED, an Indian Company,<br>SRIDHAR SANTHANAM,<br>KUMAR SHIRALAGI, PAVAN VAISH,<br>and VANI KOLA<br><br>Defendants. | Case Number:<br><br>**COMPLAINT**<br><br>**JURY DEMANDED**<br><br>Case: 2:23-cv-00733<br>Assigned To : Romero, Cecilia M.<br>Assign. Date : 10/16/2023<br>Description: Miller v. HFN et al<br><br>FILED US District Court-UT<br>OCT 16 '23 PM02:23 |

Complaint with Jury Demand

## INTRODUCTION

This is an action brought *pro se* by Plaintiff Allan Miller, who is a minority shareholder of HFN, Inc. ("HFN"), against Defendants who have intentionally forsaken their fiduciary duty to him, have fraudulently converted his assets in HFN to their own personal benefit, and have conceived and implemented a long running scheme using stock options to defraud him of the value of his shares. The Defendants, having already been forced to settle a fraud action brought by minority shareholders ten years ago, felt that they were now above the law and proceeded to use HFN resources for their own personal benefit. Coming out of the COVID era, the Plaintiff had not heard from HFN since the lawsuit, and simply requested a shareholder meeting and some updated information about the company. Instead, the Defendants, sensing that the party of unaccountability might be over, simply stonewalled and hoped that Miller would just go away. However, since the Plaintiff Miller is one of the original founders of the company, multiple anonymous informants within the company, who were all worried about what was going on, contacted Miller, and in a situation eerily similar to the 2014 litigation, provided the basis for this Complaint.

Sadly, the citizens of Utah have also suffered at the hands of the defendants. iTOK, Inc. was founded in 2004 by a group of Utah tech entrepreneurs to provide personal and welcoming technical support to its customers, using a staff located completely in its Lehi office with no outsourcing to foreign countries. In 2014, iTOK secured an $18 million Series-B financing round from ABS Capital Partners based on its successful business model, and by 2015, the company had become the 51st fastest growing company in Utah and was providing significant tax revenue and jobs for the state. In 2016, the company management rebranded as Bask Technology and expanded their market through an additional focus on the growing under-served market of senior citizens needing tech support they could trust, from a friendly staff of native English speakers.

In 2017, the Defendants discovered Bask and targeted it for acquisition. HFN offered a deal to improve the bottom line by providing the Nanoheal technology to automate the service offering and reduce the cost per customer. The deal was concluded in late 2017, but HFN did the

Complaint with Jury Demand

same thing Santhanam had previously done with HandsFree Networks. Santhanam's promises never materialized, and instead, he engineered majority control of Bask, starved the company of the promised investment capital, never provided any significant technology, never invested in any growth in the company (in development, sales, or marketing), eliminated most of the Utah employees, and moved the remaining support to the Philippines where it remains today. As a result, the once high-flying Utah star with fast-growing annual revenues over $20 million has now been reduced through mismanagement to a skeleton company with slowly decreasing annual revenues of a fraction of their former amount. HFN's main motivation for the transaction became apparent: to plunder Bask for cash and use the ill-gotten gains to pay for the personal activities of the Defendants, particularly Santhanam, and to provide a convenient base of operations inside the United States in Orem. It was yet another chapter in the oft-repeated story of a Utah tech company being invaded by outsiders and decimated to a shadow of its former self.

The results were predictable. Many Utah citizens lost their jobs (some may have left Utah as a result) and Utah lost a major source of tax income. The money was instead channeled straight into the pockets of the Defendants.

## PARTIES

Plaintiff, Allan Miller ("Miller"), is a US citizen and individual residing in Concord, California. At all relevant times, Miller was a minority shareholder of Defendant HFN, Inc. and a founder of HandsFree Networks, the predecessor of HFN, Inc.

Defendant, HFN, Inc. ("HFN"), is a Delaware corporation with a principal place of business located in Orem, Utah. HFN is registered to do business in Utah as entity number 10534657-0143 with registered agent Bryan S. Johansen at 101 South 200 East, Suite 700, Salt Lake City, UT 84111, and with DBAs as Bask and Nanoheal.

Defendant, Kalaari Capital Advisors Private Limited ("Kalaari"), is an Indian Company with a principal place of business located in Bengaluru, Karnataka. At all relevant times, Kalaari held a Board seat at HFN and owed a fiduciary duty to Plaintiff Miller.

Complaint with Jury Demand

Defendant, Sridhar Santhanam ("Santhanam"), is an Indian citizen and individual. At all relevant times, Santhanam was the CEO and Chairman of the Board of HFN and owed a fiduciary duty to Plaintiff Miller.

Defendant, Kumar Shiralagi ("Shiralagi"), is an Indian citizen, US citizen, and individual. At all relevant times, Shiralagi was on the Board of Directors of HFN, as well as a Venture Partner at Kalaari, and owed a fiduciary duty to Plaintiff Miller.

Defendant, Pavan Vaish ("Vaish"), is an Indian citizen, US citizen, and individual. At all relevant times, Vaish was on the Board of Directors of HFN and owed a fiduciary duty to Plaintiff Miller.

Defendant, Vani Kola ("Kola") is an Indian citizen, US citizen, and individual. At all relevant times, Kola was the lead Managing Director at Kalaari, and owed a fiduciary duty to Plaintiff Miller.

## JURISDICTION AND VENUE

Jurisdiction for this case arises under 28 U.S.C. § 1332(a)(1) and 28 U.S.C. § 1332(a)(2) because Plaintiff Miller is a citizen of California, Defendant HFN is a citizen of Utah, Defendant Shiralagi is a citizen of Texas, and Defendants Kalaari, Vaish, and Kola are citizens or subjects of India. The amount in controversy exceeds $75,000 exclusive of interest and costs, providing diversity jurisdiction to this Court under 28 U.S.C. § 1332(a).

Defendant HFN is a citizen of Utah under 28 U.S.C. § 1332(a)(c)(1) because its principal place of business was Utah at all relevant times. Santhanam declared under penalty of perjury that the principal place of business of HFN is in Utah. See Exhibit 1 ¶ 5.

Venue is appropriate in this District for all claims against Defendant HFN because this Court has personal jurisdiction over HFN since its principal place of business is in Utah.

Venue is appropriate in this District for all claims against Defendants Kalaari, Santhanam, Shiralagi, Vaish, and Kola because this Court has personal jurisdiction under the Long Arm Statute 78-B-205 of the Utah Code.

Complaint with Jury Demand

Venue is appropriate in this District for the Exchange Act claims because HFN has sufficient minimum contacts with the United States, since it is incorporated in Delaware and has its principal place of business in Utah. The Exchange Act claims constitute a federal case.

Venue is appropriate in this District for the claims arising under patent law because HFN has sufficient minimum contacts with the United States, since it is incorporated in Delaware and has its principal place of business in Utah. The claims arising under patent law constitute a federal case. The Plaintiff pleads with specificity that the breach of fiduciary duty arises from the fact that the *interpretation of the claims* of the patents in question could not have had any bearing on the business of the companies providing the security interest, and that HFN was needlessly foregoing the opportunity to monetize these patents as a result. The interpretation of the patent claims in light of relevance to the business underlying the security interest is the very real question at the basis of the claims of breach of fiduciary duty.

## FACTUAL ALLEGATIONS

## I.  BACKGROUND

### A.  The 2012 fraud

Eleven years ago, on January 12, 2012, the HFN management concocted a scheme to defraud its shareholders and investors by selectively withholding information to reduce the apparent value of the company in a transaction primarily designed to transfer an outsized share of ownership to the management and a new investor, NEA-IUVP. *Miller et al. v. Donnini et al., D Mass 1:14-cv-12337-NMG dkt. 1*. Thanks to the efforts of an anonymous informant, Miller became aware of a trail of documentation on the scheme and filed suit along with 11 other minority shareholders two years later, on June 2, 2014, against Santhanam and HFN, among others. Following the response and reply to the complaint by both sides, the Court sustained multiple counts against the defendants, including violations of § 10(b) and § 20(a) of the Exchange Act, Rule 10b-5 of the SEC, breach of fiduciary duty, and fraud. The case was poised for discovery, but once the depth and nature of the evidence of the plaintiffs was exposed, the defendants rapidly

Complaint with Jury Demand

progressed toward a settlement, and dismissal with prejudice, between the minority shareholders and HFN.

Defendants Kola and Shiralagi knowingly invested in this fraudulent scheme eleven years ago as NEA-IUVP, which has now changed its name to Kalaari. Santhanam, Kola, and Shiralagi should have learned their lesson and run HFN in a manner designed to benefit the company and its shareholders. But the storybooks teach us that a zebra cannot change its stripes, and this lesson seems to apply to the Defendants.

## B. Déja vu in 2022

In early 2022, Miller was approached by several anonymous informants independently, each concerned in different ways about the manner in which HFN was being run and the negative consequences that might result. The greatest concern was that key resources were not being utilized to advance the interests of HFN but were instead being channeled to activities that benefited only the Defendants, to the detriment of all others. Sensing something amiss, on July 6, 2022, Miller asked for a shareholder meeting of HFN. HFN was long overdue for a shareholder meeting since its bylaws require one every year, but there had not been a single shareholder meeting since 2012. The HFN Board and investors should have been particularly sensitive to shareholder communication and should have followed the bylaws to the letter, especially since the last shareholder meeting was the one that triggered the 2014 litigation. But this complaint will make clear that concerns about the company are low in priority for the Board and are subjugated by attention to actions that benefit the Defendants directly. The Defendants derive no particular benefit from shareholder meetings, so holding a shareholder meeting has no importance to them.

## C. HFN refuses to have a shareholder meeting

Santhanam responded the same day and promised a meeting. However, the meeting was not scheduled, so Miller repeated the request on July 11, 2022. On July 13, Santhanam scheduled a shareholder meeting for July 21, which did not meet the 10-business-day notice period required in the bylaws.

Complaint with Jury Demand

After communicating with another minority shareholder, Miller responded with a request to make the meeting date comply with the bylaws and included a list of requested information for the shareholders to review to streamline the meeting.

The response was quick and surprising. Santhanam asked Miller for a formal request to examine HFN records with the execution of a confidentiality agreement. Santhanam attached a confidentiality agreement that was inappropriate for the disclosure of corporate records to a shareholder with several unreasonable requirements.

Miller responded to Santhanam with a formal request for documentation and a shareholder meeting, accompanied by a confidentiality agreement that was more appropriate and reasonable. Arjun Sharma ("Sharma"), an attorney from Kalaari (the original investor described in the 2014 litigation), also responded to Miller indicating that Kumar Shiralagi ("Shiralagi") of Kalaari was no longer on the Board of Directors of HFN, and that Miller should stop including Kalaari on further communication about HFN.

Miller responded politely to Sharma with a request for additional information about Shiralagi's tenure, but never received a response.

As late as July 9, 2022, the HFN web site showed Shiralagi and Santhanam on the Board of Directors, along with Shirish Nimgaonkar ("Nimgaonkar") as President and CSO. However, by July 30, shortly after Miller's request, the HFN web site went offline, and then reappeared by August 12 with the "About Us" page completely removed, and no information about the Board. As late as August 8, 2022, the Kalaari web site showed Shiralagi as a Venture Partner at Kalaari. In a similar fashion to the HFN web site, shortly after Miller's request for information, the Kalaari web site was altered to remove Shiralagi from the "Team" page.

Now Miller was growing increasingly concerned with the situation. Not long after Sharma had contacted Miller with the incorrect information about Shiralagi and the composition of HFN's Board, both HFN and Kalaari had hastily and suspiciously altered their web sites to remove all references to Shiralagi. HFN was in such a hurry that the entire page describing the company was

Complaint with Jury Demand

removed. This action contradicts Kalaari's stated policy of maintaining Board seats with their portfolio companies, making it even more suspicious.

Santhanam's confidentiality agreement had been drafted using Westlaw's Practical Law template "Confidentiality Agreement for Cross-Border Commercial Transactions," which was inappropriate since this was neither a cross-border nor a commercial transaction.[1] But Santhanam was intransigent and replied on August 20 that he was unwilling to use Miller's more reasonable confidentiality agreement. To move things along, Miller responded on August 30, 2022 with a marked-up copy outlining the most objectionable parts of Santhanam's agreement with suggestions for corrections.

That was the last communication Miller had with HFN, over one year ago. Forsaking their fiduciary duty to disclose, the Defendants are uninterested in communicating with the minority shareholders.

But even though Miller has received no further information from HFN, he has continued to receive information from the several anonymous informants, and this action is the result.

## II. BREACH OF FIDUCIARY DUTY THROUGH MISMANAGEMENT OF HFN

### A. No real oversight on the Board of Directors

The corporate governance of HFN is in a state of disarray. In November 2016, shortly after the settlement of the 2014 litigation, Sridhar Santhanam was CEO and Chairman of the Board, serving along with two outside Board members, Kumar Shiralagi and Pavan Vaish ("Vaish"), and one major outside investor, Kalaari Capital ("Kalaari"). Vaish has remained active with the company, and as late as November 2022, visited the company to "brainstorm, ideate, and storyboard" with company employees as a Board member. During the same time frame, Shiralagi, a Managing Director of the investor Kalaari, was active and communicated frequently with

---

[1] Interestingly, Sharma's CV on the Kalaari website indicates that "… in his previous roles, he routinely advised institutional investors, start-ups, and growth-stage companies on domestic and cross-border investments, …"

Santhanam, serving as a liaison between HFN and Kalaari. This is consistent with Kalaari's policy to "take board seats and play an active role in the development" of their portfolio companies, as stated on their web site. No minutes were ever kept for these Board meetings.

As late as July 9, 2022, the HFN web site showed Shiralagi as a member of the Board of Directors but not Vaish, and no longer showed Kalaari as an investor. Shiralagi continued as an active Board member well into 2022 and continued to meet regularly with Santhanam. No minutes were kept for these Board meetings. In a strange series of events, as described previously, once Miller asked for some documentation from HFN, Sharma, an attorney at Kalaari, notified Miller on July 19, 2022 that "neither Kalaari nor any individual representing Kalaari is involved with the operations and management of the Company" and declined to provide any further information about Shiralagi's departure or the current composition of the Board. At about the same time, HFN hurriedly and surreptitiously scrubbed the web site of any information about the composition of its Board of Directors and its investors, and Kalaari hurriedly scrubbed Shiralagi from its web site. Kalaari felt a sudden and urgent need to distance themselves from the activities of HFN once Miller asked for some specific information about those activities.

Both Sharma's representation of Kalaari and the flurry of activity updating web sites put Kalaari in an awkward position. Kalaari owes a fiduciary duty to the minority shareholders. If Kalaari has abandoned its Board seat, it would leave the control of the Board to a single person and would therefore have difficulty serving its fiduciary duty of care to Miller. On the other hand, if Kalaari has maintained its Board seat, then by indicating the opposite to Miller, it has failed in its duty to disclose to Miller.

Sharma's communication with Miller indicates that Kalaari is still an investor in HFN. At least as late as November 2022, Pavan Vaish was still actively involved with HFN and was on the HFN Board of Directors.

The Defendants have been aware, or should have been aware, of the precarious situation of the Board of Directors, but rather than correcting it for the benefit of HFN, they have let it

Complaint with Jury Demand

progress to the current state. In doing so, they have pursued their own interests to the detriment of the Plaintiff and abandoned their fiduciary duty of care to the Plaintiff. Then, by obscuring, concealing, and falsifying information about the composition of the Board of Directors, at least some of the Defendants have abandoned their fiduciary duty to disclose to the Plaintiff. The repeated pattern of concealing and obscuring information, along with the negligent lack of oversight, has directly contributed to all the other financial harm to Miller described in this Complaint.

### B. Lack of Human Resource management and control

HFN lacks basic corporate oversight and controls. The company has no effective human resource ("HR") management, with only a single part-time HR manager and no company HR Manual or Employee Handbook.

In the #metoo era, the failure of a company to provide these basic tools is irresponsible and exposes the company to the possibility of significant litigation costs and damages. The wage loss component alone (before punitive damages) can amount to over $1 million, with an average around $500,000. For HFN, this exposure is significant. At least one Defendant has had, and continues to have, inappropriate relationships with at least one HFN employee.[2]

The Defendants are aware, or should be aware, of the failure to provide sufficient HR tools and the financial repercussions, but have chosen not to dedicate resources toward investigating allegations that have surfaced and addressing them. In fact, the Defendants are taking advantage of the lack of sufficient HR oversight to maintain their status quo at HFN to the detriment of Plaintiff Miller, and have abandoned their fiduciary duty of care to the Plaintiff.

Plaintiff Miller's direct financial loss during the relevant times due to the Defendants' lack of HR oversight is at least $14,153.10.

---

[2] Given the public nature of this Complaint, the high risk of retaliation against the victims involved, and the irrelevance of the details to the causes of action, the Plaintiff is opting not to disclose any further information about the nature of these relationships.

Complaint with Jury Demand

### C. Mismanagement of Intellectual Property: Patents

The architecture and operation of the HFN software is novel. On May 10, 1999, Miller authored a provisional patent application on behalf of the company describing this novel operation. On May 10, 2000, the Plaintiff authored a patent application with short claims that issued as US Patent No. 6,742,141 ("the '141 patent") on May 24, 2004 after a light prosecution with only one non-final rejection. On May 21, 2004, the Plaintiff authored a continuation with short claims that issued on August 29, 2006 as US Patent No. 7,100,085 ("the '085 patent") after two minor corrections requested by the Examiner.

The light prosecution for both patents is atypical of software patents and indicates the novelty of the inventions. (HFN filed a PCT application and a national stage application in Australia but abandoned both in favor of concentrating on the US market.) The HFN patents have been cited 247 times by patent applications owned by Google, Amazon, AT&T, Cisco, Citrix, Dell, Fujitsu, HCL, HP, Hitachi, Infosys, Intel, IBM, Kyndryl, Facebook (Meta), Microsoft, NetApp, Nokia, Oracle, ServiceNow, and Xerox, among others, further demonstrating their fundamental nature and inventive value.

These patents could have significant value. In *Columbia University v. NortonLifeLock*, on May 22, 2022, a jury found NortonLifeLock guilty of willful infringement of 4 claims of 2 patents in the same technology area as the HFN patents, using a similar technique, and *with a later priority date*. The jury awarded the plaintiff in that case US $185 million. *ED Virginia 3:13-cv-00808-MHL dkt. 1206*. Notably, in the course of the litigation, NortonLifeLock filed 7 challenges against 104 claims in 6 patents at the Patent Trial and Appeal Board (PTAB); the PTAB denied the challenge against 8 claims and found 24 of the claims patentable, further demonstrating the novelty of these techniques even with the later priority date.

Santhanam was aware of the value of the HFN patents. On December 18, 2015, Santhanam had a discussion with Miller in which he indicated that he had talked with a patent broker in India who had estimated the value of the patents at US $1 million. Santhanam has taken no action to

Complaint with Jury Demand

monetize the patents, and in the meantime, they both expired on May 10, 2020. Both patents have

method claims, potentially extending their value at least marginally into 2026, but under

Santhanam's stewardship, no action has been taken toward monetization.

The assignment history of the patents at the US Patent and Trademark Office (USPTO)

reveals the motivation for this inaction. See Exhibit 2. On September 30, 2019, HFN used both

the '141 patent and the '085 patent as a security interest (collateral) for a transaction involving

Zelis Payments and Red-Card Payment Systems. Zelis and Red-Card are financial management

system providers for healthcare providers that merged in 2019.

Claim 1 of the '141 patent is a method claim claiming:

> 1. A method for diagnosing and resolving problems in software-based systems, comprising:
> automating detecting said problems using software;
> automating resolving said problems using software;
> interrogating a local database to drive said automated detecting and said automated resolving;
> storing executable code in said local database having a plurality of entries to define said automated detecting and said automated resolving;
> updating said local database from a central database having a plurality of entries, said updating being initiated automatically without user intervention;
> recording a count of said automated resolutions for each entry in said local database;
> updating said central database with said count to generate a central total count in said central database of said automated resolutions;
> updating a local total count in said local database from said central total count in said central database as part of said periodic update; and
> computing priorities of said plurality of entries in said local database using said local total count.

Claim 1 of the '085 patent is a slightly broader method claim, claiming:

> 1. A method for resolving problems in software-based systems, comprising:
> automating resolving said problems using software;
> storing executable code in a local database having a plurality of entries to define said automated resolving;
> updating said local database from a central database having a plurality of entries, said updating being initiated automatically without user intervention;
> recording a count of said automated resolutions for each entry in said local database;
> updating said central database with said count to generate a central total count in said central database of said automated resolutions; and
> updating a local total count in said local database from said central total count in said central database as part of said periodic update.

A brief examination of the products of Zelis, Red-Card, and the merged entity reveals no

evidence of use (EoU) of the claimed methods of either the '141 patent or the '085 patent. Although

Complaint with Jury Demand

any business may utilize "automating resolving [said] problems using software," none of these entities have a "local database" or a "central database" of "executable code … to define … automated resolving," and certainly no database that would store a "priority" or a "count" of entries in those databases.

A brief examination of the products of HFN, on the other hand, shows that each and every claim element of both the '141 patent and the '085 patent map directly onto features of the HFN software, and are key to the commercial value of the software.

The '141 and '085 patents could not have had commercial value to the main operating business of Zelis or Red-Card, so HFN was using them as collateral for an undisclosed side venture of the Defendants that was made for the sole benefit of the Defendants. The transaction also encumbered the primary intellectual property of the company with a lien that prevented monetizing the patents in their last few years of life. All this was done solely for the sole benefit of the Defendants, in another failure to fulfil their fiduciary duty of loyalty to the Plaintiff.

Under the Defendants' leadership of HFN, no additional patent applications have been filed since the 2006 continuation filing. Either no significant advancements have been made in the product technology, or the intellectual property of the company has been neglected. In either case, the Board has been diverting HFN resources to their own ends rather than maintaining and protecting the innovation that is one of the key assets in a software technology company.

This failure to protect HFN intellectual property has also put the company into a precarious position. With no patent protection at all, a competitor could easily assert patents against HFN for patent infringement and HFN would have nothing with which to counter-assert and move toward a settlement. The result would be to tie HFN up in costly litigation and potentially even an injunction against continuing to do business.

Once again, the Board has failed to use company resources correctly, opting instead to keep them for short-term personal gain. The Defendants are abandoning their fiduciary duty of care to the Plaintiff.

Complaint with Jury Demand

Plaintiff Miller's direct financial loss during the relevant times due to the Defendants' failure to monetize intellectual property is at least $13,800.00.

### D.  Mismanagement of Intellectual Property: Software

The HFN software is organized somewhat like an app store such as the Apple iTunes Store or the Google Play Store. The software has three main components. The "core" software provides a set of basic operations to monitor and act on systems under management, analogous to the iOS or Android operating system Application Programming Interfaces (APIs) used to monitor and act on end user devices. The "application" level uses the core software operations to implement detection and solution for specific problems, analogous to the apps that are sold on app stores to provide specific functionality using the operating system APIs. The "management" level provides a user interface for controlling and reporting on the activities of the application level, analogous to the app store interface that allows end users and device managers to control and report on app usage on devices.

### E.  Core Software

The core software requires updating and maintenance on a regular basis. In addition to extensions to provide management of new versions of operating systems and new platforms, the core software is intimately tied to the underlying operation of the computer network. Network protocols and standards are updated frequently and require corresponding updates to the core software.

The only major update to the core software under the current engineering management (over ten years) has been some extensions to support mobile devices.[3] More importantly, the computer security environment has changed significantly in the past ten years. For example, ransomware is prevalent, advanced persistent threats (APTs) now target companies and infrastructure using sophisticated phishing and zero-day vulnerability attacks, and two-factor

---

[3] By way of comparison, Miller led a small engineering team at a different company to bring a similar mobile device management extension from concept to deployment in under one year.

Complaint with Jury Demand

authentication is the norm, among many other changes. The core software continues to use the mid-2000s security model that was appropriate for its time but is dangerously insecure in today's world. These security concerns are not merely hypothetical.

A key HFN customer suffered a security breach at an end user. Upon investigation, the HFN customer discovered that the cause was a well-known vulnerability in the aging HFN security model that could be exploited by simply monitoring open network traffic. The customer demonstrated this vulnerability to HFN. The response by the Defendants was to only patch the HFN software to address the specifics of that one vulnerability, rather than heed the warning and invest in an improved security model for the product. Multiple other customers, prospects, and partners have also raised concerns about the security features of the product.

This failure by the Defendants to properly address the security of the HFN products has put the company, its customers, and its customers' end users at considerable risk. On July 2, 2021, Kaseya, a company with a very similar product and business model to HFN, was compromised in a ransomware attack that caused widespread downtime for over 1,000 companies. See Exhibit 40. The attackers reported that one million end user systems were affected and demanded a ransom of $45,000 per system, also offering a "bulk discount" to Kaseya of $70 million to unlock all systems with a single payment.

The HFN web site indicates that the company has the product installed on 4 million end user systems, so in a similar compromise, one could expect the demand by the attacker to be up to $180 billion for per-system remediation, or up to $280 million for a one-time unlock. Legal analysts commenting on the Kaseya compromise have indicated that some of the liability could be shifted onto HFNs customers (the service providers), so the impact would also tarnish the reputation of HFN and damage its customer relationships.

The Defendants knew, or should have known, the gravity of the Kaseya compromise. Besides being in the main business of HFN, Kaseya had considerable coverage in mainstream media. Multiple customers have raised concerns about the security aspects of the HFN product.

Despite this, the Defendants chose yet again to continue to use company resources for their own benefit rather than invest those resources into critical development to protect the company, its customers, and its end users. The Defendants failed in their fiduciary duty of care to the Plaintiff.

### F.  Application Software

The application software is a collection of script-like code where each script uses the core operations to provide focused detection and solution of a single issue. As any computer user knows, the nature and specifics of issues can change rapidly, but can also persist over long periods. For example, one HFN script predating the current management fixed a problem that Windows had in updating the time zone after the rules changed in the US. This script was very useful but had a limited life until Microsoft fixed the problem a few months later. Another script handled the situation where a router with fixed IP addresses that were known to every machine but could not be discovered by a newly installed machine. This script would still be useful in today's networked environments. The application software therefore needs to have constant attention and testing to keep up with the ever-changing landscape of computer issues, and to make sure that they are resolved correctly. This automation of detecting and resolving issues is a key value add and differentiator for the product.

The application software has had little, if any, additions and development under the current engineering management. Instead, the Defendants believe that the *customers* should provide the specification and implementation of the scripts to do problem resolution. The CEO and product management teams consistently fail to visit key customers to understand their issues, or even respond to their inquiries. Not surprisingly, the HFN web site has no customer testimonials at all, because not a single customer has reported value added by the product, and as a result, customer turnover is high, with the company having lost more than half of its customers in the last few years.

The Defendants are aware of the issues with the application software. Multiple customers have repeatedly emphasized their expectation that HFN should properly specify and implement the application software. This makes sense since it is a part of the HFN product and represents a

Complaint with Jury Demand

key component of its value. The HFN travel budget remains large, but not for visits to customers and end users to understand the needs for the applications software. Instead, as will be described below, the travel is oriented around the Defendants' other investments of HFN resources in ventures that are not in HFN's line of business and do not benefit the company. The Defendants are consistent in their choice of investing HFN resources for personal benefit rather than the benefit of HFN, failing in their obligation to their fiduciary duty of care to the Plaintiff.

## G.  Management Software

The management software is implemented as a web site that is available to HFN's customers but typically not the end users with managed devices. This interface is intended to provide visibility to the customer about what is going on at end user devices, what kind of issues are being encountered and resolved, and what kinds of new trends are surfacing. Enterprise customers want an interface that can provide real-time information on large numbers of devices as well as generating summary reports for executive review.

The management software has only been updated with cosmetic changes for over ten years. The underlying database is still the same relational database, and no effort has been made to utilize modern big data tools or real-time analytics. Even the showcase example on the HFN web site only contains general usage information by end user devices, highlighting the product as a device monitoring tool rather than an issue detection and resolution platform.[4] This is consistent with the lack of development in the application software and the customer lack of perceived added value.

The Defendants are aware of the shortcomings of the management software. Multiple major customers have indicated that the reporting capabilities of HFN are insufficient and do not meet end user requirements. As described previously, rather than visit the customers and end users to understand and implement the required functionality, the Defendants' travel activities are

---

[4] The image shows application usage, printer usage, network usage, device type, CPU usage, uptime, boot time, and notification frequency; these are all measured parameters as opposed to diagnosing actual problems with indications of some kind of action taken at the device.

Complaint with Jury Demand

focused on those providing them personal benefit, as described below. They dependably use HFN resources for their own gain at the expense of HFN. The Defendants have not fulfilled their fiduciary duty of care to the Plaintiff.

Plaintiff Miller's direct financial loss during the relevant times due to the Defendants' failure to maintain and update the Core Software, Application Software, and Management Software is at least $142,140.00.

## H. Web Site

Any company doing business online, especially a company involved in networking or user service, needs to have a well-managed online presence in its web site. The HFN web site falls very short of this goal. The site completely lacks an "About Us" section, giving the viewer the impression that there is no real presence or history of the company. Calling the contact phone number inspires even less confidence: the call is answered by a synthesized voice that mispronounces the name of the company and asks you to leave a message.

In another hasty scrub of the site, the company has removed the link to the "Newsroom" section of the site while leaving the word "Newsroom" disturbingly present. However, during the relevant times of this Complaint, the featured "Newsroom" article was "5 Ways CBD Can Improve Your Daily Life." This article extolled the many virtues of using CBD oil, made from the active component in marijuana. The article was apparently not on the web site by mistake, since it was dated after some of the other articles. One can only assume that a potential customer reading this might not be too excited by the prospect of having their critical IT infrastructure managed by a team that was enthusiastically using CBD-based products at the same time.

The Defendants were aware of the problems with the web site. For example, they modified the site around the middle of July, 2022 to remove the "About Us" section as described previously, and have since modified it to remove the "Newsroom" section. Rather than use company resources to keep the web site accurate and timely, to encourage confidence by potential customers, they

Complaint with Jury Demand

instead predictably divert those resources to activities promoting their own gain at the expense of the company. Once again, the Defendants have failed in their fiduciary duty of care to the Plaintiff.

Plaintiff Miller's direct financial loss during the relevant times due to the Defendants' failure to maintain and update the online marketing channel is at least $24,950.40.

## III. FRAUDULENT CONVERSION OF HFN SHARES AND RESOURCES

Even more egregious than the breach of fiduciary duty through the mismanagement of the company is the outright misappropriation of shares and HFN resources for the personal benefit of the Defendants.

### A. Misuse of the Employee Stock Option Plan for self-dealing and outright grants

The option pool was a significant component of the 2015 settlement negotiations. Exhibit 3 was provided by HFN during the settlement negotiations, and showed a large pool of 2,616,500 shares, comprising over 15% of the shares of the company, for an employee stock option plan (ESOP). The plaintiffs were very concerned about such a large outstanding option pool, with particular concern that Santhanam would treat the option pool as a mechanism for self-dealing, or for making Santhanam whole after the settlement and thereby removing any punitive value. The plaintiffs wanted the entire option pool to be treated as outstanding shares for the computation of the settlement, and the defendants wanted none of the option pool to be treated as outstanding shares.

The plaintiffs were aware that an ESOP is a key component to attract talent to a high-tech company, so a compromise was reached enabling the settlement by treating half the ESOP pool as outstanding shares in computing the settlement. Exhibit 4 shows the computation that was used for the settlement, indicating that only 1,308,250 of the option shares were used to compute the 2% total. (Note that there is a rounding error in Exhibit 4; the settlement was for 307,154 shares rather than 307,155.) The 307,154 shares were provided from Santhanam's 6,560,000 shares as agreed to, leaving Santhanam with 6,252,846 shares after the settlement. The ESOP pool was 2,616,500 shares.

Complaint with Jury Demand

HFN provided no further information on its activity with the shares for the next seven years, and also did not provide a current capitalization table to the Plaintiff upon request, despite the requirement to do so under the Delaware Corporate Code. In 2022, the Plaintiff was able to see, through other means, the capitalization tables for HFN in December 2019 (Exhibit 5) and June 2021 (Exhibit 6).

Upon seeing these capitalization tables, the Plaintiff realized that as the plaintiffs had feared in 2015, the Defendants could not resist the temptation of using the ESOP for their own personal gain and self-dealing, rather than using it to attract talent to the company.

In December 2019, the ESOP option pool was 2,166,500, having been reduced by 450,000 shares from its 2015 value. 200,000 of those shares were an "Equity Award" for Ganesh Krishnan and 250,000 of the shares were an "Equity Award" for Defendant Pavan Vaish. Defendant Santhanam's shares stood at 6,252,846, consistent with the 2015 settlement.

In June 2021, the ESOP option pool was 1,859,346, having been reduced by 307,154 shares from its 2019 value. These 307,154 shares were now owned by Defendant Santhanam, bringing his ownership back to the pre-settlement value of 6,560,000.

At some time between August 2015 and December 2019, HFN allocated 200,000 shares from the ESOP to Krishnan, who has never been an employee of HFN. This allocation was based on a non-qualified option, where an ESOP must be qualified options.

At some time between August 2015 and December 2019, HFN allocated 250,000 shares from the ESOP to Defendant Vaish, who has never been an employee of HFN. Based on a reasonable assumption of a four-year vesting period for the ESOP, the earliest time at which Vaish would have been able to exercise the full amount of this option would have been August 2019.

At some time between December 2019 and June 2021, HFN allocated 307,154 shares from the ESOP to Defendant Santhanam.

In June 2021, as late as six years after HFN's representation of the option pool as an ESOP, not a single employee other than Santhanam ever received even one share from the ESOP option

Complaint with Jury Demand

pool. Santhanam is the most highly compensated employee of HFN. 26 USC § 410(b)(1)-(2) requires an ESOP to benefit at least 70% of the employees of the company who are not highly compensated. The ESOP at HFN is benefiting only non-employees and the most highly compensated employee and does not meet the 70 percent requirement mandated by law.

Rather than using the ESOP as incentive options to improve the talent and development at HFN to the benefit of the Plaintiff, the Defendants are using it for outright grants to themselves, fraudulently converting the Plaintiff's interest in the ESOP pool into shares for their own personal benefit.

Plaintiff Miller's direct financial loss during the relevant times due to HFN's fraudulent conversion of the ESOP option pool is at least $73,446.00.

**B. Direct transfer of HFN's cash to an entity with future sole control by the Defendants**

Before its recent "sanitizing," the "Newsroom" section of the HFN web site described a 2021 strategic partnership between HFN and the Seed Group, a Dubai-based conglomerate providing marketing and channel services for startup companies. The HFN web site reported that this is intended to expand its footprint in the Middle East.

This is a convenient story, but it doesn't stand up to a cursory examination. The Seed Group provides a list of its partners on its web site. The Seed Group's forte appears to be concentrated in industrial and financial businesses, and HFN (listed as Nanoheal) is the only partner in networking and endpoint management. This is a significant mismatch, and clearly the Seed Group is an inappropriate channel provider for HFN. The market share by geography for HFN, taken from the Markets and Markets "Unified Endpoint Management Market" report, shows that the market addressed by the Seed Group is insignificant compared to the North American, European, and Asia-Pacific (APAC) regions. Even if the Seed Group did a perfect job, which is unlikely given its inexperience in the sector, it could add almost no value to HFN's activities relative to the rest of the world.

Complaint with Jury Demand

The Plaintiff was able to discover the true motivation for such an unusual relationship. The transaction with the Seed Group involved no revenue commitment or compensation by the Seed Group, but involved both a multi-year financial commitment by HFN and an obligation by the Seed Group to transfer its majority interest to an unnamed party nominated by HFN, in a future transaction, for no compensation. HFN has paid, and continues to pay, a significant amount of money to the Seed Group with no return in the form of sales or support. The effect of this agreement is to transfer assets of HFN into a separate entity where they can be controlled in a future transaction by the Board outside the reach of Plaintiff Miller, with no notification or reporting of the transaction to Plaintiff Miller, fraudulently converting the Plaintiff's property for their personal benefit.

Plaintiff Miller's direct financial loss during the relevant times due to the Defendants' fraudulent conversion of HFN cash is at least $35,001.42.

### C. Use of HFN's employees and travel budgets for Santhanam's outside companies

Santhanam has active operational involvement in numerous other companies, and freely uses the services of HFN employees on HFN company time (himself as well as others), as well as the HFN travel budget, to visit and manage these side operations.

Santhanam is the CEO and Managing Director at Aavaasa Builders, an Indian construction firm with at least four current projects building and marketing residential complexes. Construction projects are notorious for having numerous problems that require constant attention. Since Aavaasa is not in any business related to HFN, no synergies exist between Aavaasa and HFN.

Santhanam is the CEO at Velo Digital, a Burbank, California corporation. Since Velo Digital is a digital marketing firm representing film personalities and managing concert logistics, no synergies exist between Velo Digital and HFN. Importantly, Ruby Jha ("Jha"), an employee of HFN, is also an officer of Velo Digital. Jha's work for Velo Digital is paid for by HFN.

Santhanam is the CEO at Iris Animation, an Indian film and video animation company that is currently active with ongoing projects. Significantly, Jha is also an officer at Iris Animation.

Complaint with Jury Demand

Animation projects are well known as having tight timelines, complex project management, and significant competition. Since Iris Animation is not in any business related to HFN, no synergies exist between the Iris Animation and HFN. Jha's work for Iris Animation is paid for by HFN.

Santhanam is the CEO at Blue Sphere Ventures, an Indian investment firm that is currently active. Investment firms require consistent attention in order to find investors and opportunities, and to stay on top of developments in the portfolio companies. Since Blue Sphere Ventures is not in any business related to HFN, no synergies exist between the Blue Sphere Ventures and HFN.

These outside commitments take a significant amount of time and energy by both Santhanam and Jha. Santhanam and Jha are only able to spend a small percentage of their time working at HFN, but are both paid a full time salary by HFN and use the HFN travel budget to finance travel for the benefit of these other companies.

The Defendants know, or should know, about the extent and nature of these commitments and expenses. This is still another compelling example of the Defendants using HFN resources for their own personal gain at the expense of HFN.

Plaintiff Miller's direct financial loss during the relevant times due to Santhanam's fraudulent conversion of HFN salaries and travel budget for use in his outside commitments is at least $765,247.54.

## IV. EXCHANGE ACT VIOLATION BY MISUSE OF ESOP OPTION POOL

After the 2015 settlement, in which the plaintiffs (including Plaintiff Miller) paid a total of $14,285.71 for 307,154 shares of HFN, the ESOP was in place and ready for use as a powerful incentive to hire top talent and grow the company.

Then, a few years later, by 2019, the Defendants had started their systematic misuse of the ESOP to provide outright grants to non-employees Ganesh Krishnan and Defendant Pavan Vaish, in a blatant display of insider self-dealing.

Complaint with Jury Demand

The Defendants continued this pattern of systematic misuse of the ESOP in the next few years, by 2021, to provide an outright grant to defendant Santhanam, essentially negating the effect of the 2015 settlement on him in yet another blatant display of insider self-dealing.

This ongoing and systematic use of the option pool to defraud the Plaintiff in light of the misrepresentation of the ESOP option pool leading up to 2019 is a "scheme liability" under 10b-5(a) and 10b-5(c) of the Exchange Act. HFN's scheme goes far beyond the initial misrepresentation, and also far beyond continued dissemination of false information. Instead, HFN's scheme involves the continuous and systematic abuse of the option pool to allocate shares to company insiders over a long period, eroding the value of the Plaintiff's holdings and flying in the face of the Plaintiff's reliance on the value of the options as an ESOP. HFN committed a deceptive act by using shares from a purported ESOP option pool to directly enrich Santhanam's account. This act was in furtherance of the scheme to use the ESOP pool for self-dealing and grants to insiders. Scienter was demonstrated by the continued concealment of the capitalization table of HFN from the Plaintiff, even after direct requests, as well as the deliberate actions of allocation of ESOP shares to non-employees and a highly compensated insider. Reliance by the Plaintiff was demonstrated by the eventual agreement to compromise on the treatment of the ESOP options during the 2015 settlement.

This action is within the two-year statute of limitations applicable to claims brought pursuant to Section 10(b), as the Plaintiff did not discover the fraudulent scheme until seeing the 2019 and 2021 capitalization tables of HFN in 2022. This action is within the five-year statute of repose applicable to claims brought pursuant to Section 10(b), as Santhanam's transfer of 307,154 shares from the ESOP option pool to his personal account through the fraudulent scheme happened sometime between 2019 and 2021, but no earlier than December 2019.

Plaintiff Miller's direct financial loss during the relevant times due to HFN's scheme to fraudulently misuse the option pool over the period from 2015 to at least 2021 is at least $73,446.00.

Complaint with Jury Demand

## THIS IS NOT A SHAREHOLDER DERIVATIVE SUIT

This is not a shareholder derivative suit. Plaintiff Miller is not seeking to recover on behalf of the corporation for injury done to the corporation by Defendants. In fact, the fact pattern of a derivative suit runs counter to the current case. Imagine, *arguendo*, that Plaintiff Miller were to successfully prosecute a shareholder derivative suit against HFN. If Miller can assume that the latest HFN capitalization table he has been able to see (Exhibit 6) is largely correct, then the damages awarded to the shareholders would mostly go straight back into the pockets of the Defendants, which would be a tragic miscarriage of justice. Instead, the reality is that the Defendants have conspired to defraud the Plaintiff in the many numerous ways described above, and justice can only be served through a direct action by the Plaintiff against the Defendants.

The filing of this action does not preclude a future derivative action.

## COUNT I: Breach of Fiduciary Duty

Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

At all relevant times, Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola had a fiduciary relationship with Plaintiff Miller. Miller was a minority shareholder of HFN, Inc.

Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola owed Plaintiff the fiduciary duty of care, duty of loyalty, duty of good faith, duty of prudence, and duty to disclose, as a matter of law. The Defendants Kalaari and Santhanam together own a majority of the shares of HFN and are acting in concert as described in the preceding paragraphs.

Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola breached these duties to Plaintiff Miller by the numerous instances of mismanagement and self-dealing outlined in the preceding paragraphs.

As a direct and proximate result of Defendants' breach of these duties owed to Plaintiff Miller, Plaintiff Miller has suffered damages by being denied the value and appreciation of the resources of HFN that were enjoyed and continue to be enjoyed by the Defendants.

Complaint with Jury Demand

Additionally, Plaintiff Miller is entitled to punitive damages as a result of Defendants' conduct. Specifically, Defendants have consistently acted with impunity and lack of regard to interests of Miller despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

### COUNT II: Aiding and Abetting Breach of Fiduciary Duty

Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

At all relevant times, Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola had a fiduciary relationship with Plaintiff Miller, as either Board Members, investors, and/or majority shareholders of HFN. Miller was a minority shareholder of HFN, Inc.

At all relevant times, Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola were aware of, or should have been aware of, the activities of the Board of Directors and CEO of HFN.

The HFN Board of Directors and CEO owed Plaintiff the fiduciary duty of care, duty of loyalty, duty of good faith, duty of prudence, and duty to disclose, as a matter of law. Kalaari as a Board member and Santhanam as CEO together own a majority of shares of HFN and are acting in concert as described in the preceding paragraphs.

The HFN Board of Directors and CEO breached these duties to Plaintiff Miller by the numerous instances of mismanagement and self-dealing outlined in the preceding paragraphs. Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola aided and abetted this breach by substantially assisting and encouraging the HFN Board and CEO. This conduct by the Defendants was a substantial factor in causing harm, by enabling the ongoing activities of the HFN Board of Directors and CEO.

As a direct and proximate result of Defendants' aiding and abetting the breach of these duties owed to Plaintiff Miller, Plaintiff Miller has suffered damages by being denied the value

and appreciation of the resources of HFN that were enjoyed and continue to be enjoyed by the Defendants.

Additionally, Plaintiff Miller is entitled to punitive damages as a result of Defendants' conduct. Specifically, Defendants have consistently acted with impunity and lack of regard to Miller's interests despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

## COUNT III: Fraudulent Conversion of HFN Shares

Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

At all relevant times, Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola had a fiduciary relationship with Plaintiff Miller, as either Board Members, investors, and/or majority shareholders of HFN. Miller was a minority shareholder of HFN, Inc.

At all relevant times, Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola were aware of, or should have been aware of, the allocation of shares from the HFN ESOP to outright grants to non-employees and insiders at HFN. In particular, Defendants Santhanam and Vaish directly benefited from these outright grants.

Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola were aware, or should have been aware, that these outright grants were made in violation of the designation of the option pool as an ESOP, and to the detriment of the ability of the use of the ESOP to attract talent to the company.

As a direct and proximate result of Defendants' actions, the shares in the ESOP pool were fraudulently converted from shares to be allocated to options for the development of HFN to instead be shares directly transferred to the benefit of the Defendants without aiding the development of HFN. Plaintiff Miller has suffered damages by being denied the value of the ESOP options in assisting the appreciation of the value of HFN to his benefit.

Complaint with Jury Demand

Additionally, Plaintiff Miller is entitled to punitive damages as a result of Defendants' conduct. Specifically, Defendants have consistently acted with impunity and lack of regard to Miller's interests despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

### COUNT IV: Fraudulent Conversion of HFN Cash through the Seed Group

Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

At all relevant times, Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola had a fiduciary relationship with Plaintiff Miller, as either Board Members, investors, and/or majority shareholders of HFN. Miller was a minority shareholder of HFN, Inc.

At all relevant times, Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola were aware of, or should have been aware of, the agreement with the Seed Group requiring no particular commitment by the Seed Group in exchange for a substantial transfer of HFN cash to an entity that would eventually be controlled by the Defendants with no participation by the Plaintiff.

Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola were aware, or should have been aware, that this transfer of cash to a new entity with no compensation, no participation by the Plaintiff, and concealment of the transaction from the Plaintiff were a fraudulent transfer of property of the Plaintiff for the personal benefit of the Defendants.

As a direct and proximate result of Defendants' actions, the cash transferred to the Seed Group was fraudulently converted from ownership by the Plaintiff to the personal benefit of the Defendants. Plaintiff Miller has suffered damages by being denied the value of his ownership of the cash transferred to the Seed Group.

Additionally, Plaintiff Miller is entitled to punitive damages as a result of Defendants' conduct. Specifically, Defendants have consistently acted with impunity and lack of regard to

Complaint with Jury Demand

Miller's interests despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

### COUNT V: Fraudulent Conversion of HFN employee time and travel budget

Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

At all relevant times, Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola had a fiduciary relationship with Plaintiff Miller, as either Board Members, investors, and/or majority shareholders of HFN. Miller was a minority shareholder of HFN, Inc.

At all relevant times, Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola were aware of, or should have been aware of, the usage of HFN employees' time while being paid by HFN, and the use of HFN's cash for the travel budget used by HFN employees. In particular, the Defendants were aware of, or should have been aware of, the allocation of HFN employee time and travel budgets used by Santhanam to visit and manage his outside companies with no business relationship with HFN.

Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola were aware, or should have been aware, that this transfer of employee salaries and travel budget to outside entities with no expectation of any return for HFN were a fraudulent transfer of property of the Plaintiff for the personal benefit of the Defendants including Santhanam.

As a direct and proximate result of Defendants' actions, the salaries and travel budget transferred to Santhanam's outside companies were fraudulently converted from ownership by the Plaintiff to the personal benefit of the Defendants including Santhanam. Plaintiff Miller has suffered damages by being denied the value of his ownership of the cash utilized for the sole benefit of Santhanam's outside companies.

Additionally, Plaintiff Miller is entitled to punitive damages as a result of Defendants' conduct. Specifically, Defendants have consistently acted with impunity and lack of regard to

Complaint with Jury Demand

Miller's interests despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

### COUNT VI: Federal Securities and Exchange Act Section 10(b) Violations

Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

HFN promulgated a scheme pursuant to 10b-5(a) and 10b-5(c) to misrepresent a pool of shares to the Plaintiff as intended for an Employee Stock Option Plan (ESOP) while fully and deliberately intending to use those shares instead for self-enrichment of insiders, including at least Defendants Santhanam and Vaish. The Plaintiff purchased shares in HFN with a value based on this misrepresentation, and then HFN continued the scheme until at least December 2019.

As a direct and proximate result of the scheme by Defendants, including at least HFN, Santhanam, and Vaish, Plaintiff Miller has suffered damages by being deprived of the true value of the HFN shares purchased by him.

Additionally, Plaintiff Miller is entitled to punitive damages as a result of the conduct by Defendants, including at least Santhanam and Vaish. Specifically, Defendants have conceived and implemented a scheme of fraud against Miller despite either participating in or being aware of previous litigation where HFN was forced to settle for a similar scheme resulting in fraudulent behavior.

### COUNT VII: Federal Securities and Exchange Act Section 20(a) Violations

Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

The Defendants, including at least Kola and Shiralagi, by virtue of their operational and management control in HFN, condoned and assisted with the conception and implementation of a scheme pursuant to 10b-5(a) and 10b-5(c) to misrepresent a pool of shares to the Plaintiff as intended for an Employee Stock Option Plan (ESOP) while fully and deliberately intending to use those shares instead for self-enrichment of insiders, including at least Defendants Santhanam and

Complaint with Jury Demand

Vaish. The Plaintiff purchased shares in HFN with a value based on this misrepresentation, and then HFN continued the scheme until at least December 2019.

As a direct and proximate result of the scheme by Defendants, including at least Kola and Shiralagi, Plaintiff Miller has suffered damages by being deprived of the true value of the HFN shares purchased by him.

Additionally, Plaintiff Miller is entitled to punitive damages as a result of the conduct by Defendants, including at least Kola and Shiralagi. Specifically, Defendants have conceived and implemented a scheme of fraud against Miller despite either participating in or being aware of previous litigation where HFN was forced to settle for a similar scheme resulting in fraudulent behavior.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Miller respectfully requests that this Court enter judgment in his favor and grant the following relief:

1. Compensatory damages in an amount and manner to be determined according to proof at trial;

2. Statutory damages;

3. Punitive damages in an amount to be determined by the Court according to proof;

4. An award of post-judgment interest for the maximum amount allowed by law;

5. A judgment that Defendants' lack of compliance with the Company's governing corporate documents and applicable corporate law has caused irreparable harm to the Plaintiff;

6. A judgment that Kumar Shiralagi had and continues to have a fiduciary duty to the Plaintiff at all relevant times;

Complaint with Jury Demand

7. A judgment that Pavan Vaish had and continues to have a fiduciary duty to the Plaintiff at all relevant times;

8. A judgment that Kalaari Capital had and continues to have a fiduciary duty to the Plaintiff at all relevant times;

9. A judgment that Vani Kola had and continues to have a fiduciary duty to the Plaintiff at all relevant times;

10. Injunctive relief in the form of an order for HFN, Inc. to provide requested documents and evidence without limitation to the Plaintiff to identify all Defendants and the scope of the damages;

11. Temporary injunctive relief in the form of an order to prevent further investment activity or non-operational disbursement of funds by HFN, Inc. until the relief for this action is complete;

12. An award of costs;

13. An award of attorneys fees' to the extent allowed by law; and

14. Any and all other relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

The Plaintiff hereby demands a trial by jury.

Date: _____October 13, 2023_____     Signature: _____

Printed name: _____Allan A. Miller_____

Complaint with Jury Demand