FILED
2023  OCT 31
CLERK
U.S. DISTRICT COURT

Allan Miller
3385 Claudia Drive
Concord, CA  94519
650-468-7387
allan.miller@alumni.stanford.edu
Pro Se Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| ALLAN MILLER<br><br>          Plaintiff,<br><br>     vs.<br><br>HFN, INC., a Delaware Corporation, d/b/a as<br>NANOHEAL BY HFN INC.,<br>KALAARI CAPITAL ADVISORS<br>PRIVATE LIMITED, an Indian Company,<br>SRIDHAR SANTHANAM,<br>KUMAR SHIRALAGI, PAVAN VAISH,<br>and VANI KOLA<br><br>Defendants. | Case Number: 2:23-cv-00733-CMR<br><br><br>**AMENDED COMPLAINT**<br><br>**JURY DEMANDED** |

## AMENDED COMPLAINT

1. This Amended Complaint is filed pursuant to Fed. Rules Civ. P. 15(a)(1). This filing is within 21 days of service of the original Complaint,[1] and is also prior to any Defendant answering the original Complaint.[2]

## INTRODUCTION

2. This is an action brought *pro se* by Plaintiff Allan Miller, who is a minority shareholder of HFN, Inc. ("HFN"), against Defendants who have fraudulently converted his assets in HFN to their own personal benefit, have intentionally forsaken their fiduciary duty to him, and have conceived and implemented a long running scheme using stock options to defraud him of the value of his shares. The Defendants, having already been forced to settle a fraud action brought by minority shareholders ten years ago, felt that they were now above the law and proceeded to use HFN resources for their own personal benefit. Coming out of the COVID era, the Plaintiff had not heard from HFN since the lawsuit, and simply requested a shareholder meeting and some updated information about the company. Instead, the Defendants, sensing that the party of unaccountability might be over, simply stonewalled and hoped that Miller would just go away. However, since the Plaintiff Miller is one of the original founders of the company, multiple anonymous informants within the company, who were all worried about what was going on, contacted Miller, and in a situation eerily similar to the 2014 litigation, provided the basis for this Complaint.

3. Sadly, the citizens of Utah have also suffered at the hands of the defendants. iTOK, Inc. was founded in 2004 by a group of Utah tech entrepreneurs to provide personal and welcoming technical support to its customers, using a staff located completely in its Lehi office with no outsourcing to foreign countries. In 2014, iTOK secured an $18 million Series-B financing round from ABS Capital Partners based on its successful business model, and by 2015, the company had

---

[1] The original Complaint was served on Defendant HFN, Inc. on October 20, 2023, and was served on Defendant Kumar Shiralagi on October 23, 2023.

[2] As of the filing of this Amended Complaint, no Defendant has filed any response.

become the 51st fastest growing company in Utah and was providing significant tax revenue and jobs for the state. In 2016, the company management rebranded as Bask Technology and expanded their market through an additional focus on the growing under-served market of senior citizens needing tech support they could trust, from a friendly staff of native English speakers.

4.      In 2017, the Defendants discovered Bask and targeted it for acquisition. HFN offered a deal to improve the bottom line by providing the Nanoheal technology to automate the service offering and reduce the cost per customer. The deal was concluded in late 2017, but HFN did the same thing Sridhar Santhanam ("Santhanam") had previously done with HandsFree Networks. Santhanam's promises never materialized, and instead, he took control of Bask, never provided any significant technology, never invested in any growth in the company (in development, sales, or marketing), eliminated most of the Utah employees, and moved the remaining support to the Philippines where it remains today. As a result, the once high-flying Utah star with fast-growing annual revenues over $20 million has now been reduced through mismanagement to a skeleton company with consistently declining annual revenues such that the current revenues are a fraction of their former amount. HFN's main motivation for the transaction became apparent: to plunder Bask for cash and use the ill-gotten gains to pay for the personal activities of the Defendants, particularly Santhanam, and to provide a convenient base of operations inside the United States in Orem. It was yet another chapter in the oft-repeated story of a Utah tech company being invaded by outsiders and decimated to a shadow of its former self. Many Utah citizens lost their jobs and Utah lost a major source of tax income.

5.      But HFN's actions were much worse than simply moving operations to the Philippines. HFN was not satisfied with the assets squeezed out of Bask and was greedy for more. HFN conspired with Zen Support Force ("Zen"), the Philippine entity providing the outsourced labor, to fraudulently provide fabricated invoices overstating the offshore expenses to the point where a significant part of the revenue received in the U.S. was transferred to the Philippines under the guise of paying the fake expenses. HFN and Zen then split up the large excess, with HFN's

share going straight into the pockets of the Defendants. This went on for several years, during which time HFN paid no Federal or Utah taxes on the actual earnings of the company. In addition to tax evasion, this is plainly an outright theft of the profits that were denied to the Plaintiff either as a dividend or investment in the growth of HFN.

**PARTIES**

6.      Plaintiff, Allan Miller ("Miller"), is a US citizen and individual residing in Concord, California. At all relevant times, Miller was a minority shareholder of Defendant HFN, Inc. and a founder of HandsFree Networks, the predecessor of HFN, Inc.

7.      Defendant, HFN, Inc. ("HFN"), is a Delaware corporation with a principal place of business located in Orem, Utah. HFN is registered to do business in Utah as entity number 10534657-0143 with registered agent Bryan S. Johansen at 101 South 200 East, Suite 700, Salt Lake City, UT 84111, and with DBAs as Bask and Nanoheal.

8.      Defendant, Kalaari Capital Advisors Private Limited ("Kalaari"), is an Indian Company with a principal place of business located in Bengaluru, Karnataka. At all relevant times, Kalaari held a Board seat at HFN and owed a fiduciary duty to Plaintiff Miller.

9.      Defendant, Sridhar Santhanam ("Santhanam"), is an Indian citizen and individual. At all relevant times, Santhanam was the CEO and Chairman of the Board of HFN and owed a fiduciary duty to Plaintiff Miller.

10.     Defendant, Kumar Shiralagi ("Shiralagi"), is an Indian citizen, US citizen, and individual. At all relevant times, Shiralagi was on the Board of Directors of HFN, as well as a Venture Partner at Kalaari, and owed a fiduciary duty to Plaintiff Miller.

11.     Defendant, Pavan Vaish ("Vaish"), is an Indian citizen, US citizen, and individual. At all relevant times, Vaish was on the Board of Directors of HFN and owed a fiduciary duty to Plaintiff Miller.

12.     Defendant, Vani Kola ("Kola") is an Indian citizen, US citizen, and individual. At all relevant times, Kola was the lead Managing Director at Kalaari, and owed a fiduciary duty to Plaintiff Miller.

### JURISDICTION AND VENUE

13.     Jurisdiction for this case arises under 28 U.S.C. § 1332(a)(1) and 28 U.S.C. § 1332(a)(2)   because Plaintiff Miller is a citizen of California, Defendant HFN is a citizen of Utah, Defendant Shiralagi is a citizen of Texas, and Defendants Santhanam, Kalaari, Vaish, and Kola are citizens or subjects of India. The amount in controversy exceeds $75,000 exclusive of interest and costs, providing diversity jurisdiction to this Court under 28 U.S.C. § 1332(a).

14.     Defendant HFN is a citizen of Utah under 28 U.S.C. § 1332(a)(c)(1) because its principal place of business was Utah at all relevant times. Santhanam declared under penalty of perjury that the principal place of business of HFN is in Utah. See Exhibit 1 ¶ 5.

15.     Venue is appropriate in this District for all claims against Defendant HFN because this Court has personal jurisdiction over HFN since its principal place of business is in Utah.

16.     Venue is appropriate in this District for all claims against Defendants Kalaari, Santhanam, Shiralagi, Vaish, and Kola because this Court has personal jurisdiction under the Long Arm Statute 78-B-205 of the Utah Code.

17.     Venue is appropriate in this District for the claims arising under patent law because HFN has sufficient minimum contacts with the United States, since it is incorporated in Delaware and has its principal place of business in Utah. The claims arising under patent law constitute a federal case. The Plaintiff pleads with specificity that the breach of fiduciary duty arises from the fact that the *interpretation of the claims* of the patents in question could not have had any bearing on the business of the companies providing the security interest, and that HFN was needlessly foregoing the opportunity to monetize these patents as a result. The interpretation of the patent claims in light of relevance to the business underlying the security interest is the very real question at the basis of the claims of breach of fiduciary duty.

Amended Complaint with Jury Demand                    Case No. 2:23-cv-00733-CMR

## FACTUAL ALLEGATIONS

### I.  BACKGROUND

#### A.  The 2012 fraud

18.     Eleven years ago, on January 12, 2012, the HFN management and investors concocted a scheme to defraud its shareholders and investors by selectively withholding information to reduce the apparent value of the company in a transaction primarily designed to transfer an outsized share of ownership to the management and a new investor, NEA-IUVP. *Miller et al. v. Donnini et al., D Mass 1:14-cv-12337-NMG dkt. 1.* Thanks to the efforts of an anonymous informant, Miller became aware of a trail of documentation on the scheme and filed suit along with 11 other minority shareholders two years later, on June 2, 2014, against Santhanam and HFN, among others. Following the response and reply to the complaint by both sides, the Court sustained multiple counts against the defendants, including violations of § 10(b) & § 20(a) of the Exchange Act, Rule 10b-5 of the SEC, breach of fiduciary duty, and fraud. The case was poised for discovery, but once the depth and nature of the evidence of the plaintiffs was exposed, the defendants rapidly progressed toward a settlement, and dismissal with prejudice, between the minority shareholders and HFN.

19.     Defendants Kola and Shiralagi knowingly invested in this fraudulent scheme eleven years ago as NEA-IUVP, which has now changed its name to Kalaari, a Defendant in this case. Santhanam, Kola, and Shiralagi should have learned their lesson and run HFN in a manner designed to benefit the company and its shareholders. But the storybooks teach us that a zebra cannot change its stripes, and this lesson seems to apply to the Defendants.

#### B.  Déja vu in 2022

20.     In early 2022, Miller was approached by several anonymous informants independently, each concerned in different ways about the manner in which HFN was being run and the negative consequences that might result. The greatest concern was that key resources were not being utilized to advance the interests of HFN but were instead being channeled to activities

that benefited only the Defendants, to the detriment of all others. Sensing something amiss, on July 6, 2022, Miller asked for a shareholder meeting of HFN. HFN was long overdue for a shareholder meeting since its bylaws require one every year, but there had not been a single shareholder meeting since 2012. The HFN Board and investors should have been particularly sensitive to shareholder communication and should have followed the bylaws to the letter, especially since the last shareholder meeting was the one that triggered the 2014 litigation. But this complaint will make clear that concerns about the company are low in priority for the Board and are subjugated by attention to actions that benefit the Defendants directly. The Defendants derive no particular benefit from shareholder meetings, so holding a shareholder meeting has no importance to them.

### C. HFN refuses to have a shareholder meeting

21.    Santhanam responded the same day and promised a meeting. However, the meeting was not scheduled, so Miller repeated the request on July 11, 2022. On July 13, Santhanam scheduled a shareholder meeting for July 21, which did not meet the 10-business-day notice period required in the bylaws.

22.    Miller responded with a request to make the meeting date comply with the bylaws and included a list of requested information for the shareholders to review to streamline the meeting.

23.    The response was quick and surprising. Santhanam asked Miller for a formal request to examine HFN records with the execution of a confidentiality agreement. Santhanam attached a confidentiality agreement that was inappropriate for the disclosure of corporate records to a shareholder with several unreasonable requirements.

24.    Miller responded to Santhanam with a formal request for documentation and a shareholder meeting, accompanied by a confidentiality agreement that was more appropriate and reasonable. Arjun Sharma ("Sharma"), an in-house attorney from Kalaari, also responded to Miller indicating that Shiralagi was no longer on the Board of Directors of HFN, and that Miller should stop including Kalaari on further communication about HFN.

Amended Complaint with Jury Demand                    Case No. 2:23-cv-00733-CMR

25.     Miller responded politely to Sharma with a request for additional information about Shiralagi's tenure, but never received a response.

26.     As late as July 9, 2022, the HFN web site showed Shiralagi and Santhanam on the Board of Directors, along with Shirish Nimgaonkar ("Nimgaonkar") as President and CSO. However, by July 30, shortly after Miller's request, the HFN web site went offline, and then reappeared by August 12 with the "About Us" page completely removed, and no information about the Board. As late as August 8, 2022, the Kalaari web site showed Shiralagi as a Venture Partner at Kalaari. In a similar fashion to the HFN web site, shortly after Miller's request for information, the Kalaari web site was altered to remove Shiralagi from the "Team" page.

27.     Now Miller was growing increasingly concerned with the situation. Not long after Sharma had contacted Miller with the incorrect information about Shiralagi and the composition of HFN's Board, both HFN and Kalaari had hastily and suspiciously altered their web sites to remove all references to Shiralagi. HFN was in such a hurry that the entire page describing the company was removed. This action contradicts Kalaari's stated policy of maintaining Board seats with their portfolio companies, making it even more suspicious.

28.     Santhanam's confidentiality agreement had been drafted using Westlaw's Practical Law template "Confidentiality Agreement for Cross-Border Commercial Transactions," which was inappropriate since this was neither a cross-border nor a commercial transaction.[3] But Santhanam was intransigent and replied on August 20 that he was unwilling to use Miller's more reasonable confidentiality agreement. To move things along, Miller responded on August 30, 2022 with a marked-up copy outlining the most objectionable parts of Santhanam's agreement with suggestions for corrections.

---

[3] Interestingly, Sharma's CV on the Kalaari website indicates that "… in his previous roles, he routinely advised institutional investors, start-ups, and growth-stage companies on domestic and cross-border investments, …"

Amended Complaint with Jury Demand                         Case No. 2:23-cv-00733-CMR

29.     That was the last communication Miller had with HFN, over one year ago. Forsaking their fiduciary duty to disclose, the Defendants are uninterested in communicating with the minority shareholders.

30.     But even though Miller has received no further information from HFN, he has continued to receive information from the several anonymous informants, and this action is the result.

## II.  FRAUDULENT CONVERSION OF HFN ASSETS

### A.  HFN used Zen Support Force to divert HFN revenue directly to the Defendants

31.     After the 2017 acquisition of Bask by HFN, Santhanam's motives for the acquisition became clear. Over a short span, he cut the employee count from about 100 to about 10 and set up an agreement with the newly formed entity Zen in Manila, Philippines, where 4 people took over support of the entire Bask customer base.

32.     The result was predictable. Customers were unhappy with the reduced service level and began to leave. However, this attrition was slower than the radical cut of re-investment of profit into the business, so there was a surge in profit, enabling the Defendants to drain cash out of Bask directly into the coffers of HFN.

33.     Not surprisingly, the Defendants were displeased with having to share this windfall with the other shareholders, Utah taxpayers, and U.S. taxpayers, so HFN hatched a scheme to circumvent the reporting of these profits. HFN asked Zen to provide fraudulent invoices covering the large amounts of extra cash, which HFN agreed to pay as an operating expense. Once the money was offshore and off the books of HFN, the two companies had a "gentlemen's agreement" to split it up, with HFN's share going directly into the pockets of the Defendants. Zen willingly complied with this scheme to not lose the business from HFN, and to get their share of the profits. The Defendants used wire transmission in foreign commerce to commit this fraud.

34.     Plaintiff Miller's direct financial loss during the relevant times due to the Defendants' fraudulent conversion of HFN revenue to Zen is at least $1,133,204.09.

**B. HFN directly transferred cash to an entity with sole control by the Defendants**

35.     Before its recent "sanitizing," the "Newsroom" section of the HFN web site described a 2021 strategic partnership between HFN and the Seed Group ("Seed"), a Dubai-based conglomerate providing marketing and channel services for startup companies. The HFN web site reported that this is intended to expand its footprint in the Middle East.

36.     This is a convenient story, but it doesn't stand up to a cursory examination. Seed provides a list of its partners on its web site. Seed's forte appears to be concentrated in industrial and financial businesses, and HFN (listed as Nanoheal) is the only partner in networking and endpoint management. This is a significant mismatch, and clearly Seed is an inappropriate channel provider for HFN. The market share by geography for HFN, taken from the Markets and Markets "Unified Endpoint Management Market" report, shows that the market addressed by Seed is insignificant compared to the North American, European, and Asia-Pacific (APAC) regions. Even if Seed did a perfect job, which is unlikely given its inexperience in the sector, it could add almost no value to HFN's activities relative to marketing in the rest of the world.

37.     The Plaintiff was able to discover the true motivation for such an unusual relationship. The transaction with Seed involved no revenue commitment or compensation to HFN by Seed, but involved both a multi-year financial commitment by HFN and an obligation by Seed to **transfer its majority interest to an unnamed party nominated by HFN, upon request by HFN, for no compensation**. HFN has paid, and likely continues to pay, a significant amount of money to Seed with no return in the form of sales or support. The effect of this agreement is to transfer assets of HFN into a separate entity where they can be controlled on demand by the Board outside the reach of Plaintiff Miller, with no notification or reporting of the transaction to Plaintiff Miller, fraudulently converting the Plaintiff's property for their personal benefit. The Defendants used wire transmission in foreign commerce to commit this fraud.

38.     Plaintiff Miller's direct financial loss during the relevant times due to the Defendants' fraudulent conversion of HFN assets is at least $35,001.42.

**C. HFN converted its Employee Stock Option Plan into shares for self-dealing and outright grants**

39.     HFN's Employee Stock Option Plan ("ESOP") was a significant component of the 2015 settlement negotiations. Exhibit 2 was provided by HFN during the settlement negotiations, and showed a large pool of 2,616,500 shares, comprising over 15% of the shares of the company, for the ESOP. The plaintiffs were very concerned about such a large outstanding option pool, with particular concern that Santhanam would treat the option pool as a mechanism for self-dealing, or for making Santhanam whole after the settlement and thereby removing any punitive value. The plaintiffs wanted the entire option pool to be treated as outstanding shares for the computation of the settlement, and the defendants wanted none of the option pool to be treated as outstanding shares.

40.     The plaintiffs were aware that an ESOP is a key component to attract talent to a high-tech company, so a compromise was reached enabling the settlement by treating half the ESOP pool as outstanding shares in computing the settlement. Exhibit 3 shows the computation that was used for the settlement, indicating that only 1,308,250 of the option shares were used to compute the 2% total. (Note that there is a rounding error in Exhibit 3; the settlement was for 307,154 shares rather than 307,155.) The 307,154 shares were provided from Santhanam's 6,560,000 shares as agreed to, leaving Santhanam with 6,252,846 shares after the settlement. The ESOP pool was 2,616,500 shares.

41.     HFN provided no further information on its activity with the shares for the next seven years, and also did not provide a current capitalization table to the Plaintiff upon request, despite the requirement to do so under the Delaware Corporate Code. In 2022, the Plaintiff was able to see, through other means, the capitalization tables for HFN in December 2019 (Exhibit 4) and June 2021 (Exhibit 5).

42.     Upon seeing these capitalization tables, the Plaintiff realized that as the plaintiffs had feared in 2015, the Defendants could not resist the temptation of using the ESOP for their own personal gain and self-dealing, rather than using it to attract talent to the company.

43.     In December 2019, the ESOP option pool was 2,166,500, having been reduced by 450,000 shares from its 2015 value. 200,000 of those shares were an "Equity Award" for Ganesh Krishnan and 250,000 of the shares were an "Equity Award" for Defendant Pavan Vaish. Defendant Santhanam's shares stood at 6,252,846, consistent with the 2015 settlement.

44.     In June 2021, the ESOP option pool was 1,859,346, having been reduced by 307,154 shares from its 2019 value. These 307,154 shares were now owned by Defendant Santhanam, bringing his ownership back to the pre-settlement value of 6,560,000.

45.     At some time between August 2015 and December 2019, HFN allocated 200,000 shares from the ESOP to Krishnan, who has never been an employee of HFN. This allocation was based on a non-qualified option, where an ESOP must be qualified options.

46.     At some time between August 2015 and December 2019, HFN allocated 250,000 shares from the ESOP to Defendant Vaish, who has never been an employee of HFN. Based on a reasonable assumption of a four-year vesting period for the ESOP, the earliest time at which Vaish would have been able to exercise the full amount of this option would have been August 2019.

47.     At some time between December 2019 and June 2021, HFN allocated 307,154 shares from the ESOP to Defendant Santhanam.

48.     In June 2021, as late as six years after HFN's representation of the option pool as an ESOP, not a single employee other than Santhanam ever received even one share from the ESOP option pool. Santhanam is the most highly compensated employee of HFN. 26 USC § 410(b)(1)-(2) requires an ESOP to benefit at least 70% of the employees of the company who are not highly compensated. The ESOP at HFN is benefiting only non-employees and the most highly compensated employee and does not meet the 70 percent requirement mandated by law.

49.     Rather than using the ESOP as incentive options to improve the talent and development at HFN to the benefit of the Plaintiff, the Defendants are using it for outright grants to themselves, fraudulently converting the Plaintiff's interest in the ESOP pool into shares for their own personal benefit.

50.     Plaintiff Miller's direct financial loss during the relevant times due to HFN's fraudulent conversion of the ESOP option pool is at least $73,446.00.

**D.  HFN used employee salaries and travel budgets for the benefit of Santhanam's unrelated outside companies**

51.     Santhanam has active operational involvement in numerous other companies, and HFN  freely provides the services of HFN employees on HFN company time (at least that of Santhanam, Jha, and Divya Choorimule), as well as the HFN travel budget, for Santhanam to visit and manage these side operations.

52.     Santhanam is the CEO and Managing Director at Aavaasa Builders, an Indian construction firm with at least four current projects building and marketing residential complexes. Construction projects are notorious for having numerous problems that require constant attention. Since Aavaasa is not in any business related to HFN, no synergies exist between Aavaasa and HFN. Santhanam's work for Aavaasa is paid for by HFN.

53.     Santhanam is the CEO at Velo Digital, a Burbank, California corporation. Since Velo Digital is a digital marketing firm representing film personalities and managing concert logistics, no synergies exist between Velo Digital and HFN. Importantly, Jha, an employee of HFN, is also an officer of Velo Digital. Santhanam and Jha's work for Velo Digital is paid for by HFN. Santhanam and Jha's travel to Velo Digital is paid for by HFN.

54.     Santhanam is the CEO at Iris Animation, an Indian film and video animation company that is currently active with ongoing projects. Significantly, Jha is also an officer at Iris Animation. Animation projects are well known as having tight timelines, complex project management, and significant competition. Since Iris Animation is not in any business related to

HFN, no synergies exist between the Iris Animation and HFN. Santhanam and Jha's work for Iris Animation is paid for by HFN.

55.     Santhanam is the CEO at Blue Sphere Ventures, an Indian investment firm that is currently active. Investment firms require consistent attention in order to find investors and opportunities, and to stay on top of developments in the portfolio companies. Since Blue Sphere Ventures is not in any business related to HFN, no synergies exist between the Blue Sphere Ventures and HFN. Santhanam's work for Blue Sphere Ventures is paid for by HFN.

56.     These outside commitments take a significant amount of time and energy by both Santhanam and Jha. Santhanam and Jha are only able to spend a small percentage of their time working at HFN, but are both paid a full time salary by HFN and use the HFN travel budget to finance travel for the benefit of these other companies.

57.     The Defendants know, or should know, about the extent and nature of these commitments and expenses. This is still another compelling example of the Defendants using HFN resources for their own personal gain at the expense of HFN.

58.     Plaintiff Miller's direct financial loss during the relevant times due to Santhanam's fraudulent conversion of HFN salaries and travel budget for use in his outside commitments is at least $765,247.54.

## III. BREACH OF FIDUCIARY DUTY THROUGH MISMANAGEMENT OF HFN

### A.  No real oversight on the Board of Directors

59.     The corporate governance of HFN is in a state of disarray. In November 2016, shortly after the settlement of the 2014 litigation, Sridhar Santhanam was CEO and Chairman of the Board, serving along with two outside Board members, Kumar Shiralagi and Pavan Vaish ("Vaish"), and one major outside investor, Kalaari Capital ("Kalaari"). Vaish has remained active with the company, and as late as November 2022, visited the company to "brainstorm, ideate, and storyboard" with company employees as a Board member. During the same time frame, Shiralagi, a Managing Director of the investor Kalaari, was active and communicated frequently with

Santhanam, serving as a liaison between HFN and Kalaari. This is consistent with Kalaari's policy to "take board seats and play an active role in the development" of their portfolio companies, as stated on their web site. No minutes were ever kept for these Board meetings.

60.     As late as July 9, 2022, the HFN web site showed Shiralagi as a member of the Board of Directors but not Vaish, and no longer showed Kalaari as an investor. Shiralagi continued as an active Board member well into 2022 and continued to meet regularly with Santhanam. No minutes were kept for these Board meetings. In a strange series of events, as described previously, once Miller asked for some documentation from HFN, Sharma, an attorney at Kalaari, notified Miller on July 19, 2022 that "neither Kalaari nor any individual representing Kalaari is involved with the operations and management of the Company" and declined to provide any further information about Shiralagi's departure or the current composition of the Board. At about the same time, HFN hurriedly and surreptitiously scrubbed the web site of any information about the composition of its Board of Directors and its investors, and Kalaari hurriedly scrubbed Shiralagi from its web site. Kalaari felt a sudden and urgent need to distance themselves from the activities of HFN once Miller asked for some specific information about those activities.

61.     Both Sharma's representation of Kalaari and the flurry of activity updating web sites put Kalaari in an awkward position. Kalaari owes a fiduciary duty to the minority shareholders. If Kalaari has abandoned its Board seat, it would leave the control of the Board to a single person and would therefore have difficulty serving its fiduciary duty of care to Miller. On the other hand, if Kalaari has maintained its Board seat, then by indicating the opposite to Miller, it has failed in its duty to disclose to Miller.

62.     Sharma's communication with Miller indicates that Kalaari is still an investor in HFN. At least as late as November 2022, Pavan Vaish was still actively involved with HFN and was on the HFN Board of Directors.

63.     HFN's disregard for proper corporate governance is continuing. On October 26, 2023, HFN sent a notice to the shareholders describing that the Defendants had elected Divya

Amended Complaint with Jury Demand                          Case No. 2:23-cv-00733-CMR

Choorimule ("Choorimule") as a Director on August 25, 2023 and elected Ruby Jha ("Jha") as a Directors September 8, 2023. Both Choorimule and Jha resigned as Directors on October 9, 2023; after Choorimule held her position for 46 days, and Jha held her position for 31 days. The only act as Directors by Choorimule and Jha was to "back-date" some Board **decisions by over 11 years**; in fact, some of those decisions bear on the counts in this Amended Complaint. Additionally, Choorimule and Jha reduced the size of the Board to one member, who is now Santhanam, guaranteeing a complete lack of any oversight by outside Directors.

64.     Neither Choorimule nor Jha have previously held an executive position or a board seat; in fact, neither has held any management position of consequence at HFN or any other company. Both Choorimule and Jha work closely under Santhanam and would jeopardize their salary and any other compensation by not following his directives. Choorimule was not even at HFN as of the date of the back-dated decisions (she was employed at Hewlett-Packard), so she could not have been aware of the circumstances or intentions of the company at that time. This was plainly a thinly veiled attempt to try to cover the past misdeeds of the Defendants, to the detriment of the Plaintiff.

65.     The Defendants have been aware, or should have been aware, of the precarious situation of the Board of Directors, but rather than correcting it for the benefit of HFN, they have made it much worse. In doing so, they have pursued their own interests to the detriment of the Plaintiff and abandoned their fiduciary duty of care to the Plaintiff. By obscuring, concealing, and falsifying information about the composition of the Board of Directors, at least some of the Defendants have abandoned their fiduciary duty to disclose to the Plaintiff. Finally, by reducing the Board to only consist of Santhanam, they have abandoned their fiduciary duty of care to act as outside Directors to curb the excesses of the sole Board member. The repeated pattern of concealing and obscuring information, along with the negligent lack of oversight, has directly contributed to all the other financial harm to Miller described in this Complaint.

**B.  Lack of Human Resource management and control**

66.      HFN lacks basic corporate oversight and controls. The company has no effective human resource ("HR") management, with only a single part-time HR manager and no company HR Manual or Employee Handbook.

67.      In the #metoo era, the failure of a company to provide these basic tools is irresponsible and exposes the company to the possibility of significant litigation costs and damages. The wage loss component alone (before punitive damages) can amount to over $1 million, with an average around $500,000. For HFN, this exposure is significant. At least one Defendant has had, and continues to have, inappropriate relationships with at least one HFN employee.[4]

68.      The Defendants are aware, or should be aware, of the failure to provide sufficient HR tools and the financial repercussions, but have chosen not to dedicate resources toward investigating allegations that have surfaced and addressing them. In fact, the Defendants are taking advantage of the lack of sufficient HR oversight to maintain their status quo at HFN to the detriment of Plaintiff Miller, and have abandoned their fiduciary duty of care to the Plaintiff.

69.      Plaintiff Miller's direct financial loss during the relevant times due to the Defendants' lack of HR oversight is at least $14,153.10.

**C.  Mismanagement of Intellectual Property: Patents**

70.      The architecture and operation of the HFN software is novel. On May 10, 1999, Miller authored a provisional patent application on behalf of the company describing this novel operation. On May 10, 2000, the Plaintiff authored a patent application with short claims that issued as US Patent No. 6,742,141 ("the '141 patent") on May 24, 2004 after a light prosecution with only one non-final rejection. On May 21, 2004, the Plaintiff authored a continuation with

---

[4] Given the public nature of this Complaint, the high risk of retaliation against the victims involved, and the irrelevance of the details to the causes of action, the Plaintiff is opting not to disclose any further information about the nature of these relationships.

short claims that issued on August 29, 2006 as US Patent No. 7,100,085 ("the '085 patent") after two minor corrections requested by the Examiner.

71. The light prosecution for both patents is atypical of software patents and indicates the novelty of the inventions. (HFN filed a PCT application and a national stage application in Australia but abandoned both in favor of concentrating on the US market.) The HFN patents have been cited 247 times by patent applications owned by Google, Amazon, AT&T, Cisco, Citrix, Dell, Fujitsu, HCL, HP, Hitachi, Infosys, Intel, IBM, Kyndryl, Facebook (Meta), Microsoft, NetApp, Nokia, Oracle, ServiceNow, and Xerox, among others, further demonstrating their fundamental nature and inventive value.

72. These patents could have significant value. In *Columbia University v. NortonLifeLock*, on May 22, 2022, a jury found NortonLifeLock guilty of willful infringement of 4 claims of 2 patents in the same technology area as the HFN patents, using a similar technique, and *with a later priority date*. The jury awarded the plaintiff in that case US $185 million. *ED Virginia 3:13-cv-00808-MHL dkt. 1206*. On September 30, 2023, U.S. District Judge M. Hannah Lauck nearly tripled the damages to $481 million based on the willful infringement verdict. Then on October 30, the same Judge added $120 million in attorney fees and interest, bringing the total for Columbia University to just over $600 million.[5] Notably, in the course of the litigation, NortonLifeLock filed 7 challenges against 104 claims in 6 patents at the Patent Trial and Appeal Board (PTAB); the PTAB denied the challenge against 8 claims and found 24 of the claims patentable, further demonstrating the novelty of these techniques even with the later priority date.

73. Santhanam was aware of the value of the HFN patents. On December 18, 2015, Santhanam had a discussion with Miller in which he indicated that he had talked with a patent broker in India who had estimated the value of the patents at US $1 million. Santhanam has taken

_____

[5] The case is currently in appeal by NortonLifeLock, now known as Gen Digital. Judge Lauck also penned a sanctions opinion outlining years of "abhorrent litigation conduct" by Quinn Emanuel and also found that Latham & Watkins "impeded" the litigation. Gen Digital is also represented by Troutman Pepper, which was not mentioned in the recently unsealed opinion.

no action to monetize the patents, and in the meantime, they both expired on May 10, 2020. Both patents have method claims, potentially extending their value at least marginally into 2026, but under Santhanam's stewardship, no action has been taken toward monetization.

74.    The assignment history of the patents at the US Patent and Trademark Office (USPTO) reveals the motivation for this inaction. See Exhibit 6. On September 30, 2019, HFN used both the '141 patent and the '085 patent as a security interest (collateral) for a transaction involving Zelis Payments and Red-Card Payment Systems. Zelis and Red-Card are financial management system providers for healthcare providers that merged in 2019.

Claim 1 of the '141 patent is a method claim claiming:
   1. A method for diagnosing and resolving problems in software-based systems, comprising:
   automating detecting said problems using software;
   automating resolving said problems using software;
   interrogating a local database to drive said automated detecting and said automated resolving;
   storing executable code in said local database having a plurality of entries to define said automated detecting and said automated resolving;
   updating said local database from a central database having a plurality of entries, said updating being initiated automatically without user intervention;
   recording a count of said automated resolutions for each entry in said local database;
   updating said central database with said count to generate a central total count in said central database of said automated resolutions;
   updating a local total count in said local database from said central total count in said central database as part of said periodic update; and
   computing priorities of said plurality of entries in said local database using said local total count.

Claim 1 of the '085 patent is a slightly broader method claim, claiming:
   1. A method for resolving problems in software-based systems, comprising:
   automating resolving said problems using software;
   storing executable code in a local database having a plurality of entries to define said automated resolving;
   updating said local database from a central database having a plurality of entries, said updating being initiated automatically without user intervention;
   recording a count of said automated resolutions for each entry in said local database;
   updating said central database with said count to generate a central total count in said central database of said automated resolutions; and
   updating a local total count in said local database from said central total count in said central database as part of said periodic update.

75.    A brief examination of the products of Zelis, Red-Card, and the merged entity reveals no evidence of use (EoU) of the claimed methods of either the '141 patent or the '085

patent. Although any business may utilize "automating resolving [said] problems using software," none of these entities have a "local database" or a "central database" of "executable code … to define … automated resolving," and certainly no database that would store a "priority" or a "count" of entries in those databases.

76.     A brief examination of the products of HFN, on the other hand, shows that each and every claim element of both the '141 patent and the '085 patent map directly onto features of the HFN software, and are key to the commercial value of the software.

77.     The '141 and '085 patents could not have had commercial value to the main operating business of Zelis or Red-Card, so HFN was using them as collateral for an undisclosed side venture of the Defendants that was made for the sole benefit of the Defendants. The transaction also encumbered the primary intellectual property of the company with a lien that prevented monetizing the patents in their last few years of life. All this was done solely for the sole benefit of the Defendants, in another failure to fulfill their fiduciary duty of loyalty to the Plaintiff.

78.     Under the Defendants' leadership of HFN, no additional patent applications have been filed since the 2006 continuation filing. Either no significant advancements have been made in the product technology, or the intellectual property of the company has been neglected. In either case, the Board has been diverting HFN resources to their own ends rather than maintaining and protecting the innovation that is one of the key assets in a software technology company.

79.     This failure to protect HFN intellectual property has also put the company into a precarious position. With no patent protection at all, a competitor could easily assert patents against HFN for patent infringement and HFN would have nothing with which to counter-assert and move toward a settlement. The result would be to tie HFN up in costly litigation and potentially even an injunction against continuing to do business.

80.     Once again, the Board has failed to use company resources correctly, opting instead to keep them for short-term personal gain. The Defendants are abandoning their fiduciary duty of care to the Plaintiff.

81.     Plaintiff Miller's direct financial loss during the relevant times due to the Defendants' failure to monetize intellectual property is at least $13,800.00.

**D.  Mismanagement of Intellectual Property: Software**

82.     The HFN software is organized somewhat like an app store such as the Apple iTunes Store or the Google Play Store. The software has three main components. The "core" software provides a set of basic operations to monitor and act on systems under management, analogous to the iOS or Android operating system Application Programming Interfaces (APIs) used to monitor and act on end user devices. The "application" level uses the core software operations to implement detection and solution for specific problems, analogous to the apps that are sold on app stores to provide specific functionality using the operating system APIs. The "management" level provides a user interface for controlling and reporting on the activities of the application level, analogous to the app store interface that allows end users and device managers to control and report on app usage on devices.

**E.  Core Software**

83.     The core software requires updating and maintenance on a regular basis. In addition to extensions to provide management of new versions of operating systems and new platforms, the core software is intimately tied to the underlying operation of the computer network. Network protocols and standards are updated frequently and require corresponding updates to the core software.

84.     The only major update to the core software under the current engineering management (over ten years) has been some extensions to support mobile devices.[6] More importantly, the computer security environment has changed significantly in the past ten years. For example, ransomware is prevalent, advanced persistent threats (APTs) now target companies and infrastructure using sophisticated phishing and zero-day vulnerability attacks, and two-factor

---

[6] By way of comparison, Miller led a small engineering team at a different company to bring a similar mobile device management extension from concept to deployment in under one year.

authentication is the norm, among many other changes. The core software continues to use the mid-2000s security model that was appropriate for its time but is dangerously insecure in today's world. These security concerns are not merely hypothetical.

85.    A key HFN customer suffered a security breach at an end user. Upon investigation, the HFN customer discovered that the cause was a well-known vulnerability in the aging HFN security model that could be exploited by simply monitoring open network traffic. The customer demonstrated this vulnerability to HFN. The response by the Defendants was to only patch the HFN software to address the specifics of that one vulnerability, rather than heed the warning and invest in an improved security model for the product. Multiple other customers, prospects, and partners have also raised concerns about the security features of the product.

86.    This failure by the Defendants to properly address the security of the HFN products has put the company, its customers, and its customers' end users at considerable risk. On July 2, 2021, Kaseya, a company with a very similar product and business model to HFN, was compromised in a ransomware attack that caused widespread downtime for over 1,000 companies. The attackers reported that one million end user systems were affected and demanded a ransom of $45,000 per system, also offering a "bulk discount" to Kaseya of $70 million to unlock all systems with a single payment.

87.    The HFN web site indicates that the company has the product installed on 4 million end user systems, so in a similar compromise, one could expect the demand by the attacker to be up to $180 billion for per-system remediation, or up to $280 million for a one-time unlock. Legal analysts commenting on the Kaseya compromise have indicated that some of the liability could be shifted onto HFNs customers (the service providers), so the impact would also tarnish the reputation of HFN and damage its customer relationships.

88.    The Defendants knew, or should have known, the gravity of the Kaseya compromise. Besides being in the main business of HFN, Kaseya had considerable coverage in mainstream media. Multiple customers have raised concerns about the security aspects of the HFN

product. Despite this, the Defendants chose yet again to continue to use company resources for their own benefit rather than invest those resources into critical development to protect the company, its customers, and its end users. The Defendants failed in their fiduciary duty of care to the Plaintiff.

### F. Application Software

89.     The application software is a collection of script-like code where each script uses the core operations to provide focused detection and solution of a single issue. As any computer user knows, the nature and specifics of issues can change rapidly, but can also persist over long periods. For example, one HFN script predating the current management fixed a problem that Windows had in updating the time zone after the rules changed in the US. This script was very useful but had a limited life until Microsoft fixed the problem a few months later. Another script handled the situation where a router with fixed IP addresses that were known to every machine but could not be discovered by a newly installed machine. This script would still be useful in today's networked environments. The application software therefore needs to have constant attention and testing to keep up with the ever-changing landscape of computer issues, and to make sure that they are resolved correctly. This automation of detecting and resolving issues is a key value add and differentiator for the product.

90.     The application software has had little, if any, additions and development under the current engineering management. Instead, the Defendants believe that the *customers* should provide the specification and implementation of the scripts to do problem resolution. The CEO and product management teams consistently fail to visit key customers to understand their issues, or even respond to their inquiries. Not surprisingly, the HFN web site has no customer testimonials at all, because not a single customer has reported value added by the product, and as a result, customer turnover is high, with the company having lost more than half of its customers in the last few years.

91.     The Defendants are aware of the issues with the application software. Multiple customers have repeatedly emphasized their expectation that HFN should properly specify and implement the application software. This makes sense since it is a part of the HFN product and represents a key component of its value. The HFN travel budget remains large, but not for visits to customers and end users to understand the needs for the applications software. Instead, as will be described below, the travel is oriented around the Defendants' other investments of HFN resources in ventures that are not in HFN's line of business and do not benefit the company. The Defendants are consistent in their choice of investing HFN resources for personal benefit rather than the benefit of HFN, failing in their obligation to their fiduciary duty of care to the Plaintiff.

### G.  Management Software

92.     The management software is implemented as a web site that is available to HFN's customers but typically not the end users with managed devices. This interface is intended to provide visibility to the customer about what is going on at end user devices, what kind of issues are being encountered and resolved, and what kinds of new trends are surfacing. Enterprise customers want an interface that can provide real-time information on large numbers of devices as well as generating summary reports for executive review.

93.     The management software has only been updated with cosmetic changes for over ten years. The underlying database is still the same relational database, and no effort has been made to utilize modern big data tools or real-time analytics. Even the showcase example on the HFN web site only contains general usage information by end user devices, highlighting the product as a device monitoring tool rather than an issue detection and resolution platform.[7] This is consistent with the lack of development in the application software and the customer lack of perceived added value.

---

[7] The image shows application usage, printer usage, network usage, device type, CPU usage, uptime, boot time, and notification frequency; these are all measured parameters as opposed to diagnosing actual problems with indications of some kind of action taken at the device.

94.     The Defendants are aware of the shortcomings of the management software. Multiple major customers have indicated that the reporting capabilities of HFN are insufficient and do not meet end user requirements. As described previously, rather than visit the customers and end users to understand and implement the required functionality, the Defendants' travel activities are focused on those providing them personal benefit, as described below. They dependably use HFN resources for their own gain at the expense of HFN. The Defendants have not fulfilled their fiduciary duty of care to the Plaintiff.

95.     Plaintiff Miller's direct financial loss during the relevant times due to the Defendants' failure to maintain and update the Core Software, Application Software, and Management Software is at least $142,140.00.

## H.  Web Site

96.     Any company doing business online, especially a company involved in networking or user service, needs to have a well-managed online presence in its web site. The HFN web site falls very short of this goal. The site completely lacks an "About Us" section, giving the viewer the impression that there is no real presence or history of the company. Calling the contact phone number inspires even less confidence: the call is answered by a synthesized voice that mispronounces the name of the company and asks you to leave a message.

97.     In another hasty scrub of the site, the company has removed the link to the "Newsroom" section of the site while leaving the word "Newsroom" disturbingly present. However, during the relevant times of this Complaint, the featured "Newsroom" article was "5 Ways CBD Can Improve Your Daily Life." This article extolled the many virtues of using CBD oil, made from the active component in marijuana. The article was apparently not on the web site by mistake, since it was dated after some of the other articles. One can only assume that a potential customer reading this might not be too excited by the prospect of having their critical IT infrastructure managed by a team that was enthusiastically using CBD-based products at the same time.

98.     The Defendants were aware of the problems with the web site. For example, they modified the site around the middle of July, 2022 to remove the "About Us" section as described previously, and have since modified it to remove the "Newsroom" section. Rather than use company resources to keep the web site accurate and timely, to encourage confidence by potential customers, they instead predictably divert those resources to activities promoting their own gain at the expense of the company. Once again, the Defendants have failed in their fiduciary duty of care to the Plaintiff.

99.     Plaintiff Miller's direct financial loss during the relevant times due to the Defendants' failure to maintain and update the online marketing channel is at least $24,950.40.

### THIS IS NOT A SHAREHOLDER DERIVATIVE SUIT

100.     This is not a shareholder derivative suit. Plaintiff Miller is not seeking to recover on behalf of the corporation for injury done to the corporation by Defendants. In fact, the fact pattern of a derivative suit runs counter to the current case. Imagine, *arguendo*, that Plaintiff Miller were to successfully prosecute a shareholder derivative suit against HFN. If Miller can assume that the latest HFN capitalization table he has been able to see (Exhibit 5) is largely correct, then the damages awarded to the shareholders would mostly go straight back into the pockets of the Defendants, which would be a tragic miscarriage of justice. Instead, the reality is that the Defendants have conspired to defraud the Plaintiff in the many numerous ways described above, and justice can only be served through a direct action by the Plaintiff against the Defendants.

101.     The filing of this action does not preclude a future derivative action.

### Count 1: Fraudulent Conversion of HFN Revenue through Zen Support Force Payments

102.     Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

103.    Defendant HFN made a false statement by falsely representing that invoices to Zen were for goods or services received, while in fact no such goods or services were received but the value was instead transferred directly to one or more Defendants.

104.    Defendant HFN made the representation knowing that it was false, by accounting for the value of the invoice as expenses rather than profit.

105.    Defendant HFN intended that Plaintiff Miller would rely on the statement, by accepting the accounting of HFN.

106.    Plaintiff Miller reasonably relied on the statement, by accepting the operational accounting of HFN.

107.    Plaintiff Miller suffered damages of at least $1,133,204.09 as a result of relying on the statement, by losing access to the value of the invoices either as a dividend or as increased value of the company through re-investment.

108.    Plaintiff Miller had a possessory interest in the HFN revenues that were used to pay the fraudulent invoices, by virtue of being a minority shareholder in HFN. Even if HFN claims to have lawfully been in possession of the revenues, HFN exceeded its scope of authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control.

109.    Defendant HFN intentionally interfered with Plaintiff Miller's possession by fraudulently accounting for the revenues as expenses rather than profit.

110.    Defendant HFN's acts are the legal cause of Plaintiff Miller's loss of the revenues.

111.    Plaintiff Miller is entitled to punitive damages as a result of Defendant HFN's conduct. Specifically, Defendant HFN has consistently acted with impunity and lack of regard to interests of Miller despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

112.    Defendant Santhanam made a false statement by directing Zen to provide false invoices to HFN for goods or services that were never received by HFN, directing HFN to pay Zen

for the invoices using HFN revenue, and directing Zen to directly transfer at least part of the payment to one or more Defendants.

113.    Defendant Santhanam directed these transactions with the false invoices knowing that the invoices were false, and also knowing that the accounting of the revenues used for the transactions was falsely made as expenses rather than profit.

114.    Defendant Santhanam intended that Plaintiff Miller would rely on the statement, by accepting the accounting of HFN.

115.    Plaintiff Miller reasonably relied on the statement, by accepting the operational accounting of HFN.

116.    Plaintiff Miller suffered damages of at least $1,133,204.09 as a result of relying on the statement, by losing access to the value of the invoices either as a dividend or as increased value of the company through re-investment.

117.    Plaintiff Miller had a possessory interest in the HFN revenues that were used to pay the fraudulent invoices, by virtue of being a minority shareholder in HFN. Even if Santhanam claims to have lawfully been in possession of the revenues, Santhanam exceeded his scope of authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control.

118.    Defendant Santhanam intentionally interfered with Plaintiff Miller's possession by fraudulently directing the HFN accounting for the revenues as expenses rather than profit.

119.    Defendant Santhanam's acts are the legal cause of Plaintiff Miller's loss of the revenues.

120.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Santhanam's conduct. Specifically, Defendant Santhanam has consistently acted with impunity and lack of regard to interests of Miller despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

**Count 2: Aiding and Abetting Fraudulent Conversion of HFN Revenue through Zen Support Force Payments**

121.    Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

122.    As an HFN Director, Defendant Shiralagi had the responsibility of regularly reviewing the financials of HFN. Defendant Shiralagi was aware, or was negligently unaware, of the discrepancy between the actual expenses of Zen and the payments to Zen.

123.    Defendant Shiralagi knowingly and intentionally assisted HFN and Santhanam in their actions described in Count 1, by being aware of the discrepancy and not taking action to resolve it.

124.    As a direct and proximate result of Defendant Shiralagi's assistance in the actions described in Count 1, Plaintiff Miller has suffered damages of at least $1,133,204.09 as a result of losing access to the value of the falsified invoices either as a dividend or as increased value of the company through re-investment.

125.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Shiralagi's conduct. Specifically, Defendant Shiralagi participated in a previous investment in HFN that resulted in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities as a Director in monitoring fraudulent activity of HFN and Santhanam.

126.    As an HFN Director, Defendant Vaish had the responsibility of regularly reviewing the financials of HFN. Defendant Vaish was aware, or was negligently unaware, of the discrepancy between the actual expenses of Zen and the payments to Zen.

127.    Defendant Vaish knowingly and intentionally assisted HFN and Santhanam in their actions described in Count 1, by being aware of the discrepancy and not taking action to resolve it.

128.   As a direct and proximate result of Defendant Vaish's assistance in the actions described in Count 1, Plaintiff Miller has suffered damages of at least $1,133,204.09 as a result of losing access to the value of the falsified invoices either as a dividend or as increased value of the company through re-investment.

129.   Plaintiff Miller is entitled to punitive damages as a result of Defendant Vaish's conduct. Specifically, Defendant Vaish was a Director of HFN during a previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities as a Director in monitoring fraudulent activity of HFN and Santhanam.

130.   As a venture investment firm with HFN as a portfolio company and a stated policy of actively monitoring and participating in portfolio companies, as well as being a majority shareholder of HFN, Defendant Kalaari had the responsibility of regularly reviewing the financials of HFN. Defendant Kalaari was aware, or was negligently unaware, of the discrepancy between the actual expenses of Zen and the payments to Zen.

131.   Defendant Kalaari knowingly and intentionally assisted HFN and Santhanam in their actions described in Count 1, by being aware of the discrepancy and not taking action to resolve it.

132.   As a direct and proximate result of Defendant Kalaari's assistance in the actions described in Count 1, Plaintiff Miller has suffered damages of at least $1,133,204.09 as a result of losing access to the value of the falsified invoices either as a dividend or as increased value of the company through re-investment.

133.   Plaintiff Miller is entitled to punitive damages as a result of Defendant Kalaari's conduct. Specifically, Defendant Kalaari led a previous investment in HFN that resulted in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of its responsibilities in monitoring fraudulent activity of HFN and Santhanam.

Amended Complaint with Jury Demand                    Case No. 2:23-cv-00733-CMR

134.    As the founder and managing director of Kalaari, Defendant Kola has the ultimate responsibility of being aware of the activities of Kalaari's portfolio companies. HFN is a portfolio company, and Kalaari had Board seats on HFN as well as being a majority shareholder, and a stated policy of actively monitoring and participating in portfolio companies. Defendant Kola had the responsibility of regularly reviewing the financials of HFN. Defendant Kola was aware, or was negligently unaware, of the discrepancy between the actual expenses of Zen and the payments to Zen.

135.    Defendant Kola knowingly and intentionally assisted HFN and Santhanam in their actions described in Count 1, by being aware of the discrepancy and not taking action to resolve it.

136.    As a direct and proximate result of Defendant Kola's assistance in the actions described in Count 1, Plaintiff Miller has suffered damages of at least $1,133,204.09 as a result of losing access to the value of the falsified invoices either as a dividend or as increased value of the company through re-investment.

137.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Kola's conduct. Specifically, Defendant Kola led a previous investment in HFN that resulted in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of her responsibilities in monitoring fraudulent activity of HFN and Santhanam.

**Count 3: Breach of Fiduciary Duty With Respect to Zen Support Force Payments**

138.    Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

139.    Defendant HFN owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

140.     Defendant HFN breached its fiduciary duty of care to Plaintiff Miller by using falsified Zen invoices to transfer money directly to one or more Defendants for their personal benefit rather than recognizing the revenue for Plaintiff Miller to participate in the benefit.

141.     As an actual and proximate result of Defendant HFN's breach of its fiduciary duty of care, Plaintiff Miller has suffered damages of at least $1,133,204.09 as a result of losing access to the value of the falsified invoices either as a dividend or as increased value of the company through re-investment. The damages would not have occurred if Defendant HFN had not breached its fiduciary duty of care and had correctly recognized the revenue.

142.     Defendant HFN breached its fiduciary duty of disclosure to Plaintiff Miller by not disclosing the use of HFN revenue to pay the falsified Zen invoices.

143.     As an actual and proximate result of Defendant HFN's breach of its fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $1,133,204.09 as a result of losing access to the value of the falsified invoices either as a dividend or as increased value of the company through re-investment. The damages would not have occurred if Defendant HFN had disclosed the payment of the falsified Zen invoices and given Plaintiff Miller the opportunity to demand the recognition of the revenue.

144.     Plaintiff Miller is entitled to punitive damages as a result of Defendant HFN's conduct. Specifically, Defendant HFN was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of its responsibilities in avoiding fraudulent activity.

145.     Defendant Santhanam, as a majority shareholder of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

146.     Defendant Santhanam breached his fiduciary duty of care to Plaintiff Miller by directing HFN to use falsified Zen invoices to transfer money directly to one or more Defendants for their personal benefit rather than recognizing the revenue for Plaintiff Miller to participate in the benefit.

147.    As an actual and proximate result of Defendant Santhanam's breach of his fiduciary duty of care, Plaintiff Miller has suffered damages of at least $1,133,204.09 as a result of losing access to the value of the falsified invoices either as a dividend or as increased value of the company through re-investment. The damages would not have occurred if Defendant Santhanam had not breached its fiduciary duty of care and had directed HFN to correctly recognize the revenue.

148.    Defendant Santhanam breached his fiduciary duty of disclosure to Plaintiff Miller by not disclosing the use of HFN revenue to pay the falsified Zen invoices.

149.    As an actual and proximate result of Defendant Santhanam's breach of his fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $1,133,204.09 as a result of losing access to the value of the falsified invoices either as a dividend or as increased value of the company through re-investment. The damages would not have occurred if Defendant Santhanam had disclosed the payment of the falsified Zen invoices and given Plaintiff Miller the opportunity to demand the recognition of the revenue.

150.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Santhanam's conduct. Specifically, Defendant Santhanam was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

151.    Defendant Shiralagi, as a Director of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

152.    As an HFN Director, Defendant Shiralagi had the responsibility of regularly reviewing the financials of HFN. Defendant Shiralagi was aware, or was negligently unaware, of the discrepancy between the actual expenses of Zen and the payments to Zen.

153.    Defendant Shiralagi breached his fiduciary duty of care to Plaintiff Miller by being aware of the discrepancy and not taking action to resolve it.

154.    As an actual and proximate result of Defendant Shiralagi's breach of his fiduciary duty of care, Plaintiff Miller has suffered damages of at least $1,133,204.09 as a result of losing

access to the value of the falsified invoices either as a dividend or as increased value of the company through re-investment. The damages would not have occurred if Defendant Shiralagi had not breached his fiduciary duty of care and taken action to cause HFN to correctly recognize the revenue.

155.    Defendant Shiralagi breached his fiduciary duty of disclosure to Plaintiff Miller by not disclosing the discrepancy between the actual expenses of Zen and the payments to Zen.

156.    As an actual and proximate result of Defendant Shiralagi's breach of its fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $1,133,204.09 as a result of losing access to the value of the falsified invoices either as a dividend or as increased value of the company through re-investment. The damages would not have occurred if Defendant Shiralagi had disclosed the discrepancy between the actual expenses of Zen and the payments to Zen and given Plaintiff Miller the opportunity to demand the recognition of the revenue.

157.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Shiralagi's conduct. Specifically, Defendant Shiralagi was previously involved the investment in HFN that led to litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

158.    Defendant Vaish, as a Director of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

159.    As an HFN Director, Defendant Vaish had the responsibility of regularly reviewing the financials of HFN. Defendant Vaish was aware, or was negligently unaware, of the discrepancy between the actual expenses of Zen and the payments to Zen.

160.    Defendant Vaish breached his fiduciary duty of care to Plaintiff Miller by being aware of the discrepancy and not taking action to resolve it.

161.    As an actual and proximate result of Defendant Vaish's breach of his fiduciary duty of care, Plaintiff Miller has suffered damages of at least $1,133,204.09 as a result of losing access to the value of the falsified invoices either as a dividend or as increased value of the company

through re-investment. The damages would not have occurred if Defendant Vaish had not breached his fiduciary duty of care and taken action to cause HFN to correctly recognize the revenue.

162.    Defendant Vaish breached his fiduciary duty of disclosure to Plaintiff Miller by not disclosing the discrepancy between the actual expenses of Zen and the payments to Zen.

163.    As an actual and proximate result of Defendant Vaish's breach of its fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $1,133,204.09 as a result of losing access to the value of the falsified invoices either as a dividend or as increased value of the company through re-investment. The damages would not have occurred if Defendant Vaish had disclosed the discrepancy between the actual expenses of Zen and the payments to Zen and given Plaintiff Miller the opportunity to demand the recognition of the revenue.

164.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Vaish's conduct. Specifically, Defendant Vaish was a Director when HFN was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

## Count 4: Aiding and Abetting Breach of Fiduciary Duty With Respect to Zen Support Force Payments

165.    Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

166.    As a venture investment firm with HFN as a portfolio company and a stated policy of actively monitoring and participating in portfolio companies, as well as being a majority shareholder of HFN, Defendant Kalaari had the responsibility of regularly reviewing the financials of HFN. Defendant Kalaari was aware, or was negligently unaware, of the discrepancy between the actual expenses of Zen and the payments to Zen.

167.    Defendant Kalaari knowingly and intentionally assisted HFN, Santhanam, Shiralagi, and Vaish in their breaches of fiduciary duty described in Count 3, by being aware of the discrepancy and not taking action to resolve it.

168.     As a direct and proximate result of Defendant Kalaari's assistance in the breaches described in Count 3, Plaintiff Miller has suffered damages of at least $1,133,204.09 as a result of losing access to the value of the falsified invoices either as a dividend or as increased value of the company through re-investment.

169.     Plaintiff Miller is entitled to punitive damages as a result of Defendant Kalaari's conduct. Specifically, Defendant Kalaari led a previous investment in HFN that resulted in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of its responsibilities in monitoring fraudulent activity connected to HFN.

170.     As the founder and managing director of Kalaari, Defendant Kola has the ultimate responsibility of being aware of the activities of Kalaari's portfolio companies. HFN is a portfolio company, and Kalaari had Board seats on HFN as well as being a majority shareholder, and a stated policy of actively monitoring and participating in portfolio companies. Defendant Kola had the responsibility of regularly reviewing the financials of HFN. Defendant Kola was aware, or was negligently unaware, of the discrepancy between the actual expenses of Zen and the payments to Zen.

171.     Defendant Kola knowingly and intentionally assisted HFN, Santhanam, Shiralagi, and Vaish in their breaches of fiduciary duty described in Count 3, by being aware of the discrepancy and not taking action to resolve it.

172.     As a direct and proximate result of Defendant Kola's assistance in the breaches described in Count 3, Plaintiff Miller has suffered damages of at least $1,133,204.09 as a result of losing access to the value of the falsified invoices either as a dividend or as increased value of the company through re-investment.

173.     Plaintiff Miller is entitled to punitive damages as a result of Defendant Kola's conduct. Specifically, Defendant Kola led a previous investment in HFN that resulted in litigation

where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of her responsibilities in monitoring fraudulent activity connected to HFN.

**Count 5: Fraudulent Conversion of HFN Cash through Seed Group Payments**

174.     Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

175.     Defendant HFN made a false statement by falsely representing that payments to Seed were for sales and support services, while in fact no such sales and support services were received, and Seed was not even competent to provide these services, but the payments were instead transferred into an entity that could be converted to exclusive control by one or more of the Defendants upon demand.

176.     Defendant HFN made the representation knowing that it was false, by providing the contractual basis for the exclusively controlled entity in the agreements with Seed.

177.     Defendant HFN intended that Plaintiff Miller would rely on the statement, by accepting the representation that the relationship with Seed was intended for sales and support services.

178.     Plaintiff Miller reasonably relied on the statement, by accepting the operational statements and news releases of HFN.

179.     Plaintiff Miller suffered damages of at least $35,001.42 as a result of relying on the statement, by losing the benefit of the payments transferred to Seed upon the exercise of the demand to convert their ownership to the entity exclusively controlled by one or more of the Defendants.

180.     Plaintiff Miller had a possessory interest in the HFN cash that was transferred to Seed, by virtue of being a minority shareholder in HFN. Even if HFN claims to have lawfully been in possession of the revenues, HFN exceeded its scope of authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control.

181.    Defendant HFN intentionally interfered with Plaintiff Miller's possession by fraudulently transferring the payments to Seed with the sole purpose of removing Plaintiff Miller's benefit from them.

182.    Defendant HFN's acts are the legal cause of Plaintiff Miller's loss of the revenues.

183.    Plaintiff Miller is entitled to punitive damages as a result of Defendant HFN's conduct. Specifically, Defendant HFN has consistently acted with impunity and lack of regard to interests of Miller despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

184.    Defendant Santhanam made a false statement by falsely representing that payments to Seed were for sales and support services, while in fact no such sales and support services were received, and Seed was not even competent to provide these services, but the payments were instead transferred into an entity that could be converted to exclusive control by one or more of the Defendants upon demand.

185.    Defendant Santhanam made the representation knowing that it was false, by negotiating the contract with Seed for the exclusively controlled entity.

186.    Defendant Santhanam intended that Plaintiff Miller would rely on the statement, by accepting the representation that the relationship with Seed was intended for sales and support services.

187.    Plaintiff Miller reasonably relied on the statement, by accepting the operational statements and news releases of HFN.

188.    Plaintiff Miller suffered damages of at least $35,001.42 as a result of relying on the statement, by losing the benefit of the payments transferred to Seed upon the exercise of the demand to convert their ownership to the entity exclusively controlled by one or more of the Defendants.

189.    Plaintiff Miller had a possessory interest in the HFN cash that was transferred to Seed, by virtue of being a minority shareholder in HFN. Even if Santhanam claims to have lawfully

been in possession of the revenues, Santhanam exceeded his scope of authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control.

190.     Defendant Santhanam intentionally interfered with Plaintiff Miller's possession by fraudulently transferring the payments to Seed with the sole purpose of removing Plaintiff Miller's benefit from them.

191.     Defendant Santhanam's acts are the legal cause of Plaintiff Miller's loss of the revenues.

192.     Plaintiff Miller is entitled to punitive damages as a result of Defendant Santhanam's conduct. Specifically, Defendant Santhanam has consistently acted with impunity and lack of regard to interests of Miller despite either participating in previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

### Count 6: Aiding and Abetting Fraudulent Conversion of HFN Cash through Seed Group Payments

193.     Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

194.     As an HFN Director, Defendant Shiralagi had the responsibility of regularly reviewing the binding contracts of HFN. Defendant Shiralagi was aware, or was negligently unaware, of the contract with Seed and its effect of transferring HFN assets into an entity that could be converted to exclusive control by one or more of the Defendants upon demand, and the detrimental effect this contract had on Plaintiff Miller.

195.     Defendant Shiralagi knowingly and intentionally assisted HFN and Santhanam in their actions described in Count 5, by being aware of the Seed contract and not taking action to correct it.

196.     As a direct and proximate result of Defendant Shiralagi's assistance in the actions described in Count 5, Plaintiff Miller has suffered damages of at least $35,001.42 as a result of

losing the benefit of the payments transferred to Seed upon the exercise of the demand to convert their ownership to the entity exclusively controlled by one or more of the Defendants.

197.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Shiralagi's conduct. Specifically, Defendant Shiralagi participated in a previous investment in HFN that resulted in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities as a Director in monitoring fraudulent activity of HFN and Santhanam.

198.    As an HFN Director, Defendant Vaish had the responsibility of regularly reviewing the binding contracts of HFN. Defendant Vaish was aware, or was negligently unaware, of the contract with Seed and its effect of transferring HFN assets into an entity that could be converted to exclusive control by one or more of the Defendants upon demand, and the detrimental effect this contract had on Plaintiff Miller.

199.    Defendant Vaish knowingly and intentionally assisted HFN and Santhanam in their actions described in Count 5, by being aware of the Seed contract and not taking action to correct it.

200.    As a direct and proximate result of Defendant Vaish's assistance in the actions described in Count 5, Plaintiff Miller has suffered damages of at least $35,001.42 as a result of losing the benefit of the payments transferred to Seed upon the exercise of the demand to convert their ownership to the entity exclusively controlled by one or more of the Defendants.

201.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Vaish's conduct. Specifically, Defendant Vaish was a Director of HFN during a previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities as a Director in monitoring fraudulent activity of HFN and Santhanam.

202.    As a venture investment firm with HFN as a portfolio company and a stated policy of actively monitoring and participating in portfolio companies, as well as being a majority

shareholder of HFN, Defendant Kalaari had the responsibility of regularly reviewing the binding contracts of HFN. Defendant Kalaari was aware, or was negligently unaware, of the contract with Seed and its effect of transferring HFN assets into an entity that could be converted to exclusive control by one or more of the Defendants upon demand, and the detrimental effect this contract had on Plaintiff Miller.

203.    Defendant Kalaari knowingly and intentionally assisted HFN and Santhanam in their actions described in Count 5, by being aware of the Seed contract and not taking action to correct it.

204.    As a direct and proximate result of Defendant Kalaari's assistance in the actions described in Count 5, Plaintiff Miller has suffered damages of at least $35,001.42 as a result of losing the benefit of the payments transferred to Seed upon the exercise of the demand to convert their ownership to the entity exclusively controlled by one or more of the Defendants.

205.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Kalaari's conduct. Specifically, Defendant Kalaari led a previous investment in HFN that resulted in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of its responsibilities in monitoring fraudulent activity of HFN and Santhanam.

206.    As the founder and managing director of Kalaari, Defendant Kola has the ultimate responsibility of being aware of the activities of Kalaari's portfolio companies. HFN is a portfolio company, and Kalaari had Board seats on HFN as well as being a majority shareholder, and a stated policy of actively monitoring and participating in portfolio companies. Defendant Kola had the responsibility of regularly reviewing the binding contracts of HFN. Defendant Kola was aware, or was negligently unaware, of the contract with Seed and its effect of transferring HFN assets into an entity that could be converted to exclusive control by one or more of the Defendants upon demand, and the detrimental effect this contract had on Plaintiff Miller.

207.    Defendant Kola knowingly and intentionally assisted HFN and Santhanam in their actions described in Count 5, by being aware of the Seed contract and not taking action to correct it.

208.    As a direct and proximate result of Defendant Kola's assistance in the actions described in Count 5, Plaintiff Miller has suffered damages of at least $35,001.42 as a result of losing the benefit of the payments transferred to Seed upon the exercise of the demand to convert their ownership to the entity exclusively controlled by one or more of the Defendants.

209.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Kola's conduct. Specifically, Defendant Kola led a previous investment in HFN that resulted in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of her responsibilities in monitoring fraudulent activity of HFN and Santhanam.

### Count 7: Breach of Fiduciary Duty With Respect to Seed Group Payments

210.    Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

211.    Defendant HFN owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

212.    Defendant HFN breached its fiduciary duty of care to Plaintiff Miller by making payments to Seed for sales and support services, while in fact no such sales and support services were received, and Seed was not even competent to provide these services, but the payments were instead transferred into an entity that could be converted to exclusive control by one or more of the Defendants upon demand.

213.    As an actual and proximate result of Defendant HFN's breach of its fiduciary duty of care, Plaintiff Miller has suffered damages of at least $35,001.42 as a result of losing the benefit of the payments transferred to Seed upon the exercise of the demand to convert their ownership to the entity exclusively controlled by one or more of the Defendants. The damages would not have

occurred if Defendant HFN had not breached its fiduciary duty of care and had not entered into the contract with Seed to transfer funds into the entity with exclusive control by one or more of the Defendants.

214.    Defendant HFN breached its fiduciary duty of disclosure to Plaintiff Miller by not disclosing the contract with Seed.

215.    As an actual and proximate result of Defendant HFN's breach of its fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $35,001.42 as a result of losing the benefit of the payments transferred to Seed upon the exercise of the demand to convert their ownership to the entity exclusively controlled by one or more of the Defendants. The damages would not have occurred if Defendant HFN had disclosed the contract with Seed and given Plaintiff Miller the opportunity to demand the revision of the contract.

216.    Plaintiff Miller is entitled to punitive damages as a result of Defendant HFN's conduct. Specifically, Defendant HFN was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of its responsibilities in avoiding fraudulent activity.

217.    Defendant Santhanam, as a majority shareholder of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

218.    Defendant Santhanam breached his fiduciary duty of care to Plaintiff Miller by making payments to Seed for sales and support services, while in fact no such sales and support services were received, and Seed was not even competent to provide these services, but the payments were instead transferred into an entity that could be converted to exclusive control by one or more of the Defendants upon demand.

219.    As an actual and proximate result of Defendant Santhanam's breach of his fiduciary duty of care, Plaintiff Miller has suffered damages of at least $35,001.42 as a result of losing the benefit of the payments transferred to Seed upon the exercise of the demand to convert their ownership to the entity exclusively controlled by one or more of the Defendants. The damages

would not have occurred if Defendant Santhanam had not breached its fiduciary duty of care and had not entered into the contract with Seed to transfer funds into the entity with exclusive control by one or more of the Defendants.

220.    Defendant Santhanam breached his fiduciary duty of disclosure to Plaintiff Miller by not disclosing the contract with Seed.

221.    As an actual and proximate result of Defendant Santhanam's breach of his fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $35,001.42 as a result of losing the benefit of the payments transferred to Seed upon the exercise of the demand to convert their ownership to the entity exclusively controlled by one or more of the Defendants. The damages would not have occurred if Defendant Santhanam had disclosed the contract with Seed and given Plaintiff Miller the opportunity to demand the revision of the contract.

222.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Santhanam's conduct. Specifically, Defendant Santhanam was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

223.    Defendant Shiralagi, as a Director of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

224.    As an HFN Director, Defendant Shiralagi had the responsibility of regularly reviewing the binding contracts of HFN. Defendant Shiralagi was aware, or was negligently unaware, of the contract with Seed and its effect of transferring HFN assets into an entity that could be converted to exclusive control by one or more of the Defendants upon demand, and the detrimental effect this contract had on Plaintiff Miller.

225.    Defendant Shiralagi breached his fiduciary duty of care to Plaintiff Miller by being aware of the Seed contract and not taking action to correct it.

226.    As an actual and proximate result of Defendant Shiralagi's breach of his fiduciary duty of care, Plaintiff Miller has suffered damages of at least $35,001.42 as a result of losing the

benefit of the payments transferred to Seed upon the exercise of the demand to convert their ownership to the entity exclusively controlled by one or more of the Defendants. The damages would not have occurred if Defendant Shiralagi had not breached his fiduciary duty of care and had not allowed HFN to enter into the contract with Seed to transfer funds into the entity with exclusive control by one or more of the Defendants.

227.    Defendant Shiralagi breached his fiduciary duty of disclosure to Plaintiff Miller by not disclosing the contract with Seed.

228.    As an actual and proximate result of Defendant Shiralagi's breach of his fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $35,001.42 as a result of losing the benefit of the payments transferred to Seed upon the exercise of the demand to convert their ownership to the entity exclusively controlled by one or more of the Defendants. The damages would not have occurred if Defendant Shiralagi had disclosed the contract with Seed and given Plaintiff Miller the opportunity to demand the revision of the contract.

229.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Shiralagi's conduct. Specifically, Defendant Shiralagi was previously involved the investment in HFN that led to litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

230.    Defendant Vaish, as a Director of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

231.    As an HFN Director, Defendant Vaish had the responsibility of regularly reviewing the binding contracts of HFN. Defendant Vaish was aware, or was negligently unaware, of the contract with Seed and its effect of transferring HFN assets into an entity that could be converted to exclusive control by one or more of the Defendants upon demand, and the detrimental effect this contract had on Plaintiff Miller.

232.    Defendant Vaish breached his fiduciary duty of care to Plaintiff Miller by being aware of the Seed contract and not taking action to correct it.

Amended Complaint with Jury Demand                    Case No. 2:23-cv-00733-CMR

233.     As an actual and proximate result of Defendant Vaish's breach of his fiduciary duty of care, Plaintiff Miller has suffered damages of at least $35,001.42 as a result of losing the benefit of the payments transferred to Seed upon the exercise of the demand to convert their ownership to the entity exclusively controlled by one or more of the Defendants. The damages would not have occurred if Defendant Vaish had not breached his fiduciary duty of care and had not allowed HFN to enter into the contract with Seed to transfer funds into the entity with exclusive control by one or more of the Defendants.

234.     Defendant Vaish breached his fiduciary duty of disclosure to Plaintiff Miller by not disclosing the contract with Seed.

235.     As an actual and proximate result of Defendant Vaish's breach of its fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $35,001.42 as a result of losing the benefit of the payments transferred to Seed upon the exercise of the demand to convert their ownership to the entity exclusively controlled by one or more of the Defendants. The damages would not have occurred if Defendant Vaish had disclosed the contract with Seed and given Plaintiff Miller the opportunity to demand the revision of the contract.

236.     Plaintiff Miller is entitled to punitive damages as a result of Defendant Vaish's conduct. Specifically, Defendant Vaish was a Director when HFN was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

## Count 8: Aiding and Abetting Breach of Fiduciary Duty With Respect to Seed Group Payments

237.     Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

238.     As a venture investment firm with HFN as a portfolio company and a stated policy of actively monitoring and participating in portfolio companies, as well as being a majority shareholder of HFN, Defendant Kalaari had the responsibility of regularly reviewing the binding

contracts of HFN. Defendant Kalaari was aware, or was negligently unaware, of the contract with Seed and its effect of transferring HFN assets into an entity that could be converted to exclusive control by one or more of the Defendants upon demand, and the detrimental effect this contract had on Plaintiff Miller.

239.    Defendant Kalaari knowingly and intentionally assisted HFN, Santhanam, Shiralagi, and Vaish in their breaches of fiduciary duty described in Count 7, by being aware of the Seed contract and not taking action to correct it.

240.    As a direct and proximate result of Defendant Kalaari's assistance in the breaches described in Count 7, Plaintiff Miller has suffered damages of at least $35,001.42 as a result of losing the benefit of the payments transferred to Seed upon the exercise of the demand to convert their ownership to the entity exclusively controlled by one or more of the Defendants.

241.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Kalaari's conduct. Specifically, Defendant Kalaari led a previous investment in HFN that resulted in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of its responsibilities in monitoring fraudulent activity connected to HFN.

242.    As the founder and managing director of Kalaari, Defendant Kola has the ultimate responsibility of being aware of the activities of Kalaari's portfolio companies. HFN is a portfolio company, and Kalaari had Board seats on HFN as well as being a majority shareholder, and a stated policy of actively monitoring and participating in portfolio companies. Defendant Kola had the responsibility of regularly reviewing the binding contracts of HFN. Defendant Kola was aware, or was negligently unaware, of the contract with Seed and its effect of transferring HFN assets into an entity that could be converted to exclusive control by one or more of the Defendants upon demand, and the detrimental effect this contract had on Plaintiff Miller.

243.    Defendant Kola knowingly and intentionally assisted HFN, Santhanam, Shiralagi, and Vaish in their breaches of fiduciary duty described in Count 7, by being aware of the Seed contract and not taking action to correct it.

244.    As a direct and proximate result of Defendant Kola's assistance in the breaches described in Count 7, Plaintiff Miller has suffered damages of at least $35,001.42 as a result of losing the benefit of the payments transferred to Seed upon the exercise of the demand to convert their ownership to the entity exclusively controlled by one or more of the Defendants.

245.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Kola's conduct. Specifically, Defendant Kola led a previous investment in HFN that resulted in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of her responsibilities in monitoring fraudulent activity connected to HFN.

**Count 9: Fraudulent Conversion of HFN Employee Salaries for Labor for Unrelated Companies**

246.    Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

247.    Defendant HFN made a false statement by falsely representing that salaries paid to HFN employees, including at least Santhanam, Jha, and Choorimule, were made in return for services that benefited HFN's business. In fact, some portion of the employee salaries, including at least those to Santhanam, Jha, and Choorimule, were made to benefit a number of companies unrelated to HFN, including at least Aasaava, Velo Digital, Iris Animation, and Blue Sphere Ventures.

248.    Defendant HFN made the representation knowing that it was false, by accounting for the employee salaries as being in return for services for HFN's benefit.

249.    Defendant HFN intended that Plaintiff Miller would rely on the statement, by accepting the normal accounting of salaries for any company, including those of HFN.

250. Plaintiff Miller reasonably relied on the statement, by accepting the normal accounting of salaries for any company, including HFN.

251. Plaintiff Miller suffered damages of at least $763,867.54 as a result of relying on the statement, by losing access to the money used to pay the salaries and the value of the services provided to other companies unrelated to HFN, including at least Aasaava, Velo Digital, Iris Animation, and Blue Sphere Ventures.

252. Plaintiff Miller had a possessory interest in the money used to pay the salaries of HFN employees, as well as the benefits to the outside companies derived from the labor of the HFN employees while they acting as at-will contractors for the outside companies, including at least Aasaava, Velo Digital, Iris Animation, and Blue Sphere Ventures, by virtue of being a minority shareholder in HFN. Even if HFN claims to have lawfully been in possession of the money used to pay the salaries, HFN exceeded its scope of authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control. Even if one or more of the outside companies claims to have lawfully been in possession of the services provided, those companies exceeded the scope of their authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control.

253. Defendant HFN intentionally interfered with Plaintiff Miller's possession by fraudulently accounting for the salaries as providing benefit to HFN, rather than benefit to the outside companies.

254. Defendant HFN's acts are the legal cause of Plaintiff Miller's loss of the salaries and value of the services to the outside companies.

255. Plaintiff Miller is entitled to punitive damages as a result of Defendant HFN's conduct. Specifically, Defendant HFN has consistently acted with impunity and lack of regard to interests of Miller despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

256.    Defendant Santhanam made a false statement by falsely representing that salaries paid to HFN employees, including at least Santhanam, Jha, and Choorimule, were made in return for services that benefited HFN's business. In fact, some portion of the employee salaries, including at least those to Santhanam, Jha, and Choorimule, were made to benefit a number of companies unrelated to HFN, including at least Aasaava, Velo Digital, Iris Animation, and Blue Sphere Ventures.

257.    Defendant Santhanam made the representation knowing that it was false, by accounting for the employee salaries as being in return for services for HFN's benefit.

258.    Defendant Santhanam intended that Plaintiff Miller would rely on the statement, by accepting the normal accounting of salaries for any company, including those of HFN.

259.    Plaintiff Miller reasonably relied on the statement, by accepting the normal accounting of salaries for any company, including HFN.

260.    Plaintiff Miller damages of at least $763,867.54 as a result of relying on the statement, by losing access to the money used to pay the salaries and the value of the services provided to other companies unrelated to HFN, including at least Aasaava, Velo Digital, Iris Animation, and Blue Sphere Ventures.

261.    Plaintiff Miller had a possessory interest in the money used to pay the salaries of HFN employees, as well as the benefits to the outside companies derived from the labor of the HFN employees while they acting as at-will contractors for the outside companies, including at least Aasaava, Velo Digital, Iris Animation, and Blue Sphere Ventures, by virtue of being a minority shareholder in HFN. Even if HFN claims to have lawfully been in possession of the money used to pay the salaries, HFN exceeded its scope of authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control. Even if one or more of the outside companies claims to have lawfully been in possession of the services provided, those companies exceeded the scope of their authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control.

262.    Defendant Santhanam intentionally interfered with Plaintiff Miller's possession by fraudulently accounting for the salaries as providing benefit to HFN, rather than benefit to the outside companies.

263.    Defendant Santhanam's acts are the legal cause of Plaintiff Miller's loss of the salaries and value of the services to the outside companies.

264.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Santhanam's conduct. Specifically, Defendant Santhanam has consistently acted with impunity and lack of regard to interests of Miller despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

### Count 10: Fraudulent Conversion of HFN Travel Expenses for Travel to Unrelated Companies

265.    Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

266.    Defendant HFN made a false statement by falsely representing that the travel budget used for HFN employees, including at least Santhanam and Jha, was spent for travel that directly benefited HFN's business. In fact, some portion of the travel paid for by HFN's travel budget, including at least travel made by Santhanam and Jha, was travel to benefit a number of companies unrelated to HFN, including at least Velo Digital and Iris Animation.

267.    Defendant HFN made the representation knowing that it was false, by accounting for the travel budget as being spent in return for travel for HFN's benefit.

268.    Defendant HFN intended that Plaintiff Miller would rely on the statement, by accepting the normal accounting of travel budget for any company, including that of HFN.

269.    Plaintiff Miller reasonably relied on the statement, by accepting the normal accounting of travel budget for any company, including HFN.

270.    Plaintiff Miller suffered damages of at least $1,380.00 as a result of relying on the statement, by losing access to the money used to pay the travel budget that was used for travel to other companies, including at least Velo Digital and Iris Animation.

271.    Plaintiff Miller had a possessory interest in the money used to pay the travel budget for travel to other companies, including at least Velo Digital and Iris Animation, by virtue of being a minority shareholder in HFN. Even if HFN claims to have lawfully been in possession of the money used to pay the salaries, HFN exceeded its scope of authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control. Even if one or more of the outside companies claims to have lawfully been in possession of the services provided, those companies exceeded the scope of their authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control.

272.    Defendant HFN intentionally interfered with Plaintiff Miller's possession by fraudulently accounting for the travel budget as providing benefit to HFN, rather than benefit to the outside companies.

273.    Defendant HFN's acts are the legal cause of Plaintiff Miller's loss of the money used to pay the travel budget for travel to the outside companies.

274.    Plaintiff Miller is entitled to punitive damages as a result of Defendant HFN's conduct. Specifically, Defendant HFN has consistently acted with impunity and lack of regard to interests of Miller despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

275.    Defendant Santhanam made a false statement by falsely representing that the travel budget used for HFN employees, including at least Santhanam and Jha, was spent for travel that directly benefited HFN's business. In fact, some portion of the travel paid for by HFN's travel budget, including at least travel made by Santhanam and Jha, was travel to benefit a number of companies unrelated to HFN, including at least Velo Digital and Iris Animation.

276.    Defendant Santhanam made the representation knowing that it was false, by accounting for the travel budget as being spent in return for travel for HFN's benefit.

277.    Defendant Santhanam intended that Plaintiff Miller would rely on the statement, by accepting the normal accounting of travel budget for any company, including that of HFN.

278.    Plaintiff Miller reasonably relied on the statement, by accepting the normal accounting of travel budget for any company, including HFN.

279.    Plaintiff Miller damages of at least $1,380.00 as a result of relying on the statement, by losing access to the money used to pay the travel budget that was used for travel to other companies, including at least Velo Digital and Iris Animation.

280.    Plaintiff Miller had a possessory interest in the money used to pay the travel budget for travel to other companies, including at least Velo Digital and Iris Animation, by virtue of being a minority shareholder in HFN. Even if HFN claims to have lawfully been in possession of the money used to pay the salaries, HFN exceeded its scope of authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control. Even if one or more of the outside companies claims to have lawfully been in possession of the services provided, those companies exceeded the scope of their authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control.

281.    Defendant Santhanam intentionally interfered with Plaintiff Miller's possession by fraudulently accounting for the travel budget as providing benefit to HFN, rather than benefit to the outside companies.

282.    Defendant Santhanam's acts are the legal cause of Plaintiff Miller's loss of the money used to pay the travel budget for travel to the outside companies.

283.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Santhanam's conduct. Specifically, Defendant Santhanam has consistently acted with impunity and lack of regard to interests of Miller despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

### Count 11: Breach of Fiduciary Duty in Corporate Governance

284.    Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

285.    Defendant HFN owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

286.    Defendant HFN breached its fiduciary duty of care to Plaintiff Miller by not providing adequate oversight of HFN through its Board of Directors. This breach includes at least inadequate oversight of the activities of the Board, electing a single Board member thereby providing no real corporate governance, and electing inappropriate Board members not in a position to provide effective corporate governance.

287.    As an actual and proximate result of Defendant HFN's breach of its fiduciary duty of care, Plaintiff Miller has suffered damages of at least $1,297,958.62 as a result of the inadequate and ineffective corporate governance with no checks and balances. The damages would not have occurred if Defendant HFN had not breached its fiduciary duty of care, and correct corporate governance had been in place to prevent the activities described in Counts 1, 3, 5, 7, 14, and 18.

288.    Defendant HFN breached its fiduciary duty of disclosure to Plaintiff Miller by not conducting regular shareholder meetings, not conducting a shareholder meeting upon request, and misrepresenting the Board membership when asked.

289.    As an actual and proximate result of Defendant HFN's breach of its fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $1,297,958.62 as a result having inadequate visibility into the inadequacy of HFN's corporate governance. The damages would not have occurred if Defendant HFN had disclosed composition and operations of the Board and given Plaintiff Miller the opportunity to demand correction of the shortcomings.

290.    Plaintiff Miller is entitled to punitive damages as a result of Defendant HFN's conduct. Specifically, Defendant HFN was previously involved in litigation where HFN was

forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of its responsibilities in avoiding fraudulent activity.

291.    Defendant Santhanam, as a majority shareholder and Director of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

292.    Defendant Santhanam breached his fiduciary duty of care to Plaintiff Miller by not providing adequate oversight of HFN through its Board of Directors. This breach includes at least inadequate oversight of the activities of the Board, electing a single Board member thereby providing no real corporate governance, and electing inappropriate Board members not in a position to provide effective corporate governance.

293.    As an actual and proximate result of Defendant Santhanam's breach of his fiduciary duty of care, Plaintiff Miller has suffered damages of at least $1,297,958.62 as a result of the inadequate and ineffective corporate governance with no checks and balances. The damages would not have occurred if Defendant Santhanam had not breached his fiduciary duty of care, and correct corporate governance had been in place to prevent the activities described in Counts 1, 3, 5, 7, 14, and 18.

294.    Defendant Santhanam breached his fiduciary duty of disclosure to Plaintiff Miller by not conducting regular shareholder meetings, not conducting a shareholder meeting upon request, and misrepresenting the Board membership when asked.

295.    As an actual and proximate result of Defendant Santhanam's breach of his fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $1,297,958.62 as a result having inadequate visibility into the inadequacy of HFN's corporate governance. The damages would not have occurred if Defendant Santhanam had disclosed composition and operations of the Board and given Plaintiff Miller the opportunity to demand correction of the shortcomings.

296.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Santhanam's conduct. Specifically, Defendant Santhanam was previously involved in litigation where HFN was

forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

297.    Defendant Shiralagi, as a Director of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

298.    As an HFN Director, Defendant Shiralagi had the responsibility of regularly participating in Board meetings of HFN. Defendant Shiralagi breached his fiduciary duty of care to Plaintiff Miller by not providing adequate oversight of HFN through its Board of Directors. This breach includes at least inadequate oversight of the activities of the Board, electing a single Board member thereby providing no real corporate governance, and electing inappropriate Board members not in a position to provide effective corporate governance.

299.    As an actual and proximate result of Defendant Shiralagi's breach of his fiduciary duty of care, Plaintiff Miller has suffered damages of at least $1,297,958.62 as a result of the inadequate and ineffective corporate governance with no checks and balances. The damages would not have occurred if Defendant Shiralagi had not breached his fiduciary duty of care, and correct corporate governance had been in place to prevent the activities described in Counts 1, 3, 5, 7, 14, and 18.

300.    Defendant Shiralagi breached his fiduciary duty of disclosure to Plaintiff Miller by not conducting regular shareholder meetings, not conducting a shareholder meeting upon request, and misrepresenting the Board membership when asked.

301.    As an actual and proximate result of Defendant Shiralagi's breach of its fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $1,297,958.62 as a result having inadequate visibility into the inadequacy of HFN's corporate governance. The damages would not have occurred if Defendant Shiralagi had disclosed composition and operations of the Board and given Plaintiff Miller the opportunity to demand correction of the shortcomings.

302.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Shiralagi's conduct. Specifically, Defendant Shiralagi was previously involved the investment in HFN that

led to litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

303.     Defendant Vaish, as a Director of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

304.     As an HFN Director, Defendant Vaish had the responsibility of regularly participating in Board meetings of HFN. Defendant Vaish breached his fiduciary duty of care to Plaintiff Miller by not providing adequate oversight of HFN through its Board of Directors. This breach includes at least inadequate oversight of the activities of the Board, electing a single Board member thereby providing no real corporate governance, and electing inappropriate Board members not in a position to provide effective corporate governance.

305.     As an actual and proximate result of Defendant Vaish's breach of his fiduciary duty of care, Plaintiff Miller has suffered damages of at least $1,297,958.62 as a result of the inadequate and ineffective corporate governance with no checks and balances. The damages would not have occurred if Defendant Vaish had not breached his fiduciary duty of care, and correct corporate governance had been in place to prevent the activities described in Counts 1, 3, 5, 7, 14, and 18.

306.     Defendant Vaish breached his fiduciary duty of disclosure to Plaintiff Miller by not conducting regular shareholder meetings, not conducting a shareholder meeting upon request, and misrepresenting the Board membership when asked.

307.     As an actual and proximate result of Defendant Vaish's breach of its fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $1,297,958.62 as a result having inadequate visibility into the inadequacy of HFN's corporate governance. The damages would not have occurred if Defendant Vaish had disclosed composition and operations of the Board and given Plaintiff Miller the opportunity to demand correction of the shortcomings.

308.     Plaintiff Miller is entitled to punitive damages as a result of Defendant Vaish's conduct. Specifically, Defendant Vaish was a Director when HFN was previously involved in

litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

309.    Defendant Kalaari, as a majority shareholder of HFN with Board seats, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

310.    Defendant Kalaari breached its fiduciary duty of care to Plaintiff Miller by not providing adequate oversight of HFN through its Board of Directors. This breach includes at least inadequate oversight of the activities of the Board, electing a single Board member thereby providing no real corporate governance, and electing inappropriate Board members not in a position to provide effective corporate governance.

311.    As an actual and proximate result of Defendant Kalaari's breach of its fiduciary duty of care, Plaintiff Miller has suffered damages of at least $1,297,958.62 as a result of the inadequate and ineffective corporate governance with no checks and balances. The damages would not have occurred if Defendant Kalaari had not breached its fiduciary duty of care, and correct corporate governance had been in place to prevent the activities described in Counts 1, 3, 5, 7, 14, and 18.

312.    Defendant Kalaari breached its fiduciary duty of disclosure to Plaintiff Miller by not conducting regular shareholder meetings, not conducting a shareholder meeting upon request, and misrepresenting the Board membership when asked.

313.    As an actual and proximate result of Defendant Kalaari's breach of its fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $1,297,958.62 as a result having inadequate visibility into the inadequacy of HFN's corporate governance. The damages would not have occurred if Defendant Kalaari had disclosed composition and operations of the Board and given Plaintiff Miller the opportunity to demand correction of the shortcomings.

314.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Kalaari's conduct. Specifically, Defendant Kalaari led a previous investment in HFN that resulted in

litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of its responsibilities in monitoring fraudulent activity connected to HFN.

### Count 12: Aiding and Abetting Breach of Fiduciary Duty in Corporate Governance

315.    Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

316.    As the founder and managing director of Kalaari, Defendant Kola has the ultimate responsibility of being aware of the activities of Kalaari's portfolio companies. HFN is a portfolio company, and Kalaari had Board seats on HFN as well as being a majority shareholder, and a stated policy of actively monitoring and participating in portfolio companies. Defendant Kola had the responsibility of regularly reviewing the activities of the Board of HFN. Defendant Kola was aware, or was negligently unaware, of the inadequate oversight of the activities of the Board, including at least electing a single Board member thereby providing no real corporate governance and electing inappropriate Board members not in a position to provide effective corporate governance.

317.    Defendant Kola knowingly and intentionally assisted HFN's Board in the actions described in Count 11, by being aware of the inadequate corporate governance and not taking action to resolve it.

318.    As a direct and proximate result of Defendant Kola's assistance in the actions described in Count 11, Plaintiff Miller has suffered damages of at least $1,297,958.62 as a result of the inadequate and ineffective corporate governance with no checks and balances, and as a result having inadequate visibility into the inadequacy of HFN's corporate governance.

319.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Kola's conduct. Specifically, Defendant Kola led a previous investment in HFN that resulted in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a

heightened awareness of her responsibilities in monitoring fraudulent activity of HFN and Santhanam.

**Count 13: Breach of Fiduciary Duty through Inadequate Human Resource Management**

320.     Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

321.     Defendant HFN owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

322.     Defendant HFN breached its fiduciary duty of care to Plaintiff Miller by not providing adequate HR management, with only Jha as a part-time HR manager having a conflict of interest, no company HR manual, and no Employee Handbook or process for HR violations. This breach was compounded by the existence of at least one inappropriate relationship between at least one of the Defendants and an HFN employee.

323.     As an actual and proximate result of Defendant HFN's breach of its fiduciary duty of care, Plaintiff Miller has suffered damages of at least $14,153.10 as a result of the inadequate and ineffective HR management. The damages would not have occurred if Defendant HFN had not breached its fiduciary duty of care, and correct HR management and procedures had been in place to address the existing HR violations.

324.     Defendant HFN breached its fiduciary duty of disclosure to Plaintiff Miller by not informing the shareholders of the inadequate HR management and any plans to remedy it.

325.     As an actual and proximate result of Defendant HFN's breach of its fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $14,153.10 as a result having no visibility into the HR management situation. The damages would not have occurred if Defendant HFN had disclosed the state of HR management and given Plaintiff Miller the opportunity to demand correction of the shortcomings.

326.     Plaintiff Miller is entitled to punitive damages as a result of Defendant HFN's conduct. Specifically, Defendant HFN was previously involved in litigation where HFN was

forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of its responsibilities in avoiding fraudulent activity.

327.    Defendant Santhanam, as a majority shareholder and Director of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

328.    Defendant Santhanam breached his fiduciary duty of care to Plaintiff Miller by not providing adequate HR management, with only Jha as a part-time HR manager having a conflict of interest, no company HR manual, and no Employee Handbook or process for HR violations. This breach was compounded by the existence of at least one inappropriate relationship between at least one of the Defendants and an HFN employee.

329.    As an actual and proximate result of Defendant Santhanam's breach of his fiduciary duty of care, Plaintiff Miller has suffered damages of at least $14,153.10 as a result of the inadequate and ineffective HR management. The damages would not have occurred if Defendant Santhanam had not breached his fiduciary duty of care, and correct HR management and procedures had been in place to address the existing HR violations.

330.    Defendant Santhanam breached his fiduciary duty of disclosure to Plaintiff Miller by not informing the shareholders of the inadequate HR management and any plans to remedy it.

331.    As an actual and proximate result of Defendant Santhanam's breach of his fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $14,153.10 as a result having no visibility into the HR management situation. The damages would not have occurred if Defendant Santhanam had disclosed the state of HR management and given Plaintiff Miller the opportunity to demand correction of the shortcomings.

332.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Santhanam's conduct. Specifically, Defendant Santhanam was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

**Count 14: Breach of Fiduciary Duty through Lack of Patent Monetization**

333.    Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

334.    Defendant HFN owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

335.    Defendant HFN breached its fiduciary duty of care to Plaintiff Miller by not pursuing the monetization of its patent portfolio before the patents expired. This breach occurred because HFN took on an inappropriate encumbrance to the patents through a third-party security interest that prevented the unencumbered sale of the patents or patent licenses.

336.    This Count arises under federal patent law.

337.    As an actual and proximate result of Defendant HFN's breach of its fiduciary duty of care, Plaintiff Miller has suffered damages of at least $13,800.00 as a result of the inappropriate encumbrance of the patents preventing proper monetization of those patents. The damages would not have occurred if Defendant HFN had not breached its fiduciary duty of care by taking on a third-party security interest in the patents.

338.    Defendant HFN breached its fiduciary duty of disclosure to Plaintiff Miller by not informing him as a shareholder of the third-party security interest in the patents.

339.    As an actual and proximate result of Defendant HFN's breach of its fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $13,800.00 as a result of having inadequate visibility into the licensing of HFN's patents. The damages would not have occurred if Defendant HFN had disclosed the third-party security interest and given Plaintiff Miller the opportunity to object to the inappropriate licensing.

340.    Plaintiff Miller is entitled to punitive damages as a result of Defendant HFN's conduct. Specifically, Defendant HFN was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of its responsibilities in avoiding fraudulent activity.

341.    Defendant Santhanam, as a majority shareholder and Director of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

342.    Defendant Santhanam breached his fiduciary duty of care to Plaintiff Miller by not pursuing the monetization of its patent portfolio before the patents expired. This breach occurred because Santhanam coordinated an inappropriate encumbrance to the patents through a third-party security interest that prevented the unencumbered sale of the patents or patent licenses.

343.    This Count arises under federal patent law.

344.    As an actual and proximate result of Defendant Santhanam's breach of its fiduciary duty of care, Plaintiff Miller has suffered damages of at least $13,800.00 as a result of the inappropriate encumbrance of the patents preventing proper monetization of those patents. The damages would not have occurred if Defendant Santhanam had not breached his fiduciary duty of care by coordinating a third-party security interest in the patents.

345.    Defendant Santhanam breached his fiduciary duty of disclosure to Plaintiff Miller by not informing him as a shareholder of the third-party security interest in the patents.

346.    As an actual and proximate result of Defendant Santhanam's breach of its fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $13,800.00 as a result of having inadequate visibility into the licensing of HFN's patents. The damages would not have occurred if Defendant Santhanam had disclosed the third-party security interest and given Plaintiff Miller the opportunity to object to the inappropriate licensing.

347.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Santhanam's conduct. Specifically, Defendant Santhanam was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

348.    Defendant Shiralagi, as a Director of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

349.    As an HFN Director, Defendant Shiralagi had the responsibility of regularly reviewing the IP strategy of HFN, an important part of planning for a software company. Defendant Shiralagi breached his fiduciary duty of care to Plaintiff Miller by failing to prevent an inappropriate encumbrance to the patents through a third-party security interest that prevented the unencumbered sale of the patents or patent licenses, and thereby preventing the monetization of HFN's patent portfolio before the patents expired.

350.    This Count arises under federal patent law.

351.    As an actual and proximate result of Defendant Shiralagi's breach of its fiduciary duty of care, Plaintiff Miller has suffered damages of at least $13,800.00 as a result of the inappropriate encumbrance of the patents preventing proper monetization of those patents. The damages would not have occurred if Defendant Shiralagi had not breached his fiduciary duty of care and had instead intervened to prevent the third-party security interest in the patents.

352.    Defendant Shiralagi breached his fiduciary duty of disclosure to Plaintiff Miller by not informing him as a shareholder of the third-party security interest in the patents.

353.    As an actual and proximate result of Defendant Shiralagi's breach of his fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $13,800.00 as a result of having inadequate visibility into the licensing of HFN's patents. The damages would not have occurred if Defendant Shiralagi had disclosed the third-party security interest and given Plaintiff Miller the opportunity to object to the inappropriate licensing.

354.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Shiralagi's conduct. Specifically, Defendant Shiralagi was previously involved the investment in HFN that led to litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

355.    Defendant Vaish, as a Director of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

356.    As an HFN Director, Defendant Vaish had the responsibility of regularly reviewing the IP strategy of HFN, an important part of planning for a software company. Defendant Vaish breached his fiduciary duty of care to Plaintiff Miller by failing to prevent an inappropriate encumbrance to the patents through a third-party security interest that prevented the unencumbered sale of the patents or patent licenses, and thereby preventing the monetization of HFN's patent portfolio before the patents expired.

357.    This Count arises under federal patent law.

358.    As an actual and proximate result of Defendant Vaish's breach of its fiduciary duty of care, Plaintiff Miller has suffered damages of at least $13,800.00 as a result of the inappropriate encumbrance of the patents preventing proper monetization of those patents. The damages would not have occurred if Defendant Vaish had not breached his fiduciary duty of care and had instead intervened to prevent the third-party security interest in the patents.

359.    Defendant Vaish breached his fiduciary duty of disclosure to Plaintiff Miller by not informing him as a shareholder of the third-party security interest in the patents.

360.    As an actual and proximate result of Defendant Vaish's breach of his fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $13,800.00 as a result of having inadequate visibility into the licensing of HFN's patents. The damages would not have occurred if Defendant Vaish had disclosed the third-party security interest and given Plaintiff Miller the opportunity to object to the inappropriate licensing.

361.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Vaish's conduct. Specifically, Defendant Vaish was a Director when HFN was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

362.    Defendant Kalaari, as a majority shareholder of HFN with Board seats, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

363.     As a venture investment firm with HFN as a portfolio company and a stated policy of actively monitoring and participating in portfolio companies, as well as being a majority shareholder of HFN, Defendant Kalaari had the responsibility of regularly reviewing the IP strategy of HFN, an important part of planning for a software company. Defendant Kalaari breached its fiduciary duty of care to Plaintiff Miller by failing to prevent an inappropriate encumbrance to the patents through a third-party security interest that prevented the unencumbered sale of the patents or patent licenses, and thereby preventing the monetization of HFN's patent portfolio before the patents expired.

364.     This Count arises under federal patent law.

365.     As an actual and proximate result of Defendant Kalaari's breach of its fiduciary duty of care, Plaintiff Miller has suffered damages of at least $13,800.00 as a result of the inappropriate encumbrance of the patents preventing proper monetization of those patents. The damages would not have occurred if Defendant Kalaari had not breached its fiduciary duty of care and had instead intervened to prevent the third-party security interest in the patents.

366.     Defendant Kalaari breached its fiduciary duty of disclosure to Plaintiff Miller by not informing him as a shareholder of the third-party security interest in the patents.

367.     As an actual and proximate result of Defendant Kalaari's breach of his fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $13,800.00 as a result having inadequate visibility into the licensing of HFN's patents. The damages would not have occurred if Defendant Kalaari had disclosed the third-party security interest and given Plaintiff Miller the opportunity to object to the inappropriate licensing.

368.     Plaintiff Miller is entitled to punitive damages as a result of Defendant Kalaari's conduct. Specifically, Defendant Kalaari led a previous investment in HFN that resulted in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of its responsibilities in monitoring fraudulent activity connected to HFN.

**Count 15: Aiding and Abetting Breach of Fiduciary Duty through Lack of Patent Monetization**

369.    Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

370.    As the founder and managing director of Kalaari, Defendant Kola has the ultimate responsibility of being aware of the activities of Kalaari's portfolio companies. HFN is a portfolio company, and Kalaari had Board seats on HFN as well as being a majority shareholder, and a stated policy of actively monitoring and participating in portfolio companies. Defendant Kola had the responsibility of regularly reviewing the IP strategy of HFN, an important part of planning for a software company. Defendant Kola was aware, or was negligently unaware, of the inappropriate encumbrance to the patents through a third-party security interest that prevented the unencumbered sale of the patents or patent licenses, and thereby preventing the monetization of HFN's patent portfolio before the patents expired.

371.    Defendant Kola knowingly and intentionally assisted HFN's Board in the actions described in Count 14, by being aware of the inappropriate third-party security interest and not taking action to resolve it.

372.    As a direct and proximate result of Defendant Kola's assistance in the actions described in Count 14, Plaintiff Miller has suffered damages of at least $13,800.00 as a result of the inappropriate encumbrance of the patents preventing proper monetization of those patents.

373.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Kola's conduct. Specifically, Defendant Kola led a previous investment in HFN that resulted in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of her responsibilities in monitoring fraudulent activity of HFN and Santhanam.

**Count 16: Breach of Fiduciary Duty in Maintaining Software Product**

374.    Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

375.    Defendant HFN owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care.

376.    Defendant HFN breached its fiduciary duty of care to Plaintiff Miller by not investing resources into product development in clearly defined areas that were causing customers to abandon the product after asking for improvements and not seeing them implemented. This breach includes failing to address major cybersecurity issues that exposed customers to significant risk, failing to develop promised application scripts to address support issues specified by customers, and failing to provide promised updates to the management dashboard to meet customer specified requirements. This breach was compounded by the fact that the money that should have funded this development was not available as the result of at least the activities described in Counts 1, 5, 9, 10, and 14.

377.    As an actual and proximate result of Defendant HFN's breach of its fiduciary duty of care, Plaintiff Miller has suffered damages of at least $142,140.00 as a result of the lack of development promised to customers. The damages would not have occurred if Defendant HFN had not breached its fiduciary duty of care, and provided the development requested by and promised to customers.

378.    Plaintiff Miller is entitled to punitive damages as a result of Defendant HFN's conduct. Specifically, Defendant HFN was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of its responsibilities in avoiding fraudulent activity.

379.    Defendant Santhanam, as a majority shareholder and Director of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care.

380.    Defendant Santhanam, as the technical director of HFN, breached his fiduciary duty of care to Plaintiff Miller by not investing resources into product development in clearly defined areas that were causing customers to abandon the product after asking for improvements and not seeing them implemented. This breach includes failing to address major cybersecurity issues that exposed customers to significant risk, failing to develop promised application scripts to address support issues specified by customers, and failing to provide promised updates to the management dashboard to meet customer specified requirements. This breach was compounded by the fact that the money that should have funded this development was not available as the result of at least the activities described in Counts 1, 5, 9, 10, and 14.

381.    As an actual and proximate result of Defendant Santhanam's breach of his fiduciary duty of care, Plaintiff Miller has suffered damages of at least $142,140.00 as a result of the lack of development promised to customers. The damages would not have occurred if Defendant Santhanam had not breached his fiduciary duty of care, and provided the development requested by and promised to customers.

382.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Santhanam's conduct. Specifically, Defendant Santhanam was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

## Count 17: Breach of Fiduciary Duty in Maintaining Marketing Site

383.    Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

384.    Defendant HFN owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care.

385.    Defendant HFN breached its fiduciary duty of care to Plaintiff Miller by not investing resources into maintaining a marketing web site with a minimum level of proficiency to provide confidence in HFN by prospective customers. This breach includes failing to provide key

functionality that is expected by prospective customers on any web site, as well as removing inappropriate materials not relevant to the business of HFN. This breach was compounded by the fact that the money that should have funded this maintenance was not available as the result of at least the activities described in Counts 1, 5, 9, 10, and 14.

386.     As an actual and proximate result of Defendant HFN's breach of its fiduciary duty of care, Plaintiff Miller has suffered damages of at least $24,950.40 as a result of the lack of maintenance of the web site causing HFN to lose contacts by prospective customers. The damages would not have occurred if Defendant HFN had not breached its fiduciary duty of care, and had provided the required minimum maintenance of the HFN web site.

387.     Plaintiff Miller is entitled to punitive damages as a result of Defendant HFN's conduct. Specifically, Defendant HFN was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of its responsibilities in avoiding fraudulent activity.

388.     Defendant Santhanam, as a majority shareholder and Director of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care.

389.     Defendant Santhanam, as the CEO of HFN, breached his fiduciary duty of care to Plaintiff Miller by not investing resources into maintaining a marketing web site with a minimum level of proficiency to provide confidence in HFN by prospective customers. This breach includes failing to provide key functionality that is expected by prospective customers on any web site, as well as removing inappropriate materials not relevant to the business of HFN. This breach was compounded by the fact that the money that should have funded this maintenance was not available as the result of at least the activities described in Counts 1, 5, 9, 10, and 14.

390.     As an actual and proximate result of Defendant Santhanam's breach of his fiduciary duty of care, Plaintiff Miller has suffered damages of at least $24,950.40 as a result of the lack of maintenance of the web site causing HFN to lose contacts by prospective customers. The damages

would not have occurred if Defendant Santhanam had not breached his fiduciary duty of care, and had provided the required minimum maintenance of the HFN web site.

391.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Santhanam's conduct. Specifically, Defendant Santhanam was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

### Count 18: Fraudulent Misrepresentation of ESOP

392.    Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

393.    Defendant HFN made a false statement by falsely representing that the pool of 2,616,500 shares allocated but not issued in 2015 was an ESOP that would be used to attract talent to HFN, while in fact the pool of shares was never intended to be used as an ESOP but was instead intended for use for direct grants to non-employees and self-dealing with company insiders.

394.    Defendant HFN made the representation knowing that it was false, as evidenced by the fact that none of the shares have ever gone to non-management employees in the form of options, and numerous direct grants have gone to non-employees and to Defendant Santhanam, who is the highest paid employee in the company.

395.    Defendant HFN intended that Plaintiff Miller would rely on the statement, by describing the pool as an ESOP on capitalization tables of HFN.

396.    Plaintiff Miller reasonably relied on the statement, by using the capitalization tables provided by HFN.

397.    Plaintiff Miller suffered damages of at least $115,953.11 as a result of relying on the statement, by the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose.

398.    Plaintiff Miller had a possessory interest in the HFN shares that were either granted outright from the pool and the options that were failed to be granted, by virtue of being a minority

shareholder in HFN. Even if HFN claims to have lawfully been in possession of the shares, HFN exceeded its scope of authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control.

399.   Defendant HFN intentionally interfered with Plaintiff Miller's possession by fraudulently accounting for the shares as an ESOP but never actually using them as an ESOP.

400.   Defendant HFN's acts are the legal cause of Plaintiff Miller's loss of the revenues.

401.   Plaintiff Miller is entitled to punitive damages as a result of Defendant HFN's conduct. Specifically, Defendant HFN has consistently acted with impunity and lack of regard to interests of Miller despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

402.   Defendant Santhanam made a false statement by falsely representing that the pool of 2,616,500 shares allocated but not issued in 2015 was an ESOP that would be used to attract talent to HFN, while in fact the pool of shares was never intended to be used as an ESOP but was instead intended for use for direct grants to non-employees and self-dealing with company insiders.

403.   Defendant Santhanam made the representation knowing that it was false, as evidenced by the fact that none of the shares have ever gone to non-management employees in the form of options, and numerous direct grants have gone to non-employees and to Defendant Santhanam himself, who is the highest paid employee in the company.

404.   Defendant Santhanam intended that Plaintiff Miller would rely on the statement, by describing the pool as an ESOP on capitalization tables of HFN.

405.   Plaintiff Miller reasonably relied on the statement, by using the capitalization tables provided by HFN.

406.   Plaintiff Miller suffered damages of at least $115,953.11 as a result of relying on the statement, by the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose.

407.    Plaintiff Miller had a possessory interest in the HFN shares that were either granted outright from the pool and the options that were failed to be granted, by virtue of being a minority shareholder in HFN. Even if HFN claims to have lawfully been in possession of the shares, HFN exceeded its scope of authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control.

408.    Defendant Santhanam intentionally interfered with Plaintiff Miller's possession by fraudulently accounting for the shares as an ESOP but never actually using them as an ESOP.

409.    Defendant Santhanam's acts are the legal cause of Plaintiff Miller's loss of the revenues.

410.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Santhanam's conduct. Specifically, Defendant Santhanam was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

411.    Defendant Shiralagi made a false statement by falsely representing that the pool of 2,616,500 shares allocated but not issued in 2015 was an ESOP that would be used to attract talent to HFN, while in fact the pool of shares was never intended to be used as an ESOP but was instead intended for use for direct grants to non-employees and self-dealing with company insiders.

412.    Defendant Shiralagi made the representation knowing that it was false, as evidenced by the fact that none of the shares have ever gone to non-management employees in the form of options, and numerous direct grants have gone to non-employees and to Defendant Santhanam, who is the highest paid employee in the company.

413.    Defendant Shiralagi intended that Plaintiff Miller would rely on the statement, by describing the pool as an ESOP on capitalization tables of HFN.

414.    Plaintiff Miller reasonably relied on the statement, by using the capitalization tables provided by HFN.

415.    Plaintiff Miller suffered damages of at least $115,953.11 as a result of relying on the statement, by the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose.

416.    Plaintiff Miller had a possessory interest in the HFN shares that were either granted outright from the pool and the options that were failed to be granted, by virtue of being a minority shareholder in HFN. Even if HFN claims to have lawfully been in possession of the shares, HFN exceeded its scope of authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control.

417.    Defendant Shiralagi intentionally interfered with Plaintiff Miller's possession by fraudulently accounting for the shares as an ESOP but never actually using them as an ESOP.

418.    Defendant Shiralagi's acts are the legal cause of Plaintiff Miller's loss of the revenues.

419.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Shiralagi's conduct. Specifically, Defendant Shiralagi was previously involved the investment in HFN that led to litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

420.    Defendant Vaish made a false statement by falsely representing that the pool of 2,616,500 shares allocated but not issued in 2015 was an ESOP that would be used to attract talent to HFN, while in fact the pool of shares was never intended to be used as an ESOP but was instead intended for use for direct grants to non-employees and self-dealing with company insiders.

421.    Defendant Vaish made the representation knowing that it was false, as evidenced by the fact that none of the shares have ever gone to non-management employees in the form of options, and numerous direct grants have gone to non-employees, including Defendant Vaish himself, and to Defendant Santhanam, who is the highest paid employee in the company.

422.    Defendant Vaish intended that Plaintiff Miller would rely on the statement, by describing the pool as an ESOP on capitalization tables of HFN.

Amended Complaint with Jury Demand                Case No. 2:23-cv-00733-CMR

423.    Plaintiff Miller reasonably relied on the statement, by using the capitalization tables provided by HFN.

424.    Plaintiff Miller suffered damages of at least $115,953.11 as a result of relying on the statement, by the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose.

425.    Plaintiff Miller had a possessory interest in the HFN shares that were either granted outright from the pool and the options that were failed to be granted, by virtue of being a minority shareholder in HFN. Even if HFN claims to have lawfully been in possession of the shares, HFN exceeded its scope of authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control.

426.    Defendant Vaish intentionally interfered with Plaintiff Miller's possession by fraudulently accounting for the shares as an ESOP but never actually using them as an ESOP.

427.    Defendant Vaish's acts are the legal cause of Plaintiff Miller's loss of the revenues.

428.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Vaish's conduct. Specifically, Defendant Vaish was a Director when HFN was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

429.    Defendant Kalaari made a false statement by falsely representing that the pool of 2,616,500 shares allocated but not issued in 2015 was an ESOP that would be used to attract talent to HFN, while in fact the pool of shares was never intended to be used as an ESOP but was instead intended for use for direct grants to non-employees and self-dealing with company insiders.

430.    Defendant Kalaari made the representation knowing that it was false, as evidenced by the fact that none of the shares have ever gone to non-management employees in the form of options, and numerous direct grants have gone to non-employees, and to Defendant Santhanam, who is the highest paid employee in the company.

431.    Defendant Kalaari intended that Plaintiff Miller would rely on the statement, by describing the pool as an ESOP on capitalization tables of HFN.

432.    Plaintiff Miller reasonably relied on the statement, by using the capitalization tables provided by HFN.

433.    Plaintiff Miller suffered damages of at least $115,953.11 as a result of relying on the statement, by the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose.

434.    Plaintiff Miller had a possessory interest in the HFN shares that were either granted outright from the pool and the options that were failed to be granted, by virtue of being a minority shareholder in HFN. Even if HFN claims to have lawfully been in possession of the shares, HFN exceeded its scope of authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control.

435.    Defendant Kalaari intentionally interfered with Plaintiff Miller's possession by fraudulently accounting for the shares as an ESOP but never actually using them as an ESOP.

436.    Defendant Kalaari's acts are the legal cause of Plaintiff Miller's loss of the revenues.

437.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Kalaari's conduct. Specifically, Defendant Kalaari led a previous investment in HFN that resulted in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of its responsibilities in monitoring fraudulent activity connected to HFN.

438.    Defendant Kola made a false statement by falsely representing that the pool of 2,616,500 shares allocated but not issued in 2015 was an ESOP that would be used to attract talent to HFN, while in fact the pool of shares was never intended to be used as an ESOP but was instead intended for use for direct grants to non-employees and self-dealing with company insiders.

439.    Defendant Kola made the representation knowing that it was false, as evidenced by the fact that none of the shares have ever gone to non-management employees in the form of

options, and numerous direct grants have gone to non-employees, and to Defendant Santhanam, who is the highest paid employee in the company.

440.    Defendant Kola intended that Plaintiff Miller would rely on the statement, by describing the pool as an ESOP on capitalization tables of HFN.

441.    Plaintiff Miller reasonably relied on the statement, by using the capitalization tables provided by HFN.

442.    Plaintiff Miller suffered damages of at least $115,953.11 as a result of relying on the statement, by the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose.

443.    Plaintiff Miller had a possessory interest in the HFN shares that were either granted outright from the pool and the options that were failed to be granted, by virtue of being a minority shareholder in HFN. Even if HFN claims to have lawfully been in possession of the shares, HFN exceeded its scope of authority for that possession by removing and therefore seriously violating Plaintiff Miller's right of control.

444.    Defendant Kola intentionally interfered with Plaintiff Miller's possession by fraudulently accounting for the shares as an ESOP but never actually using them as an ESOP.

445.    Defendant Kola's acts are the legal cause of Plaintiff Miller's loss of the revenues.

446.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Kola's conduct. Specifically, Defendant Kola led a previous investment in HFN that resulted in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of her responsibilities in monitoring fraudulent activity of HFN and Santhanam.

### Count 19: Breach of Fiduciary Duty in Misuse of ESOP

447.    Plaintiff Miller hereby incorporates the preceding paragraphs as if fully set forth herein.

448.    Defendant HFN owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

449.    Defendant HFN breached its fiduciary duty of care to Plaintiff Miller by not managing HFN's ESOP to maximize its benefit in attracting talent to HFN, but instead using it for outright grants for non-employees and insider self-dealing.

450.    As an actual and proximate result of Defendant HFN's breach of its fiduciary duty of care, Plaintiff Miller has suffered damages of at least $115,953.11 as a result of the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose. The damages would not have occurred if Defendant HFN had used the ESOP for its intended purpose.

451.    Defendant HFN breached its fiduciary duty of disclosure to Plaintiff Miller by not disclosing that the ESOP was not being used for incentive options, but was instead being used for outright grants to non-employees and self-dealing for insiders.

452.    As an actual and proximate result of Defendant HFN's breach of its fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $115,953.11 as a result of the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose. The damages would not have occurred if Defendant HFN had disclosed the true use of the ESOP and had given Plaintiff Miller the opportunity to demand correction of the misuse.

453.    Plaintiff Miller is entitled to punitive damages as a result of Defendant HFN's conduct. Specifically, Defendant HFN was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of its responsibilities in avoiding fraudulent activity.

454.    Defendant Santhanam, as a majority shareholder and Director of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

455.     Defendant Santhanam breached his fiduciary duty of care to Plaintiff Miller by not managing HFN's ESOP to maximize its benefit in attracting talent to HFN, but instead using it for outright grants for non-employees and insider self-dealing. In fact, Santhanam was a recipient of shares from the ESOP pool in one of the insider self-deals.

456.     As an actual and proximate result of Defendant Santhanam's breach of his fiduciary duty of care, Plaintiff Miller has suffered damages of at least $115,953.11 as a result of the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose. The damages would not have occurred if Defendant Santhanam had used the ESOP for its intended purpose.

457.     Defendant Santhanam breached his fiduciary duty of disclosure to Plaintiff Miller by not disclosing that the ESOP was not being used for incentive options, but was instead being used for outright grants to non-employees and self-dealing for insiders.

458.     As an actual and proximate result of Defendant Santhanam's breach of his fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $115,953.11 as a result of the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose. The damages would not have occurred if Defendant Santhanam had disclosed the true use of the ESOP and had given Plaintiff Miller the opportunity to demand correction of the misuse.

459.     Plaintiff Miller is entitled to punitive damages as a result of Defendant Santhanam's conduct. Specifically, Defendant Santhanam was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

460.     Defendant Shiralagi, as a Director of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

461.     As an HFN Director, Defendant Shiralagi had the responsibility of reviewing and managing the share allocation of HFN. Defendant Shiralagi breached his fiduciary duty of care to

Plaintiff Miller by not managing HFN's ESOP to maximize its benefit in attracting talent to HFN, but instead using it for outright grants for non-employees and insider self-dealing.

462.    As an actual and proximate result of Defendant Shiralagi's breach of his fiduciary duty of care, Plaintiff Miller has suffered damages of at least $115,953.11 as a result of the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose. The damages would not have occurred if Defendant Shiralagi had directed HFN to use the ESOP for its intended purpose.

463.    Defendant Shiralagi breached his fiduciary duty of disclosure to Plaintiff Miller by not disclosing that the ESOP was not being used for incentive options, but was instead being used for outright grants to non-employees and self-dealing for insiders.

464.    As an actual and proximate result of Defendant Shiralagi's breach of his fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $115,953.11 as a result of the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose. The damages would not have occurred if Defendant Shiralagi had disclosed the true use of the ESOP and had given Plaintiff Miller the opportunity to demand correction of the misuse.

465.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Shiralagi's conduct. Specifically, Defendant Shiralagi was previously involved the investment in HFN that led to litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

466.    Defendant Vaish, as a Director of HFN, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

467.    As an HFN Director, Defendant Vaish had the responsibility of reviewing and managing the share allocation of HFN. Defendant Vaish breached his fiduciary duty of care to Plaintiff Miller by not managing HFN's ESOP to maximize its benefit in attracting talent to HFN,

but instead using it for outright grants for non-employees and insider self-dealing. In fact, Vaish was a recipient of shares from the ESOP pool in one of the insider self-deals.

468.    As an actual and proximate result of Defendant Vaish's breach of his fiduciary duty of care, Plaintiff Miller has suffered damages of at least $115,953.11 as a result of the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose. The damages would not have occurred if Defendant Vaish had directed HFN to use the ESOP for its intended purpose.

469.    Defendant Vaish breached his fiduciary duty of disclosure to Plaintiff Miller by not disclosing that the ESOP was not being used for incentive options, but was instead being used for outright grants to non-employees and self-dealing for insiders.

470.    As an actual and proximate result of Defendant Vaish's breach of his fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $115,953.11 as a result of the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose. The damages would not have occurred if Defendant Vaish had disclosed the true use of the ESOP and had given Plaintiff Miller the opportunity to demand correction of the misuse.

471.    Plaintiff Miller is entitled to punitive damages as a result of Defendant Vaish's conduct. Specifically, Defendant Vaish was a Director when HFN was previously involved in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of his responsibilities in avoiding fraudulent activity.

472.    Defendant Kalaari, as a majority shareholder of HFN with Board seats, owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure.

473.    Defendant Kalaari breached its fiduciary duty of care to Plaintiff Miller by not managing HFN's ESOP to maximize its benefit in attracting talent to HFN, but instead using it for outright grants for non-employees and insider self-dealing.

474.     As an actual and proximate result of Defendant Kalaari's breach of its fiduciary duty of care, Plaintiff Miller has suffered damages of at least $115,953.11 as a result of the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose. The damages would not have occurred if Defendant Kalaari had directed HFN to use the ESOP for its intended purpose.

475.     Defendant Kalaari breached its fiduciary duty of disclosure to Plaintiff Miller by not disclosing that the ESOP was not being used for incentive options, but was instead being used for outright grants to non-employees and self-dealing for insiders.

476.     As an actual and proximate result of Defendant Kalaari's breach of its fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $115,953.11 as a result of the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose. The damages would not have occurred if Defendant Kalaari had disclosed the true use of the ESOP and had given Plaintiff Miller the opportunity to demand correction of the misuse.

477.     Plaintiff Miller is entitled to punitive damages as a result of Defendant Kalaari's conduct. Specifically, Defendant Kalaari led a previous investment in HFN that resulted in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of its responsibilities in monitoring fraudulent activity connected to HFN.

478.     As the founder and managing director of Kalaari, Defendant Kola acted as a majority shareholder of HFN and owed Plaintiff Miller, as a minority shareholder of HFN, at least the fiduciary duty of care and fiduciary duty of disclosure. Kola had the ultimate responsibility of being aware of the activities of Kalaari's portfolio companies. HFN is a portfolio company, and Kalaari had Board seats on HFN as well as being a majority shareholder, and a stated policy of actively monitoring and participating in portfolio companies.

479. Defendant Kola had the responsibility of reviewing and managing the share allocation of HFN. Defendant Kola breached her fiduciary duty of care to Plaintiff Miller by not managing HFN's ESOP to maximize its benefit in attracting talent to HFN, but instead using it for outright grants for non-employees and insider self-dealing.

480. As an actual and proximate result of Defendant Kola's breach of her fiduciary duty of care, Plaintiff Miller has suffered damages of at least $115,953.11 as a result of the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose. The damages would not have occurred if Defendant Kola had directed HFN to use the ESOP for its intended purpose.

481. Defendant Kola breached her fiduciary duty of disclosure to Plaintiff Miller by not disclosing that the ESOP was not being used for incentive options, but was instead being used for outright grants to non-employees and self-dealing for insiders.

482. As an actual and proximate result of Defendant Kola's breach of her fiduciary duty of disclosure, Plaintiff Miller has suffered damages of at least $115,953.11 as a result of the loss of asset value given out in self-dealing, and by the loss of the value of the options taken out of the pool instead of being used for their intended purpose. The damages would not have occurred if Defendant Kola had disclosed the true use of the ESOP and had given Plaintiff Miller the opportunity to demand correction of the misuse.

483. Plaintiff Miller is entitled to punitive damages as a result of Defendant Kola's conduct. Specifically, Defendant Kola led a previous investment in HFN that resulted in litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior, and had a heightened awareness of her responsibilities in monitoring fraudulent activity of HFN and Santhanam.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Miller respectfully requests that this Court enter judgment in his favor and grant the following relief:

1. Compensatory damages in an amount and manner to be determined according to proof at trial;

2. Statutory damages;

3. Punitive damages in an amount to be determined by the Court according to proof;

4. An award of post-judgment interest for the maximum amount allowed by law;

5. A judgment that Defendants' lack of compliance with the Company's governing corporate documents and applicable corporate law has caused irreparable harm to the Plaintiff;

6. A judgment that Kumar Shiralagi had and continues to have a fiduciary duty to the Plaintiff at all relevant times;

7. A judgment that Pavan Vaish had and continues to have a fiduciary duty to the Plaintiff at all relevant times;

8. A judgment that Kalaari Capital had and continues to have a fiduciary duty to the Plaintiff at all relevant times;

9. A judgment that Vani Kola had and continues to have a fiduciary duty to the Plaintiff at all relevant times;

10. Injunctive relief in the form of an order for HFN, Inc. to provide requested documents and evidence without limitation to the Plaintiff to identify all Defendants and the scope of the damages;

11. Temporary injunctive relief in the form of an order to prevent further investment activity or non-operational disbursement of funds by HFN, Inc. until the relief for this action is complete;

12. An award of costs;

13. An award of attorneys fees' to the extent allowed by law; and

14. Any and all other relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

The Plaintiff hereby demands a trial by jury.


Date: _____October 31, 2023_____      Signature: _____/s/ Allan A. Miller_____

                                             Printed name: _____Allan A. Miller_____

# EXHIBIT 1

**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Matthew H. Ladner (SBN 284594)
350 S. Grand Ave., Suite 3400
Los Angeles, CA 90071
Telephone: (213) 928-9816
E-mail: Matthew.Ladner@troutman.com

Attorneys for Defendant
HFN, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLAN MILLER,<br><br>      Plaintiff,<br><br> vs.<br><br>HFN, INC., a Delaware Corporation, d/b/a as NANOHEAL BY HFN INC.; KALAARI CAPITAL ADVISORS PRIVATE LIMITED, an Indian Company; SRIDHAR SANTHANAM; KUMAR SHIRALAGI; PAVAN VAISH; and VANI KOLA,<br><br>      Defendants. | Case No. 23-CV-0533-VC<br><br>**DECLARATION OF SRIDHAR SANTHANAM IN SUPPORT OF DEFENDANT HFN, INC.'S MOTION TO DISMISS FOR: (1) LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE, OR, IN THE ALTERNATIVE, FOR (2) FAILURE TO STATE A CLAIM, LACK OF SUBJECT MATTER JURISDICTION, AND LACK OF STANDING**<br><br>[Filed concurrently with Notice of Motion and Motion]<br><br>**DATE:** APRIL 20, 2023<br>**TIME:** 10:00 A.M.<br>**COURTROOM:** 4<br>**FLOOR:** 17TH |

## DECLARATION OF SRIDHAR SANTHANAM

I, Sridhar Santhanam, declare as follows:

1.      I am the Chairman of the Board of Directors of HFN, Inc. ("**HFN**"), and I have served in that position since 2012.  I offer this Declaration in support of HFN's Motion to Dismiss for: (1) Lack of Personal Jurisdiction and Improper Venue, or, in the Alternative, for (2) Failure to State a Claim, Lack of Subject Matter Jurisdiction, and Lack of Standing.

2.      Based on my position and tenure as the Chairman of the Board of HFN, I am personally familiar with HFN's business operations and activities, locations, property, management, financial information, and business relationships with customers and other third-parties. Accordingly, I have personal knowledge of all matters stated in this Declaration.  In addition, I am personally familiar with, have access to, and have reviewed business records of HFN regarding the matters stated in this Declaration.  Those business records: (i) were made in the regular course of business at HFN; (ii) were kept in the course of HFN's regularly conducted business, as part of HFN's regular business practices; and (iii) were made at or near the time of the act, transaction, occurrence, or event referred to herein by someone with knowledge, or from information transmitted by someone with knowledge.

3.      If called and sworn as a witness, I could and would competently testify to the matters stated in this Declaration.

4.      HFN is a software and technology support company which conducts business under the DBAs Nanoheal and Bask Technology.

5.      HFN is incorporated in Delaware and its principal place of business is Utah, where HFN maintains its corporate headquarters and nearly all operational employees. HFN's management team principally resides and works in India.

6.      HFN is not incorporated in California or currently registered or certified to conduct intrastate business in California.  HFN has not been registered or certified to conduct intrastate business in California since April 2018, when its standing with the California Secretary of State was forfeited.

146273698v2

7.     HFN does not currently own, lease, sublease, or occupy any real property in California, nor does HFN maintain any office, post office box, mailing address, telephone listing, or other physical address in California.  In December 2014, HFN subleased a small office space in San Jose from another company because, at the time, HFN was engaged in discussions with a potential customer in California.  However, HFN vacated its San Jose office in December 2015 when it relocated to Utah, and HFN subsequently sub-subleased the San Jose office to a third-party named IDM Cloud until July 2016, when HFN's sublease expired.

8.     HFN has never held Board meetings or conducted other corporate management activities in California, and no HFN Board member, officer, or director resides or works in California.  In particular, HFN does not make decisions in California regarding the granting of equity to its officers, directors, or employees.

9.     In 2015, HFN opened a checking account and savings account at the San Jose branch of Wells Fargo (the "**WF Accounts**").  After relocating to Utah, HFN started to principally use a Utah-based bank for all of its corporate banking needs, activities, and transactions.  Since March 2020, HFN has maintained less than $20,000 in total funds across the WF Accounts, and other than the WF Accounts, HFN does not own any property or assets of any kind in California.

10.    Because HFN offers software products and services to customers around the world, certain HFN customers may reside in California.  HFN's relationships with customers in California represent a small fraction of HFN's business worldwide, and California accounts for less than 10 percent of HFN's total revenue.

11.    HFN does not directly or indirectly own any subsidiary or other entity that is incorporated in California or that maintains a principal place of business in California.

12.    I have reviewed the Complaint filed by Plaintiff Allan Miller in the above-captioned action.  The Complaint makes reference to a certain alleged strategic partnership between HFN and a Dubai-based company named the Seed Group ("**Seed**").  HFN's decision to enter into a strategic partnership was not made in California; the partnership with Seed was not negotiated in California;

and the partnership will not be implemented in California – rather, the focus of the partnership is the potential expansion of HFN's business internationally in the Middle East.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 3, 2023 at Bengaluru, India.

_____

Sridhar Santhanam

DECLARATION OF SRIDHAR SANTHANAM
CASE NO. 23-CV-0533-VC

# EXHIBIT 2

EXHIBIT G

ANTICIPATED POST CLOSING CAP TABLE

|  | Name of Parties | No. of Shares in the Company (Common or Preferred) | Percentage Shareholding (%) |
|---|---|---|---|
| 1 | Sridhar Santhanam | 6,560,000 Common | 39.3616 % |
| 2 | Alessandro Donnini | 823,500 Common | 4.9412 % |
| 3 | Allan Miller | 1976 Common | 0.0119 % |
| 4 | Max Kupchik | 151 Common | 0.0009 % |
| 5 | William Harding | 27 Common | 0.0002 % |
| 6 | Dennis Callagy | 83 Common | 0.0005 % |
| 7 | State Street Bank | 81 Common | 0.0005 % |
| 8 | Richard Gabriel | 59 Common | 0.0004 % |
| 9 | Scott Noone | 50 Common | 0.0003 % |
| 10 | Gene Robinson | 36 Common | 0.0002 % |
| 11 | John Murgo | 36 Common | 0.0002 % |
| 12 | Victoria Silioutina | 21 Common | 0.0001 % |
| 13 | Eric Brown | 19 Common | 0.0001 % |
| 14 | Yongyue (Cora) Sun | 15 Common | 0.0001 % |
| 15 | Geoff Meek | 3 Common | 0.0000 % |
| 16 | ESOP | 2,61,6500 Common | 15.6996 % |
| 17 | IndoUS Venture Partners II, LLC | 6,666,000 Preferred | 40% |
|  | Total | 1,66,66,000 | 100% |

# EXHIBIT 3

| Name | 2012 shares | Settlement | Adjusted |
|---|---|---|---|
| Settlement | | 307,155 | |
| | | | |
| Allan Miller | 10,000 | 228,080 | 230,247 |
| Max Kupchik | 764 | 17,425 | 17,425 |
| William Harding | 741 | 16,901 | 16,901 |
| Dennis Callagy | 421 | 9,602 | 9,602 |
| State Street Bank | 410 | 9,351 | 9,351 |
| Richard Gabriel | 300 | 6,842 | 6,842 |
| Scott Noone | 252 | 5,748 | 5,748 |
| Gene Robinson | 180 | 4,105 | 4,105 |
| John Murgo | 180 | 4,105 | 4,105 |
| Victoria Silioutina | 108 | 2,463 | 2,463 |
| Eric Brown | 95 | 2,167 | 0 |
| Geoff Meek | 16 | 365 | 365 |
| | | | |
| Total | 13,467 | 307,155 | 307,155 |
| | | | |
| | | | |
| | | | |
| Santhanam | 6,560,000 | | |
| Donnini | 823,500 | | |
| Kalaari | 6,666,000 | | |
| Half of options | 1,308,250 | Options: | 2,616,500 |
| Total | 15,357,750 | | |
| 2% of total | 307,155 | | |

# EXHIBIT 4

| HFN Inc Cap table (December, 2019) | | |
|---|---|---|
| Name | Shares | % |
| Alessandro Donnini | 823,500 | 4.94% |
| Allan Miller | 230,247 | 1.38% |
| Dennis Callagy | 9,602 | 0.06% |
| Gene Robinson | 4,105 | 0.02% |
| Geoffry Meek | 365 | 0.00% |
| Victoria Dudin Silioutina | 2,463 | 0.01% |
| John Murgo | 4,105 | 0.02% |
| Kalaari Capital Partners II, LLC | 6,666,000 | 40.00% |
| Max Kupchik | 17,425 | 0.10% |
| Richard Gabriel | 6,842 | 0.04% |
| Scott Noone | 5,748 | 0.03% |
| Sridhar Santhanam | 6,252,846 | 37.52% |
| State Street Bank & Trust Comp | 9,351 | 0.06% |
| William Harding | 16,901 | 0.10% |
| | | |
| **Equity Awards** | | |
| Ganesh Krishnan | 200,000 | 1.20% |
| Pavan Vaish | 250,000 | 1.50% |
| | | |
| **Stock Option** | | |
| Stock Option Plan | 2,166,500 | 13.00% |
| | | |
| **Total** | **16,666,000** | **100.00%** |

# EXHIBIT 5

**HFN Inc. Cap table June 2021**

| Name | Shares | % |
|---|---|---|
| Alessandro Donnini | 823,500 | 4.94% |
| Allan Miller | 230,247 | 1.38% |
| Dennis Callagy | 9,602 | 0.06% |
| Gene Robinson | 4,105 | 0.02% |
| Geoffry Meek | 365 | 0.00% |
| Victoria Dudin Silioutina | 2,463 | 0.01% |
| John Murgo | 4,105 | 0.02% |
| Kalaari Capital Partners II, LLC | 6,666,000 | 40.00% |
| Max Kupchik | 17,425 | 0.10% |
| Richard Gabriel | 6,842 | 0.04% |
| Scott Noone | 5,748 | 0.03% |
| Sridhar Santhanam | 6,560,000 | 39.36% |
| State Street Bank & Trust Comp | 9,351 | 0.06% |
| William Harding | 16,901 | 0.10% |
| | | |
| **Equity Awards** | | |
| Ganesh Krishnan | 200,000 | 1.20% |
| Pavan Vaish | 250,000 | 1.50% |
| | | |
| **Stock Option** | | |
| Stock Option Plan | 1,859,346 | 11.16% |
| | | |
| **Total** | **16,666,000** | **100.00%** |

# EXHIBIT 6



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Assignment abstract of title for Application 09568390

| Invention title/Inventor | Patent | Publication | Application | PCT | International registration |
|---|---|---|---|---|---|
| SYSTEM FOR AUTOMATED PROBLEM DETECTION, DIAGNOSIS, AND RESOLUTION IN A SOFTWARE DRIVEN SYSTEM<br>Allan A. Miller | 6742141<br>May 25, 2004 | | 09568390<br>May 10, 2000 | | |

# Assignments (5 of 5 total)

## Assignment 5

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 050630/0166 | Sep 30, 2019 | Oct 03, 2019 | 2 | 5 |

**Conveyance**
RELEASE OF SECURITY INTEREST RECORDED AT REEL/FRAME 35987/0308

**Assignors**
SUNTRUST BANK

**Correspondent**
ROB SONESON
300 N LASALLE
KIRKLAND & ELLIS LLP
CHICAGO, IL 60654

**Assignee**
HFN, LLC
TWO CONCOURSE PARKWAY
SUITE 300
ATLANTA, GEORGIA 30328

## Assignment 4

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 050568/0192 | Sep 30, 2019 | Sep 30, 2019 | 4 | 8 |

**Conveyance**
SECURITY INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**
ZELIS PAYMENTS, LLC
RED-CARD PAYMENT SYSTEMS, LLC
HFN, LLC

**Correspondent**
STEWART WALSH
1025 VERMONT AVE NW, STE 1130
COGENCY GLOBAL INC.
WASHINGTON, DC 20005

**Assignee**
MORGAN STANLEY SENIOR FUNDING, INC., AS
COLLATERAL AGENT
1300 THAMES STREET, 4TH FLOOR, THAMES
STREET WHARF
BALTIMORE, MARYLAND 21231

## Assignment 3

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 050570/0413 | Jun 25, 2015 | Sep 30, 2019 | 2 | 8 |

**Conveyance**
MERGER AND CHANGE OF NAME (SEE DOCUMENT FOR DETAILS).

**Assignors**
HFN, INC.
HFN ILLINOIS, LLC

**Correspondent**
ROB SONESON
300 N LASALLE
KIRKLAND & ELLIS LLP
CHICAGO, IL 60654

**Assignee**
HFN, LLC
TWO CONCOURSE PARKWAY
SUITE 300
ATLANTA, GEORGIA 30328

## Assignment 2

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 027872/0244 | Mar 15, 2012 | Mar 15, 2012 | 2 | 3 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**
HANDSFREE NETWORKS, INC.

**Correspondent**
DAVID J. THIBODEAU, JR.
530 VIRGINIA ROAD, P.O. BOX 9133
HAMILTON, BROOK, SMITH &
REYNOLDS, P.C.
CONCORD, MA 01742-9133

**Assignee**
HFN, INC.
90 WASHINGTON STREET
NEWTON, MASSACHUSETTS 02458-2220

## Assignment 1

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 011153/0159 | Sep 25, 2000 | Oct 03, 2000 | 1 | 3 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**
MILLER, ALLAN A.

**Correspondent**
HAMILTON, BROOK, SMITH &
REYNOLDS, P.C.
DAVID J. THIBODEAU, JR.
TWO MILITIA DRIVE
LEXINGTON, MA 02421-4799

**Assignee**
HANDSFREE NETWORKS, INC.

90 WASHINGTON STREET
NEWTON, MASSACHUSETTS 02458

# PATENT ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

EPAS ID: PAT5745991

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | SECURITY INTEREST |

**CONVEYING PARTY DATA**

| Name | Execution Date |
|---|---|
| ZELIS PAYMENTS, LLC | 09/30/2019 |
| RED-CARD PAYMENT SYSTEMS, LLC | 09/30/2019 |
| HFN, LLC | 09/30/2019 |

**RECEIVING PARTY DATA**

| Name: | MORGAN STANLEY SENIOR FUNDING, INC., AS COLLATERAL AGENT |
|---|---|
| Street Address: | 1300 THAMES STREET, 4TH FLOOR, THAMES STREET WHARF |
| City: | BALTIMORE |
| State/Country: | MARYLAND |
| Postal Code: | 21231 |

**PROPERTY NUMBERS Total: 4**

| Property Type | Number |
|---|---|
| Patent Number: | 6742141 |
| Patent Number: | 7100085 |
| Application Number: | 10851690 |
| Application Number: | 14561173 |

**CORRESPONDENCE DATA**

**Fax Number:**

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

| Phone: | 800-494-5225 |
|---|---|
| Email: | ipteam@cogencyglobal.com |
| Correspondent Name: | STEWART WALSH |
| Address Line 1: | 1025 VERMONT AVE NW, STE 1130 |
| Address Line 2: | COGENCY GLOBAL INC. |
| Address Line 4: | WASHINGTON, D.C. 20005 |

| ATTORNEY DOCKET NUMBER: | 1135417 PAT |
|---|---|
| NAME OF SUBMITTER: | JONATHAN LARSON |
| SIGNATURE: | /Jonathan Larson/ |
| DATE SIGNED: | 09/30/2019 |

**Total Attachments: 6**

source=NY-#35658788-v1-EXECUTED_-_Patent_Security_Ageement#page4.tif
source=NY-#35658788-v1-EXECUTED_-_Patent_Security_Ageement#page5.tif
source=NY-#35658788-v1-EXECUTED_-_Patent_Security_Ageement#page6.tif
source=NY-#35658788-v1-EXECUTED_-_Patent_Security_Ageement#page7.tif
source=NY-#35658788-v1-EXECUTED_-_Patent_Security_Ageement#page8.tif
source=NY-#35658788-v1-EXECUTED_-_Patent_Security_Ageement#page9.tif

GRANT OF
SECURITY INTEREST IN PATENT

        This GRANT OF SECURITY INTEREST IN PATENT, dated as of September 30, 2019 (this "Agreement"), is made by HFN, LLC, an Illinois limited liability company, Zelis Payments, LLC, a Delaware limited liability company, and Red-Card Payment Systems, LLC, a Missouri limited liability company (each, a "Grantor" and collectively, the "Grantors"), in favor of Morgan Stanley Senior Funding, Inc., as the Collateral Agent for the benefit of the Secured Parties.

W I T N E S S E T H:

        WHEREAS, pursuant to the Credit Agreement, dated as of September 30, 2019 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified, replaced or refinanced from time to time, the "Credit Agreement"), among ZELIS PAYMENTS INTERMEDIATE II, INC., a Delaware corporation ("Holdings I"), ZELIS COST MANAGEMENT INTERMEDIATE II, INC., a Delaware corporation ("Holdings II"), ZELIS PAYMENTS BUYER, INC., a Delaware corporation ("Borrower I"), ZELIS COST MANAGEMENT BUYER, INC., a Delaware corporation (the "Borrower Representative", and, together with Co-Borrower I, the "Borrowers"), the Lenders from time to time party thereto, Morgan Stanley Senior Funding, Inc., as the Administrative Agent, the Collateral Agent, a Swingline Lender and a Lender, and the other parties from time to time party thereto, the Lenders and Letter of Credit Issuers have severally agreed to make their respective loans and extensions of credit to Holdings I, Holdings II, the Borrowers and the Subsidiaries upon the terms and subject to the conditions set forth therein;

        WHEREAS, in connection with the Credit Agreement, Holdings I, Holdings II, the Borrower and any Subsidiaries of the Borrowers that are or become a party thereto as Grantors, have executed and delivered the Security Agreement, dated as of September 30, 2019 in favor of the Collateral Agent (as amended, restated, amended and restated, supplemented or otherwise modified, replaced or refinanced from time to time, the "Security Agreement"), or a supplement thereto;

        WHEREAS, pursuant to the Security Agreement, each Grantor has granted to the Collateral Agent, for the benefit of the Secured Parties, a lien on and security interest in all of its right, title and interest in, to and under all Intellectual Property, including the Patents, that are not Excluded Property; and

        NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, and in order to induce the Lenders, the Swingline Lender and the Letter of Credit Issuers to make their respective Extensions of Credit to Holdings I, Holdings II, the Borrowers and the Restricted Subsidiaries, as applicable, and to induce one or more Cash Management Banks, Bank Product Providers or Hedge Banks to enter into Secured Cash Management Agreements, Secured Bank Product Agreements or Secured Hedge Agreements, respectively, with Holdings I, Holdings II, the Borrowers and/or the Restricted Subsidiaries, each Grantor hereby agrees with the Collateral Agent, for the benefit of the Secured Parties, as follows:

        1.     Definitions.  Unless otherwise defined herein, or the context otherwise requires, capitalized terms used in this Agreement, including its preamble and recitals, have the meanings given to them in the Security Agreement, or if not defined therein, in the Credit Agreement.

        2.     Grant of Security Interest.  Subject to the terms of the Security Agreement, the Grantor hereby grants to the Collateral Agent, for the benefit of the Secured Parties, a Lien on and security interest in all of its right, title and interest in, to and under the following property owned by such Grantor or in which such Grantor has any right title or interest (collectively, the "Patent Collateral"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise)of the Obligations, but excluding the Excluded Property.

**PATENT
REEL: 050568 FRAME: 0194**

(i) the Patents listed on Schedule A hereto, (ii) all reissues, reexaminations, continuations, divisions, continuations-in-part,  or extensions thereof, and the inventions, discoveries or designs disclosed or claimed therein, (iii) all rights, priorities and privileges related thereto, and (iv) all rights to sue at law or in equity for any infringement or other violation or impairment thereof,  including the right to receive all Proceeds therefrom.

3.      Purpose.  This Agreement has been executed and delivered by Grantor for the purpose of recording the grant of security interest herein with the United States Patent and Trademark Office.

4.      Termination or Release.  Upon the termination of the Security Agreement or release of a Grantor in accordance with Section 6.4 thereof, the Collateral Agent shall, at the expense of such Grantor, execute, acknowledge, and deliver to the Grantors an instrument in writing in recordable form releasing the Security Interest in the Patent Collateral of such Grantor under this First Lien Grant of Security Interest in Patents.

5.      Acknowledgment.  The Grantor does hereby further acknowledge and affirm that the rights and remedies of the Secured Parties with respect to the security interest in the Patent Collateral granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which (including the remedies provided for therein) are incorporated by reference herein as if fully set forth herein.  In the event of any conflict between the terms of this Agreement and the terms of the Security Agreement, the terms of the Security Agreement shall govern.

6.      Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic transmission), and all of said counterparts taken together shall be deemed to be originals and shall constitute one and the same instrument.

7.      Governing Law.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

[Signature pages follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers or representatives thereunto duly authorized as of the day and year first above written.

**GRANTORS:**

**HFN, LLC**
**ZELIS PAYMENTS, LLC**

By: _____
Name:  Douglas E. Klinger
Title:    Chief Executive Officer

**RED-CARD PAYMENT SYSTEMS, LLC**

By: _____
Name:  Eric J. Schaefer
Title:   President

[Grant of Security Interest in Patent]

**PATENT**
**REEL: 050568 FRAME: 0196**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers or representatives thereunto duly authorized as of the day and year first above written.

GRANTORS:

HFN, LLC
ZELIS PAYMENTS, LLC

By: _____
Name : Douglas E. Klinger
Title  : Chief Executive Officer

RED-CARD PAYMENT SYSTEMS, LLC

By: _____
Name:  Eric J. Schaefer
Title:   President

PATENT
REEL: 050568 FRAME: 0197

MORGAN STANLEY SENIOR FUNDING, INC.,
as the Collateral Agent

By:_____
Name:  Graham T. Robertson
Title: Authorized Signatory

[Grant of Security Interest in Patent]

## SCHEDULE A

### U.S. Patent Registrations and Applications

| Patent Title | Application Number | Filing Date | Registration Number | Issue Date | Owner of Record |
|---|---|---|---|---|---|
| System For Automated Problem Detection, Diagnosis, And Resolution In A Software Driven System | 09/568,390 | May 10, 2000 | 6,742,141 | May 25, 2004 | HFN, Inc. |
| System For Automated Problem Detection, Diagnosis, And Resolution In A Software Driven System | 10/851,690 | May 21, 2004 | 7,100,085 | August 29, 2006 | HFN, Inc. |
| Healthcare Transaction Facilitation Platform Apparatuses, Methods and Systems | 14/561,173 | December 4, 2014 | | | Zelis Payments, Inc. |
| Healthcare Provider Bill Validation and Payment | 16/019,816 | June 27, 2018 | | | Red-Card Payment Systems, LLC (Applicant) |

KE 64370720.2

<u>Certificate of Service</u>

I certify that Plaintiff Allan Miller:

1.  has registered for Email Filing and Electronic Notification pursuant to DUCivR 5-1(b)(1)(A);

2.  has verified that the above document meets the requirements outlined in DUCivR 5-1(b)(1)(A);

3.  has filed this document electronically through email to utdecf_clerk@utd.uscourts.gov; and

4.  has served all non-ECF parties by an acceptable means pursuant to DUCivR 5-1(b)(1)(A)(ii)(g).

Accordingly, the document will be served upon all ECF parties through the Court's ECF system.


Date: _____October 31, 2023_____     Signature: _____/s/ Allan A. Miller_____

Printed name: _____Allan A. Miller_____