# EXHIBIT 1

Allan Miller
3385 Claudia Drive
Concord, CA 94519
650-468-7387
(no fax number)
allan.miller@alumni.stanford.edu
Pro Se Plaintiff

FILED
FEB -6 2023
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

CV 23-0533 KAW

| | |
|---|---|
| ALLAN MILLER<br>Plaintiff,<br>vs.<br>HFN, INC., a Delaware Corporation, d/b/a as NANOHEAL BY HFN INC., KALAARI CAPITAL ADVISORS PRIVATE LIMITED, an Indian Company, SRIDHAR SANTHANAM, KUMAR SHIRALAGI, PAVAN VAISH, and VANI KOLA<br>Defendants. | Case Number:<br><br>**COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

"Plus ça change, plus c'est la même chose." *Jean-Baptiste Alphonse Karr, 1849.*

"We live and do not learn – or so the cynics say." *Beryl Markham, 1938.*

"Oops! … I did it again." *Britney Spears, 2000.*

1. This is an action brought pro se by Plaintiff Allan Miller, who is a minority shareholder of HFN, Inc. ("HFN"), against Defendants who have intentionally forsaken their fiduciary duty to him and the other minority shareholders of HFN. The Defendants, having already been forced to settle a fraud action brought by minority shareholders nine years ago, felt that they were now above the law and proceeded to use HFN resources for their own personal benefit. Coming out of the COVID era, the Plaintiff had not heard from HFN since the lawsuit, and simply requested a shareholder meeting and some updated information about the company. Instead, the Defendants, sensing that the party of unaccountability might be over, simply stonewalled and hoped that Miller would just go away. However, since the Plaintiff Miller is one of the original founders of the company, multiple anonymous informants within the company, who were all worried about what was going on, contacted Miller, and in a situation eerily similar to the 2014 litigation, provided the basis for this Complaint.

2. This is not a derivative suit. Plaintiff Miller is not seeking to recover on behalf of the corporation for injury done to the corporation by Defendants. Instead, the injury applies directly to the Plaintiff through his unlawful loss of access, value, and appreciation of HFN's resources, benefit that was unlawfully enjoyed by the Defendants. "A stockholder's derivative suit is brought to enforce a cause of action which the corporation itself possesses against some third party, a suit to recompense the corporation for injuries which it has suffered as a result of the acts of third parties . . . [t]he stockholder's individual suit, on the other hand, is a suit to enforce a right against the corporation which the stockholder possesses as an individual." (Fed. R. Civ. Proc., Advisory Committee Notes (1966) H.R. Doc. No. 391, 89th Cong., 2d Sess. 40.) The filing of this action does not preclude a future derivative action.

**PARTIES**

3. Plaintiff, Allan Miller ("Miller"), is a US citizen and individual residing in Concord, California. At all relevant times, Miller was a minority shareholder of Defendant HFN, Inc. and a founder of HandsFree Networks, the predecessor of HFN, Inc.

4. Defendant, HFN, Inc. ("HFN"), is a Delaware corporation with a principal place of business located in Orem, Utah.

5. Defendant, Kalaari Capital Advisors Private Limited ("Kalaari"), is an Indian Company with a principal place of business located in Bengaluru, Karnataka. At all relevant times, Kalaari held a Board seat at HFN and owed a fiduciary duty to Plaintiff Miller.

6. Defendant, Sridhar Santhanam ("Santhanam"), is an Indian citizen and individual. At all relevant times, Santhanam was the CEO and Chairman of the Board of HFN and owed a fiduciary duty to Plaintiff Miller.

7. Defendant, Kumar Shiralagi ("Shiralagi"), is an Indian citizen and individual. At all relevant times, Shiralagi was on the Board of Directors of HFN, as well as a Venture Partner at Kalaari, and owed a fiduciary duty to Plaintiff Miller.

8. Defendant, Pavan Vaish ("Vaish"), is an Indian citizen and individual. At all relevant times, Vaish was on the Board of Directors of HFN and owed a fiduciary duty to Plaintiff Miller.

9. Defendant, Vani Kola ("Kola") is an Indian citizen and individual. At all relevant times, Kola was the lead Managing Director at Kalaari, and owed a fiduciary duty to Plaintiff Miller.

## JURISDICTION AND VENUE

10. Jurisdiction in this Action arises under 28 U.S.C. § 1331, in that it alleges claims under Sections 10(b) and 20(a) of the Exchange Act of 1933, 15 U.S.C. § 78(j)(b) and 15 U.S.C. § 78(t)(a). Jurisdiction also arises under 28 U.S.C. § 1331 because Plaintiff Miller is a resident of California while the Defendants all reside outside the District.

11. Venue is appropriate in this District because the Defendants' actions caused harm to the Plaintiff within the District.

12. HFN is incorporated in the State of Delaware with branches in at least the State of Connecticut and the State of Utah. See Exhibit 1.

13. The Defendants have exchanged shares of HFN without reasonable compensation in a course of conduct which operated as a fraud and deceit upon the Plaintiff who owned HFN stock, in violation of 15 U.S.C. § 78(j)(b).

14. The Defendants have used their operational management and control of HFN to influence and control the exchange of shares of HFN without reasonable compensation in a course of conduct which operated as a fraud and deceit upon the Plaintiff who owned HFN stock, in violation of 15 U.S.C. § 78(t)(a).

15. The Defendants have breached their fiduciary duty to Plaintiff Miller by denying him the value and appreciation of the resources of HFN while instead using these resources for their own personal gain, in violation of Cal. Corp. Code § 309.

16. The Defendants have aided and abetted the breach of fiduciary duty to Plaintiff Miller by condoning and assisting in conduct that denied him the value and appreciation of the resources of HFN while instead using these resources for the personal gain of one or more Defendants, in violation of Cal. Corp. Code § 309.

17. In connection with the acts, transactions, and conduct alleged in this Complaint, the Defendants used the means and instrumentalities of interstate commerce, including United States mail, interstate telephone communications, internet communications, and federal roads.

18. The unlawful use of HFN travel funds described in paragraph 60 included travel at San Francisco International Airport in an unincorporated area of San Mateo County, California, where the Defendants utilized services and products and this Court has personal jurisdiction.

19. As late as May 2021, HFN owned a branch incorporated in San Jose, where this Court has personal jurisdiction, and was making filings relevant to that branch. See Exhibit 2. During relevant times, at least one of the Defendants visited the San Jose branch of HFN regularly and participated materially in the causes of action in this Complaint.

20. The HFN web site indicates that in December 2018, Bask, a division of the Defendant HFN Inc., announced a partnership with Malwarebytes in San Mateo, where this Court has personal jurisdiction. See Exhibit 3. The partnership between the Defendant and Malwarebytes was active during relevant times and contributed materially to the causes of action in this complaint. As late as 2020, Malwarebytes and HFN provided services to the San Francisco Symphony in San Francisco, where this Court has personal jurisdiction. See Exhibit 4.

21. As late as October 2020, HFN and Bask were providing software and services to GoDaddy, which has an office in Santa Clara where this Court has personal jurisdiction. See Exhibit 5. As described in paragraph 78, the partnership between HFN and GoDaddy was active during relevant times and contributed materially to the causes of action in this complaint. GoDaddy and HFN provided and continue to provide services to the Plaintiff in Concord, where this Court has personal jurisdiction. See Exhibit 6.

22. As late as February 2019, HFN announced a partnership with TCS, which has an office in Santa Clara where this Court has personal jurisdiction. See Exhibit 7. The partnership between HFN and TCS was active during relevant times and contributed materially to the causes of action in this complaint. TCS and HFN provided services using the HFN software in San Francisco, where this Court has personal jurisdiction.

23. The sole Plaintiff Miller is a resident of Concord where this Court has personal jurisdiction, and the injury to Miller described in this complaint took place while he was residing in Concord.

24. The amount in controversy exceeds $75,000 exclusive of interest and costs, providing diversity jurisdiction to this Court under 28 U.S.C. § 1332(a).

**DIVISIONAL ASSIGNMENT**

25. The causes of action of this Complaint relate to Plaintiff Miller's ownership of HFN, which resides with him in Concord. As described in paragraph 20, Defendant HFN's partnership with Malwarebytes in San Mateo contributed materially to these causes of action. As described in paragraph 78, Defendant HFN contributed materially to these causes of action by providing services to Plaintiff Miller in Concord through its partnership with GoDaddy. As described in paragraph 60, Defendant Santhanam contributed materially to these causes of action by using travel services at San Francisco International Airport in an unincorporated area of San Mateo County. Assignment to the San Francisco Division of this Court is appropriate under Civil L. R. 3-2(d).

**FACTUAL ALLEGATIONS**

26. Ten years ago, on January 12, 2012, the HFN management concocted a scheme to defraud its shareholders and investors by selectively withholding information to reduce the apparent value of the company in a transaction primarily designed to transfer an outsized share of ownership to the management and a new investor, NEA-IUVP. *Miller et al. v. Donnini et al., D Mass 1:14-cv-12337-NMG dkt. 1.* Thanks to the efforts of an anonymous informant, Miller became aware of a trail of documentation on the scheme and filed suit along with 11 other minority shareholders two years later, on June 2, 2014, against Santhanam and HFN, among others. Following the response and reply to the complaint by both sides, the Court sustained multiple counts against the defendants, including violations of § 10(b) and § 20(a) of the Exchange Act, Rule 10b-5 of the SEC, breach of fiduciary duty, and fraud. The case was poised for discovery, but once the depth and nature of the evidence of the plaintiffs was exposed, the defendants rapidly progressed toward a settlement, and dismissal with prejudice, between the minority shareholders and HFN.

27. Defendants Kola and Shiralagi knowingly invested in this fraudulent scheme ten years ago as NEA-IUVP, which has now changed its name to Kalaari. Santhanam, Kola, and Shiralagi should have learned their lesson and run HFN in a manner designed to benefit the company and its shareholders. But the storybooks teach us that a zebra cannot change its stripes, and this lesson seems to apply to the Defendants.

28. In early 2022, Miller was approached by several anonymous informants independently, each concerned in different ways about the manner in which HFN was being run and the negative consequences that might result. The greatest concern was that key resources were not being utilized to advance the interests of HFN but were instead being channeled to activities that benefited only the Defendants, to the detriment of all others. Sensing something amiss, on July 6, 2022, Miller asked for a shareholder meeting of HFN. See Exhibits 8 and 9. HFN was long overdue for a shareholder meeting since its bylaws require one every year, but there had not been a single shareholder meeting since 2012. See Exhibit 10, § 2.2 and 2.3. The HFN Board and investors should have been particularly sensitive to shareholder communication and follow the bylaws to the letter, especially since the last shareholder meeting was the one that

triggered the 2014 litigation. But this complaint will make clear that concerns about the company
are low in priority for the Board and are subjugated by attention to actions that benefit the
Defendants directly. The Defendants derive no particular benefit from shareholder meetings, so
holding a shareholder meeting has no importance to them.

29.     Santhanam responded the same day and promised a meeting. However, the
meeting was not scheduled, so Miller repeated the request on July 11, 2022. On July 13,
Santhanam scheduled a shareholder meeting for July 21, which did not meet the 10-business-day
notice period required in the bylaws (see Exhibit 10, § 2.4).

30.     After communicating with another minority shareholder, Miller responded with a
request to make the meeting date comply with the bylaws and included a list of requested
information for the shareholders to review to streamline the meeting. See Exhibit 11.

31.     The response was quick and surprising. Santhanam asked Miller for a formal
request to examine HFN records with the execution of a confidentiality agreement. Santhanam
attached a confidentiality agreement that was inappropriate for the disclosure of corporate
records to a shareholder with several unreasonable requirements.

32.     Miller responded to Santhanam with a formal request for documentation and a
shareholder meeting, accompanied by a confidentiality agreement that was more appropriate and
reasonable. Arjun Sharma ("Sharma"), an attorney from Kalaari (the original investor described
in the 2014 litigation), also responded to Miller indicating that Kumar Shiralagi ("Shiralagi") of
Kalaari was no longer on the Board of Directors of HFN, and that Miller should stop including
Kalaari on further communication about HFN.

33.     Miller responded politely to Sharma with a request for additional information
about Shiralagi's tenure, but never received a response. See Exhibit 12 for a record of the email
communication and Exhibit 13 for the reasonable confidentiality agreement executed by Miller.

34.     As late as July 9, 2022, the HFN web site showed Shiralagi and Santhanam on the
Board of Directors, along with Shirish Nimgaonkar ("Nimgaonkar") as President and CSO (see
Exhibit 14). However, by July 30, shortly after Miller's request, the HFN web site went offline
(see Exhibit 15), and then reappeared by August 12 with the "About Us" page completely

removed, and no information about the Board (see Exhibit 16). As late as August 8, 2022, the Kalaari web site showed Shiralagi as a Venture Partner at Kalaari (see Exhibit 17). In a similar fashion to the HFN web site, shortly after Miller's request for information, the Kalaari web site was altered to remove Shiralagi from the "Team" page. Exhibit 18 shows the state of the "Team" page as of January 29, 2023.

35. Now Miller was growing increasingly concerned with the situation. Not long after Sharma had contacted Miller with the incorrect information about Shiralagi and the composition of HFN's Board, both HFN and Kalaari hastily and suspiciously altered their web sites to remove all references to Shiralagi. HFN was in such a hurry that the entire page describing the company was removed. This action is in contradiction with Kalaari's stated policy of maintaining Board seats with their portfolio companies (see Exhibit 22).

36. Santhanam's confidentiality agreement had been drafted using Westlaw's Practical Law template "Confidentiality Agreement for Cross-Border Commercial Transactions," which was inappropriate since this was neither a cross-border nor a commercial transaction.[1] But Santhanam was intransigent and replied on August 20 that he was unwilling to use Miller's more reasonable confidentiality agreement. To move things along, Miller responded on August 30, 2022 with a marked-up copy outlining the most objectionable parts of Santhanam's agreement with suggestions for corrections. See Exhibit 19.

37. That was the last communication Miller had with HFN, over five months ago. Forsaking their fiduciary duty to disclose, the Defendants are uninterested in communicating with the minority shareholders.

38. But even though Miller has received no further information from HFN, he has continued to receive information from the several anonymous informants, and this action is the result.

**HFN'S LAX CORPORATE GOVERNANCE**

[1] Interestingly, Sharma's CV on the Kalaari website indicates that "… in his previous roles, he routinely advised institutional investors, start-ups, and growth-stage companies on domestic and cross-border investments, …"

39. The corporate governance of HFN is in a state of disarray. In November 2016, shortly after the settlement of the 2014 litigation, Sridhar Santhanam was CEO and Chairman of the Board, serving along with two outside Board members, Kumar Shiralagi and Pavan Vaish ("Vaish"), and one major outside investor, Kalaari Capital ("Kalaari"). See Exhibit 20. Vaish has remained active with the company, and as late as November 2022, visited the company to "brainstorm, ideate, and storyboard" with company employees as a Board member. See Exhibit 21. During the same time frame, Shiralagi, a Managing Director of the investor Kalaari, was active and communicated frequently with Santhanam, serving as a liaison between HFN and Kalaari. No minutes were ever kept for these Board meetings. This is consistent with Kalaari's policy to "take board seats and play an active role in the development" of their portfolio companies, as stated on their web site. See Exhibit 22, noting that "HandsFree Networks Inc." became HFN after Kalaari's investment as NEA-IUVP. *Miller et al. v. Donnini et al., D Mass 1:14-cv-12337-NMG dkt. 1.*

40. As late as July 9, 2022, the HFN web site showed Shiralagi as a member of the Board of Directors but not Vaish, and no longer showed Kalaari as an investor. See Exhibit 14. Shiralagi continued as an active Board member well into 2022 and continued to meet regularly with Santhanam. No minutes were kept for these Board meetings. In a strange series of events, as described in paragraphs 32-35, once Miller asked for some documentation from HFN, Sharma, an attorney at Kalaari, notified Miller on July 19, 2022 that "neither Kalaari nor any individual representing Kalaari is involved with the operations and management of the Company" and declined to provide any further information about Shiralagi's departure or the current composition of the Board. See Exhibit 12. At about the same time, HFN hurriedly and surreptitiously scrubbed the web site of any information about the composition of its Board of Directors and its investors, and Kalaari hurriedly scrubbed Shiralagi from its web site. Kalaari felt a sudden and urgent need to distance themselves from the activities of HFN once Miller asked for some specific information about those activities.

41. Both Sharma's representation of Kalaari and the flurry of activity updating web sites put Kalaari in an awkward position. Kalaari owes a fiduciary duty to the minority

shareholders. If Kalaari has abandoned its Board seat, it would leave the control of the Board to a single person and would therefore have difficulty serving its fiduciary duty of care to Miller. On the other hand, if Kalaari has maintained its Board seat, then by indicating the opposite to Miller, it has failed in its duty to disclose to Miller.

42. Sharma's communication with Miller indicates that Kalaari is still an investor in HFN. Exhibit 21 shows that at least as late as November 2022, Pavan Vaish was still actively involved with HFN and was on the HFN Board of Directors.

43. The Defendants have been aware, or should have been aware, of the precarious situation of the Board of Directors, but rather than correcting it for the benefit of HFN, they have let it progress to the current state. In doing so, they have pursued their own interests to the detriment of the Plaintiff and abandoned their fiduciary duty of care to the Plaintiff. Then, by obscuring, concealing, and falsifying information about the composition of the Board of Directors, at least some of the Defendants have abandoned their fiduciary duty to disclose to the Plaintiff. This failure occurred in a communication to Miller at his residence in Concord, within the personal jurisdiction of this Court. The repeated pattern of concealing and obscuring information, along with the negligent lack of oversight, has directly contributed to all the other financial harm to Miller described in this Complaint.

**HFN'S LACK OF HUMAN RESOURCE MANAGEMENT**

44. HFN lacks basic corporate oversight and controls. The company has no effective human resource ("HR") management, with only a single part-time HR manager and no company HR Manual or Employee Handbook.

45. In the #metoo era, the failure of a company to provide these basic tools is irresponsible and exposes the company to the possibility of significant litigation costs and damages. The wage loss component alone (before punitive damages) can amount to over $1 million, with an average around $500,000. See Exhibit 23. For HFN, this exposure is significant.

At least one Defendant has had, and continues to have, inappropriate relationships with at least one HFN employee.[2]

46. The Defendants are aware, or should be aware, of the failure to provide sufficient HR tools and the financial repercussions, but have chosen not to dedicate resources toward investigating allegations that have surfaced and addressing them. In fact, the Defendants are taking advantage of the lack of sufficient HR oversight to maintain their status quo at HFN to the detriment of Plaintiff Miller, and have abandoned their fiduciary duty of care to the Plaintiff.

47. Plaintiff Miller's direct financial loss during the relevant times due to the Defendants' lack of HR oversight is at least $14,153.10.

**HFN'S FINANCIAL MISMANAGEMENT**

48. HFN lacks basic accounting and reporting tools. This is consistent with the financial reports provided by the company during the 2012 shareholder meeting that led to the 2014 litigation, since those reports were incomplete, misleading, and audited incorrectly if at all.

49. In fact, no financial reports have been provided to any minority shareholder since 2012, over ten years ago. This deficiency continues today, and the Defendants are aware of it. By continuing this practice, the Defendants are derelict in their fiduciary duty to disclose.

50. Due to the disarray of the corporate governance described above, important financial and investment decisions are happening with little or no oversight at the Board level. The HFN web site describes a 2021 strategic partnership between HFN and the Seed Group, a Dubai-based conglomerate providing marketing and channel services for startup companies (from the Seed Group web site). See Exhibit 24. The HFN web site reports that this is intended to expand its footprint in the Middle East.

51. The Seed Group provides a list of its partners on its web site. Exhibit 25 shows a summary of these partners, their product, and their market sector, along with a count of the market sectors. The Seed Group's forte appears to be concentrated in industrial and financial

[2] Given the public nature of this Complaint, the high risk of retaliation against the victims involved, and the irrelevance of the details to the causes of action, the Plaintiff is opting not to disclose any further information about the nature of these relationships.

businesses, and HFN (listed as Nanoheal) is the only partner in networking and endpoint management. This is a significant mismatch, and clearly the Seed Group is an inappropriate channel provider for HFN. Exhibit 26 shows the market share by geography for HFN, taken from the Markets and Markets "Unified Endpoint Management Market" report. The market addressed by the Seed Group is represented by the yellow bar in the graph (MEA is Middle East and Africa), which is an insignificant part compared to the North American, European, and Asia-Pacific (APAC) regions. Even if it did a perfect job, which is unlikely given its inexperience in the sector, the Seed Group could add almost no value to HFN's activities relative to the rest of the world.

52. The transaction with the Seed Group involved no revenue commitment or compensation by the Seed Group, but involved both a multi-year financial commitment by HFN and an obligation by the Seed Group to transfer its majority interest to an unnamed party nominated by HFN, in a future transaction, for no compensation. HFN has paid, and continues to pay, a significant amount of money to the Seed Group with no return in the form of sales or support. The effect of this agreement is to transfer assets of HFN into a separate entity where they can be controlled in a future transaction by the Board outside the reach of Plaintiff Miller, with no notification or reporting of the transaction to Plaintiff Miller.

53. The Defendants are aware, or should be aware, of this relationship and its expense with no return. This is still another example where the Defendants are utilizing HFN resources for their own personal reasons, with little to no motivation for the benefit of HFN itself, with a dereliction of their fiduciary duty of care to the Plaintiff.

54. Plaintiff Miller's direct financial loss during the relevant times due to the Defendants' financial mismanagement is at least $35,001.42.

**SANTHANAM'S LACK OF COMMITMENT TO HFN AND INAPPROPRIATE USE OF HFN EMPLOYEES**

55. Running a startup is hard work. It requires long hours and a large commitment to the company. This typically precludes operational involvement in other companies. However, Santhanam appears to have active operational involvement in numerous other companies.

56.     Santhanam is the CEO and Managing Director at Aavaasa Builders, an Indian construction firm with at least four current projects building and marketing residential complexes. See Exhibit 27. Construction projects are notorious for having numerous problems that require constant attention. Since Aavaasa is not in any business related to HFN, no synergies exist between Aavaasa and HFN.

57.     Santhanam is the CEO at Velo Digital, a Burbank, California corporation. See Exhibit 28. Since Velo Digital is a digital marketing firm representing film personalities and managing concert logistics, no synergies exist between Velo Digital and HFN. Importantly, Ruby Jha ("Jha"), an employee of HFN, is also an officer of Velo Digital. Jha's work for Velo Digital is paid for by HFN.

58.     Santhanam is the CEO at Iris Animation, an Indian film and video animation company that is currently active with ongoing projects. See Exhibit 29. Significantly, Jha is also an officer at Iris Animation. Animation projects are well known as having tight timelines, complex project management, and significant competition. Since Iris Animation is not in any business related to HFN, no synergies exist between the Iris Animation and HFN. Jha's work for Iris Animation is paid for by HFN.

59.     Santhanam is the CEO at Blue Sphere Ventures, an Indian investment firm that is currently active. See Exhibit 30. Investment firms require consistent attention in order to find investors and opportunities, and to stay on top of developments in the portfolio companies. Since Blue Sphere Ventures is not in any business related to HFN, no synergies exist between the Blue Sphere Ventures and HFN.

60.     These outside commitments take a significant amount of time and energy by both Santhanam and Jha. Santhanam and Jha are only able to spend a small percentage of their time working at HFN, but are both paid a full time salary by HFN and use the HFN travel budget to finance travel for the benefit of these other companies. This includes travel and the use of services at San Francisco International Airport in an unincorporated area of San Mateo County, California, where this Court has personal jurisdiction.

61. The Defendants know, or should know, about the extent and nature of these commitments and expenses. This is still another compelling example of the Defendants using HFN resources for their own personal gain at the expense of HFN. The Defendants are not fulfilling their fiduciary duty of loyalty to the Plaintiff.

62. Plaintiff Miller's direct financial loss during the relevant times due to Santhanam's outside commitments is at least $765,247.54.

**PATENTS**

63. The architecture and operation of the HFN software is novel. On May 10, 1999, Miller authored a provisional patent application on behalf of the company describing this novel operation. On May 10, 2000, the Plaintiff authored a patent application with short claims that issued as US Patent No. 6,742,141 on May 24, 2004 after a light prosecution with only one non-final rejection. On May 21, 2004, the Plaintiff authored a continuation with short claims that issued on August 29, 2006 as US Patent No. 7,100,085 after two minor corrections requested by the Examiner.

64. The light prosecution for both patents is atypical of software patents and indicates the novelty of the inventions. (HFN filed a PCT application and a national stage application in Australia but abandoned both in favor of concentrating on the US market.) The HFN patents have been cited 247 times by patent applications owned by Google, Amazon, AT&T, Cisco, Citrix, Dell, Fujitsu, HCL, HP, Hitachi, Infosys, Intel, IBM, Kyndryl, Facebook (Meta), Microsoft, NetApp, Nokia, Oracle, ServiceNow, and Xerox, among others, further demonstrating their fundamental nature and inventive value.

65. These patents could have significant value. In *Columbia University v. NortonLifeLock*, on May 22, 2022, a jury found NortonLifeLock guilty of willful infringement of 4 claims of 2 patents in the same technology area as the HFN patents, using a similar technique, and *with a later priority date*. The jury awarded the plaintiff in that case US $185 million. *ED Virginia 3:13-cv-00808-MHL dkt. 1206*. Notably, in the course of the litigation, NortonLifeLock filed 7 challenges against 104 claims in 6 patents at the Patent Trial and Appeal Board (PTAB);

the PTAB denied the challenge against 8 claims and found 24 of the claims patentable, further demonstrating the novelty of these techniques even with the later priority date.

66.     Santhanam was aware of the value of the HFN patents. On December 18, 2015, Santhanam had a discussion with Miller in which he indicated that he had talked with a patent broker in India who had estimated the value of the patents at US $1 million. Santhanam has taken no action to monetize the patents, and in the meantime, they both expired on May 10, 2020. Both patents have method claims, potentially extending their value at least marginally into 2026, but under Santhanam's stewardship, no action has been taken toward monetization.

67.     The assignment history of the patents at the US Patent and Trademark Office (USPTO) reveals the motivation for this inaction. See Exhibit 31. On September 30, 2019, HFN used both US patents 6,742,141 and 7,100,085 as a security interest (collateral) for a transaction involving Zelis Payments and Red-Card Payment Systems. Zelis and Red-Card are financial management system providers for healthcare providers that merged in 2019. See Exhibit 32. Since HFN is not involved in either financial management or healthcare, this transaction is related to yet another side venture of the Defendants and was made for the sole benefit of the Defendants. The Defendants are using company resources on transactions outside the main business of HFN and encumbering the primary technology of the company solely for their own benefit. The Defendants are failing to fulfill their fiduciary duty of loyalty to the Plaintiff.

68.     Under the Defendants' leadership of HFN, no additional patent applications have been filed since the 2006 continuation filing. Either no significant advancements have been made in the product technology, or the intellectual property of the company has been neglected. In either case, the Board has been diverting HFN resources to their own ends rather than maintaining and protecting the innovation that is one of the key assets in a software technology company.

69.     This failure to protect HFN intellectual property has also put the company into a precarious position. With no patent protection at all, a competitor could easily assert patents against HFN for patent infringement and HFN would have nothing with which to counter-assert

and move toward a settlement. The result would be to tie HFN up in costly litigation and potentially even an injunction against continuing to do business.

70. Once again, the Board has failed to use company resources correctly, opting instead to keep them for short-term personal gain. The Defendants are abandoning their fiduciary duty of care to the Plaintiff.

71. Plaintiff Miller's direct financial loss during the relevant times due to the Defendants' failure to monetize intellectual property is at least $13,800.00.

**SOFTWARE**

72. The HFN software is organized somewhat like an app store such as the Apple iTunes Store or the Google Play Store. The software has three main components. The "core" software provides a set of basic operations to monitor and act on systems under management, analogous to the iOS or Android operating system Application Programming Interfaces (APIs) used to monitor and act on end user devices. The "application" level uses the core software operations to implement detection and solution for specific problems, analogous to the apps that are sold on app stores to provide specific functionality using the operating system APIs. The "management" level provides a user interface for controlling and reporting on the activities of the application level, analogous to the app store interface that allows end users and device managers to control and report on app usage on devices.

**Core Software**

73. The core software requires updating and maintenance on a regular basis. In addition to extensions to provide management of new versions of operating systems and new platforms, the core software is intimately tied to the underlying operation of the computer network. Network protocols and standards are updated frequently and require corresponding updates to the core software.

74. The only major update to the core software under the current engineering management (over ten years) has been some extensions to support mobile devices.[3] More importantly, the computer security environment has changed significantly in the past ten years. For example, ransomware is prevalent, advanced persistent threats (APTs) now target companies and infrastructure using sophisticated phishing and zero-day vulnerability attacks, and two-factor authentication is the norm, among many other changes. The core software continues to use the mid-2000s security model that was appropriate for its time but is dangerously insecure in today's world. These security concerns are not merely hypothetical.

75. A key HFN customer suffered a security breach at an end user. Upon investigation, the HFN customer discovered that the cause was a well-known vulnerability in the aging HFN security model that could be exploited by simply monitoring open network traffic. The customer demonstrated this vulnerability to HFN. The response by the Defendants was to only patch the HFN software to address the specifics of that one vulnerability, rather than heed the warning and invest in an improved security model for the product. Multiple other customers, prospects, and partners have also raised concerns about the security features of the product.

76. This failure by the Defendants to properly address the security of the HFN products has put the company, its customers, and its customers' end users at considerable risk. On July 2, 2021, Kaseya, a company with a very similar product and business model to HFN, was compromised in a ransomware attack that caused widespread downtime for over 1,000 companies. See Exhibit 33. The attackers reported that one million end user systems were affected and demanded a ransom of $45,000 per system, also offering a "bulk discount" to Kaseya of $70 million to unlock all systems with a single payment. See Exhibit 34.

77. The HFN web site indicates that the company has the product installed on 4 million end user systems (see Exhibit 35), so in a similar compromise, one could expect the demand by the attacker to be up to $180 billion for per-system remediation, or up to $280 million

[3] By way of comparison, Miller led a small engineering team at a different company to bring a similar mobile device management extension from concept to deployment in under one year.

for a one-time unlock. Legal analysts commenting on the Kaseya compromise (see Exhibit 36) have indicated that some of the liability could be shifted onto HFNs customers (the service providers), so the impact would also tarnish the reputation of HFN and damage its customer relationships.

78. The Defendants knew, or should have known, the gravity of the Kaseya compromise. Besides being in the main business of HFN, Kaseya had considerable coverage in mainstream media. See Exhibit 37. Multiple customers have raised concerns about the security aspects of the HFN product. Despite this, the Defendants chose yet again to continue to use company resources for their own benefit rather than invest those resources into critical development to protect the company, its customers, and its end users. The Defendants failed in their fiduciary duty of care to the Plaintiff. This Court has personal jurisdiction over many of the end users where the Defendants failed in their duty. For example, GoDaddy provided services to Plaintiff Miller at his residence at all relevant times. See Exhibit 6.

**Application Software**

79. The application software is a collection of script-like code where each script uses the core operations to provide focused detection and solution of a single issue. As any computer user knows, the nature and specifics of issues can change rapidly, but can also persist over long periods. For example, one HFN script predating the current management fixed a problem that Windows had in updating the time zone after the rules changed in the US. This script was very useful but had a limited life until Microsoft fixed the problem a few months later. Another script handled the situation where a router with fixed IP addresses that were known to every machine but could not be discovered by a newly installed machine. This script would still be useful in today's networked environments. The application software therefore needs to have constant attention and testing to keep up with the ever-changing landscape of computer issues, and to make sure that they are resolved correctly. This automation of detecting and resolving issues is a key value add and differentiator for the product.

80. The application software has had little, if any, additions and development under the current engineering management. Instead, the Defendants believe that the *customers* should

provide the specification and implementation of the scripts to do problem resolution. The CEO and product management teams consistently fail to visit key customers to understand their issues, or even respond to their inquiries. Not surprisingly, the HFN web site has no customer testimonials at all, because not a single customer has reported value added by the product, and as a result, customer turnover is high, with the company having lost more than half of its customers in the last few years.

81. The Defendants are aware of the issues with the application software. Multiple customers have repeatedly emphasized their expectation that HFN should properly specify and implement the application software. This makes sense since it is a part of the HFN product and represents a key component of its value. The HFN travel budget remains large, but not for visits to customers and end users to understand the needs for the applications software. Instead, as described in paragraph 60, the travel is oriented around the Defendants' other investments of HFN resources in ventures that are not in HFN's line of business and do not benefit the company. The Defendants are consistent in their choice of investing HFN resources for personal benefit rather than the benefit of HFN, failing in their obligation to their fiduciary duty of care to the Plaintiff.

**Management Software**

82. The management software is implemented as a web site that is available to HFN's customers but typically not the end users with managed devices. This interface is intended to provide visibility to the customer about what is going on at end user devices, what kind of issues are being encountered and resolved, and what kinds of new trends are surfacing. Enterprise customers want an interface that can provide real-time information on large numbers of devices as well as generating summary reports for executive review.

83. The management software has only been updated with cosmetic changes for over ten years. The underlying database is still the same relational database, and no effort has been made to utilize modern big data tools or real-time analytics. As Exhibit 38 shows, even the showcase example on the HFN web site only contains general usage information by end user devices, highlighting the product as a device monitoring tool rather than an issue detection and

resolution platform.[4] This is consistent with the lack of development in the application software and the customer lack of perceived added value.

84. The Defendants are aware of the shortcomings of the management software. Multiple major customers have indicated that the reporting capabilities of HFN are insufficient and do not meet end user requirements. As described previously, rather than visit the customers and end users to understand and implement the required functionality, the Defendants' travel activities are focused on those providing them personal benefit, as described in paragraph 60. They dependably use HFN resources for their own gain at the expense of HFN. The Defendants have not fulfilled their fiduciary duty of care to the Plaintiff.

85. Plaintiff Miller's direct financial loss during the relevant times due to the Defendants' failure to maintain and update the core product is at least $142,140.00.

**WEB SITE**

86. Any company doing business online, especially a company involved in networking or user service, needs to have a well-managed online presence in its web site. The HFN web site falls very short of this goal. The site completely lacks an "About Us" section, giving the viewer the impression that there is no real presence or history of the company. That impression is further reinforced in that the address of HFN in the "Contact Us" section (see Exhibit 39) is listed as 514 East Timpanogos Circle, Building G, Suite 2100, Orem, Utah 84097, which the Plaintiff Miller confirmed cannot accept deliveries. See Exhibit 40. Plaintiff Miller has verified that calling the contact phone number inspires even less confidence: the call is answered by a synthesized voice that mispronounces the name of the company and asks you to leave a message. The Google Maps information on Nanoheal at the Utah address indicates that the company is "Permanently Closed." See Exhibit 41.

87. Turning to the "Newsroom" section of the site (see Exhibit 42), one finds the featured article to be "5 Ways CBD Can Improve Your Daily Life." This article extols the many

---

[4] The image shows application usage, printer usage, network usage, device type, CPU usage, uptime, boot time, and notification frequency; these are all measured parameters as opposed to diagnosing actual problems with indications of some kind of action taken at the device.

virtues of using CBD oil, made from the active component in marijuana. The article is apparently not on the web site by mistake, since it is dated after some of the other articles. One can only assume that a potential customer reading this might not be too excited by the prospect of having their critical IT infrastructure managed by a team that was enthusiastically using CBD-based products at the same time.

88. The Defendants are aware of the problems with the web site. For example, they modified the site around the middle of July, 2022 to remove the "About Us" section as described in paragraph 34. Rather than use company resources to keep the web site accurate and timely, to encourage confidence by potential customers, they instead predictably divert those resources to activities promoting their own gain at the expense of the company. Once again, the Defendants have failed in their fiduciary duty of care to the Plaintiff.

89. Plaintiff Miller's direct financial loss during the relevant times due to the Defendants' failure to maintain and update the online marketing channel is at least $24,950.40.

## EQUITY IRREGULARITIES AND SELF-DEALING

90. HFN has an unallocated equity pool that was set aside to allow incentives for addition of key management and corporate-level employees. Santhanam has been awarding himself and Vaish significant shares from this pool. Since there is no oversight from a single-member Board of Directors (if that is indeed the state of the Board as has been represented to the Plaintiff), this is a simple task on Santhanam's part. Given the dismal picture of engineering and product management outlined by the previous sections, there is certainly no justification for any sort of equity award like this for Santhanam.

91. The Defendants know, or should know, about this program of equity transfer and the damaging effect it has on the possibility of hiring good future talent. This is perhaps one of the clearest examples of the Defendants acting in their own best interests to the detriment of HFN and demonstrates a failure of the Defendants to exercise their fiduciary duty of loyalty to the Plaintiff.

92. Plaintiff Miller's direct financial loss during the relevant times due to the Defendants' self-allocation using shares from the incentive option pool is at least $42,507.11.

**BUSINESS JUDGMENT RULE**

93. The business judgment rule insulates corporate directors and officers from liability if they acted in good faith in a manner believed to be in the best interests of the corporation and exercised the care of an ordinarily prudent person under similar circumstances, including reasonable inquiry (Cal. Corp. Code § 309; *Berg & Berg Enters., LLC v. Boyle*, 178 Cal. App. 4th 1020, 1044-45 (2009)).

94. In each of the facts described previously, there is no interpretation where HFN directors and officers could have acted in good faith in a manner that any prudent person would believe to be in the best interests of HFN.

95. In paragraph 43, no prudent person would leave a single HFN Board member with no oversight, especially one who had previously demonstrated a penchant for fraud against shareholders.

96. In paragraph 46, no prudent person would leave HFN without an HR Manual or Employee Handbook, especially in the new litigious #metoo era, and especially given the history of indiscretion at HFN.

97. In paragraph 49, no prudent person would sanction the practice of not reporting audited HFN financials to shareholders, especially for a company like HFN where the minority shareholders had previously sued the company based on fraudulent financials.

98. In paragraph 53, no prudent person would advise the significant expense of a channel partner like Seed Group in a relatively unimportant market without first addressing the important markets, especially when the channel partner has little or no experience or other partners in the area.

99. In paragraph 61, no prudent person would take on the management of numerous time-consuming outside companies while managing a startup, especially a startup like HFN in a complex high technology area.

100. In paragraph 67, no prudent person would fail to monetize patents owned by HFN simply to use those patents as collateral for a loan for an outside unrelated company, especially when the patents have potentially high value.

101. In paragraph 69, no prudent person would fail to develop and patent the intellectual property of HFN, leaving the company open to an injunction by a competitor with no defense, especially when the company is a startup like HFN in a high technology area.

102. In paragraph 78, no prudent person would fail to keep the security of the HFN product up to date, especially when doing so exposes customers and end users of the product to considerable financial and reputational risk.

103. In paragraph 81, no prudent person would leave it up to customers to specify and implement a key differentiator of the HFN product, especially without even visiting and understanding the needs of those customers.

104. In paragraph 84, no prudent person would focus development on the user interface of the HFN product without also developing the underlying functionality, especially without visiting and understanding the customer needs for the user interface itself.

105. In paragraph 88, no prudent person would fail to keep the web site of an online company like HFN accurate and timely, especially when that web site is one of the first things a potential customer will look at.

106. In paragraph 91, no prudent person would allocate shares to themselves without any oversight by a Board of Directors, especially when those shares were not intended for current company employees.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act in the Seed Group transaction**

107. Plaintiff Miller incorporates by reference each and all of the allegations contained in Paragraphs 1 through 106, as if fully set forth herein.

108. The Defendants, including at least Santhanam, entered into an agreement with the Seed Group obligating the Seed Group to a future transaction of shares in a third company for no compensation, using undisclosed manipulative tactics to wrongfully decrease the value of Plaintiff's interest in the shares in the third company.

109. This commitment is in violation of Section 10(b) of the Exchange Act and Rule 10b-5, and in engaging in this unlawful scheme, the Defendants, including at least Santhanam,

used means and instrumentalities of interstate commerce, including United States mail, interstate telephone communications, internet communications, and federal roads.

110. As a direct and proximate result of the scheme by Defendants, including at least Santhanam, to defraud Plaintiff Miller, Plaintiff Miller has suffered damages by being denied the value and appreciation of the resources of HFN that were enjoyed and continue to be enjoyed by the Defendants.

111. Additionally, Plaintiff Miller is entitled to punitive damages as a result of the conduct by Defendants, including at least Santhanam. Specifically, Defendants have consistently acted with impunity and lack of regard to interests of Miller despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

**COUNT II**

**Violation of Section 10(b) of the Exchange Act in HFN incentive stock allocation**

112. Plaintiff Miller incorporates by reference each and all of the allegations contained in Paragraphs 1 through 111, as if fully set forth herein.

113. The Defendants, including at least Santhanam and Vaish, directly transferred HFN shares to themselves which had been allocated for an incentive stock option pool to attract high quality employees, and had been described as such to the Plaintiff. This transfer was done in an undisclosed transaction that wrongfully decreased the value of the Plaintiff's ownership of the shares. Rule 10b-5 under § 10(b) prohibits nondisclosure and misrepresentation, both of which are operative in this context.

114. As a direct and proximate result of the scheme by Defendants, including at least Santhanam and Vaish, to defraud Plaintiff Miller, Plaintiff Miller has suffered damages by being denied the value and appreciation of the resources of HFN that were enjoyed and continue to be enjoyed by the Defendants.

115. Additionally, Plaintiff Miller is entitled to punitive damages as a result of the conduct by Defendants, including at least Santhanam and Vaish. Specifically, Defendants have consistently acted with impunity and lack of regard to interests of Miller despite either

participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

**COUNT III**

**Violation of Section 20(a) of the Exchange Act in the Seed Group transaction**

116. Plaintiff Miller incorporates by reference each and all of the allegations contained in Paragraphs 1 through 115, as if fully set forth herein.

117. The Defendants, including at least Kola, Shiralagi, and Vaish, by virtue of their operational and management control in HFN, condoned and assisted with HFN's entering into an agreement with the Seed Group committing to significant payments by HFN and a future transaction of shares in a third company for no compensation, using undisclosed manipulative tactics to wrongfully decrease the value of Plaintiff's interest in the shares in the third company.

118. As a direct and proximate result of the scheme by Defendants, including at least Kola, Shiralagi, and Vaish, to defraud Plaintiff Miller, Plaintiff Miller has suffered damages by being denied the value and appreciation of the resources of HFN that were enjoyed and continue to be enjoyed by the Defendants.

119. Additionally, Plaintiff Miller is entitled to punitive damages as a result of the conduct by Defendants, including at least Kola, Shiralagi, and Vaish. Specifically, Defendants have consistently acted with impunity and lack of regard to interests of Miller despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

**COUNT IV**

**Violation of Section 20(a) of the Exchange Act in HFN incentive stock allocation**

120. Plaintiff Miller incorporates by reference each and all of the allegations contained in Paragraphs 1 through 119, as if fully set forth herein.

121. The Defendants, including at least Kola and Shiralagi, by virtue of their operational and management control in HFN, condoned and assisted with the direct transfer of HFN shares to Santhanam and Vaish which had been allocated for an incentive stock option pool to attract high quality employees, and had been described as such to the Plaintiff. This transfer

was done in an undisclosed transaction that wrongfully decreased the value of the Plaintiff's ownership of the shares.

122. As a direct and proximate result of the scheme by Defendants, including at least Kola and Shiralagi, to defraud Plaintiff Miller, Plaintiff Miller has suffered damages by being denied the value and appreciation of the resources of HFN that were enjoyed and continue to be enjoyed by the Defendants.

123. Additionally, Plaintiff Miller is entitled to punitive damages as a result of the conduct by Defendants, including at least Kola and Shiralagi. Specifically, Defendants have consistently acted with impunity and lack of regard to interests of Miller despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

**COUNT V**

**Breach of Fiduciary Duty**

124. Plaintiff Miller incorporates by reference each and all of the allegations contained in Paragraphs 1 through 123, as if fully set forth herein.

125. At all relevant times, Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola had a fiduciary relationship with Plaintiff Miller. Miller was a minority shareholder of HFN, Inc.

126. Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola owed Plaintiff the fiduciary duty of care, duty of loyalty, duty of good faith, duty of prudence, and duty to disclose, as a matter of law. The Defendants Kalaari and Santhanam together own a majority of the shares of HFN and are acting in concert as described in paragraphs 1 through 106. "The Courts of Appeal have often recognized that majority shareholders, **either singly or acting in concert to accomplish a joint purpose**, have a fiduciary responsibility to the minority and to the corporation to use their ability to control the corporation in a fair, just, and equitable manner. Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority." (*Jones v. HF Ahmanson & Co.*, 460 P. 2d 464 - Cal: Supreme Court 1969) (emphasis added)

127. Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola breached these duties to Plaintiff Miller by the numerous instances of mismanagement and self-dealing outlined in paragraphs 1 through 106.

128. As a direct and proximate result of Defendants' breach of these duties owed to Plaintiff Miller, Plaintiff Miller has suffered damages by being denied the value and appreciation of the resources of HFN that were enjoyed and continue to be enjoyed by the Defendants.

129. Additionally, Plaintiff Miller is entitled to punitive damages as a result of Defendants' conduct. Specifically, Defendants have consistently acted with impunity and lack of regard to interests of Miller despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

**COUNT VI**

**Aiding and Abetting Breach of Fiduciary Duty**

130. Plaintiff Miller incorporates by reference each and all of the allegations contained in Paragraphs 1 through 129, as if fully set forth herein.

131. At all relevant times, Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola had a fiduciary relationship with Plaintiff Miller, as either Board Members, investors, and/or majority shareholders of HFN. Miller was a minority shareholder of HFN, Inc.

132. At all relevant times, Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola were aware of, or should have been aware of, the activities of the Board of Directors and CEO of HFN.

133. The HFN Board of Directors and CEO owed Plaintiff the fiduciary duty of care, duty of loyalty, duty of good faith, duty of prudence, and duty to disclose, as a matter of law. Kalaari as a Board member and Santhanam as CEO together own a majority of shares of HFN and are acting in concert as described in paragraphs 1 through 106. "The Courts of Appeal have often recognized that majority shareholders, **either singly or acting in concert to accomplish a joint purpose**, have a fiduciary responsibility to the minority and to the corporation to use their ability to control the corporation in a fair, just, and equitable manner. Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner

detrimental to the minority." (*Jones v. HF Ahmanson & Co.*, 460 P. 2d 464 - Cal: Supreme Court 1969) (emphasis added)

134. The HFN Board of Directors and CEO breached these duties to Plaintiff Miller by the numerous instances of mismanagement and self-dealing outlined in paragraphs 1 through 106. Defendants HFN, Kalaari, Santhanam, Shiralagi, Vaish, and Kola aided and abetted this breach by substantially assisting and encouraging the HFN Board and CEO. This conduct by the Defendants was a substantial factor in causing harm, by enabling the ongoing activities of the HFN Board of Directors and CEO.

135. As a direct and proximate result of Defendants' aiding and abetting the breach of these duties owed to Plaintiff Miller, Plaintiff Miller has suffered damages by being denied the value and appreciation of the resources of HFN that were enjoyed and continue to be enjoyed by the Defendants.

136. Additionally, Plaintiff Miller is entitled to punitive damages as a result of Defendants' conduct. Specifically, Defendants have consistently acted with impunity and lack of regard to Miller's interests despite either participating in or being aware of previous litigation where HFN was forced to settle for similar disregard resulting in fraudulent behavior.

**COUNT VII**

**Injunctive Relief for Books and Records**

137. Plaintiff Miller incorporates by reference each and all of the allegations contained in Paragraphs 1 through 136, as if fully set forth herein.

138. Plaintiff Miller has repeatedly requested that HFN make available its corporate books and records.

139. Plaintiff Miller has made these requests for the legitimate purpose of ensuring that the corporate monies are properly spent, where, as shown above, he has ample reason to believe otherwise.

140. Section 220 of the Delaware General Corporate Law gives Plaintiff Miller the right to inspect corporate books and records if he has stated a "proper purpose" "sufficiently tailored" to identify the books and records relevant to the demand.

141. HFN has refused to comply with Plaintiff Miller's request.

142. In the absence of HFN's failure to comply with its duty, Plaintiff Miller requests that the Court injoin HFN to make these books and records available.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Miller respectfully requests that this Court enter judgment in his favor and grant the following relief:

1. Compensatory damages in an amount and manner to be determined according to proof at trial;
2. Statutory damages;
3. Punitive damages in an amount to be determined by the Court according to proof;
4. An award of post-judgment interest for the maximum amount allowed by law;
5. A judgment that Defendants' lack of compliance with the Company's governing corporate documents and applicable corporate law has caused irreparable harm to the Plaintiff;
6. A judgment that Kumar Shiralagi was on the Board of Directors of HFN, Inc. at all relevant times;
7. A judgment that Pavan Vaish was on the Board of Directors of HFN, Inc. at all relevant times;
8. A judgment that Kumar Shiralagi had and continues to have a fiduciary duty to the Plaintiff at all relevant times;
9. A judgment that Pavan Vaish had and continues to have a fiduciary duty to the Plaintiff at all relevant times;
10. A judgment that Kalaari Capital had and continues to have a fiduciary duty to the Plaintiff at all relevant times;
11. A judgment that Vani Kola had and continues to have a fiduciary duty to the Plaintiff at all relevant times;

12. Injunctive relief in the form of an order for HFN, Inc. to provide requested documents and evidence without limitation to the Plaintiff to identify all Defendants and the scope of the damages;
13. Temporary injunctive relief in the form of an order to prevent further investment activity or non-operational disbursement of funds by HFN, Inc. until the relief for this action is complete;
14. An award of costs;
15. An award of attorneys fees' to the extent allowed by law; and
16. Any and all other relief as this Court deems just and proper.

**JURY TRIAL DEMANDED**

The Plaintiff hereby demands a trial by jury.

Date: Feb. 6, 2023

Sign Name: Allan A. Miller (pro se)

Print Name: Allan A. Miller

# EXHIBIT 1



opencorporates

The Open Database Of The Corporate World

Company name or number

Companies Officers

# HFN, INC.

**Company Number** 5091108

**Incorporation Date** 5 January 2012 (almost 11 years ago)

**Company Type** Corporation

**Jurisdiction** Delaware (US)

**Agent Name** A REGISTERED AGENT, INC

**Agent Address** 8 THE GREEN, STE A, DOVER, Kent, DE, 19901

**Directors / Officers** A REGISTERED AGENT, INC, agent

**Registry Page** https://icis.corp.delaware.gov/Ecorp/...

**Source** *Delaware Department of State: Division of Corporations, http://www.corp.delaware.gov/, 1 Sep 2019*

opencorporates

The Open Database Of The Corporate World

Company name or number

Companies Officers

# HFN, INC. BRANCH

**Company Number** 1377880

**Status** Active

**Incorporation Date** 11 February 2021 (almost 2 years ago)

**Company Type** Stock

**Jurisdiction** Connecticut (US)

**Branch** Branch of HFN, INC. (Delaware (US))

**Registered Address** 514 E TIMPANOGOS CIRCLE BLDG G STE 2100<br>OREM<br>84097-4942<br>UT<br>United States

**Directors / Officers** SRIDHAR SANTHANAM, officer

**Registry Page** https://service.ct.gov/business/s/onl...

**Source** *Connecticut Secretary Of State, Commercial Recording Division, https://service.ct.gov/business/s/onl..., 26 Jul 2022*

## Company Addresses

MAILING ADDRESS

514 E TIMPANOGOS CIRCLE BLDG G, STE 2100, OREM, UT, 84097, USA



opencorporates
The Open Database Of The Corporate World

Company name or number

Companies Officers

# HFN, INC. BRANCH

| | |
|---|---|
| **Company Number** | 10534657-0143 |
| **Status** | Active |
| **Incorporation Date** | 22 September 2017 (over 5 years ago) |
| **Company Type** | Corporation - Foreign - Profit |
| **Jurisdiction** | Utah (US) |
| **Branch** | Branch of HFN, INC. (Delaware (US)) |
| **Registered Address** | 514 EAST TIMPANOGOS CIRCLE BUILDING G STE 2100 OREM, UT 84097<br>United States |
| **Industry Codes** | 5112: Software Publishers (North American Industry Classification System 2007) |
| **Alternative Names** | BASK (trading name)<br>NANOHEAL (trading name) |
| **Agent Name** | SAM BELL |
| **Agent Address** | 5200 S HIGHLAND DR STE 303 SALT LAKE CITY, UT 84117 |
| **Directors / Officers** | SAM BELL, agent |
| **Registry Page** | https://secure.utah.gov/bes/details.h... |

**Source** *Utah Department of Commerce, https://secure.utah.gov/bes/details.h..., 29 Feb 2020*

# EXHIBIT 2



**(/hfn-inc-profile_b5ce7b56f42e0943)** (/hfn-inc-email-format_b5ce7b56f42e0943) (/hfn-inc-management_b5ce7b56f42e0943)

(/hfn-inc-profile_b5ce7b56f42e0943)

# HFN, Inc. Information (/hfn-inc-profile_b5ce7b56f42e0943)

(http://facebook.com/nanoheal) (http://twitter.com/handsfreecorp) (http://linkedin.com/company/549508) (http://crunchbase.com/organization/handsfree-networks)

Nanoheal by HFN Inc., is a patented predictive and cognitive workplace automation software for technology support providers, Managed Service Providers, large OEMs, and SMB IT helpdesk providers. Nanoheal's Software as a Service (SaaS) technology platform, using built-in intelligence, automates the resolution of technology support issues for all kinds of smart devices including Laptops, Desktops Mobile Devices and IoT devices, and reduces the volume of issues that require support from a helpdesk provider thus, enabling them to provide next generation support services powered by intelligent automation and real-time analytics. We help companies connect with their businesses and consumers in a whole new way. Recognized be leading global analysts, we are blazing new trails in the space of automation every day while focusing on our mission to transform the way people live and work with technology. Headquartered in Utah, USA and with offices in Bangalore, we are a team of 50 in India and 80 in the US, and are pacing towards exponential growth. Nanoheal was recognized by Parks Associates as the "Future of automated tech support and predictive intelligent automation" and named a Cool Vendor by Gartner.

View Top Employees from HFN, Inc. (/person?employer[]="HFN%2C%20Inc.")

| | |
|---|---|
| **Website** | http://www.nanoheal.com (http://www.nanoheal.com) |
| **Revenue** | $37 million |
| **Employees** | 78 (78 on RocketReach(/person?employer[]="nanoheal.com")) |
| **Founded** | 2012 |
| **Address** | 2099 Gateway place #350, San Jose, California 95110, US (https://www.google.com/maps?q=2099%20Gateway%20place%20%23350%2C%20San%20Jose%2C%20California%2095110%2C%20US) |
| **Phone** | (630) 954-1232 (tel:(630) 954-1232) |
| **Category** | Computer Software, Automation/Workflow Software, IT Support Automation, Software Development Applications, PC Healthcare, Managed Services Software, Remote IT Infrastructure Automation |
| **Web Rank** | 3 Million |
| **Keywords** | avast.com/go, www.avast.com/go, nanoheal getronics, go.avast.com/go, agnostic nano click |
| **Competitors** | avast.com, mspcomparison.com, forums.clamwin.com, acunetix.com, prowareness.com |

Looking for a particular **Hfn, Inc.** employee's phone or email?

Enter employee's name, title or keywords

Find Info

## HFN, Inc. Questions

What is the annual revenue of HFN, Inc.? >

Is HFN, Inc. growing? >

Who is the Director - Product Marketing of HFN, Inc.? >

How many people are employed at HFN, Inc.? >

Where is HFN, Inc. based? >

## Top **HFN, Inc.** Employees

**David Holland**
**Sales Lead**
**(/david-holland-email_29929003)**
Bengaluru, KA, IN

View (/david-holland-email_29929003)

2 gmail.com, air-watch.com
5 +91 98803 4XXXX, +91 98860 1XXXX, ...

**Prerana Srinivas**
**Director - Product Marketing**
**(/prerana-srinivas-email_9104624)**
Bengaluru, KA, IN

View (/prerana-srinivas-email_9104624)

1 nanoheal.com

**Sentthil Dg**
**Director - Delivery and Technical Sales**
**(/sentthil-dg-email_84945282)**
Bengaluru, Karnataka, India

View (/sentthil-dg-email_84945282)

2 nanoheal.com, gmail.com

**Akshay Shonik**
**Global Sales and Alliances Lead**
**(/akshay-shonik-email_101796762)**
Bengaluru, KA, IN

View (/akshay-shonik-email_101796762)

3 gmail.com, lakesidesoftware.com, ...

**Nitin Chandra**
**Senior Practice Lead**
**(/nitin-chandra-email_138724055)**
Chennai, Tamil Nadu, India

View (/nitin-chandra-email_138724055)

1 tcs.com

**Ronanki Kumar**
**Lead Generation**
**(/ronanki-kumar-email_161504258)**
Bengaluru, Karnataka, India

View (/ronanki-kumar-email_161504258)

1 indecomm.net

**Smita Biswal**
**Assistant Manager**



**(/smita-biswal-email_47743623)**
Bangalore Urban, Karnataka, India

View (/smita-biswal-email_47743623)

2 nanoheal.com, gmail.com

**Satish Jagajampi**
**Senior Practice Lead**
**(/satish-jagajampi-email_49176025)**
Bengaluru, Karnataka, India

View (/satish-jagajampi-email_49176025)

2 gmail.com, cognizant.com

**Sharon Williams**
**VP FinanceandBenefits**
**(/sharon-williams-email_140706746)**
Naperville, Illinois, United States

View (/sharon-williams-email_140706746)

**Isha Malegaonkar**
**Strategy Mergers and Acquisitions Associate**
**(/isha-malegaonkar-email_284775672)**
Bengaluru, KA, IN

View (/isha-malegaonkar-email_284775672)

1 in.gt.com

View Similar People (/person?employer[]="HFN%2C%20Inc.")

**Learn More**

# HFN, INC BRANCH

**Company Number** 3736840
**Previous Company Numbers** C3736840
**Status** Forfeited
**Incorporation Date** 22 December 2014 (about 8 years ago)
**Company Type** FOREIGN STOCK
**Jurisdiction** California (US)
**Branch** Branch of HFN, INC (Delaware (US))
**Registered Address** 90 WASHINGTON ST
NEWTON MA 02458
United States
**Inactive Directors / Officers** NATIONAL REGISTERED AGENTS, INC, agent
SRIDHAR SANTHANAM, chief executive officer
**Registry Page** https://bizfileonline.sos.ca.gov/sear...

## Recent filings for HFN, INC

*26 Apr 2018* SECRETARY OF STATE FORFEITURE

***Source*** *California Secretary of State, https://bizfileonline.sos.ca.gov/sear..., 10 Jul 2022*

**UPDATE FROM REGISTRY**

## Company Addresses

MAILING ADDRESS
90 WASHINGTON ST NEWTON MA 02458

## Latest Events

- **2014-12-22 - 2019-02-02** Addition of officer NATIONAL REGISTERED AGENTS, INC, agent
- **2021-04-22 - 2021-05-27** Addition of officer SRIDHAR SANTHANAM, chief executive officer
- **2021-04-22 - 2021-05-27** Change of status from 'Sos Forfeited' to 'Forfeited'

See all events

## Corporate Grouping USER CONTRIBUTED

None known. **Add one now?**

See all corporate groupings

## Similarly named companies

Found 40. Showing first 10

- **HFN, INC.** *(Delaware (US), 5 Jan 2012- )*
- branch **HFN, INC.** *(Connecticut (US), 11 Feb 2021- )*
- branch **HFN, INC.** *(Utah (US), 22 Sep 2017- )*
- branch **HFN, INC.** *(Missouri (US), 22 May 1986- )*
- inactive HFN, INC. *(Illinois (US), 21 Mar 1985- )*
- inactive branch nonprofit Home Today, Inc. *(Texas (US), 28 Sep 2017-10 Feb 2020)*
- inactive HFN, INC. *(California (US), 20 Nov 1986- 1 May 1989)*
- **HFN PUBLICATIONS INC.** *(New Jersey (US), 2 Sep 1983- )*
- **HFN VENTURES, INC.** *(Oklahoma (US), 18 Jul 2017- )*
- **HFN Consulting, Inc.** *(Minnesota (US), 27 Aug 2008- )*
- **HFN FOOD INC.** *(British Columbia (Canada), 30 Jul 2015- )*

HFN, INC > All officers

# SRIDHAR SANTHANAM

**Company**
inactive HFN, INC
**Name**
SRIDHAR SANTHANAM
**Address**
2099 GATEWAY PLACE #350, SAN JOSE, CA, 95110
**Position**
chief executive officer

## Other resources

- Search Google for 'SRIDHAR SANTHANAM'
- Search LittleSis for 'SRIDHAR SANTHANAM'

## Other officers in HFN, INC

NATIONAL REGISTERED AGENTS, INC , *agent*

## See all

*Last updated November 2 2022, 7:58AM (2 months ago)*

# EXHIBIT 3

# Malwarebytes Announces Partnership with Bask, a Division of Nanoheal

*New partnership expands Bask tech support footprint in endpoint protection for consumers and small businesses.*

Santa Clara, California – December 13, 2018 – Malwarebytes, the leading advanced endpoint protection and remediation solution, announced today a new partnership with Bask, a division of Nanoheal (www.nanoheal.com), a leader in consumer tech support. The partnership is an important step in Bask's focus and investment in supporting consumer and small business customers with premier endpoint protection.

Implementing Malwarebytes allows Bask to significantly expedite malware remediation for customer issues. Having malware remediation and protection together in a single, managed console, further amplifies Bask's reputation as one of the largest and best-rated consumer tech support companies in the United States.

*"At Bask, protecting customers is our highest priority. We constantly evaluate our partnerships to ensure that we're doing everything we can to efficiently remediate tech issues and keep their endpoints up and running," said Clancey Dollard, director of service delivery at Bask. "Our technicians and engineers, who use Malwarebytes for virus remediation, have always favored the tool. Not only has Malwarebytes surpassed our expectations for protection and remediation, their customer service has been exemplary."*

Malwarebytes Endpoint Protection

Privacy & Cookies Policy

Malwarebytes Endpoint Protection for business is built on the Malwarebytes platform and provides an endpoint security platform that combines seven detection and remediation technologies into a single, Cloud-managed endpoint agent, and detects and blocks more than seven million threats every day.

Key benefits include:

· Superior protection with multiple protection layers in a single platform

· Reduced cost and complexity—reducing time to install and application footprint

· Collaborative protection with cross-layer shared intelligence

· Compatibility across device types and software preferences

"The partnership with Bask is a big win for Malwarebytes in the consumer and small business market space," said Raj Mallempati, Senior Vice President of Marketing, Malwarebytes. "Moving beyond our core strength as the single best remediation tool available, our products and services are now recognized for providing corporate endpoint customers with proactive security and ease of use. The opportunity to work with Bask, which has a huge managed security practice, will help us continue to grow our network of satisfied users."

About Bask

Based in Orem, Utah, Bask, a division of Nanoheal, offers more than technical support, they provide people support. The company empowers its home and small business customers to embrace new technology and stay protected from threats to their privacy and data by combining top-rated software with advice and solutions from an all U.S.-based team of Technology Advisors. Bask provides assistance when people need it, for any device, in everyday language. For more information, visit www.bask.com.

About Malwarebytes

Malwarebytes proactively protects people and businesses against dangerous threats such as malware, ransomware and exploits that escape detection by traditional antivirus solutions. Malwarebytes completely replaces antivirus with artificial intelligence-powered technology that stops cyberattacks before they can compromise home computers and business endpoints. More than 60,000 businesses and millions of people worldwide trust and recommend Malwarebytes solutions. Our team of threat researchers and security experts process emerging and established threats every day, from all over the globe. Founded in 2008, the company is headquartered in California, with offices in Europe and Asia. For more information, please visit us at http://www.malwarebytes.com/.

Malwarebytes founder and CEO Marcin Kleczynski started the company to create the best disinfection and protection solutions to combat the world's most harmful Internet threats. The market continues to recognize Marcin's advancements in cybersecurity with the recent recognition as "CEO of the Year" in the Global Excellence awards. He has also been named to the Forbes 30 Under 30 Rising Stars of Enterprise Technology list and received both the Silicon Valley Business Journal's 40 Under 40 and Ernst & Young Entrepreneur of the Year awards.

Follow us on

Facebook: https://www.facebook.com/Malwarebytes

Twitter: https://twitter.com/malwarebytes (@malwarebytes)

LinkedIn: https://www.linkedin.com/company/malwarebytes

YouTube: http://www.youtube.com/malwarebytes



Blog: https://blog.malwarebytes.com/

share: f 🐦 ℗ in

NO COMMENTS

## Related Post

TCS and Nanoheal to Provide Digital Workspace Auto

5 Ways CBD Can Improve Your Daily Life

Seed Group inks deal with Nanoheal to Usher in AI-

Search

## Recent Posts

5 Ways CBD Can I
September 11, 2021

Seed Group inks deal wit
June 15, 2021

Top Technology Predictio
February 5, 2021

Helpdesk Automation Mark
January 15, 2021

How Fast is your IT Issu
December 18, 2020

nanoheal™
Resolutions within.

Enhance your digital device experience with AI-driven automated issue remediation.

**Solutions**

Enterprises

Small Businesses

OEMs & Support Channels

**Learn**

Platform

Blog

Request a demo

**Company**

Contact Us

Privacy Policy

Newsroom

Privacy & Cookies Policy

# EXHIBIT 4

Malwarebytes Endpoint Protection

Malwarebytes

CASE STUDY

# "Malwarebytes gives us the strong protection we need to stay secure."

**Inundated** with ransomware attacks

**Legacy products** ineffective

**Eliminated malware** disruptions

## Challenges

- **Malware attacks** were focused on financial gain
- **Multiple attacks** were coming in the form of ransomware
- **Weak protection** from current products
- **IT teams were spending time manually searching** for malware on devices

## Reasons for Choosing Malwarebytes

- **Support team:** The Malwarebytes Premium Support subscription allows the IT team better access to Malwarebytes resources.
- **Guaranteed protection:** Teams rely on Malwarebytes to catch dangerous malware that was missed by other AV systems, like McAfee.
- **User-friendly:** Malwarebytes has an intuitive set up that allows IT to see and track their systems with the click of a button.

## How Malwarebytes Solved the Problem

- **Significantly reduced risk** of malware and ransomware infections
- **Simplified malware** detection and response
- **Eliminated malware-related disruptions** for users

## OVERVIEW

**CUSTOMER**

**San Francisco Symphony**
San Francisco, CA

250 employees

**INDUSTRY**

Nonprofit

**IT ENVIRONMENT**

McAfee antivirus, firewalls, Active Directory and group-based permissions

**SOLUTION**

Malwarebytes Endpoint Protection





Our McAfee solution just wasn't catching the dangerous malware and ransomware that are attacking us. Replacing it with Malwarebytes gives us the strong protection we need to stay secure.

Aaron Bennet, Chief Information Officer
The San Francisco Symphony

 malwarebytes.com/business  corporate-sales@malwarebytes.com  1.800.520.2796

Malwarebytes is a cybersecurity company that millions worldwide trust. Malwarebytes proactively protects people and businesses against malicious threats, including ransomware, that traditional antivirus solutions miss. The company's flagship product uses signature-less technologies to detect and stop a cyberattack before damage occurs. Learn more at www.malwarebytes.com.

Copyright © 2020, Malwarebytes. All rights reserved. Malwarebytes and the Malwarebytes logo are trademarks of Malwarebytes. Other marks and brands may be claimed as the property of others. All descriptions and specifications herein are subject to change without notice and are provided without warranty of any kind.

# EXHIBIT 5

This is Google's cache of https://www.godaddy.com/legal/agreements/godaddy-it-service-agreement. It is a snapshot of the page as it appeared on Jan 8, 2023 18:48:56 GMT. The current page could have changed in the meantime. Learn more.

**Full version** Text-only version View source

Tip: To quickly find your search term on this page, press **Ctrl+F** or **⌘-F** (Mac) and use the find bar.

# GoDaddy - GoDaddy IT Services Agreement

Last Revised: 10/21/2020

1 **Description of Services**

**GoDaddy IT Services.** We offer varying GoDaddy IT Services, powered by Bask ("GoDaddy IT Services") plans, which can include the following services:

- **Antivirus Protection.** Antivirus Protection includes preventing threats that traditional antivirus software can't stop. Actively blocks threats like worms, rogues, dialers, trojans, rootkits, spyware, exploits, bots, and other malware. Use your computer and mobile devices with confidence and peace of mind.
- **Data File Restore.** Data File Restore includes restoring files from your data backup or moving them from one computer to another.
- **New Computer Setup.** It doesn't matter if it's a PC or a Mac, desktop or laptop, we'll help you set up everything the way you want it. We'll remove bloatware, setup your Wi-Fi and network settings, sync to any subscribed cloud services, set up desired power settings, and more.
- **New Device Setup.** GoDaddy IT Services will help you set up any Apple or Android device. We'll help you connect to Wi-Fi, setup your non-GoDaddy email, and sync to the cloud. We'll help you personalize your device so you can feel confident using it.
- **OS Upgrade.** Whether you use a Mac or PC, we can help. We can take your computer through the upgrade process so you don't have to worry. Once the upgrade is complete, we'll show you what's changed so you can feel confident using your computer.
- **Printer Setup.** We'll help you connect your printer to your computer and a wireless network (if possible).

- **Social Media Access Settings.** We can help you adjust your account settings to protect your privacy and personal information so you stay safe online. We'll also teach you how to use a social media platform of your choice.

- **Software Install/Uninstall.** We can install or uninstall any standard software on your computer for you. We'll also show you how to run updates, uninstall unwanted software, and set up shortcuts to access your programs faster.

- **Tune-Up.** Getting a tune-up quarterly identifies and prevents several issues that can slow down your computer, including viruses and malware. Tune-ups ensure that your computer is functioning like it's meant to with improved speed and efficiency.

- **Virus & Malware Removal with @T[companyname:name]@T] IT Services Deep Clean.** Malware is any type of program used to attack or damage computers, including viruses, spyware, adware, worms, and Trojans. It can record your passwords and steal your information. It's often difficult to remove because bits of code are scattered inside other applications to hide them from your computer's operating system. A deep cleaning of your computer will ensure we remove every little piece of malware from your computer.

- **3rd Party Server SSL Certificate Installation/Configuration.** We'll install the encrypted data on your server so that you can secure/encrypt sensitive communication between your site and your customers. This isn't applicable to GoDaddy hosted websites.

## 2 ACCOUNT TERMINATION; LIMITATIONS

**GoDaddy Shopper ID.** In order to purchase the GoDaddy Paid IT Services, you must already have a GoDaddy Shopper ID and have created a GoDaddy account.

## 3 YOUR OBLIGATIONS; REPRESENTATIONS AND WARRANTIES

**Intellectual Property.** You represent and warrant that you have the necessary rights to any data, software programs, or services that you use in connection with your access or use of the GoDaddy IT Services and that such activities do not infringe the intellectual property or other proprietary rights of any third party.

## 4 PROVISIONS SPECIFIC TO PAID IT SERVICES

- **Bask Terms and Conditions.** We offer a variety of GoDaddy IT Services. The GoDaddy IT Services are available for purchase as stand-alone products and some are occasionally included for free with the purchase of other products. Your use of the GoDaddy IT Services is subject to the [Bask Terms and Conditions](https://www.bask.com/terms-conditions) and [Bask Privacy Policy](https://www.bask.com/privacy-policy), which is hereby incorporated by reference, including but not limited to terms therein governing privacy and the handling of your data. You hereby consent to the processing of your data and personal data by GoDaddy, Bask, and their respective affiliates, subsidiaries, and service

providers. You hereby acknowledge and agree that Bask may collect, use, transfer, disclose, and otherwise process your data, including personal data, as described in the [Bask Terms and Conditions](https://www.bask.com/terms-conditions) and [Bask Privacy Policy](https://www.bask.com/privacy-policy).

- **Nanoheal End-User License Agreement**. As part of the GoDaddy IT Services, you may be required to download and install a HFN, Inc. Software product, in order for a Bask agent to perform the GoDaddy IT Services. By installing, copying, or otherwise using this Software product, you agree to be bound to the terms of the [Nanoheal End-User License Agreement](https://nanoheal.com/eula/), which is hereby incorporated by reference.
- **Auto-Renewal Terms.** In lieu of any language, contained in Section 10 of the [Bask Terms and Conditions](https://www.bask.com/terms-conditions), pertaining to the Renewal of Customer's Paid IT Services, the Auto-Renewal Terms in Section 13 (A) of the GoDaddy Universal Terms of Service shall apply.
- **Refund Policy.** In lieu of Section 9 of the [Bask Terms and Conditions] (https://www.bask.com/terms-conditions), pertaining to refunds; the GoDaddy Refund Policy shall apply. In addition, for GoDaddy Paid IT Services, you shall not be eligible for a refund if the GoDaddy IT Services breakfix solution has already been performed.

We love taking your call.
GoDaddy guides
Sign up for news and special offers
Email address
Sign Up


About GoDaddy +

Help Center +

Resources +

Partner Programs +

Account +

Shopping +

GoDaddy

United States - English

USD

Legal

Privacy Policy

Cookies

Do not sell my personal information

Copyright © 1999 - 2023 GoDaddy Operating Company, LLC. All Rights Reserved. The GoDaddy word mark is a registered trademark of GoDaddy Operating Company, LLC in the US and other countries. The "GO" logo is a registered trademark of GoDaddy.com, LLC in the US.

Use of this Site is subject to express terms of use. By using this site, you signify that you agree to be bound by these Universal Terms of Service.

Domain Names Websites & Hosting

   

Location

# Santa Clara, CA

## Welcome to our newest location!

At the southern end of the south bay and just north of San Jose, you'll find our Santa Clara office that we opened in 2020. Working and living here means you're at the center of all the cultural opportunities Silicon Valley has to offer, plus you're not far from Northern California's natural delights and within driving distance to San Francisco.

Contact Us

# Commuting and office information.

We're actively reimagining what office life will look like to adjust to changes in how we work and live, but we can say for certain that you'll find easy parking for your car or bike, delicious catered lunches and free snacks, as well the use of our on-site gym for times when you need to clear your head and get the blow off steam.

GoDaddy Jobs

## Join us where you are.

Check out a wide variety of open positions.

View All Openings

Get the help you need 24/7. Call our expert Guides on 1-866-938-1119. We're here for you every step of the way.

> Visit > Locations > Santa Clara

We love taking your call.

Copyright © 1999 - 2023 GoDaddy Operating Company, LLC. All Rights Reserved. The GoDaddy word mark is a registered trademark of GoDaddy Operating Company, LLC in the US and other countries. The "GO" logo is a registered trademark of GoDaddy.com, LLC in the US.

Use of this Site is subject to express terms of use. By using this site, you signify that you agree to be bound by these Universal Terms of Service.

# EXHIBIT 6

# Receipt

CONTACT US 24/7 1-866-938-1119

№ 2403316390

**DATE:**
2022-12-10

**CUSTOMER #:**
29413195

**BILL TO:**
Allan Miller
3385 Claudia Dr,
Concord, California 94519,
United States
+1.6504687387

**PAYMENT:**

| | |
|---|---|
| Visa •••• 9104 | $80.68 |
| **Previous Balance** | $80.68 |
| **Received Payment** | ($80.68) |
| **Balance Due (USD)** | **$0.00** |

| Term | Product | Amount |
|---|---|---|
| 2 yrs | .COM Domain Renewal<br>SUSANREDHOUSE.COM [1] | $39.98 |
| 2 yrs | .COM Domain Renewal<br>SUSANSREDHOUSE.COM [1] | $39.98 |
| | **Subtotal** | **$79.96** |
| | Taxes | $0.00 |
| | Fees | $0.72 |
| | **Total (USD)** | **$80.68** |

REFERENCE

| | Taxes | | $0.00 |
|---|---|---|---|

GoDaddy.com, LLC
2155 E GoDaddy Way,
Tempe, Arizona 85284,
United States

$0.00

| | Fees | | $0.72 |
|---|---|---|---|
| 1. | ICANN | | $0.72 |
| | SUSANREDHOUSE.COM | $0.36 | |
| | SUSANSREDHOUSE.COM | $0.36 | |

Universal Terms of Service

# EXHIBIT 7

Case 2:23Case03723-cvMR533oVOmeDtcl9m1entF1led Filed082/36/P3ageP1age258 of age59 of 266

1/13/23, 4:04 PM TCS partners Nanoheal to provide self-healing device management solutions | Mint

mint

e-paper

Home Latest News Markets Premium Money Mutual Fund Industry Companies Technology Opinion Web Stories

Upto 20% off* on premium plans Subscribe Now

Advertisement

Home / Companies / News / TCS partners Nanoheal to provide self-healing device management solutions

# TCS partners Nanoheal to provide self-healing device management solutions

1 min read . Updated: 19 Feb 2019, 06:08 PM IST

IANS

TATA
TATA CONSULTANCY SERVICES

*(Mint)*

SYNOPSIS

- *The partnership is aimed at providing an error-free enterprise workspace, says TCS*
- *Nanoheal will provide smart hands-off tools to automate workspace management operations, drastically reduce resolution time and monitor device performance*

**Bengaluru:** Indian IT bellwether Tata Consultancy Services (TCS) on Tuesday announced its partnership with Bengaluru-based predictive workspace automation provider Nanoheal to facilitate enterprises' cognitive and self-healing end-user device management

OPEN IN APP

https://www.livemint.com/companies/news/tcs-partners-nanoheal-to-provide-self-healing-device-management-solutions-1550579342179.html 1/4

mint

e-paper

Home Latest News Markets Premium Money Mutual Fund Industry Companies Technology Opinion Web Stories

of customers
reply to your
surveys?
Learn more
dialpad

Combining TCS' workspace management and deep delivery capabilities with Nanoheal's automated, proactive, self-healing device platform, the partnership is aimed at providing an error-free enterprise workspace, TCS said in a statement.

Children in Ukraine in the Crossfire
UNICEF USA | Sponsored

Kitty Sift Disposable Cat Litter Box, 6 count, Large
$23.99 - Chewy... | Sponsored

Kitty Sift Disposable Sifting Cat Litter Box Kit, Jumbo
$30.99 - Chewy... | Sponsored

Gwen Stefani, 53, Takes Off Makeup, Leaves Us

rtner with Nanoheal to provide our customers with automated solutions that free up their resources from mundane asks to focus on forward-thinking initiatives that help them thrive as Business 4.0 enterprises," said Raman President and Global Head, Alliances and Technology Unit, TCS.

Nanoheal will provide smart hands-off tools to automate workspace management operations, drastically reduce resolution time and formance.

Advertisement

40 Historic Figures Who Were Actually Photographed

What, if anything, can you do to prepare for a recession?

PREMIUM
Mint Explainer: After covid, the unfolding of an unfair world

West Bengal Bar Council to observe 'Black Day' on Jan 16 - he...

PREMIUM
Inflation regrets? The Federal Reserve has too few

World's longest river cruise Ganga Vilas 'fully booked' till ...

Horoscope Today: Money astrological predictions for 14th Janu...



# Tata Consultancy Services

Website Directions Save Call

4.2 ★★★★ 50 Google reviews

Software company in Santa Clara, California

**Address:** 5201 Great America Pkwy #522, Santa Clara, CA 95054

**Hours:** Open · Closes 5 PM

**Phone:** (408) 200-2943

Suggest an edit · Own this business?

## Questions & answers

Ask a question

Be the first to ask a question

**Send to your phone** Send

## Reviews

Write a review Add a photo

"Nice **location** and good place"
★★★★★

"Great office, its a **customer center** of TCS here."
★★★★★

"**Coffee** served has no taste"
★★★★

View all Google reviews

# EXHIBIT 8

**Subject:** Shareholder meeting
**Date:** Wednesday, July 6, 2022 at 11:27:23 AM Pacific Daylight Time
**From:** Allan Miller
**To:** Sridar Santhanam
**CC:** Shirish Nimgaonkar, Ruby Jha, Kumar Shiralagi, Vani Kola
**BCC:** Max Kupchik, William Harding, Dennis Callagy, Chet Jakubowski, Dick Gabriel, Scott Noone, John Murgo, Victoria Dudin, Geoff Meek, Jake Paine, Wayne Wetzel
**Attachments:** meeting-request-signed.pdf

Dear Mr. Santhanam:

The Bylaws of HFN Inc. require an annual shareholder meeting on the last Tuesday of April. It has been over 10 years since the last shareholder meeting on January 18, 2012.

As I'm sure you're aware, it is within my rights as a shareholder to ask for a shareholder meeting, and I am therefore doing so now. I'm sure all the shareholders are looking forward to hearing about the performance and plans of HFN. Please schedule this meeting for a time within the next three weeks and let us know when and how you plan to hold it.

Sincerely,

Allan A. Miller

bcc (minority shareholders/representatives): Max Kupchik, William Harding, Dennis Callagy, Chet Jakubowski, Dick Gabriel, Scott Noone, John Murgo, Victoria Dudin, Geoff Meek, Jake Paine, Wayne Wetzel

# EXHIBIT 9

Allan Miller
3385 Claudia Dr.
Concord, CA 94519

650-468-7387
allan.miller@alumni.stanford.edu

July 6, 2022

Sridhar Santhanam, CEO
Nanoheal by HFN Inc.
514 East Timpanogos Circle,
Building G, Suite 2100
Orem, Utah 84097

855-436-4621
sridhar@nanoheal.com

Dear Mr. Santhanam:

The Bylaws of HFN Inc. require an annual shareholder meeting on the last Tuesday of April. It has been over 10 years since the last shareholder meeting on January 18, 2012.

As I'm sure you're aware, it is within my rights as a shareholder to ask for a shareholder meeting, and I am therefore doing so now. I'm sure all the shareholders are looking forward to hearing about the performance and plans of HFN. Please schedule this meeting for a time within the next three weeks and let us know when and how you plan to hold it.

Sincerely,

Allan A. Miller 7/6/2022

Allan A. Miller

paper cc to:

Nanoheal
Salarpuria symbiosis Bannerghatta Main Rd Arekere, Venugopal Reddy Layout
Uttarahalli Hobli, Bengaluru, Karnataka 560076, India

cc (for HFN): Shirish Nimgaonkar, President and CSO; Ruby Jha, HR and Legal
cc (for Kalaari): Kumar Shiralagi, Board Member; Vani Kola, Managing Director
bcc (minority shareholders/representatives): Max Kupchik, William Harding, Dennis Callagy, Chet Jakubowski, Dick Gabriel, Scott Noone, John Murgo, Victoria Dudin, Geoff Meek, Jake Paine, Wayne Wetzel

# EXHIBIT 10

# BYLAWS

# OF

# HFN, INC.

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE I | CORPORATE OFFICES | 1 |
| 1.1 | REGISTERED OFFICE. | 1 |
| 1.2 | OTHER OFFICES. | 1 |
| ARTICLE II | MEETINGS OF STOCKHOLDERS | 1 |
| 2.1 | PLACE OF MEETINGS. | 1 |
| 2.2 | ANNUAL MEETING. | 1 |
| 2.3 | SPECIAL MEETING. | 1 |
| 2.4 | NOTICE OF STOCKHOLDERS' MEETINGS. | 2 |
| 2.5 | MANNER OF GIVING NOTICE; AFFIDAVIT OF NOTICE. | 2 |
| 2.6 | QUORUM. | 2 |
| 2.7 | ADJOURNED MEETING; NOTICE. | 2 |
| 2.8 | CONDUCT OF BUSINESS. | 3 |
| 2.9 | VOTING. | 3 |
| 2.10 | STOCKHOLDER ACTION BY WRITTEN CONSENT WITHOUT A MEETING. | 3 |
| 2.11 | RECORD DATE FOR STOCKHOLDER NOTICE; VOTING; GIVING CONSENTS. | 3 |
| 2.12 | PROXIES. | 4 |
| 2.13 | LIST OF STOCKHOLDERS ENTITLED TO VOTE. | 4 |
| ARTICLE III | DIRECTORS | 5 |
| 3.1 | POWERS. | 5 |
| 3.2 | NUMBER OF DIRECTORS. | 5 |
| 3.3 | ELECTION, QUALIFICATION AND TERM OF OFFICE OF DIRECTORS. | 5 |
| 3.4 | RESIGNATION AND VACANCIES. | 5 |
| 3.5 | PLACE OF MEETINGS; MEETINGS BY TELEPHONE. | 6 |
| 3.6 | REGULAR MEETINGS. | 6 |
| 3.7 | SPECIAL MEETINGS; NOTICE. | 6 |
| 3.8 | QUORUM. | 7 |
| 3.9 | BOARD ACTION BY WRITTEN CONSENT WITHOUT A MEETING. | 7 |
| 3.10 | FEES AND COMPENSATION OF DIRECTORS. | 7 |
| 3.11 | APPROVAL OF LOANS TO OFFICERS. | 7 |
| 3.12 | REMOVAL OF DIRECTORS. | 7 |
| ARTICLE IV | COMMITTEES | 8 |
| 4.1 | COMMITTEES OF DIRECTORS. | 8 |
| 4.2 | COMMITTEE MINUTES. | 8 |
| 4.3 | MEETINGS AND ACTION OF COMMITTEES. | 8 |
| ARTICLE V | OFFICERS | 9 |
| 5.1 | OFFICERS. | 9 |
| 5.2 | APPOINTMENT OF OFFICERS. | 9 |
| 5.3 | SUBORDINATE OFFICERS. | 9 |
| 5.4 | REMOVAL AND RESIGNATION OF OFFICERS. | 9 |
| 5.5 | VACANCIES IN OFFICES. | 9 |
| 5.6 | CHAIRPERSON OF THE BOARD. | 10 |
| 5.7 | CHIEF EXECUTIVE OFFICER. | 10 |
| 5.8 | PRESIDENT. | 10 |

TABLE OF CONTENTS
*(Continued)*

| | | Page |
|---|---|---|
| 5.9 | VICE PRESIDENTS. | 10 |
| 5.10 | SECRETARY. | 10 |
| 5.11 | CHIEF FINANCIAL OFFICER. | 11 |
| 5.12 | ASSISTANT SECRETARY. | 11 |
| 5.13 | ASSISTANT TREASURER. | 11 |
| 5.14 | REPRESENTATION OF SHARES OF OTHER CORPORATIONS. | 12 |
| 5.15 | AUTHORITY AND DUTIES OF OFFICERS. | 12 |
| ARTICLE VI | RECORDS AND REPORTS | 12 |
| 6.1 | MAINTENANCE AND INSPECTION OF RECORDS. | 12 |
| 6.2 | INSPECTION BY DIRECTORS. | 12 |
| ARTICLE VII | GENERAL MATTERS | 13 |
| 7.1 | CHECKS. | 13 |
| 7.2 | EXECUTION OF CORPORATE CONTRACTS AND INSTRUMENTS. | 13 |
| 7.3 | STOCK CERTIFICATES; PARTLY PAID SHARES. | 13 |
| 7.4 | SPECIAL DESIGNATION ON CERTIFICATES. | 13 |
| 7.5 | LOST CERTIFICATES. | 14 |
| 7.6 | CONSTRUCTION; DEFINITIONS. | 14 |
| 7.7 | DIVIDENDS. | 14 |
| 7.8 | FISCAL YEAR. | 14 |
| 7.9 | SEAL. | 14 |
| 7.10 | TRANSFER OF STOCK. | 14 |
| 7.11 | STOCK TRANSFER AGREEMENTS. | 15 |
| 7.12 | REGISTERED STOCKHOLDERS. | 15 |
| 7.13 | WAIVER OF NOTICE. | 15 |
| ARTICLE VIII | NOTICE BY ELECTRONIC TRANSMISSION | 15 |
| 8.1 | NOTICE BY ELECTRONIC TRANSMISSION. | 15 |
| 8.2 | DEFINITION OF ELECTRONIC TRANSMISSION. | 16 |
| 8.3 | INAPPLICABILITY. | 16 |
| ARTICLE IX | AMENDMENTS | 16 |

# BYLAWS OF HFN, INC.

## ARTICLE I
## CORPORATE OFFICES

### 1.1 REGISTERED OFFICE.

The registered office of HFN, Inc. shall be fixed in the Corporation's certificate of incorporation, as the same may be amended from time to time.

### 1.2 OTHER OFFICES.

The Corporation's Board of Directors (the "**Board**") may at any time establish other offices at any place or places where the Corporation is qualified to do business.

## ARTICLE II
## MEETINGS OF STOCKHOLDERS

### 2.1 PLACE OF MEETINGS.

Meetings of stockholders shall be held at any place, within or outside the State of Delaware, designated by the Board. The Board may, in its sole discretion, determine that a meeting of stockholders shall not be held at any place, but may instead be held solely by means of remote communication as authorized by Section 211(a)(2) of the Delaware General Corporation Law (the "**DGCL**"). In the absence of any such designation or determination, stockholders' meetings shall be held at the Corporation's principal executive office.

### 2.2 ANNUAL MEETING.

The annual meeting of stockholders shall be held each year. The Board shall designate the date and time of the annual meeting. In the absence of such designation the annual meeting of stockholders shall be held on the second Tuesday of May of each year at 10:00 a.m. However, if such day falls on a legal holiday, then the meeting shall be held at the same time and place on the next succeeding business day. At the annual meeting, directors shall be elected and any other proper business may be transacted.

### 2.3 SPECIAL MEETING.

A special meeting of the stockholders may be called at any time by the Board, chairperson of the Board, chief executive officer or president (in the absence of a chief executive officer) or by one or more stockholders holding shares in the aggregate entitled to cast not less than 10% of the votes at that meeting.

If any person(s) other than the Board call a special meeting, the request shall:

(i) be in writing;

(ii) specify the time of such meeting and the general nature of the business proposed to be transacted; and

(iii) be delivered personally or sent by registered mail or by facsimile transmission to the chairperson of the Board, the chief executive officer, the president (in the absence of a chief executive officer) or the secretary of the Corporation.

The officer(s) receiving the request shall cause notice to be promptly given to the stockholders entitled to vote at such meeting, in accordance with the provisions of Sections 2.4 and 2.5 of these bylaws, that a meeting will be held at the time requested by the person or persons calling the meeting. No business may be transacted at such special meeting other than the business specified in such notice to stockholders. Nothing contained in this paragraph of this Section 2.3 shall be construed as limiting, fixing, or affecting the time when a meeting of stockholders called by action of the Board may be held.

## 2.4 NOTICE OF STOCKHOLDERS' MEETINGS.

All notices of meetings of stockholders shall be sent or otherwise given in accordance with either Section 2.5 or Section 8.1 of these bylaws not less than 10 nor more than 60 business days before the date of the meeting to each stockholder entitled to vote at such meeting. The notice shall specify the place, if any, date and hour of the meeting, the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called.

## 2.5 MANNER OF GIVING NOTICE; AFFIDAVIT OF NOTICE.

Notice of any meeting of stockholders shall be given:

(i) if mailed, when deposited in the United States mail, postage prepaid, directed to the stockholder at his or her address as it appears on the Corporation's records; or

(ii) if electronically transmitted as provided in Section 8.1 of these bylaws.

An affidavit of the secretary or an assistant secretary of the Corporation or of the transfer agent or any other agent of the Corporation that the notice has been given by mail or by a form of electronic transmission, as applicable, shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

## 2.6 QUORUM.

The holders of a majority of the stock issued and outstanding and entitled to vote, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of the stockholders. If, however, such quorum is not present or represented at any meeting of the stockholders, then either (i) the chairperson of the meeting, or (ii) the stockholders entitled to vote at the meeting, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present or represented. At such adjourned meeting at which a quorum is present or represented, any business may be transacted that might have been transacted at the meeting as originally noticed.

## 2.7 ADJOURNED MEETING; NOTICE.

When a meeting is adjourned to another time or place, unless these bylaws otherwise require, notice need not be given of the adjourned meeting if the time, place if any thereof, and the means of remote communications if any by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is

taken. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 business days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

2.8 CONDUCT OF BUSINESS.

The chairperson of any meeting of stockholders shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of business.

2.9 VOTING.

The stockholders entitled to vote at any meeting of stockholders shall be determined in accordance with the provisions of Section 2 of these bylaws, subject to Section 217 (relating to voting rights of fiduciaries, pledgors and joint owners of stock) and Section 218 (relating to voting trusts and other voting agreements) of the DGCL.

Except as may be otherwise provided in the certificate of incorporation or these bylaws, each stockholder shall be entitled to one vote for each share of capital stock held by such stockholder.

2.10 STOCKHOLDER ACTION BY WRITTEN CONSENT WITHOUT A MEETING.

Unless otherwise provided in the certificate of incorporation, any action required by the DGCL to be taken at any annual or special meeting of stockholders of a corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the Corporation as provided in Section 228 of the DGCL. In the event that the action which is consented to is such as would have required the filing of a certificate under any provision of the DGCL, if such action had been voted on by stockholders at a meeting thereof, the certificate filed under such provision shall state, in lieu of any statement required by such provision concerning any vote of stockholders, that written consent has been given in accordance with Section 228 of the DGCL.

2.11 RECORD DATE FOR STOCKHOLDER NOTICE; VOTING; GIVING CONSENTS.

In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board may fix, in advance, a record date, which record date shall not precede the date on which the resolution fixing the record date is adopted and which shall not be more than 60 nor less than 10 business days before the date of such meeting, nor more than 60 business days prior to any other such action.

If the Board does not so fix a record date:

(i) The record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

(ii) The record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when no prior action by the Board is necessary, shall be the day on which the first written consent is expressed.

(iii) The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided, however*, that the Board may fix a new record date for the adjourned meeting.

2.12 PROXIES.

Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy authorized by an instrument in writing or by a transmission permitted by law filed in accordance with the procedure established for the meeting, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Section 212 of the DGCL.

2.13 LIST OF STOCKHOLDERS ENTITLED TO VOTE.

The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least 10 business days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. The Corporation shall not be required to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of at least 10 business days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the Corporation's principal executive office. In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation. If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting. Such list shall presumptively determine the identity of the stockholders entitled to vote at the meeting and the number of shares held by each of them.

## ARTICLE III
## DIRECTORS

3.1 POWERS.

Subject to the provisions of the DGCL and any limitations in the certificate of incorporation or these bylaws relating to action required to be approved by the stockholders or by the outstanding shares, the business and affairs of the corporation shall be managed and all corporate powers shall be exercised by or under the direction of the Board.

3.2 NUMBER OF DIRECTORS.

The authorized number of directors shall be determined from time to time by resolution of the Board, provided the Board shall consist of at least one member. No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

3.3 ELECTION, QUALIFICATION AND TERM OF OFFICE OF DIRECTORS.

Except as provided in Section 3.4 of these bylaws, directors shall be elected at each annual meeting of stockholders to hold office until the next annual meeting. Directors need not be stockholders unless so required by the certificate of incorporation or these bylaws. The certificate of incorporation or these bylaws may prescribe other qualifications for directors. Each director, including a director elected to fill a vacancy, shall hold office until such director's successor is elected and qualified or until such director's earlier death, resignation or removal.

All elections of directors shall be by written ballot, unless otherwise provided in the certificate of incorporation; if authorized by the Board, such requirement of a written ballot shall be satisfied by a ballot submitted by electronic transmission, provided that any such electronic transmission must be either set forth or be submitted with information from which it can be determined that the electronic transmission authorized by the stockholder or proxy holder.

3.4 RESIGNATION AND VACANCIES.

Any director may resign at any time upon notice given in writing or by electronic transmission to the corporation. When one or more directors so resigns and the resignation is effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in this section in the filling of other vacancies.

Unless otherwise provided in the certificate of incorporation or these bylaws:

(i) Vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director.

(ii) Whenever the holders of any class or classes of stock or series thereof are entitled to elect one or more directors by the provisions of the certificate of incorporation, vacancies and newly created directorships of such class or classes or series may be filled by a majority of the directors elected by such class or classes or series thereof then in office, or by a sole remaining director so elected.

If at any time, by reason of death or resignation or other cause, the corporation should have no directors in office, then any officer or any stockholder or an executor, administrator, trustee or guardian of a stockholder, or other fiduciary entrusted with like responsibility for the person or estate of a stockholder, may call a special meeting of stockholders in accordance with the provisions of the certificate of incorporation or these bylaws, or may apply to the Court of Chancery for a decree summarily ordering an election as provided in Section 211 of the DGCL.

If, at the time of filling any vacancy or any newly created directorship, the directors then in office constitute less than a majority of the whole Board (as constituted immediately prior to any such increase), then the Court of Chancery may, upon application of any stockholder or stockholders holding at least 10% of the total number of the shares at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly created directorships, or to replace the directors chosen by the directors then in office as aforesaid, which election shall be governed by the provisions of Section 211 of the DGCL as far as applicable.

### 3.5 PLACE OF MEETINGS; MEETINGS BY TELEPHONE.

The Board may hold meetings, both regular and special, either within or outside the State of Delaware.

Unless otherwise restricted by the certificate of incorporation or these bylaws, members of the Board, or any committee designated by the Board, may participate in a meeting of the Board, or any committee, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

### 3.6 REGULAR MEETINGS.

Regular meetings of the Board may be held without notice at such time and at such place as shall from time to time be determined by the Board.

### 3.7 SPECIAL MEETINGS; NOTICE.

Special meetings of the Board for any purpose or purposes may be called at any time by the chairperson of the Board, the chief executive officer, the president, the secretary or any two directors.

Notice of the time and place of special meetings shall be:

(i) delivered personally by hand, by courier or by telephone;

(ii) sent by United States first-class mail, postage prepaid;

(iii) sent by facsimile; or

(iv) sent by electronic mail,

directed to each director at that director's address, telephone number, facsimile number or electronic mail address, as the case may be, as shown on the corporation's records.

If the notice is (i) delivered personally by hand, by courier or by telephone, (ii) sent by facsimile or (iii) sent by electronic mail, it shall be delivered or sent at least 24 hours before the time of the holding

of the meeting. If the notice is sent by United States mail, it shall be deposited in the United States mail at least four business days before the time of the holding of the meeting. Any oral notice may be communicated to the director. The notice need not specify the place of the meeting (if the meeting is to be held at the corporation's principal executive office) nor the purpose of the meeting.

3.8 QUORUM.

At all meetings of the Board, a majority of the authorized number of directors shall constitute a quorum for the transaction of business. The vote of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board, except as may be otherwise specifically provided by statute, the certificate of incorporation or these bylaws. If a quorum is not present at any meeting of the Board, then the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.

A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for that meeting.

3.9 BOARD ACTION BY WRITTEN CONSENT WITHOUT A MEETING.

Unless otherwise restricted by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board, or of any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

3.10 FEES AND COMPENSATION OF DIRECTORS.

Unless otherwise restricted by the certificate of incorporation or these bylaws, the Board shall have the authority to fix the compensation of directors.

3.11 APPROVAL OF LOANS TO OFFICERS.

The corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the corporation or of its subsidiary, including any officer or employee who is a director of the corporation or its subsidiary, whenever, in the judgment of the Board, such loan, guaranty or assistance may reasonably be expected to benefit the corporation. The loan, guaranty or other assistance may be with or without interest and may be unsecured, or secured in such manner as the Board shall approve, including, without limitation, a pledge of shares of stock of the corporation.

3.12 REMOVAL OF DIRECTORS.

Unless otherwise restricted by statute, the certificate of incorporation or these bylaws, any director or the entire Board may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors.

No reduction of the authorized number of directors shall have the effect of removing any director prior to the expiration of such director's term of office.

ARTICLE IV
COMMITTEES

4.1 COMMITTEES OF DIRECTORS.

The Board may designate one or more committees, each committee to consist of one or more of the directors of the corporation. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board or in these bylaws, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers that may require it; but no such committee shall have the power or authority to (i) approve or adopt, or recommend to the stockholders, any action or matter expressly required by the DGCL to be submitted to stockholders for approval, or (ii) adopt, amend or repeal any bylaw of the corporation.

4.2 COMMITTEE MINUTES.

Each committee shall keep regular minutes of its meetings and report the same to the Board when required.

4.3 MEETINGS AND ACTION OF COMMITTEES.

Meetings and actions of committees shall be governed by, and held and taken in accordance with, the provisions of:

(i) Section 3.5 (place of meetings and meetings by telephone);

(ii) Section 3.6 (regular meetings);

(iii) Section 3.7 (special meetings and notice);

(iv) Section 3.8 (quorum);

(v) Section 7.13 (waiver of notice); and

(vi) Section 3.9 (action without a meeting)

with such changes in the context of those bylaws as are necessary to substitute the committee and its members for the Board and its members. *However*:

(i) the time of regular meetings of committees may be determined either by resolution of the Board or by resolution of the committee;

(ii) special meetings of committees may also be called by resolution of the Board; and

(iii)    notice of special meetings of committees shall also be given to all alternate members, who shall have the right to attend all meetings of the committee.  The Board may adopt rules for the government of any committee not inconsistent with the provisions of these bylaws.

## ARTICLE V
## OFFICERS

### 5.1    OFFICERS.

The officers of the corporation shall be a president and a secretary.  The corporation may also have, at the discretion of the Board, a chairperson of the Board, a vice chairperson of the Board, a chief executive officer, a chief financial officer or treasurer, one or more vice presidents, one or more assistant vice presidents, one or more assistant treasurers, one or more assistant secretaries, and any such other officers as may be appointed in accordance with the provisions of these bylaws.  Any number of offices may be held by the same person.

### 5.2    APPOINTMENT OF OFFICERS.

The Board shall appoint the officers of the corporation, except such officers as may be appointed in accordance with the provisions of Sections 5.3 and 5.5 of these bylaws, subject to the rights, if any, of an officer under any contract of employment.

### 5.3    SUBORDINATE OFFICERS.

The Board may appoint, or empower the chief executive officer or, in the absence of a chief executive officer, the president, to appoint, such other officers and agents as the business of the corporation may require.  Each of such officers and agents shall hold office for such period, have such authority, and perform such duties as are provided in these bylaws or as the Board may from time to time determine.

### 5.4    REMOVAL AND RESIGNATION OF OFFICERS.

Subject to the rights, if any, of an officer under any contract of employment, any officer may be removed, either with or without cause, by an affirmative vote of the majority of the Board at any regular or special meeting of the Board or, except in the case of an officer chosen by the Board, by any officer upon whom such power of removal may be conferred by the Board.

Any officer may resign at any time by giving written notice to the corporation.  Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice.  Unless otherwise specified in the notice of resignation, the acceptance of the resignation shall not be necessary to make it effective.  Any resignation is without prejudice to the rights, if any, of the corporation under any contract to which the officer is a party

### 5.5    VACANCIES IN OFFICES.

Any vacancy occurring in any office of the corporation shall be filled by the Board or as provided in Section 5.3.

5.6 CHAIRPERSON OF THE BOARD.

The chairperson of the Board, if such an officer be elected, shall, if present, preside at meetings of the Board and exercise and perform such other powers and duties as may from time to time be assigned to him by the Board or as may be prescribed by these bylaws. If there is no chief executive officer or president, then the chairperson of the Board shall also be the chief executive officer of the corporation and shall have the powers and duties prescribed in Section 5.7 of these bylaws.

5.7 CHIEF EXECUTIVE OFFICER.

Subject to such supervisory powers, if any, as the Board may give to the chairperson of the Board, the chief executive officer, if any, shall, subject to the control of the Board, have general supervision, direction, and control of the business and affairs of the corporation and shall report directly to the Board. All other officers, officials, employees and agents shall report directly or indirectly to the chief executive officer. The chief executive officer shall see that all orders and resolutions of the Board are carried into effect. The chief executive officer shall serve as chairperson of and preside at all meetings of the stockholders. In the absence of a chairperson of the Board, the chief executive officer shall preside at all meetings of the Board.

5.8 PRESIDENT.

In the absence or disability of the chief executive officer, the president shall perform all the duties of the chief executive officer. When acting as the chief executive officer, the president shall have all the powers of, and be subject to all the restrictions upon, the chief executive officer. The president shall have such other powers and perform such other duties as from time to time may be prescribed for him by the Board, these bylaws, the chief executive officer or the chairperson of the Board.

5.9 VICE PRESIDENTS.

In the absence or disability of the president, the vice presidents, if any, in order of their rank as fixed by the Board or, if not ranked, a vice president designated by the Board, shall perform all the duties of the president. When acting as the president, the appropriate vice president shall have all the powers of, and be subject to all the restrictions upon, the president. The vice presidents shall have such other powers and perform such other duties as from time to time may be prescribed for them respectively by the Board, these bylaws, the chairperson of the Board, the chief executive officer or, in the absence of a chief executive officer, the president.

5.10 SECRETARY.

The secretary shall keep or cause to be kept, at the principal executive office of the corporation or such other place as the Board may direct, a book of minutes of all meetings and actions of directors, committees of directors, and stockholders. The minutes shall show

(i) the time and place of each meeting;

(ii) whether regular or special (and, if special, how authorized and the notice given);

(iii) the names of those present at directors' meetings or committee meetings;

(iv) the number of shares present or represented at stockholders' meetings;

(v) and the proceedings thereof.

The secretary shall keep, or cause to be kept, at the principal executive office of the corporation or at the office of the corporation's transfer agent or registrar, as determined by resolution of the Board, a share register, or a duplicate share register showing;

(i) the names of all stockholders and their addresses;

(ii) the number and classes of shares held by each;

(iii) the number and date of certificates evidencing such shares; and

(iv) the number and date of cancellation of every certificate surrendered for cancellation.

The secretary shall give, or cause to be given, notice of all meetings of the stockholders and of the Board required to be given by law or by these bylaws. The secretary shall keep the seal of the corporation, if one be adopted, in safe custody and shall have such other powers and perform such other duties as may be prescribed by the Board or by these bylaws.

5.11 CHIEF FINANCIAL OFFICER.

The chief financial officer shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the corporation, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital retained earnings, and shares. The books of account shall at all reasonable times be open to inspection by any director.

The chief financial officer shall deposit all moneys and other valuables in the name and to the credit of the corporation with such depositories as the Board may designate. The chief financial officer shall disburse the funds of the corporation as may be ordered by the Board, shall render to the chief executive officer or, in the absence of a chief executive officer, the president and directors, whenever they request it, an account of all his or her transactions as chief financial officer and of the financial condition of the corporation, and shall have other powers and perform such other duties as may be prescribed by the Board or these bylaws.

The chief financial officer shall be the treasurer of the corporation.

5.12 ASSISTANT SECRETARY.

The assistant secretary, or, if there is more than one, the assistant secretaries in the order determined by the stockholders or Board (or if there be no such determination, then in the order of their election) shall, in the absence of the secretary or in the event of the secretary's inability or refusal to act, perform the duties and exercise the powers of the secretary and shall perform such other duties and have such other powers as may be prescribed by the Board or these bylaws.

5.13 ASSISTANT TREASURER.

The assistant treasurer, or, if there is more than one, the assistant treasurers, in the order determined by the stockholders or Board (or if there be no such determination, then in the order of their election), shall, in the absence of the chief financial officer or in the event of the chief financial officer's inability or refusal to act, perform the duties and exercise the powers of the chief financial officer and

shall perform such other duties and have such other powers as may be prescribed by the Board or these bylaws.

### 5.14 REPRESENTATION OF SHARES OF OTHER CORPORATIONS.

The chairperson of the Board, the president, any vice president, the treasurer, the secretary or assistant secretary of this corporation, or any other person authorized by the Board or the president or a vice president, is authorized to vote, represent, and exercise on behalf of this corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of this corporation. The authority granted herein may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

### 5.15 AUTHORITY AND DUTIES OF OFFICERS.

In addition to the foregoing authority and duties, all officers of the corporation shall respectively have such authority and perform such duties in the management of the business of the corporation as may be designated from time to time by the Board or the stockholders.

## ARTICLE VI
## RECORDS AND REPORTS

### 6.1 MAINTENANCE AND INSPECTION OF RECORDS.

The corporation shall, either at its principal executive office or at such place or places as designated by the Board, keep a record of its stockholders listing their names and addresses and the number and class of shares held by each stockholder, a copy of these bylaws as amended to date, accounting books, and other records.

Any stockholder of record, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the corporation's stock ledger, a list of its stockholders, and its other books and records and to make copies or extracts therefrom. A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder. In every instance where an attorney or other agent is the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing that authorizes the attorney or other agent so to act on behalf of the stockholder. The demand under oath shall be directed to the corporation at its registered office in Delaware or at its principal executive office.

### 6.2 INSPECTION BY DIRECTORS.

Any director shall have the right to examine the corporation's stock ledger, a list of its stockholders, and its other books and records for a purpose reasonably related to his or her position as a director. The Court of Chancery is hereby vested with the exclusive jurisdiction to determine whether a director is entitled to the inspection sought. The Court may summarily order the corporation to permit the director to inspect any and all books and records, the stock ledger, and the stock list and to make copies or extracts therefrom. The Court may, in its discretion, prescribe any limitations or conditions with reference to the inspection, or award such other and further relief as the Court may deem just and proper.

## ARTICLE VII
## GENERAL MATTERS

7.1 CHECKS.

From time to time, the Board shall determine by resolution which person or persons may sign or endorse all checks, drafts, other orders for payment of money, notes or other evidences of indebtedness that are issued in the name of or payable to the corporation, and only the persons so authorized shall sign or endorse those instruments.

7.2 EXECUTION OF CORPORATE CONTRACTS AND INSTRUMENTS.

The Board, except as otherwise provided in these bylaws, may authorize any officer or officers, or agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the corporation; such authority may be general or confined to specific instances. Unless so authorized or ratified by the Board or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

7.3 STOCK CERTIFICATES; PARTLY PAID SHARES.

The shares of the corporation shall be represented by certificates, provided that the Board may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the corporation. Notwithstanding the adoption of such a resolution by the Board, every holder of stock represented by certificates and upon request every holder of uncertificated shares shall be entitled to have a certificate signed by, or in the name of the corporation by the chairperson or vice-chairperson of the Board, or the president or vice-president, and by the treasurer or an assistant treasurer, or the secretary or an assistant secretary of such corporation representing the number of shares registered in certificate form. Any or all of the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the corporation with the same effect as if he were such officer, transfer agent or registrar at the date of issue.

The corporation may issue the whole or any part of its shares as partly paid and subject to call for the remainder of the consideration to be paid therefor. Upon the face or back of each stock certificate issued to represent any such partly paid shares, upon the books and records of the corporation in the case of uncertificated partly paid shares, the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated. Upon the declaration of any dividend on fully paid shares, the corporation shall declare a dividend upon partly paid shares of the same class, but only upon the basis of the percentage of the consideration actually paid thereon.

7.4 SPECIAL DESIGNATION ON CERTIFICATES.

If the corporation is authorized to issue more than one class of stock or more than one series of any class, then the powers, the designations, the preferences, and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate that the corporation shall issue to represent such class or series of stock; *provided, however*, that, except as otherwise provided in Section 202 of the DGCL, in lieu of the foregoing requirements

there may be set forth on the face or back of the certificate that the corporation shall issue to represent such class or series of stock a statement that the corporation will furnish without charge to each stockholder who so requests the powers, the designations, the preferences, and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

### 7.5 LOST CERTIFICATES.

Except as provided in this Section 7.5, no new certificates for shares shall be issued to replace a previously issued certificate unless the latter is surrendered to the corporation and cancelled at the same time. The corporation may issue a new certificate of stock or uncertificated shares in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the corporation may require the owner of the lost, stolen or destroyed certificate, or such owner's legal representative, to give the corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

### 7.6 CONSTRUCTION; DEFINITIONS.

Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the DGCL shall govern the construction of these bylaws. Without limiting the generality of this provision, the singular number includes the plural, the plural number includes the singular, and the term "person" includes both a corporation and a natural person.

### 7.7 DIVIDENDS.

The Board, subject to any restrictions contained in either (i) the DGCL, or (ii) the certificate of incorporation, may declare and pay dividends upon the shares of its capital stock. Dividends may be paid in cash, in property, or in shares of the corporation's capital stock.

The Board may set apart out of any of the funds of the corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve. Such purposes shall include but not be limited to equalizing dividends, repairing or maintaining any property of the corporation, and meeting contingencies.

### 7.8 FISCAL YEAR.

The fiscal year of the corporation shall be fixed by resolution of the Board and may be changed by the Board.

### 7.9 SEAL.

The corporation may adopt a corporate seal, which shall be adopted and which may be altered by the Board. The corporation may use the corporate seal by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

### 7.10 TRANSFER OF STOCK.

Upon surrender to the corporation or the transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignation or authority to

transfer, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction in its books.

7.11 STOCK TRANSFER AGREEMENTS.

The corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the corporation to restrict the transfer of shares of stock of the corporation of any one or more classes owned by such stockholders in any manner not prohibited by the DGCL.

7.12 REGISTERED STOCKHOLDERS.

The corporation:

(i) shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends and to vote as such owner;

(ii) shall be entitled to hold liable for calls and assessments the person registered on its books as the owner of shares; and

(iii) shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

7.13 WAIVER OF NOTICE.

Whenever notice is required to be given under any provision of the DGCL, the certificate of incorporation or these bylaws, a written waiver, signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by the certificate of incorporation or these bylaws.

## ARTICLE VIII
## NOTICE BY ELECTRONIC TRANSMISSION

8.1 NOTICE BY ELECTRONIC TRANSMISSION.

Without limiting the manner by which notice otherwise may be given effectively to stockholders pursuant to the DGCL, the certificate of incorporation or these bylaws, any notice to stockholders given by the Corporation under any provision of the DGCL, the certificate of incorporation or these bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given. Any such consent shall be revocable by the stockholder by written notice to the corporation. Any such consent shall be deemed revoked if:

(i) the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent; and

(ii) such inability becomes known to the secretary or an assistant secretary of the Corporation or to the transfer agent, or other person responsible for the giving of notice.

However, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

Any notice given pursuant to the preceding paragraph shall be deemed given:

(i) if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice;

(ii) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice;

(iii) if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (A) such posting and (B) the giving of such separate notice; and

(iv) if by any other form of electronic transmission, when directed to the stockholder.

An affidavit of the secretary or an assistant secretary or of the transfer agent or other agent of the corporation that the notice has been given by a form of electronic transmission shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

8.2 DEFINITION OF ELECTRONIC TRANSMISSION.

An "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

8.3 INAPPLICABILITY.

Notice by a form of electronic transmission shall not apply to Sections 164, 296, 311, 312 or 324 of the DGCL.

## ARTICLE IX
## AMENDMENTS

These bylaws may be adopted, amended or repealed by the stockholders entitled to vote. However, the corporation may, in its certificate of incorporation, confer the power to adopt, amend or repeal bylaws upon the directors. The fact that such power has been so conferred upon the directors shall not divest the stockholders of the power, nor limit their power to adopt, amend or repeal bylaws.

HFN, INC.

**CERTIFICATE OF ADOPTION OF BYLAWS**

The undersigned hereby certifies that he or she is the duly elected, qualified, and acting Secretary of HFN, Inc., a Delaware corporation and that the foregoing bylaws, comprising eighteen (18) pages, were adopted as the corporation's bylaws on January [______], 2012 by the Corporation's board of directors or action by sole incorporator.

**IN WITNESS WHEREOF**, the undersigned has hereunto set his or her hand this [______] day of January, 2012.

Secretary

# EXHIBIT 11

**Subject:** Shareholder meeting update
**Date:** Sunday, July 17, 2022 at 10:08:14 PM Pacific Daylight Time
**From:** Allan Miller
**To:** Sridar Santhanam
**CC:** Shirish Nimgaonkar, Ruby Jha, Kumar Shiralagi, Vani Kola
**BCC:** Max Kupchik, William Harding, Dennis Callagy, Chet Jakubowski, Dick Gabriel, Scott Noone, John Murgo, Victoria Dudin, Geoff Meek, Jake Paine, Wayne Wetzel

Dear Mr. Santhanam:

Thank you for scheduling the shareholder meeting. Since it has been ten years since the last meeting, it will be useful for the shareholders to review some materials to understand the progress that the company has made. To that end, I'm exercising my rights as a shareholder to the books and records of the company to request copies of the following:

1. The current capitalization table of the company, identifying all classes of shares and any encumbrances, including unexercised outstanding options
2. A list of the current members of the Board of Directors of the company
3. The proposed slate of Directors of the company for election at the shareholder meeting
4. A list of all meetings of the Board of Directors of the company, with minutes, since 2012
5. Audited annual financials of the company for years ending March 2012 to 2022, broken down by division, including balance sheet, cash flow statement, and profit and loss statement
6. Unaudited financials of the company ending March 2017 to 2022 with monthly details, broken down by division, including balance sheet, cash flow statement, and profit and loss statement
7. A list of expenses and investments committed to or incurred by the company over the total amount of US$50,000 since 2012, with a description of the expense or investment
8. A list of all investments received by the company, whether debt or equity, since 2012, indicating the source and terms of the investment, including any valuation ascribed to the company
9. A list of customers acquired by the company since 2017, broken down by division
10. A list of customers lost by the company since 2017, broken down by division, with a description of why the customer was lost
11. The organization chart for the company, highlighting key roles, titles, and names
12. The total annual compensation including bonuses and incentives for all C-level management of the company since 2017
13. The current Human Resources manual of the company, including the expense policy and harassment policy
14. A list of any internal complaints to Human Resources at the company since 2015, describing the complaint, the resolution process, and the resolution
15. The current written security breach response plan for the company
16. A list of all security breaches since 2015 at the company, or at an end customer as a result of using the company's software
17. A list of all litigation in which the company was a plaintiff or defendant, including a copy of the complaint, a description of the termination of litigation, and the terms of any settlement
18. A list of all filings by the company with the United States Securities and Exchange Commission since 2012
19. A list of all patent activity at the company since 2012, including filing, prosecution, grant, abandonment, expiration, licensing, and assignment

I may have some additional requests for information to add after I hear from the other minority shareholders.

It has also come to my attention that the Bylaws of the company require that this shareholder meeting must be held at least 10 business days after, but no more than 60 business days after, the notice is sent. Since the current notice was sent on July 13, we can't have the meeting on July 21 as stated, so you will need to send out a new notice. Please select a day at least 10 business days after the notice is sent, but as soon as practical and no later than September 9, 2022. The 8 AM PST / 11 AM PST / 8:30 PM IST time is probably the most convenient for all concerned.

It will take a while to consider the information I have requested above, so please send it by the end of this week, July 22, 2022.

Thank you.

Sincerely,

Allan Miller

# EXHIBIT 12

**Subject:** Re: Shareholder meeting update
**Date:** Tuesday, August 9, 2022 at 2:54:37 PM Pacific Daylight Time
**From:** Allan Miller
**To:** Sridhar
**CC:** Ruby.Jha, HFN minority shareholders
**BCC:** Max Kupchik, William Harding, Dennis Callagy, Chet Jakubowski, Dick Gabriel, Scott Noone, John Murgo, Victoria Dudin, Geoff Meek, Jake Paine, Wayne Wetzel, Shirish Nimgaonkar
**Attachments:** nanoheal-cda-signed.pdf, image001.png

Hi Mr. Santhanam,

Thank you for going ahead with my request, which does indeed meet the requirements of the statue. As you are likely aware, the statue is silent on confidentiality agreements, but in Stroud v. Grace, the Chancery Court ruled that the board is obligated to send information a shareholder that first "execute[s] a **reasonable** confidentiality agreement." The agreement you had attached is plainly unreasonable, so I have taken the liberty to attach a **reasonable** confidentiality agreement. Please countersign and return it to me, so that we can proceed on this long-overdue shareholder meeting.

Thank you,
Allan Miller

> On 7/29/22, 9:50 PM, "Sridhar" <sridhar@nanoheal.com> wrote:
>
> Hi Allan,
>
> Thank you for resending the request for access to the business records of HFN, Inc. Unfortunately, the demand still does not meet the requirements of the Delaware statute. That said, HFN remains willing to provide business records consistent with the obligations of Delaware law provided that you execute the attached Confidentiality Agreement representing and warranting, among other things, that you are a valid stockholder, are making the demand for a proper purpose, and will maintain the confidentiality of the information provided.
>
> We note also that the requested items presume the existence of business records that may not exist or request narrative lists of certain events and/or records. HFN is not under an obligation to create documents, but to provide access to validly requested categories of existing business books and records, which HFN stands willing to do.
>
> Regards
>
> Sridhar

**From:** Allan Miller <allan.miller@alumni.stanford.edu>
**Sent:** Monday, July 25, 2022 11:40 AM
**To:** Sridhar <sridhar@nanoheal.com>
**Cc:** Shirish Nimgaonkar <shirish@nanoheal.com>; Ruby.Jha <ruby.jha@nanoheal.com>; Kumar Shiralagi <kumar@kalaari.com>; Vani Kola <vani@kalaari.com>; Arjun Sharma <arjun@kalaari.com>; HFN minority shareholders <hfn-minority-shareholders@epiimaging.com>
**Subject:** Re: Shareholder meeting update

[CAUTION: This Email is from outside the Organization. Unless you trust the sender, Don't click links or open attachments as it may be a Phishing email, which can steal your Information and compromise your Computer.]

Dear Mr. Santhanam:

Thank you for your response to my email. I'd like to set the record straight on my request for a shareholder meeting. My original request was on July 6, so if you had acted on it immediately, then indeed any meeting July 19 or later would have met the 10-day notice requirement. After 5 days of waiting for a response, I suggested some dates, mainly to provide times that would work for all who needed to be involved. In your response to me, you reminded me of the 10 day notice requirement and indicated that you would schedule a meeting complying with the requirement. Unfortunately, your response did not include all the shareholders, so on July 11, I sent an email to all the shareholders thanking you for reminding me of the notice requirement and reiterating my request for a shareholder meeting. On July 13, you inexplicably scheduled a meeting for July 21 that did NOT meet the notice requirement. Wanting to remain in compliance with the company Bylaws, I asked you to cancel and reschedule the meeting. The actual sequence of events is different from the rather confusing narrative in your message that seems to end up asking me to set the annual shareholder meeting, which I don't understand.

Let me reiterate: please schedule a shareholder meeting, compliant with the 10 day notice requirement. Given that we are now 18 days past my first request, please schedule the meeting as soon as practical and no later than September 9, 2022.

As you are aware, I am a record and beneficial holder of shares of HFN, Inc., a Delaware corporation.

Pursuant to Section 220 of the Delaware General Corporation Law, I hereby demand the right, during the usual hours of business and via electronic communication, to inspect the following books and records of the Company and to receive copies or extracts therefrom.

1. The current capitalization table of the company, identifying all classes of shares and any encumbrances, including unexercised outstanding options
2. A list of the current members of the Board of Directors of the company
3. The proposed slate of Directors of the company for election at the shareholder meeting

4.  A list of all meetings of the Board of Directors of the company, with minutes, since 2012

5.  Audited annual financials of the company for years ending March 2012 to 2022, broken down by division, including balance sheet, cash flow statement, and profit and loss statement

6.  Unaudited financials of the company ending March 2017 to 2022 with monthly details, broken down by division, including balance sheet, cash flow statement, and profit and loss statement

7.  A list of expenses and investments committed to or incurred by the company over the total amount of US$50,000 since 2012, with a description of the expense or investment

8.  A list of all investments received by the company, whether debt or equity, since 2012, indicating the source and terms of the investment, including any valuation ascribed to the company

9.  A list of customers acquired by the company since 2017, broken down by division

10. A list of customers lost by the company since 2017, broken down by division, with a description of why the customer was lost

11. The organization chart for the company, highlighting key roles, titles, and names

12. The total annual compensation including bonuses and incentives for all C-level management of the company since 2017

13. The current Human Resources manual of the company, including the expense policy and harassment policy

14. A list of any internal complaints to Human Resources at the company since 2015, describing the complaint, the resolution process, and the resolution

15. The current written security breach response plan for the company

16. A list of all security breaches since 2015 at the company, or at an end customer as a result of using the company's software

17. A list of all litigation in which the company was a plaintiff or defendant, including a copy of the complaint, a description of the termination of litigation, and the terms of any settlement

18. A list of all filings by the company with the United States Securities and Exchange Commission since 2012

19. A list of all patent activity at the company since 2012, including filing, prosecution, grant, abandonment, expiration, licensing, and assignment

I also reserve the right to ask for additional documents that may not be included in this list.

Purpose: As you are aware, the company has failed to have annual shareholder meetings for at least the last ten years, and the last shareholder meeting was held in 2012 under a cloud of suspicion that ultimately led to a shareholder lawsuit against the company in 2014. The company settled the suit for a dismissal with prejudice in 2015, after certain documents came to light casting significant doubt on the veracity and transparency of the corporate governance. Since no further information from the company has reached the shareholders, that is the current situation.

In the 2012 meeting, most of the documentation from the company arrived late and incomplete, and repeated requests by the shareholders for additional information went largely unheeded. I would like to avoid a repetition of this kind of shareholder meeting, so my request is to provide sufficient information about the company to the shareholders in advance of the meeting to enable a productive discussion during the meeting. You should have most of these documents available already.

Please advise me when you can have this list of documents ready to distribute to the shareholders, with sufficient time to review them prior to the meeting.

Allan Miller

> On 7/20/22, 12:45 PM, "Sridhar" <sridhar@nanoheal.com> wrote:
>
> Hi Allan
>
> Thank you for your email. With respect to your request to inspect the corporation's books and records, please submit a request that complies with Section 220 of the Delaware General Corporation Law. Upon receipt of a proper request and execution of a confidentiality agreement, we will make the corporations books and records available to you for inspection as required under Section 220 of the Delaware General Corporate Law.
>
> As you know, we are in the process of scheduling the annual meeting of stockholders. Although we sent a notice of the meeting, you objected to the date (even after we informed you of the 10 day requirement), requesting an earlier date that did not comply with the DE code or the Bylaws. We are looking for a date that works and intend to send a notice of the annual meeting shortly. If you would like to call a special meeting of the stockholders, please do so in compliance with Section 2.3 of the corporation's bylaws.

Regards

Sridhar

Get [Outlook for iOS]

**From:** Allan Miller <allan.miller@alumni.stanford.edu>
**Sent:** Wednesday, July 20, 2022 5:53:18 AM
**To:** Arjun Sharma <arjun@kalaari.com>
**Cc:** Sridhar <sridhar@nanoheal.com>; Shirish Nimgaonkar <shirish@nanoheal.com>; Ruby.Jha <ruby.jha@nanoheal.com>; Kumar Shiralagi <kumar@kalaari.com>; Vani Kola <vani@kalaari.com>
**Subject:** Re: Shareholder meeting update

[CAUTION: This Email is from outside the Organization. Unless you trust the sender, Don't click links or open attachments as it may be a Phishing email, which can steal your Information and compromise your Computer.]

Hi Arjun:

Thanks for the quick response. I usually don't hear from an attorney when I'm just looking for information about a shareholder meeting, but it's nice to meet you electronically, and of course it's always a delight to hear from a fellow shareholder.

I apologize if it sounded like my request was directed to anyone at Kalaari. The email was to Mr. Santhanam, and I cc'ed Ms. Kola and Mr. Shiralagi because, as you say, they are interested in efforts to make the company successful, and all the shareholder activities are part of those efforts. I'll continue to cc them (and add you) unless you confirm in writing that no one at Kalaari wants to be kept abreast of shareholder activities vis-à-vis the company.

I must say that I was surprised to find that Mr. Shiralagi is not on the Board of Directors. As of a few days ago, he was listed on the company web site as the only outside Board member. The company suddenly removed that page just in the past week, so now there is no public information at all about the company management. When did Mr. Shiralagi leave the Board? Are you able to share with me the minutes of the meeting where he was removed, or perhaps his resignation letter? Do you know who is on the Board at this time? None of this information seems to be forthcoming directly from the company.

Again, great to meet you, and thank you!

Allan

On 7/19/22, 7:01 AM, "Arjun Sharma" <arjun@kalaari.com> wrote:

Dear Mr. Miller

In relation to your earlier emails on conducting a stockholders' meeting and seeking business / operational information of HFN Inc. (Company), please note that Kalaari Capital Partners II, LLC (earlier known as IndoUS Venture Partners II, LLC) is a financial investor in the Company. Like any other portfolio company of ours, we look for appreciation of our investment value and an exit from the Company, which unfortunately has not been realized yet. Neither Kalaari nor any individual representing Kalaari is involved in the operations and management of the Company. Kalaari currently has not nominated anyone on the board of directors as well. The management team of the Company is led by Sridhar and Shirish. In this context, please direct your queries and information requests to Sridhar and Shirish and not involve us in those exchanges. We will participate in meetings that the Company calls for in the best interest of the Company and we appreciate and will be supportive of efforts to make the Company successful.

Regards

---

Arjun Sharma

Legal Counsel

arjun@kalaari.com | www.kalaari.com

M +91-9535833255

Kalaari Capital Advisors Pvt Ltd, Ground Floor, Unit-2, Navigator ITPB

Whitefield Road, Bangalore 560 066



**From:** Allan Miller <allan.miller@alumni.stanford.edu>
**Date:** Monday, July 18, 2022 at 10:38 AM
**To:** sridhar <sridhar@nanoheal.com>
**Cc:** Shirish Nimgaonkar <shirish@nanoheal.com>, Ruby Jha <ruby.jha@nanoheal.com>, Kumar Shiralagi <kumar@kalaari.com>, Vani Kola <vani@kalaari.com>
**Subject:** Shareholder meeting update

Dear Mr. Santhanam:

Thank you for scheduling the shareholder meeting. Since it has been ten years since the last meeting, it will be useful for the shareholders to review some materials to understand the progress that the company has made. To that end, I'm exercising my rights as a shareholder to the books and records of the company to request copies of the following:

1. The current capitalization table of the company, identifying all classes of shares and any encumbrances, including unexercised outstanding options

2. A list of the current members of the Board of Directors of the company

3. The proposed slate of Directors of the company for election at the shareholder meeting

4. A list of all meetings of the Board of Directors of the company, with minutes, since 2012

5. Audited annual financials of the company for years ending March 2012 to 2022, broken down by division, including balance sheet, cash flow statement, and profit and loss statement

6. Unaudited financials of the company ending March 2017 to 2022 with monthly details, broken down by division, including balance sheet, cash flow statement, and profit and loss statement

7. A list of expenses and investments committed to or incurred by the company over the total amount of US$50,000 since 2012, with a description of the expense or investment

8. A list of all investments received by the company, whether debt or equity, since 2012, indicating the source and terms of the investment, including any valuation ascribed to the company

9. A list of customers acquired by the company since 2017, broken down by division

10. A list of customers lost by the company since 2017, broken down by division, with a description of why the customer was lost

11. The organization chart for the company, highlighting key roles, titles, and names

12. The total annual compensation including bonuses and incentives for all C-level management of the company since 2017

13. The current Human Resources manual of the company, including the expense policy and harassment policy

14. A list of any internal complaints to Human Resources at the company since 2015, describing the complaint, the resolution process, and the resolution

15. The current written security breach response plan for the company

16. A list of all security breaches since 2015 at the company, or at an end customer as a result of using the company's software

17. A list of all litigation in which the company was a plaintiff or defendant, including a copy of the complaint, a description of the termination of litigation, and the terms of any settlement

18. A list of all filings by the company with the United States Securities and Exchange Commission since 2012

19. A list of all patent activity at the company since 2012, including filing, prosecution, grant, abandonment, expiration, licensing, and assignment

I may have some additional requests for information to add after I hear from the other minority shareholders.

It has also come to my attention that the Bylaws of the company require that this shareholder meeting must be held at least 10 business days after, but no more than 60 business days after, the notice is sent. Since the current notice was sent on July 13, we can't have the meeting on July 21 as stated, so you will need to send out a new notice. Please select a day at least 10 business days after the notice is sent, but as soon as practical and no later than September 9, 2022. The 8 AM PST / 11 AM PST / 8:30 PM IST time is probably the most convenient for all concerned.

It will take a while to consider the information I have requested above, so please send it by the end of this week, July 22, 2022.

Thank you.

Sincerely,

Allan Miller

# EXHIBIT 13

# MUTUAL NONDISCLOSURE AGREEMENT

THIS MUTUAL NONDISCLOSURE AGREEMENT (the "Agreement") is made and entered into as of this 9th day of August, 2022, by and between HFN, Inc. ("HFN"), with its principal place of business at 514 East Timpanogos Circle, Building G, Suite 2100, Orem, UT 84097, and Allan Miller ("Counterparty"), with its principal place of business 3385 Claudia Drive, Concord CA 94519.

1) Purpose. The Recipient wishes to inspect certain books and records of HFN in preparation for the annual shareholder meeting of HFN, and each party may disclose to the other certain confidential technical and business information which the disclosing party desires the receiving party to treat as confidential.

2) "Confidential Information" means any information disclosed by either party to the other party, either directly or indirectly, in writing, orally or by inspection of tangible objects (including without limitation documents, prototypes, samples, plans and equipment), which is designated as "Confidential," "Proprietary" or some similar designation. Confidential Information shall also include, without limitation, terms, conditions, pricing, notes, analyses, correspondence and draft documents regarding the annual shareholder meeting. Information communicated orally shall be considered Confidential Information if such information is identified orally as Confidential Information at the time of disclosure. Confidential Information may also include information disclosed to a disclosing party by third parties. Confidential Information shall not, however, include any information which: (i) was publicly known and made generally available in the public domain prior to the time of disclosure by the disclosing party; (ii) becomes publicly known and made generally available after disclosure by the disclosing party to the receiving party through no action or inaction of the receiving party; (iii) is already in the possession of the receiving party at the time of disclosure by the disclosing party as shown by the receiving party's files and records immediately prior to the time of disclosure; (iv) is obtained by the receiving party from a third party without a breach of such third party's obligations of confidentiality; or (v) is independently developed by the receiving party without use of or reference to the disclosing party's Confidential Information, as shown by documents and other competent evidence in the receiving party's possession.

3) Non-use and Non-disclosure.

   a) Each party agrees not to disclose any Confidential Information of the other party to third parties or to such party's employees or agents, except to those employees or agents of the receiving party who are required to have the information in order to evaluate or engage in discussions concerning the annual shareholder meeting.

   b) If receiving party is requested or required to disclose Confidential Information of the disclosing party by a governmental, judicial or regulatory authority or by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or other legally binding process, it is agreed that the receiving party will provide to the disclosing party prompt notice of any such request or requirement and provide reasonable cooperation to the disclosing party (at the disclosing party's expense) to enable the disclosing party the ability to seek an appropriate protective order or other appropriate remedy or to waive compliance with the provisions of this Agreement. In the event that such protective order or other remedy is not obtained, or the disclosing party grants a waiver hereunder, the receiving party subject to the disclosure requirement may furnish that portion (and only that portion) of the Confidential Information which it determines, with the advice of its counsel, it is legally compelled to disclose and will use reasonable efforts to obtain reliable assurance that confidential treatment will be maintained.

4) Maintenance of Confidentiality. Each party agrees that it shall take reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information of the other party. Without limiting the foregoing, each party shall take at least those measures that it takes to protect its own most highly confidential information and shall ensure that its employees and agents who have access to Confidential Information of the other party have signed a non-use and non-disclosure agreement in content similar to the provisions hereof (or are bound by similar professional obligations), prior to any disclosure of Confidential Information to such employees or agents. Each party shall reproduce the other party's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original.

5) No Obligation. Nothing herein shall obligate either party to proceed with any transaction between them, and

each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the annual shareholder meeting. Unless and until the parties execute a definitive written agreement regarding the Purpose, neither party will be under any legal obligation of any kind whatsoever with respect to the Purpose except for those obligations specifically agreed to in this Agreement. Without limiting the foregoing, in no event will either party allege that any oral discussions, emails, texts or the like constitute a binding agreement.

6) No Warranty. ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS". EACH PARTY MAKES NO WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING ITS ACCURACY, COMPLETENESS OR PERFORMANCE.

7) Return of Materials. All documents and other tangible objects containing or representing Confidential Information which have been disclosed by either party to the other party, and all copies thereof which are in the possession of the other party, shall be and remain the property of the disclosing party and shall be promptly returned to the disclosing party or destroyed, upon the disclosing party's written request.

8) No License. Nothing in this Agreement is intended to grant any implied rights or licenses to either party under any patent, trade secret, trademark, mask work right, copyright or any other intellectual property right in the applicable jurisdiction of the other party, nor shall this Agreement grant any party any rights in or to the Confidential Information of the other party except as expressly set forth herein.

9) Term. Except as set forth in Sections 3(b), which shall survive indefinitely, the obligations of each party hereunder shall survive for the lesser of: (i) three (3) years from the date of disclosure; or (ii) until such time as all Confidential Information of the disclosing party becomes publicly known and made generally available through no action or inaction of the receiving party.

10) Remedies. Each party agrees that any violation or threatened violation of this Agreement may cause irreparable injury to the other party, entitling the other party to seek injunctive relief in addition to all legal remedies.

11) Miscellaneous. This Agreement shall bind and inure to the benefit of the parties hereto and their successors and assigns (including without limitation all subsequent owners or exclusive licensees of any patent assets identified in connection with the Purpose of this Agreement). This Agreement shall be governed by the laws of the State of California, without reference to conflict of laws principles. All actions arising out of or relating to this Agreement (for clarity, said actions shall not include any action alleging or disputing infringement, validity, or enforceability of any patent) shall be heard and determined exclusively by the Superior Court of the State of California for the County of San Francisco or the United States District Court for the Northern District of California located in the County of San Francisco. This document contains the entire agreement between the parties with respect to the subject matter hereof, and neither party shall have any obligation, express or implied by law, with respect to trade secret or proprietary information of the other party except as set forth herein. Any failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision. This Agreement may not be amended, nor any obligation waived, except by a writing signed by both parties hereto.

Please confirm your agreement with the foregoing by signing and returning one copy of this Agreement to HFN, whereupon, when countersigned by HFN, this Agreement shall become a binding Agreement between HFN and the undersigned Counterparty. This Agreement may be executed by a facsimile signature or PDF copy of the original signature.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HFN INC.**

By: ______________________

Printed Name: Sridhar Santhanam

Title: CEO, HFN, Inc.

E-mail address: sridhar@nanoheal.com

Allan Miller **("COUNTERPARTY")**

By: Allan A. Miller

Printed Name: Allan Miller

Title: self

E-mail address: allan.miller@alumni.stanford.edu

# EXHIBIT 14

This is Google's cache of https://www.nanoheal.com/about-us/. It is a snapshot of the page as it appeared on Jul 9, 2022 02:00:32 GMT. The current page could have changed in the meantime. Learn more.

**Full version** Text-only version View source

Tip: To quickly find your search term on this page, press **Ctrl+F** or **⌘-F** (Mac) and use the find bar.

Our Story
Nanoheal provides automated, cognitive device user experien
sizes. Our innovative, patented platform provides companies
Businesses and Support Providers with everything needed to
end-user devices.
Our solutions give companies total transparency and complet
all with the fastest, most forward-thinking, future proof techn
laptop, tablet, smart phone, or IoT device, with Nanoheal you a
Privacy & Cookies Policy



## Our Values

We don't follow tents set in stone, but, collectively we've come to stand for something, which we've learnt to say in Latin.

mpled

**Contineo**

To touch or affect : Touch the life of every device user.

**Nitor**

To persevere : Strive to make tech support autonomous.

**Sin**

Indi peo

## Our Partners

We're exceptionally proud of the relationships that we built and success stories that we have created with amazing companies from across the globe.

Privacy & Cookies Policy

## Meet Our Leadership Team

Sridhar Santhanam
Founder & CEO

Shirish Nimgaonkar
President & CSO

Kumar Shiral
Board Membe

## We Stay Balanced to Three Key Anchors.

Privacy & Cookies Policy



## Happy Customers

We need to meet the expectations of our customers by delivering undeniable value and transforming their helpdesk into a next generation helpdesk, driving visible return on investment.



## Successful People

We are committed to retaining our top talent, allowing them to do their best work, grow exponentially and feel purpose in what they do and share the company's success.

Privacy & Cookies Policy



## Profitable Business

We have to strive to succeed in bringing the company's vision to life and continue to make a difference to the world by being on every device and scaling across millions of devices around the globe.

Start growing with Na
Automate, Manage and Drive powerful digital user
Workplace Analyt
Get Started
nanoheal
Resolutions within.
Enhance your digital device experience with AI-driven automated issue remediation.
Solutions
Enterprises
Small Businesses
OEMs & Support Channels
Learn
Platform
Blog
Request a demo
Company
About Us
Contact Us
Privacy Policy
Newsroom
Privacy & Cookies Policy

# EXHIBIT 15

Loading...

http://nanoheal.com/ |
14:34:31 July 30, 2022

Got an HTTP 302 response at crawl time

Redirecting to...

http://p3nlhclust404.shr.prod.phx3.secureserver.net/SharedContent/redirect_0.html

Impatient?

The Wayback Machine is an initiative of the Internet Archive, a 501(c)(3) non-profit, building a digital library of Internet sites and other cultural artifacts in digital form. Other projects include Open Library & archive-it.org.

Your use of the Wayback Machine is subject to the Internet Archive's Terms of Use.

1/29/23, 12:28 AM Site Suspended - This site has stepped out for a bit

The Wayback Machine - https://web.archive.org/web/20220730143432/http://p3nlhclust404.shr.prod.phx3.sec...

# This site has stepped out of a

**If you're the site owner, contact us at 1-480-505-8855.**

**If you are a visitor, please check back soon.**

1/1

# EXHIBIT 16

The Wayback Machine - https://web.archive.org/web/20220812212841/https://www.nanoheal.com/

- Simplify Technology Ownership.
- Simplify Technology Ownership.
- Simplify Technology Ownership.
- Simplify Technology Ownership.

Nanoheal's cognitive device experience management platform helps revolutionize workplace device management by using AI, Automation and Analytics.

Learn More
Simplify Technology Ownership.

## Zero-code Automation

Our patented script-less, zero-code architecture enables the combination of cognitive automation and centralized policy management for workplace devices.

## Predictive Self-Healing

Ability to predict and resolve issues before they happen and real-time analytics for automated workplace management, to improve business productivity and drive innovation.

## Proactive Remediation

Actionable alerts and notifications allow agents to be proactive in eliminating issues by triggering one-click resolutions silently on the end-user devices using an intuitive yet simple dashboard console.

## Automated ITSM

Embed next-gen technology within the service architecture by enforcing governance standards through automation, enabling stronger compliance and security.



## Insights & Analytics

Gain deep-dive visibility, analytics and manageability across your end-point infrastructure, and manage insights based on user groups and personas.

Measure individual user-experience by combining technical metrics and business drivers and get visibility & insights of your digital user experience across key areas.
The power of the platform.
Technology built on principles of tomorrow to offer tailor made solutions for any kind of business.
View
Predict
Automate
Manage
Analyze
Integrate
Unified view of device infrastructure
Logical categorization of devices using AI
Cognitive automation resolves issues e
Proactive IT Management
AI predicts failures before they occur
Connect all tools and sources

Technology built on principles of tomorrow to offer tailor made solutions for any kind of business.

Manage, deliver and drive powerful digital device experiences in the modern-day workplace by adopting a transformational AI & Automation based platform to manage workplace devices.

Learn More

Providing delightful service delivery and saving on costs is now within reach. Our simple, intuitive and scalable digital device experience management platform lets you manage all your devices and keep them hassle-free at all times.

Learn More

4 M

Software Installs

453

Self-Heal Configurations

276 M

Resolutions Performed

Deliver exceptional support services for PCs, laptops, tablets, smart phones, and other consumer electronics by using an automation platform to keep devices humming along.

93 %

Automation Coverage

Learn More

| Your Name | Your Company | Your Email | **Request For Demo** |
|---|---|---|---|

Enhance your digital device experience with AI-driven automated issue remediation.



Enterprises
Small Businesses
OEMs & Support Channels

Platform
Blog
Request a demo

Contact Us
Privacy Policy
Newsroom

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept", you consent to the use of ALL the cookies.

Cookie settings ACCEPT REJECT

# EXHIBIT 17

The Wayback Machine - https://web.archive.org/web/20220516193956/https://www.kalaari.com/kalaari-team/

- About
  - Team
  - Company
- About
  - Team
  - Company
  - Culture
  - Events
  - Hindustan Hamara
- Resources
- Portfolio
- News
- Innovation Partner
- Resources
- News
- PITCH
- PITCH

Phable

Why We Invested in Phable

26 April, 2022

Why We Invested in Bombay Play

25 April, 2022

Why We Invested in Baaz Bikes

18 April, 2022

[What is Conversational AI]

14 April, 2022

## Follow Us

- 
- 
- 
- 

# Meet

# the Team

The Kalaari team includes entrepreneurs, technologists, leaders, and seasoned professionals.

## Advisory Team

Investment

Services

Fellows

Board

Admin

1/20/23, 6:03 AM Kalaari Team – Kalaari Capital

Vani Kola

Managing Director

Rajesh Raju

Managing Director

Ravinder Singh

Partner

1/20/23, 6:03 AM Kalaari Team – Kalaari Capital

**Kiran Vasireddy**

Partner

**Vamshi Krishna Reddy**

Partner

**Kumar Shiralagi**

Venture Partner

4/6

**Avinash Ramanathan**

Vice President

**Kumar Ritesh**

Associate Vice President

## Connect with Our Team

Book a Session

Kalaari Recap
Subscribe to our Newsletter
Enter your email ID

subscribe
kalaari
capital
- CXXO
- Portfolio
- Innovation Partner
- News
About
- Team
- Company
- Culture
- Events
- Hindustan Hamara
- Resources
- Contact Us
- Pitch
- Refer a Founder
- +91-80-6715-9600
- Connect with Us
Designed by
PEPPER SQUARE
© 2021 Kalaari Capital
Privacy Policy

# EXHIBIT 18





# Meet
# **the Team**

The Kalaari team includes entrepreneurs, technologists, leaders, and seasoned professionals.

## Advisory Team

Investment

Services

Fellows

Board

Admin

(https://www.kalaari.com/kalaari_team/vani-kola/)

**Vani Kola (https://www.kalaari.com/kalaari_team/vani-kola/)**

Managing Director



(https://www.kalaari.com/kalaari_team/rajesh-raju/)



**Rajesh Raju (https://www.kalaari.com/kalaari_team/rajesh-raju/)**

Managing Director

(https://www.kalaari.com/kalaari_team/ravinder-singh/)



**Ravinder Singh (https://www.kalaari.com/kalaari_team/ravinder-singh/)**

Partner

(https://www.kalaari.com/kalaari_team/kiran-vasireddy/)



**Kiran Vasireddy (https://www.kalaari.com/kalaari_team/kiran-vasireddy/)**

Partner

(https://www.kalaari.com/kalaari_team/vamshi-reddy/)

**Vamshi Krishna Reddy (https://www.kalaari.com/kalaari_team/vamshi-reddy/)**

Partner

(https://www.kalaari.com/kalaari_team/avinash-ramanathan/)

**Avinash Ramanathan (https://www.kalaari.com/kalaari_team/avinash-ramanathan/)**

Vice President

(https://www.kalaari.com/kalaari_team/kumar-ritesh/)

**Kumar Ritesh (https://www.kalaari.com/kalaari_team/kumar-ritesh/)**

Associate Vice President

# Subscribe to our Newsletter

Enter your email ID

in

(https://www.linkedin.com/company/kalaari-capital?trk=tyah) (https://www.youtube.com/Kalaari) (https://twitter.com/TheKalaari)

**CXXO (http://cxxo.kalaari.com)**

**Portfolio (https://www.kalaari.com/portfolio/)**

**Innovation Partner (https://www.kalaari.com/innovation-partner/)**

**News (https://www.kalaari.com/news/)**

**About**

Team (https://www.kalaari.com/kalaari-team/)

Company (https://www.kalaari.com/company/)

Culture (https://www.kalaari.com/culture/)

Events (https://www.kalaari.com/events/)

Hindustan Hamara (https://www.kalaari.com/hindustanhamara/)

**Resources (https://www.kalaari.com/resources/)**

**Contact Us (https://www.kalaari.com/contact-us/)**

**Pitch (https://www.kalaari.com/pitch/)**

**Refer a Founder**

**+91-80-6715-9600 (tel:+918067159600)**

**Connect with Us (mailto:info@kalaari.com)**

Designed by

© 2021 Kalaari Capital

(https://www.peppersquare.com/)

Privacy Policy (/terms-of-use/#1630501092290-4fd76eea-c6ac) Cookies Policy (/terms-of-use/#1630501265022-5d16c67a-631b)
Terms of Use (/terms-of-use/#1630501053608-55d00683-174d)

kalaari
capital

# Meet
# the Team

The Kalaari team includes entrepreneurs, technologists, leaders, and seasoned professionals.

## Advisory Team

Investment

Services

Fellows

Board

Admin

(https://www.kalaari.com/kalaari_team/karthik-nageswaran/)

**Karthik Nageswaran (https://www.kalaari.com/kalaari_team/karthik-nageswaran/)**

Chief Financial Officer

(https://www.kalaari.com/kalaari_team/arjun-sharma/)

**Arjun Sharma (https://www.kalaari.com/kalaari_team/arjun-sharma/)**

Legal Counsel

(https://www.kalaari.com/kalaari_team/satish-hebbar/)

**Satish Hebbar (https://www.kalaari.com/kalaari_team/satish-hebbar/)**

Sr. Manager Finance & Accounts

(https://www.kalaari.com/kalaari_team/viraj-nair/)

**Viraj Nair (https://www.kalaari.com/kalaari_team/viraj-nair/)**

AVP – Thought Leadership, D&C



(https://www.kalaari.com/kalaari_team/paul-ebin-divakar/)

**Paul Ebin Divakar (https://www.kalaari.com/kalaari_team/paul-ebin-divakar/)**

Design

(https://www.kalaari.com/kalaari_team/aditya-viswanatha/)

**Aditya Viswanatha (https://www.kalaari.com/kalaari_team/aditya-viswanatha/)**

Vice President - Finance

## Subscribe to our Newsletter

Enter your email ID

in
(https://www.linkedin.com/company/kalaari-capital?trk=tyah) (https://twitter.com/Kalaari) (https://www.youtube.com/TheKalaari)

**CXXO (http://cxxo.kalaari.com)**

**Portfolio (https://www.kalaari.com/portfolio/)**

**Innovation Partner (https://www.kalaari.com/innovation-partner/)**

**News (https://www.kalaari.com/news/)**

**About**

Team (https://www.kalaari.com/kalaari-team/)

Company (https://www.kalaari.com/company/)

Culture (https://www.kalaari.com/culture/)

Events (https://www.kalaari.com/events/)

Hindustan Hamara (https://www.kalaari.com/hindustanhamara/)

**Resources (https://www.kalaari.com/resources/)**

**Contact Us (https://www.kalaari.com/contact-us/)**

**Pitch (https://www.kalaari.com/pitch/)**

**Refer a Founder**

**+91-80-6715-9600 (tel:+918067159600)**

**Connect with Us (mailto:info@kalaari.com)**

Designed by (https://www.peppersquare.com/)

**© 2021 Kalaari Capital**

Privacy Policy (/terms-of-use/#1630501092290-4fd76eea-c6ac) Cookies Policy (/terms-of-use/#1630501265022-5d16c67a-631b)
Terms of Use (/terms-of-use/#1630501053608-55d00683-174d)

kalaari
capital

≡

Meet

**the Team**

The Kalaari team includes entrepreneurs, technologists, leaders, and seasoned professionals.

## Advisory Team

Investment

Services

Fellows

Board

Admin

(https://www.kalaari.com/kalaari_team/anvita-khosla/)

**Anvita Khosla (https://www.kalaari.com/kalaari_team/anvita-khosla/)**

Fellow'21

(https://www.kalaari.com/kalaari_team/harish-sharma/)

**Harish Sharma (https://www.kalaari.com/kalaari_team/harish-sharma/)**

Fellow'21

(https://www.kalaari.com/kalaari_team/harshit-kumar/)

**Harshit Kumar (https://www.kalaari.com/kalaari_team/harshit-kumar/)**

Fellow'21

(https://www.kalaari.com/kalaari_team/jatin-nayak/)

**Jatin Nayak (https://www.kalaari.com/kalaari_team/jatin-nayak/)**

Fellow'21

(https://www.kalaari.com/kalaari_team/jayraj-bharat-patel/)



**Jayraj Bharat Patel (https://www.kalaari.com/kalaari_team/jayraj-bharat-patel/)**

Fellow'21

(https://www.kalaari.com/kalaari_team/kanika-mittal/)



**Kanika Mittal (https://www.kalaari.com/kalaari_team/kanika-mittal/)**

Fellow'21

(https://www.kalaari.com/kalaari_team/keshav-lohia/)



**Keshav Lohia (https://www.kalaari.com/kalaari_team/keshav-lohia/)**

Fellow'21

(https://www.kalaari.com/kalaari_team/nesar-rao/)

**Nesar Rao (https://www.kalaari.com/kalaari_team/nesar-rao/)**

Fellow'21

(https://www.kalaari.com/kalaari_team/niyati-bharne/)

**Niyati Bharne (https://www.kalaari.com/kalaari_team/niyati-bharne/)**

Fellow'21

(https://www.kalaari.com/kalaari_team/pranav-koshal/)

**Pranav Koshal (https://www.kalaari.com/kalaari_team/pranav-koshal/)**

Fellow'21

# Subscribe to our Newsletter

Enter your email ID

in
(https://www.linkedin.com/company/kalaari-capital?trk=tyah) (https://www.youtube.com/Kalaari) (https://twitter.com/TheKalaari)

**CXXO (http://cxxo.kalaari.com)**

**Portfolio (https://www.kalaari.com/portfolio/)**

**Innovation Partner (https://www.kalaari.com/innovation-partner/)**

**News (https://www.kalaari.com/news/)**

**About**

Team (https://www.kalaari.com/kalaari-team/)

Company (https://www.kalaari.com/company/)

Culture (https://www.kalaari.com/culture/)

Events (https://www.kalaari.com/events/)

Hindustan Hamara (https://www.kalaari.com/hindustanhamara/)

**Resources (https://www.kalaari.com/resources/)**

**Contact Us (https://www.kalaari.com/contact-us/)**

**Pitch (https://www.kalaari.com/pitch/)**

**Refer a Founder**

**+91-80-6715-9600 (tel:+918067159600)**

**Connect with Us (mailto:info@kalaari.com)**

1/29/23, 2:40 AM Kalaari Team – Kalaari Capital

Designed by

**© 2021 Kalaari Capital**

(https://www.peppersquare.com/)

Privacy Policy (/terms-of-use/#1630501092290-4fd76eea-c6ac) Cookies Policy (/terms-of-use/#1630501265022-5d16c67a-631b)

Terms of Use (/terms-of-use/#1630501053608-55d00683-174d)

≡

Meet

**the Team**

The Kalaari team includes entrepreneurs, technologists, leaders, and seasoned professionals.

## Advisory Team

Investment

Services

Fellows

Board

Admin

(https://www.kalaari.com/kalaari_team/resmah-mandary/)

**Resmah Mandary (https://www.kalaari.com/kalaari_team/resmah-mandary/)**

Board of Directors

(https://www.kalaari.com/kalaari_team/ramanand-guzadhur/)

**Ramanand Guzadhur (https://www.kalaari.com/kalaari_team/ramanand-guzadhur/)**

Board of Directors

---

(https://www.kalaari.com/kalaari_team/peter-john-harkin/)

**Peter John Harkin (https://www.kalaari.com/kalaari_team/peter-john-harkin/)**

Board of Directors

---

## Subscribe to our Newsletter

Enter your email ID

in
(https://www.linkedin.com/company/kalaari-capital?trk=tyah) (https://www.youtube.com/Kalaari) (https://twitter.com/TheKalaari)

**CXXO (http://cxxo.kalaari.com)**

**Portfolio (https://www.kalaari.com/portfolio/)**

**Innovation Partner (https://www.kalaari.com/innovation-partner/)**

**News (https://www.kalaari.com/news/)**

**About**

Team (https://www.kalaari.com/kalaari-team/)

Company (https://www.kalaari.com/company/)

Culture (https://www.kalaari.com/culture/)

Events (https://www.kalaari.com/events/)

Hindustan Hamara (https://www.kalaari.com/hindustanhamara/)

**Resources (https://www.kalaari.com/resources/)**

**Contact Us (https://www.kalaari.com/contact-us/)**

**Pitch (https://www.kalaari.com/pitch/)**

**Refer a Founder**

**+91-80-6715-9600 (tel:+918067159600)**

**Connect with Us (mailto:info@kalaari.com)**

Designed by (https://www.peppersquare.com/)

**© 2021 Kalaari Capital**

Privacy Policy (/terms-of-use/#1630501092290-4fd76eea-c6ac) Cookies Policy (/terms-of-use/#1630501265022-5d16c67a-631b)
Terms of Use (/terms-of-use/#1630501053608-55d00683-174d)

≡

Meet

**the Team**

The Kalaari team includes entrepreneurs, technologists, leaders, and seasoned professionals.

## Advisory Team

Investment

Services

Fellows

Board

Admin

(https://www.kalaari.com/kalaari_team/kandasamy-moorthy/)

**Kandasamy Moorthy (https://www.kalaari.com/kalaari_team/kandasamy-moorthy/)**

Sr. IT Executive

(https://www.kalaari.com/kalaari_team/padmavathi-sk/)

**Padmavathi SK (https://www.kalaari.com/kalaari_team/padmavathi-sk/)**

Sr. Executive Assistant

(https://www.kalaari.com/kalaari_team/padma-balaji/)

**Padma Balaji (https://www.kalaari.com/kalaari_team/padma-balaji/)**

Asst. Manager Admin & Operations

## Subscribe to our Newsletter

Enter your email ID

in

(https://www.linkedin.com/company/kalaari-capital?trk=tyah) (https://www.youtube.com/Kalaari) (https://twitter.com/TheKalaari)

**CXXO (http://cxxo.kalaari.com)**

**Portfolio (https://www.kalaari.com/portfolio/)**

**Innovation Partner (https://www.kalaari.com/innovation-partner/)**

**News (https://www.kalaari.com/news/)**

**About**

Team (https://www.kalaari.com/kalaari-team/)

Company (https://www.kalaari.com/company/)

Culture (https://www.kalaari.com/culture/)

Events (https://www.kalaari.com/events/)

Hindustan Hamara (https://www.kalaari.com/hindustanhamara/)

**Resources (https://www.kalaari.com/resources/)**

**Contact Us (https://www.kalaari.com/contact-us/)**

**Pitch (https://www.kalaari.com/pitch/)**

**Refer a Founder**

**+91-80-6715-9600 (tel:+918067159600)**

**Connect with Us (mailto:info@kalaari.com)**

Designed by (https://www.peppersquare.com/)

**© 2021 Kalaari Capital**

Privacy Policy (/terms-of-use/#1630501092290-4fd76eea-c6ac) Cookies Policy (/terms-of-use/#1630501265022-5d16c67a-631b) Terms of Use (/terms-of-use/#1630501053608-55d00683-174d)

# EXHIBIT 19

## Confidentiality Agreement

This Confidentiality Agreement (this "**Agreement**"), effective as of July 29th, 2022 (the "**Effective Date**"), is entered into by and between HFN, Inc., a Delaware corporation (the "**Disclosing Party**"), and Allan Miller, an individual (the "**Recipient**," and together with the Disclosing Party, the "**Parties**," and each, a "**Party**").

WHEREAS, in connection with the Recipient's demand dated July 24, 2022 to inspect certain books and records of Disclosing Party (the "**Inspection Demand**"), the Disclosing Party will provide to Recipient certain non-public, confidential, proprietary and other information ~~on the basis that such information is used solely for a proper purpose under Delaware Code Title 8 § 220 (the "**Purpose**")~~;

**Commented [AM1]:** When you actually read §220 you'll see that it's for "any proper purpose". You wouldn't want to invalidate the whole thing by referring to something in the preamble that doesn't exist.

WHEREAS, the Recipient desires to receive from the Disclosing Party such non-public, confidential, proprietary and other information on the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, the Disclosing Party will disclose such information to the Recipient, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, ~~and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged,~~ the Parties agree as follows:

**Commented [AM2]:** What consideration? This looks like a leftover from your commercial contract template.

1. Confidential Information. Except as set forth in Section 2 below, "**Confidential Information**" means all non-public, confidential or proprietary information disclosed before on, or after the Effective Date, by the Disclosing Party to the Recipient, ~~or to any of such Recipient's employees, officers, directors, partners, shareholders, agents, attorneys, accountants or advisors (collectively, "**Representatives**"),~~ whether disclosed or accessed in written, electronic or other form or media, and ~~whether or not~~ marked, designated or otherwise identified as "confidential." "**Affiliate**" means, with respect to ~~any Party~~the Disclosing Party, any person or entity that is directly or indirectly Controlling, Controlled by or under common Control with such Party, where "**Control**" and derivative terms mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person or entity, whether through the ownership of voting securities, by contract or otherwise.

**Commented [AM3]:** An individual doesn't have any of these. Another leftover from the commercial contract template.

**Commented [AM4]:** The way this is written, anything you ever say to me is confidential. That can't work at a shareholder meeting, so let's use my wording.

**Commented [AM5]:** No one is controlling me, or controlled by me. That isn't a thing for individuals.

Confidential Information includes, without limitation:

(a) All information concerning the past, present and future business affairs of the Disclosing Party or any of its Affiliates and their customers, suppliers and other third parties, including, without limitation, finances, customer information, shareholder information, supplier information, products, services, technology, organizational structure and internal practices, forecasts, governance records and practices, sales and other financial results, records and budgets, and business, marketing, development, sales and other commercial strategies;

(b) unpatented inventions, ideas, methods, and discoveries, trade secrets, know-how, unpublished patent applications and other confidential intellectual property of the Disclosing Party or any of its Affiliates;

(c) all designs, specifications, documentation, components, source code, object code, images, icons, audiovisual components and objects, schematics, drawings, protocols, processes and other visual depictions, in whole or in part, of any of the foregoing;

(d) all third-party confidential information (including, without limitation, any Personal Information as defined in Section 5 below) included with, or incorporated in, any information provided by the Disclosing Party to the Recipient or his Representatives;

(e) other information that would reasonably be considered non-public, confidential or proprietary given the nature of the information and the Disclosing Party's business; and

(f) all notes, analyses, compilations, reports, forecasts, studies, samples, data, statistics, summaries, interpretations and other materials (the "**Notes**") prepared by or for the Recipient or his Affiliates or Representatives that contain, are based on, or otherwise reflect or are derived from, in whole or in part, any of the foregoing.

**Commented [AM6]:** With my change, this section is not needed. Anything marked confidential is confidential. You can send restaurant menus marked confidential if you like, so there is no need for these limitations. Also, putting this in opens up the possibility that the document is not internally consistent.

2. Exclusions from Confidential Information. Except as required by applicable federal, state or local law or regulation, the term "**Confidential Information**" as used in this Agreement shall not include information that:

(a) at the time of disclosure is, or thereafter becomes, generally available to and known by the public other than as a result of, directly or indirectly, any breach of this Agreement or act or omission by the Recipient or any of his Representatives (except that any compilation of otherwise public information in a form not publicly known shall still be treated as Confidential Information); or

(b) at the time of disclosure is, or thereafter becomes, available to the Recipient on a non-confidential basis from a third-party source, as established by documentary evidence, provided that such third party, is not and was not prohibited from disclosing such Confidential Information to the Recipient by a legal, fiduciary or contractual obligation.

The Recipient shall have the burden of proving by clear and convincing evidence that one of the exclusions under Section 2 applies.

3. Recipient Obligations. The Recipient shall:

(a) protect and safeguard the confidentiality of all such Confidential Information;

~~(b) not use the Confidential Information, or permit it to be accessed or used, for any purpose other than the Purpose, or otherwise in any manner to the Disclosing Party's detriment;~~

**Commented [AM7]:** Just the fact that this is in here is a red alert, especially given what went on in the last shareholder meeting. This is not reasonable.

~~(c)~~(b) not disclose any Confidential Information to any person or entity, except to the Recipient's Representatives who: (i) need to know the Confidential Information to assist the Recipient, or act on its behalf, in relation to the Purpose; (ii) are informed in writing by the Recipient of the confidential nature of the Confidential Information; and (iii) are subject to confidentiality duties or obligations to the Recipient that are no less restrictive than the terms and conditions of this Agreement;

**Commented [AM8]:** I'm OK with this, ,but think about how you want to handle the disclosure of information during the shareholder meeting. I don't think it is de rigueur to have everyone at the meeting sign a confidentiality agreement.

~~(d) comply with all applicable on site access, remote access and related security rules and procedures of the Disclosing Party;~~

> **Commented [AM9]:** I don't know what these are, so I can't comply with them. In fact, one of the things I requested was these rules and procedures, so we'd be stuck in a loop with this in here.

~~(e)~~(c) immediately notify the Disclosing Party of any unauthorized access, disclosure, loss or misuse of any Confidential Information, or other breaches of this Agreement by the Recipient or his Representatives, of which the Recipient has knowledge;

~~(f)~~(d) use his best efforts to immediately contain and remedy any such unauthorized access, disclosure, loss or misuse;

~~(g)~~(e) fully cooperate with the Disclosing Party in any effort undertaken by the Disclosing Party to enforce his rights related to any such unauthorized disclosure; and

~~(h) be responsible for any breach of this Agreement caused by any of his Affiliates or Representatives.~~

> **Commented [AM10]:** As described earlier, since I'm an individual, I don't have any affiliates or representatives.

4. Additional Obligations.

~~(a) Except as required by applicable federal, state or local law or regulation, the Recipient shall not, and shall not permit his Affiliates or Representatives to, disclose to any person: (i) that the Confidential Information has been made available to the Recipient or his Representatives, or that he has inspected any portion of the Confidential Information; (ii) that discussions or negotiations may be, or are, underway between the Parties regarding the Confidential Information or the Purpose, including the status thereof; or (iii) any terms, conditions or other arrangements that are being discussed or negotiated in relation to the Confidential Information, the Purpose or this Confidentiality Agreement, including the existence of such agreement.~~

> **Commented [AM11]:** None of this applies. It again appears to be left over from the commercial contract.

~~(b)~~(a) Except with the prior written consent of the Disclosing Party, neither the Recipient nor his Representatives shall contact any Representative, shareholder, customer or supplier of the Disclosing Party with respect to the Confidential Information ~~or the Purpose~~.

> **Commented [AM12]:** No longer defined

5. Recipient Representations, Warranties and Covenants. The Recipient represents, warrants and covenants that:

(a) he is a legal holder of stock in HFN, Inc.;

(b) he is seeking the disclosure of business records in the possession of HFN, Inc. solely for a proper purpose under Delaware law.

(c) he does and will comply~~, and will require his Affiliates and Representatives to comply,~~ with all applicable federal, state and local privacy and data protection laws, regulations and directives in the maintenance, disclosure, use and disposal of all Personal Information contained in any Confidential Information that is disclosed to the Recipient or his Representatives hereunder. For purposes of this Agreement, "**Personal Information**" means information that: (i) relates to an individual person; and (ii) identifies or can be used to identify, locate or contact that individual alone or when combined with other personal or identifying information that is or can be associated with that specific individual;

~~(d) he will not transfer any Confidential Information to servers or persons located outside the United States of America;~~

Commented [AM13]: Since you are in India, this makes things a little inconvenient for email discussions. Apparently this is left over from the cross-border agreement template.

~~(e)~~(d) the performance of his obligations herein does not and will not violate any other contract or obligation to which the Recipient is a party, including covenants not to compete and confidentiality agreements;

~~(f)~~(e) he has implemented and will continue to maintain information security protocols to secure and protect the confidentiality of all Confidential Information in the Recipient's or his Representatives' possession or control from unauthorized access, disclosure, loss or misuse; and

~~(g)~~(f) he will, at Recipient's sole cost and expense: (i) promptly notify the Disclosing Party and all local, state and federal departments and agencies required to receive notice under applicable law as a result of unauthorized access or disclosure of Personal Information, and all persons whose Personal Information has been accessed or disclosed; and (ii) pay all associated claims and fines and reimburse Disclosing Party for all costs and expenses incurred by Disclosing Party in connection with or resulting from any unauthorized access or disclosure, including all costs of notice, remediation, claims and fines.

6. Required Disclosure. Any disclosure by the Recipient or his Representatives of Confidential Information pursuant to a valid order issued by a court or governmental agency of competent jurisdiction (a "**Legal Order**") shall be subject to the terms of this Section. Prior to making any such disclosure, the Recipient shall provide the Disclosing Party with:

(a) immediate written notice of such requirement so that the Disclosing Party may seek a protective order or other remedy; and

(b) reasonable assistance in opposing such disclosure or seeking a protective order or other limitations on disclosure.

If, after providing such notice and assistance as required herein, the Recipient remains subject to a Legal Order to disclose any Confidential Information, the Recipient shall disclose~~, and, if applicable, shall require his Affiliates, Representatives or other persons to whom such Legal Order is directed to disclose,~~ no more than that portion of the Confidential Information which, on the advice of the Recipient's legal counsel, such Legal Order specifically requires, and shall use commercially reasonable efforts to obtain assurances from the applicable court or agency that such Confidential Information will be afforded confidential treatment.

7. Term and Termination. The term of this Agreement shall commence on the Effective Date and shall expire ~~ten~~ three years from the Effective Date~~. Notwithstanding anything to the contrary herein, each Party's rights and obligations under this Agreement shall survive the expiration of this Agreement for a period of ten years from the date of such expiration even after the return or destruction of Confidential Information by the Recipient (the "**Survival Period**")~~, provided that for any and all:

Commented [AM14]: Everything I've asked for is short-fuse. Ten years is not reasonable.

Commented [AM15]: There is no need for any survival period in this case. This appears to be left over from the commercial contract.

(a) Personal Information disclosed by Disclosing Party hereunder, the ~~Survival Period shall last~~ Effective Date shall be extended for the period of time required under applicable federal, state and/or local law; and

(b) trade secrets of the Disclosing Party indicated as such by the Disclosing Party, the ~~Survival Period shall last~~Effective Date shall be extended for as long as such Confidential Information qualifies as a trade secret under applicable federal, state and/or local law.

8. Indemnification. The Recipient shall defend, indemnify and hold harmless the Disclosing Party, its Affiliates and their respective shareholders, partners, officers, directors, employees, agents, successors and assigns from and against all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and costs, in connection with any third party claim, suit, action or proceeding arising out of or resulting from a breach of this Agreement by the Recipient ~~or any of his Representatives~~.

9. No Transfer of Rights, Title or Interest. The Disclosing Party hereby retains its entire right, title and interest, including all intellectual property rights, in and to all Confidential Information. Any disclosure of Confidential Information hereunder shall not be construed as an assignment, grant, option, license or other transfer of any such right, title or interest whatsoever to the Recipient ~~or any of his Representatives~~.

10. Remedies. The Recipient acknowledges and agrees that money damages might not be a sufficient remedy for any breach or threatened breach of this Agreement by the Recipient or his Representatives. Therefore, in addition to all other remedies available at law (which the Disclosing Party does not waive by the exercise of any rights hereunder), the Disclosing Party shall be entitled to specific performance and injunctive and other equitable relief as a remedy for any such breach or threatened breach, and the Recipient hereby waives any requirement for the securing or posting of any bond or the showing of actual monetary damages in connection with such claim, and further agrees not to oppose the granting of such relief on the basis the Disclosing Party has an adequate remedy at law. In the event that Disclosing Party prevails in any legal suit, action or proceeding against Recipient enforcing Recipient's obligations hereunder, Disclosing Party shall be entitled to receive in addition to all other damages to which it may be entitled, the costs incurred by Disclosing Party in conducting such suit, action or proceeding, including reasonable attorneys' fees and expenses and court costs.

11. Governing Law, Jurisdiction, and Venue. This Agreement shall be governed by and construed in accordance with the internal laws of the State of ~~Delaware~~ California without giving effect to any choice or conflict of law provision or rule (whether of ~~Delaware~~ California or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of ~~Delaware~~California. Any legal suit, action or proceeding arising out of or related to this Agreement or the matters contemplated hereunder shall be instituted exclusively in the courts ~~of Delaware~~In the Northern District of California. Each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding and waives any objection based on improper venue or *forum non conveniens*.

**Commented [AM16]:** I'm in California, so we'll use California law. It really doesn't matter that the company is incorporated in Delaware.

12. Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given:

(a) when delivered by hand (with written confirmation of receipt);

(b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested);

(c) on the date sent by facsimile or e-mail (with oral or written confirmation of receipt) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or

(d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.

Such communications must be sent to the respective parties at:

If to Disclosing Party:

Sridhar K.S,
514, East Timpanogos Circle, Building G, Suite 2100, Orem, Utah – 84097
Email: sridhar@nanoheal.com

**Commented [AM17]:** Is there a real US address? FedEx returns materials sent to this address. Or else, go ahead and use the real address in India.

If to Recipient:

Allan Miller

____________________
____________________
____________________

Email: allan.miller@alumni.standord.edu

(or to such other address that may be designated by a Party from time to time in accordance with this Section).

13. Entire Agreement. This Agreement constitutes the sole and entire agreement between the Parties regarding the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, regarding such subject matter. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party hereto. Each Party acknowledges that in entering into this Agreement it does not rely on any statement, representation or warranty other than those expressly set out in this Agreement.

14. Costs. Except as expressly provided in this Agreement, each Party shall bear and pay its own costs, fees and expenses incurred in connection with the negotiation, preparation, execution and delivery of this Agreement.

15. Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

16. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

17. No Third Party Rights. This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to

or shall confer on any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

18. Waivers. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

**"Disclosing Party"**

**HFN, INC.**

By:

________________________________________

Name: Sridhar K.S
Title: Chief Executive Officer

**"Recipient"**

By:

________________________________________

Allan Miller, an individual

# EXHIBIT 20

The Wayback Machine - https://web.archive.org/web/20161108190431/http://nanoheal.com:80/executive-team/

nanoheal WHY NANOHEAL TECHNOLOGY COMP... LOG IN FREE TRIAL

/ Executive Team

We glimpsed the future and brought back a revolutionary tech support platform that can transform your helpdesk

Nanoheal is a manifestation of our collective vision to create a proactive and non-invasive support platform to meet all your tech support needs.

## Sridhar Santhanam

**Founder & CEO**

Sridhar's been an entrepreneur for more than 20 years now. As founder and CEO of HFN, Inc., he is responsible for the overall strategic relationship of the company He brings the adroit experience of leading and managing software delivery units to a young and enthusiastic company that is eager to learn from his experience. Sridhar is himself a software architect from a very young age.

## Kumar Shiralagi

**Board of Director**

Kumar Shiralagi is on the Board of Directors of HFN, Inc., representing Kalaari Capital, and has been part of the Indian Venture Capital ecosystem since 2003. In 2000, Kumar co-founded Lytek Corporation, a semiconductor laser manufacturer based in Arizona, and served as COO. He holds 23 U.S. patents and has published more than 60 papers in international journals and conferences in the areas of semiconductors, optoelectronics, and nanotechnology.





## Pavan Vaish

**Board of Director**

FREE TRIAL

Pavan Vaish is the co-founder of Daksh e-Services, and has been instrumental in integrating Daksh e-Services with the global enterprise model of IBM, now known as IBM-Daksh. He is currently the Global Chief Operating Officer and Board member at UnitedLex. He is also serving as Board of Director with HFN, Inc.

## INVESTORS

Kalaari Capital is a $160 million venture capital fund with a strong advisory team investing in early-stage, technology-oriented companies. They are passionate about investing in entrepreneurs who are poised to be tomorrow's global leaders. They seek companies that are capturing new markets, providing innovative solutions, and creating new wealth across geographies.

**FEATURES**

Self Service
Universal Console
Proactive Support
Incident Management
Device Management
Security and Control
Service Availability Management
Autonomic Engine
Application Management
Asset Management
Customer Engagement
Analytics and Reporting
Mobile Device Management
BYOD

**TECHNOLOGY**

Six Key Principle
Support Process
Platforms
Third Party Tools Integration
Security

**COMPANY**

About Us
Executive Team
Blog
Locations

**CONTACT US**

Phone :
+1 855 436 4621

Email Us
contact@nanoheal.com

**FOLLOW US**

2015-16 © HFN, Inc. All Rights Reserved.



# EXHIBIT 21







Home My Network Jobs Messaging Notifications Me Work Lear

## Sabyasachi (Saby) Das · 2nd

Digital Transformation. P&L Management. Global Delivery. Automation. Employee Experience.

Talks about #leadership, #globaldelivery, #digitalworkplace, and #digitaltransformation

- Nanoheal
- Xavier Institute of Management

Bengaluru, Karnataka, India · Contact info

5,378 followers · 500+ connections

1 mutual connection: Sentthil Padmanaban DG

+ Follow Message More

### Featured

Post
Never thought I would write a post like this, but after an...

Post
"Would it be okay if I mentioned you as a reference on my...

Post
Today, with D

1,407 · 909 comments

943 · 231 comments

### Activity

5,378 followers

+ Follow

Sabyasachi (Saby) Das posted this · 3w

Yesterday, I completed 6 months at Nanoheal. Having worked 40 times as long in my previous organization, this period seems ephemeral. However, when I look at the volume and velocity of action,

490 39 comments

Sabyasachi (Saby) Das posted this · 2mo



If culture eats strategy for breakfast, execution perhaps has it for lunch! :) A strategy is only as good as your execution. However, every so often it is important to keep aside the din of executior ...show more

178 · 1 comment

Sabyasachi (Saby) Das posted this • 2mo

Sharing this lovely ad that I came across a short while ago. If every corporate did their bit to help those around them, the world would be a much bett ...show more

**Iss Diwali, Thodi si Jagah Bana lo**
youtube.com

122 · 16 comments

Show all activity →

## About

I hate status quo. Love challenges. And the opportunity to excel. I try to lead from the front and motivate people to push their boundaries. Be the best you can be is my mantra. I am loved by people who work to make an impact and disliked by those who don't. I think big, talk straight and don't shy away from taking hard decisions. I can navigate through choppy waters. I deliver results and don't enjoy finishing second. I work hard (and play even harder). I love winning. The

## Experience

**Managing Director**
Nanoheal · Full-time
Jun 2022 - Present · 8 mos
Bengaluru, Karnataka, India

Responsible for Nanoheal's enterprise business, with special focus on Global System Integrators / Partners.

Skills: Automation · DEX · User Experience (UX) · Software as a Service (SaaS) · General Management

**Sabyasachi (Saby) Das on LinkedIn: #strategy #nanoheal #dex #employeeexperience...**
Strategizing the way forward with Pavan Vaish, a member of the Nanoheal Board.

**Personal goal pursuit**
Career Break
Oct 2021 - May 2022 · 8 mos
Bengaluru, Karnataka

**DXC Technology**
4 yrs 7 mos

**Global Service Line Head - Modern Workplace (Digital Workplace)**
Full-time
Jul 2020 - Oct 2021 · 1 yr 4 mos
Bengaluru, Karnataka, India

Delivered transformational results within a year of standing up the Service Line: 610 bps margin improvement while improving CSAT to an all time high (95%) and delivering an industry leading employee

...ead of DXC's market leading Modern Workplace Service ...ible for:
...-end operations for a USD ~3 Billion line of business, the largest Digital Workplace operations in the industry
* Delivering digital workplace services to 7+ million end users in 1100 enterprises globally
* Managing 20,000+ resources spread over 100+ countries
* Driving industry leading employee engagement score
* Crafting differentiated solutions, implementing them in time & on budget, & running silent operations

**Director, Product Engineering & Digital Transformation Centers - Workplace & Mobility**
Apr 2019 - Jul 2020 · 1 yr 4 mos
Bengaluru Area, India

## Experience

**Managing Director**
Nanoheal · Full-time
Jun 2022 - Present · 8 mos
Bengaluru, Karnataka, India

Responsible for Nanoheal's enterprise business, with special focus on Global System Integrators / Partners.

**Skills:** Automation · DEX · User Experience (UX) · Software as a Service (SaaS) · General Management

**Sabyasachi (Saby) Das on LinkedIn: #strategy #nanoheal #dex #employeeexperience #hybridworking**
Strategizing the way forward with Pavan Vaish, a member of the Nanoheal Board.

Media

×

**Sabyasachi (Saby) Das on LinkedIn: #strategy #nanoheal #dex #employeeexperience #hybridworking**

Strategizing the way forward with Pavan Vaish, a member of the Nanoheal Board.

View

Home My Network Jobs Messaging Notifications Me Work Lear

**Sabyasachi (Saby) Das**

Digital Transformation. P&L Management. Global Delivery. Automation. Employee Experience.

+ Follow

**View full profile**

**Sabyasachi (Saby) Das** • 2nd + Follow •••

Digital Transformation. P&L Management. Global Delivery. Aut...

2mo • Edited •

If culture eats strategy for breakfast, execution perhaps has it for lunch! :) A strategy is only as good as your execution. However, every so often it is important to keep aside the din of execution and revisit the strategy to ensure we continue to tread on the right path.

And what better way than to brainstorm, ideate and storyboard the journey with one of our Board members, Pavan Vaish.

Given that employee experience is now a Board-level priority in many organizations, and increasingly so in the hybrid working world we live in today, Nanoheal, with it's differentiated technology, is on the cusp of exponential growth. So, the timing of this session couldn't have been better.

Equally important was sharing and discussing the strategy with the rest of the team to get them aligned on the way forward.

Thanks Pavan for taking the time to do this.

#strategy #Nanoheal #DEX #employeeexperience #hybridworking

with Sentthil Padmanaban DG and 3 others

Sentthil Padmanaban DG and 178 others 1 comment · 2 reposts

Reactions

Like Comment Repost Send

About Accessibility Help Center Privacy & Terms Ad Choices Advertising
Business Services Get the LinkedIn app More
LinkedIn LinkedIn Corporation © 2023

# EXHIBIT 22

 DEALS - INDIA

OCTOBER 1, 2012 / 11:15 AM / UPDATED 10 YEARS AGO

# IndoU.S. Venture rebrands as Kalaari Capital; closes $150 mln fund

By VCCircle.com

Sailing through tough economic conditions, Kalaari Capital, a new entity formed by the founders of Indo US Venture Partners (IUVP), has raised an investment fund worth $150 million for the Indian market. Though the investment strategy of IUVP fund and Kalaari will be similar, this is a rebranding for IUVP which would help it to bring in fresh ideas and focus on the Indian market, said Vani Kola, managing director, Kalaari Capital Advisors.

The firm also said that it has invested in HandsFree Networks Inc., a US-based provider of automated technical support with offices in Bangalore. According to US SEC filings, HandsFree raised $4 million from a single investor earlier this year.

VCCircle reported in July that the fund has raised $149 million. Kalaari's new fund close as several early stage VCs like Nexus Venture Partners, Helion Venture Partners, Accel Partners India and Matrix Partners India have closed new India funds over the last 12 months.

Vinod Dham, who had led the first fund and is well-known for developing Intel's Pentium microprocessor, will not be involved in the new fund.

"IUVP will continue to function as it is and will be working with the companies it has already invested in. IUVP had invested over a $100 million in 35 companies in the last five years. Similarly, we plan to invest Kalaari's fund of $150 million over the next four to five years in India," said Kola. The founders of Kalaari are Vani Kola, Kumar Shiralagi and Rajesh Raju.

Vani and Kumar are the continuing partners from IUVP and are associated with marquee venture investments such as Snapdeal, VIA, Attero, Microqual, Myntra, Medplus, Apalya. Raju is the new partner who joined IndoUS after working as an investment director at private equity firm Peepul Capital for five years.

Kumar Shiralagi, managing director at Kalaari noted, "We have been attracted to invest in technology companies always and would continue to do so. Whether it be software products and services, e-commerce, mobile and telecom Services, education, healthcare, media and clean tech—all are hot sectors within technology."

However, Vani said the company might look at some emerging sectors also apart from technology. This part of the strategy is reflective by its early bets on pharma chain MedPlus Healthcare (where it netted a healthy exit) and e-waste recycling firm Attero.

IUVP and Kalaari both believe in investing in early-stage companies. "In the time of slowdown, only entrepreneurs who have a long-term plan would think of a start up and we want to back them with enough funding." Vani said.

Most investments by Kalaari too are in companies that are less than three years old and have received little or no prior institutional funding. Thus, they require capital in the range of

NOW READING **IndoU.S. Venture rebrands as Kalaari Capital; closes $150 mln fund**

Urban Ladder, Vyome, Zivame. "The total fund of $150 million includes investment of last year as well. We had already raised initial funds by LPs at that time and had started investing," said Sumit Jain , vice president, Kalaari Advisors.

On the LP front, the Kalaari is optimistic. Most of the LPs for IUVP and Kalaari are from North America. "The successful closure of the $150 million fund despite the current economic environment is a testament to the quality of our portfolio to date as well as the continuing conviction of LPs in our team," Vani said.

Kalaari advises on investments in companies in the early stages of growth, with Series A and Series B funding. This initial capital is primarily utilised for customer acquisition, market validation, product development and hiring.

Kalaari Capital Partners II, which has backed companies including Hands Free Networks, Lapis, Magzter, Mettl, Simplilearn and Urban Ladder, Vyome and Zivame, is actively considering various other investment opportunities.

On Kalaari's investment strategy, Kumar Shiralagi, MD said, "We strongly believe in the potential of early stage investing in India and will remain focused on early-stage investments across a wide spectrum of sectors that capture the India growth story."

"Kalaari's key criteria for an investment are an innovative business model, market leadership, market size, product advantage, domain expertise, management characteristics and an entrepreneurial spirit."

Kalaari would remain focused on early-stage investments across a wide spectrum of sectors that capture the India growth story, according to Shiralagi. Rajesh Raju said Kalaari aims to

1/13/23, 7:48 PM IndoU.S. Venture rebrands as Kalaari Capital; closes $150 mln fund | Reuters

NOW READING IndoU.S. Venture rebrands as Kalaari Capital; closes $150 mln fund

Copyright 2012 VCCircle.com. All rights reserved. This content/article is provided by Mosaic Media Ventures Private Limited and not by Reuters. All rights, including copyright, in this content/article provided by VCCircle.com are owned or controlled by Mosaic Media Ventures Private Limited. The content may not be copied, broadcast, downloaded and stored (in any medium), transmitted, adapted or changed in any way whatsoever without the prior written permission of Mosaic Media Ventures Private Limited.

MORE FROM REUTERS

00:02
01:23



People love the unique vibe and ethnic feel of our offices. We strive for a friendly and warm environment.

Navigator Building ITPB,
ngaluru, Karnataka – 560066

ternational Tech Park' (ITPB) in Bengaluru. Vivanta by Taj is a prominent landmark in the vicinity.

ng Instructions (https://www.kalaari.com/wp-content/uploads/2021/09/Contact-



Name*

Please enter your name

Email*

Please enter your email

Leave a Message

Enter your message here

Submit

# FAQs

When is the right time to approach Kalaari for potential investment? +

What does Kalaari look for in an idea? +

What is our investment process and how long does it take? +

Does Kalaari only invest in particular areas or industries? +

kalaari
capital

**How much does Kalaari usually invest in a new company? What size rounds do we participate in?** +

**Will we only invest if we can lead the round?** +

**Does Kalaari syndicate deals?** +

**Do our Limited Partners (LPs) have any special rights?** +

**What value does Kalaari bring to companies that we invest in?** +

**How does Kalaari support companies in future financing rounds?** +

**Do we take board seats? How do we try to help as a supportive board member?** –

We take board seats and play an active role in the development of the company. As a board member, we assist founders on growth strategy, talent management and future fundraise. We are the first port of call for our portfolio companies in good and bad times, and always offer honest advice and guidance during the critical vulnerable periods in a company's life.

## Subscribe to our Newsletter

Enter your email ID

in

(https://www.linkedin.com/company/kalaari-capital?trk=tyah) (https://www.youtube.com/Kalaari) (https://twitter.com/TheKalaari)

**CXXO (http://cxxo.kalaari.com)**

**Portfolio (https://www.kalaari.com/portfolio/)**

**Innovation Partner (https://www.kalaari.com/innovation-partner/)**

**News (https://www.kalaari.com/news/)**

**About**

Team (https://www.kalaari.com/kalaari-team/)

Company (https://www.kalaari.com/company/)

Culture (https://www.kalaari.com/culture/)

Events (https://www.kalaari.com/events/)

Hindustan Hamara (https://www.kalaari.com/hindustanhamara/)

**Resources (https://www.kalaari.com/resources/)**

**Contact Us (https://www.kalaari.com/contact-us/)**

**Pitch (https://www.kalaari.com/pitch/)**

**Refer a Founder**

**+91-80-6715-9600 (tel:+918067159600)**

**Connect with Us (mailto:info@kalaari.com)**

Designed by (https://www.peppersquare.com/)

**© 2021 Kalaari Capital**

Privacy Policy (/terms-of-use/#1630501092290-4fd76eea-c6ac) Cookies Policy (/terms-of-use/#1630501265022-5d16c67a-631b)

Terms of Use (/terms-of-use/#1630501053608-55d00683-174d)

# EXHIBIT 23



# New Research Uncovers the True Financial Costs of Sexual Harassment in the Workplace for Women

Equity, Private Sector, Public Policy

July 21, 2021

---

**Washington, DC** – Today the **Institute for Women's Policy Research** and the **TIME'S UP Foundation** released a report showing that workplace sexual harassment has large financial costs and economic consequences. The report, "**Paying Today and Tomorrow: Charting the Financial Costs of Workplace Sexual Harassment**," is the first-ever attempt to monetize the lifetime financial costs of sexual harassment to individual women. Among those interviewed, workplace sexual harassment cost individuals anywhere from $600 to $1.3 million or more over a lifetime, depending on the wages of the worker.

The report shows how sexual harassment contributes to the gender wage gap and limits women's earning potential. These costs can be seen through job loss and unemployment, lower earnings, missed opportunities for advancement, forced job changes, and loss of critical employer-sponsored benefits like health insurance and pension contributions. The financial impact of workplace sexual harassment can be detrimental and long-lasting to those who experience it.

The short-term and long-term impact on the economic security of those working in low-wage jobs can be particularly severe. Workers in lower-income occupations and those impacted by historical racial and ethnic discrimination were more likely to be in economically precarious situations without significant savings. A $600 wage loss can quickly translate into increased debts and credit card fees, eviction, homelessness, and food insecurity.

"As employers rethink their post-COVID workplaces, we need to ensure that work—whether it's remote or in the office—is safe, dignified, and equitable," said **C. Nicole Mason, PhD, President and CEO of IWPR**. "This report shows the different ways sexual harassment imposes financial and economic costs to women workers."

"No person should ever choose between reporting sexual harassment or speaking up for themselves while considering whether they might lose their ability to feed their families or take their children to the doctor," said **Jessica Forden of TIME'S UP Foundation**. "When we think about the true cost of sexual harassment, we have to think about what's at stake when women come forward and how this impacts not just them, but everyone around them: their families, communities, and more."

For every individual interviewed, the experiences of harassment were compounded, and the costs magnified, because those who could have addressed the harassment (supervisors, human resources staff, colleagues) failed to act, and even worse, often retaliated against the employees who were harassed. Few were able to seek legal advice, being kept away by uncertain immigration status, lack of funds, or lack of information on their rights.

Based on in-depth interviews with survivors of workplace sexual harassment, as well as with experts, the report charts the detailed pathways that lead to financial costs to individual workers as a result of workplace sexual harassment and retaliation.

Key findings from the report include:

- The costs to economic security are particularly profound for workers in low-paid jobs.
- While lower earnings and lower job quality in many women-dominated service sector jobs mean that the monetary costs of harassment are lower for those in these positions, for one fast-food worker forced out of her job, lifetime costs still totaled over $125,600.
- The lifetime costs of workplace sexual harassment and retaliation were particularly high for those pushed out of well-paid, men-dominated occupations, reaching $1.3 million for an apprentice in the construction trades.
- The cost of a single year out of work for another apprentice in a construction occupation translates into a lifetime loss of $230,864 due to lost wage progression and foregone benefits.

- Forced career change may necessitate paying for new degrees or credentials. These costs came to almost $70,000 for one woman, reflecting direct tuition costs for a two-year community college degree plus lost earnings over two years as she pursued her new degree.

The report suggests that culture change, company change, and governmental change are all needed for prevention and accountability.

"It's clear from our interviews that a lack of enforcement is a part of what's missing," said co-author of the report **Ariane Hegewisch of IWPR**. "Sexual harassment policies alone will not work unless there are consequences when they are broken."

---

**TIME'S UP FOUNDATION**

The TIME'S UP™ Foundation insists upon safe, fair, and dignified work for all by changing culture, companies, and laws. We enable more people to seek justice through the TIME'S UP Legal Defense Fund™. We pioneer innovative research driving toward solutions to address systemic inequality and injustice in the workplace through the TIME'S UP Impact Lab. And we reshape key industries from within so they serve as a model for all industries. The TIME'S UP Foundation is a 501(c)(3) charitable organization.

**Fighting for justice, creating real change. Join us.**

Your Email Address

Zip Code

SIGN UP FOR ALERTS

DONATE

Every donation of any size helps TIME'S UP Foundation fight for a future where no one is harassed, assaulted, or discriminated against at work.

©2023 TIME'S UP™ Foundation. The TIME'S UP trademark is the protected property of TIME'S UP Now.

Newsroom Contact Financials Privacy Policy Terms and Conditions Cookie Policy      

# EXHIBIT 24



# Seed Group inks deal with Nanoheal to Usher in AI-Driven Digital Experience Businesses in UAE

Utah, U.S.A | Dubai, U.A.E, 14 June 2021: Seed Group, a company of the Private Office of Sheikh Saeed bin Ahmed Al Maktoum, has entered into a strategic partnership with US-based leading software company Nanoheal, which specializes in providing powerful digital-user experiences with artificial intelligence (AI), automation, and workplace analytics.

As part of the deal, Seed Group will facilitate Utah-headquartered Nanoheal expand its business footprint in the UAE and the wider Middle East by connecting it with prospective clients and helping it access top decision-makers in government as well as private sectors, and market their automated tech support and predictive intelligent automation services effectively in the region.

Hisham Al Gurg, CEO of the Seed Group and the Private Office of Sheikh Saeed bin Ahmed Al Maktoum, said, "There has been a phenomenal growth in the adoption of automated services and data analytics in the MENA region in recent times. Businesses are looking for powerful digital-user experiences. We are pleased to partner with Nanoheal, which we believe will further the digitization in the region with their cutting-edge AI and automation solutions."

"Our extensive knowledge and expertise of the MENA business landscape and our commitment to advancing the interests of our partners will definitely help Nanoheal create a niche for itself in the region," he added.

Nanoheal has been named a 'Cool Vendor' by global research and advisory firm Gartner, which has also mentioned the former in a research paper titled 'Enhance Digital Workplace Operations With Machine Learning and Automation'.

Privacy & Cookies Policy

The technology platform has also been recognized by Parks Associates as the 'Future of automated tech support and predictive intelligent automation'. Nanoheal is currently working with top multinational companies such as



Sridhar Santhanam, Founder and CEO, Nanoheal, said, "The strategic partnership with the Seed Group will definitely help us expand our footprint in the Middle East. The guidance and networking opportunities provided by the Seed Group will play a pivotal role in our success in the region."

Nanoheal provides automated, AI-driven digital experience management software for brands of all sizes. The company automates the resolution of technology support issues for all kinds of smart devices, including IoTs, and enables businesses to provide individual experience focused next-generation helpdesk services powered by intelligent automation and real-time analytics.

The Seed Group is a notable diversified company operating in technology, healthcare, tourism and hospitality, and real estate sectors in the Gulf region. Over the past 16 years, it has formed strategic alliances with leading global companies representing diverse regions to accelerate their sustainable market entry and presence within the MENA region.

Nanoheal's partnership with the Seed Group will give it access to one of the fastest-growing economies and further opportunities with prospective clients based out of the Middle East, Africa, and Asia regions.

About Nanoheal

Based in Orem, Utah, Nanoheal's AI-driven Digital Experience Automation platform analyzes and automates the digital experience for PC, mobile, and IoT devices. Nanoheal helps deliver self-healing for digital touchpoints, to enterprises and individuals. The AI-powered platform provides the ability to intelligently consolidate and understand device data, and automate complicated remediation processes to dramatically enhance the experience for both users and IT helpdesk. Nanoheal works closely with large global service integrators, enterprises, managed service providers, and premium tech support services, with product offerings to meet each industry's unique needs both at work and in the home. For more information, reach us at www.nanoheal.com.

Privacy & Cookies Policy

About Seed Group

Over the past 16 years, Seed Group has formed strategic alliances with leading global companies representing diverse regions and industries. These companies have propelled their business interests and goals in the Middle East and North Africa region through the support and strong base of regional connections of the Seed Group. The Group's goal is to create mutually beneficial partnerships with multinational organizations and to accelerate their sustainable market entry and presence within the MENA region. Seed Group has been a key point in the success of all its partners in the region, helping them reach their target customers and accelerate their businesses. The Private Office was established by Sheikh Saeed bin Ahmed Al Maktoum to directly invest in or assist potential business opportunities in the region, which meet The Private Office's criteria. For more information, visit www.seedgroup.com.

## Seed Group Media Contact

Nomarie Jean Lacsamana
Ph: +971 58 220 4258
Email: jean@seedgroup.com

## Nanoheal Media Contact

Prerana Srinivas
Ph: +91 99165 85370
Email: prerana@nanoheal.com

share:

NO COMMENTS

## Related Post

TCS and Nanoheal to Provide Digital Workspace Auto

5 Ways CBD Can Improve Your Daily Life

Malwarebytes Announces Partnership with Bask, a Di

Search

Privacy & Cookies Policy

## Recent Posts

5 Ways CBD Can I

September 11, 2021

Seed Group inks deal wit

June 15, 2021

Top Technology Predictio

February 5, 2021

Helpdesk Automation Mark

January 15, 2021

How Fast is your IT Issu

December 18, 2020

เว็บแตกง่าย

nanoheal
Resolutions within.
Enhance your digital device experience with AI-driven automated issue remediation.
Solutions
Enterprises
Small Businesses
OEMs & Support Channels
Learn
Platform
Blog
Request a demo
Company
Contact Us
Privacy Policy
Newsroom

เว็บแตกง่าย ok

Privacy & Cookies Policy

# EXHIBIT 25

| Company | Product | Market |
|---|---|---|
| 2bminer | Cryptocurrency mining | Financial |
| Apeejay Education | Educational institutions | Education |
| asistensi | Health and medical insurance | Financial |
| Beaconsmind | Retail location-based marketing | Commercial |
| CoinCorner | Bitcoin and Lighting services | Financial |
| Dubai FDI | Support for foreign investment | Financial |
| Exelen | Wireless smart data for energy, industrial, commercial | Industrial |
| Gourmet Restaurant | Zambia restaurant | Entertainment |
| Gupshup | Messaging | Software |
| HuviAir | Remote construction monitoring and management | Industrial |
| Investree | Financial marketplace | Financial |
| Jollibee | Philippine fast food | Entertainment |
| Lasting Dynamics | Software app development for web and mobile | Consulting |
| Limelight | Marketing software | Software |
| Microavia | Robotic drones for industrial uses | Industrial |
| MIR Digital Solutions | App development for robotics and cloud migration | Consulting |
| Nanoheal | Endpoint management and automation | Networking |
| NewTech | UAE insurance specialists | Financial |
| Nexxiot | Data analysis for global shipping | Industrial |
| PayCargo | Cargo logistics | Industrial |
| Prismax | Virtual live events | Entertainment |
| Reviver | Automobile license plates | Industrial |
| Riskovry | Digital insurance management | Financial |
| SentiOne | Chatbot | Software |
| Servion | Contact center provisioning and outsourcing | Commercial |
| Sinopec | Energy and chemical | Industrial |
| Stark | Utilities enterprise analytics | Consulting |
| Stockal | Investment platform | Financial |
| Synerise | Business Intelligence platform | Commercial |
| Talkdesk | Customer service automation | Software |
| Tramigo | IoT connectivity | Industrial |
| TravelFlan | Travel agent functions | Entertainment |
| Ubirch | Blockchain IoT interface | Industrial |
| Village | Event management | Entertainment |
| Vivi | Education platform | Education |
| Voovio | Industrial operations simulation | Industrial |
| Wyzetalk | Mobile communications for enterprise | Commercial |

| Row Labels | Count of Market |
| --- | ---: |
| Industrial | 10 |
| Financial | 8 |
| Entertainment | 5 |
| Software | 4 |
| Commercial | 4 |
| Consulting | 3 |
| Education | 2 |
| Networking | 1 |
| **Grand Total** | **37** |

# EXHIBIT 26

UNIFIED ENDPOINT MANAGEMENT MARKET, BY REGION (USD BILLION)
7.0
1.4
2015
2016
2017
2018
2019
2020
2021
2022
North America
Europe
APAC
MEA
Latin America

# EXHIBIT 27



ilders Private
Is this your Company?
Claim Account
Follow
Buy Report
Company Status
Strike Off
Company Age
11 years 4 months
Basic Data Updated
2 months ago
Last Filing with ROC
The company selected is having status as strike off hence financial data is not available. You may check its last filed documents by making a request.
Company Overview
People & Contacts
Charges
Control & Ownership
Competition
Compliance Check
Financials
Legal Cases
Documents
vaasa Builders Private Limited
vaasa Builders Private Limited is an Strike Off company
ablished on 24 Aug 2011 with its office registered at Old No.C4,
w No.3/335, First Cross Street A.G.S.Colony, Beach Layour,
ttivakam Chennai Chennai Tn 600041 In and has been running
ce 11 years 4 months with a paid up capital of 1.00 lakh.
cording to MCA records, 2 Directors are linked to this company as
08 Oct 2022
CIN/LLPIN/FCRN
U45200TN2011PTC082034
Company Legal Name
Aavaasa Builders Private Limited
ROC Code
RoC-Chennai
Company No.
082034
Company Category
Company limited by Shares
Company Sub Category
Non-govt company
Company Class
Private
Authorised Capital
₹ 1.00 lakh
Paid up Capital
₹ 1.00 lakh
Incorporation Date
24 Aug 2011
Date of AGM
-
Date of Balance Sheet
-
Listing Status
Unlisted
Industry
Construction
Company Size
-
Want to share the information?
Financials
Financials
This information is available in our reports and to subscription users.
View Information
Directors & Signatories of Aavaasa Builders Private Limited
2
Hemaa Ramakrishnan
Indian
Director
Total Directorship: 1
Santhanam Sridhar
Indian
Director
Total Directorship: 1
View People & Contacts
Contact Details of Aavaasa Builders Private Limited
Location
Chennai, Tamil Nadu
Country
INDIA
Telephone
Buy a Report or Upgrade
Email Address
Buy a Report or Upgrade
Website
-
View People & Contacts
Charges(Loans) of Aavaasa Builders Private Limited
LOAN
Charges
There are no open charges registered against the company as per our records.
Legal Cases
Legal Cases



## Shareholders

Purchase reports or subscription to get access to information on legal cases of company in the District Courts, High Courts and Supreme Court of

Company Status
Strike Off

Company Age
11 years 4 months

Basic Data Updated
2 months ago

Last Filing with ROC
-

and to subscription users.

View Information

## FAQs

What is the Incorporation or founding date of Aavaasa Builders Private Limited?

What is authorized share capital and paid-up capital of Aavaasa Builders Private Limited?

Who are the current board members & directors of Aavaasa Builders Private Limited?

What is the registered address of Aavaasa Builders Private Limited?

What is the corporate identification number (CIN) and company number of Aavaasa Builders Private Limited?

## Documents

### Documents

This information is available in our reports and to subscription users.

View Information

## Competition

### Competition

This information is available in our reports and to subscription users.

View Information

We love getting feedback from our customers. Connect with The Company Check on social media today.

   

Disclaimer

Features
Company Search
Claim Company
Director Profile
Company Directory
Director Directory

Quick Links
About Us
Terms & Conditions
Privacy Policy
Contact Us

Subscribe
Your E-mail Address

Get Latest Update & Offers

The Company Check is a registered information and data resource technology platform developed, owned and maintained solely by TCC Information Private Limited. The data we provide on The Company Check is sourced from reliable portals and we have greatly endeavoured to verify its authenticity and have made certain of its security. We, The Company Check, do not take any responsibility, express or implied, with regards to the quality, accuracy, timeliness, completeness, performance, fitness for a particular purpose of the data we provide and The Company Check is not liable for the same. Any information found on the platform of The Company Check cannot be

Follow
ilders Private

| Company Status | Company Age | Basic Data Updated |
|---|---|---|
| Strike Off | 11 years 4 months | 2 months ago |
| | Last Filing with ROC | |
| | - | |





Home

43
My Network

Jobs

8
Messaging

20
Notifications

Me

Work

Lear

People
aavaasa builders 1 | Connections | Locations | All filters | Reset

13 results

**Sridhar Santhanam** • 3rd+
MD, CEO at aavaasa builders
Tiruvallur

Connect

**LinkedIn Member**
--
India

**LinkedIn Member**
Owner at Aavaasa building construction and developers
East Godavari

**LinkedIn Member**
--
Rajahmundry

**Hemaa Ramakrishnan** • 3rd+
An ingenious senior architect with 25+ years of experti...
Chennai

Connect

**Raj Kumar** • 3rd+
Aditya college of engineering and technology, sumram...
East Godavari

Connect

**LinkedIn Member**
Business Development Manager at aavaasa builders
Kolkata

**LinkedIn Member**
Site Civil Engineer at aavaasa builders
Rajahmundry

**LinkedIn Member**
Site Engineer at aavaasa builders
Washim

**LinkedIn Member**
site engineer at aavaasa builders
Chengalpattu

Are these results helpful?
Your feedback helps us improve search results

Previous

1
2
Next

Ad •••

Get the latest jobs and industry news

Allan, explore relevant opportunities with **Pathstream**

Follow

**LinkedIn**

| | | | |
|---|---|---|---|
| About | Accessibility | Talent Solutions | **Questions?** Visit our Help Center. |
| Community Guidelines | Careers | Marketing Solutions | |
| Privacy & Terms | Ad Choices | Advertising | **Manage your account and privacy** Go to your Settings. |
| Sales Solutions | Mobile | Small Business | |
| Safety Center | | | |

Select Language

English (English)

LinkedIn Corporation © 2023



aavaasa builders®
dream homes
builders and flat promoters

(index.php)

## Ongoing Projects

Residential Building

Aavaasa's "Kowsthubam"

Plot No.26, Door No.15/28, 29th Street, Nanganallur

m.php)

(index.php)

Aavaasa's Ganga

Plot No. 96, 18th Street, Nanganallur, Chennai – 600 061.

(ganga-flats.php)

Aavaasa's Ramyam

Vijaya Nagar Velachery, Chennai

(ramyam.php)





## Ashraya (Sold Out)

Ashok nagar, Chennai

Current Project Upcoming Project Completed Project

**QUICK LINKS**

- Home
- About Us
- Construction
- Joint Venture
- Services
- Testimonials
- Contact Us

**AAVAASA BUILDERS :**

Flat No : 2, Ground Floor, AKN Block, KG Nataraj Palace, No:54, Saravana Street, T.Nagar, Chennai - 600 017.

9884488673 (tel:9884488673)

info@aavaasabuilders.com (mailto:info@aavaasabuilders.com)

Facebook (https://www.facebook.com/Aavaasa-Builders-310847775767728/)

aavaasa builders®

Instagram (https://www.instagram.com/aavaasabuilders/)

dream homes

builders and promoters

(index.php)

©Copyright 2021 Aavaasa Builders. Ready All rights reserved | Designed and Developed (https://www.glintcreatives.com/portfolio.html) by Glint Creatives (https://www.glintcreatives.com/portfolio.html)

# EXHIBIT 28

# VELO DIGITAL, LLC

| | |
|---|---|
| **Company Number** | 200829010243 |
| **Status** | Suspended Ftb |
| **Incorporation Date** | 16 October 2008 (about 14 years ago) |
| **Dissolution Date** | 1 April 2014 |
| **Company Type** | Limited Liability Company - CA |
| **Jurisdiction** | California (US) |
| **Registered Address** | 210 N PASS AVE #105<br>BURBANK<br>91505<br>United States |
| **Inactive Directors / Officers** | KOMENDUR SANTHANAM SRIDHAR<br>NO AGENT, agent<br>RUBY JHA |
| **Registry Page** | https://bizfileonline.sos.ca.gov/sear... |

## Recent filings for VELO DIGITAL, LLC

| | | |
|---|---|---|
| *19 Feb 2013* | AMENDMENT | view |
| *3 Jun 2009* | SI-COMPLETE | view |
| *30 Oct 2008* | SI-COMPLETE | view |
| *16 Oct 2008* | REGISTRATION | view |

**Source** *California Secretary of State, https://bizfileonline.sos.ca.gov/sear..., 31 Oct 2022*

## Latest Events

- **2021-04-21 - 2021-04-30** Addition of officer RUBY JHA,
- **2021-04-30 - 2022-07-10** Addition of officer NO AGENT, agent
- **2022-07-10 - 2022-10-30** Change of status from 'Franchise Tax Board (Ftb) Suspended/Forfeited' to 'Suspended Ftb'

See all events

## Corporate Grouping USER CONTRIBUTED

None known. Add one now?

See all corporate groupings

# EXHIBIT 29

# IRIS ANIMATION PRIVATE LIMITED

**Company Number** U72900TN2008PTC067621

**Status** Under Process Of Striking Off

**Incorporation Date** 5 May 2008 (over 14 years ago)

**Company Type** Company limited by Shares

**Jurisdiction** India

**Registered Address** OLD NO.4, NEW NO.7, VALLIAMMAL GARDEN, 1ST STREET, KODAMBAKKAM, CHENNAI TN 600024 IN
India

**Industry Codes** 72900: (India National Industrial Classification 2004 (MCA 2009))

**Inactive Directors / Officers** PRIYA SRIDHAR SRIDHAR, director, *5 May 2008-*
RUBY JHA, *25 Sep 2020*

**Source** *India Ministry of Corporate Affairs, http://www.mca.gov.in/, 20 Oct 2022*

## Latest Events

- **2020-01-06 - 2022-10-20** Became inactive
- **2020-01-06 - 2022-10-20** Change of status from 'Active' to 'Under Process Of Striking Off'
- **2020-09-25** Addition of officer RUBY JHA,

See all events

## Corporate Grouping USER CONTRIBUTED

None known. Add one now?

See all corporate groupings



Instagram

Log In Sign Up

arcoiris_studios Follow Message •••

5 posts 9 followers 2 following

**The Iris of Arcoiris Studios**

From Imagination to Image. Animation and Visual Studio.

www.arcoiris-studios.com

POSTS TAGGED

og into Instagram

og in to see photos and videos from friends and discover other accounts you'll love.



og into Instagram

og in to see photos and videos from friends and discover other accounts you'll love.

 

 

 Home  My Network  Jobs   Messaging Notifications  Me  Work  Lear

People  IRIS Animation Studios 1 | Connections | Locations | All filters | Reset

4 results

**LinkedIn Member**
Director at Iris Animation
Pune

**LinkedIn Member**
Visualiser at iris animation
Pune

**LinkedIn Member**
animater at iris animation
Pune

**LinkedIn Member**
EP at IRIS Animation
Bengaluru

**Are these results helpful?**

Your feedback helps us improve search results
 

Ad •••

Get the latest jobs and industry news

 

Allan, explore relevant opportunities with Nom Nom

Follow

LinkedIn

About | Accessibility | Talent Solutions
Community Guidelines | Careers | Marketing Solutions
Privacy & Terms | Ad Choices | Advertising
Sales Solutions | Mobile | Small Business
Safety Center

Questions? Visit our Help Center.

Manage your account and privacy
Go to your Settings.

Select Language
English (English)

LinkedIn Corporation © 2023

# EXHIBIT 30

# BLUE SPHERE VENTURES PRIVATE LIMITED

**Company Number** U52300TN2013PTC090748

**Status** Active

**Incorporation Date** 25 April 2013 (over 9 years ago)

**Company Type** Company limited by Shares

**Jurisdiction** India

**Registered Address** 1/715, KARTHIKEYAPURAM 7TH STREET, MADIPAKKAM CHENNAI Chennai TN 600091 IN
India

**Industry Codes** 52300: (India National Industrial Classification 2004 (MCA 2009))

**Directors / Officers** GEETHA SRIDHAR, *15 Apr 2015-*
SANTHANAM SRIDHAR, *10 Sep 2015-*
SRIDHAR SANTHANAM KAILASH BHARADHWAJ, *15 Apr 2015-*

# EXHIBIT 31



uspto
UNITED STATES
PATENT AND TRADEMARK OFFICE

# Assignment abstract of title for Application 09568390

| Invention title/Inventor | Patent | Publication | Application | PCT | International registration |
|---|---|---|---|---|---|
| SYSTEM FOR AUTOMATED PROBLEM DETECTION, DIAGNOSIS, AND RESOLUTION IN A SOFTWARE DRIVEN SYSTEM<br>Allan A. Miller | 6742141<br>May 25, 2004 | | 09568390<br>May 10, 2000 | | |

## Assignments (5 of 5 total)

### Assignment 5

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 050630/0166 | Sep 30, 2019 | Oct 03, 2019 | 2 | 5 |

**Conveyance**
RELEASE OF SECURITY INTEREST RECORDED AT REEL/FRAME 35987/0308

**Assignors**
SUNTRUST BANK

**Correspondent**
ROB SONESON
300 N LASALLE
KIRKLAND & ELLIS LLP
CHICAGO, IL 60654

**Assignee**
HFN, LLC
TWO CONCOURSE PARKWAY
SUITE 300
ATLANTA, GEORGIA 30328

### Assignment 4

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 050568/0192 | Sep 30, 2019 | Sep 30, 2019 | 4 | 8 |

**Conveyance**
SECURITY INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**
ZELIS PAYMENTS, LLC
RED-CARD PAYMENT SYSTEMS, LLC
HFN, LLC

**Correspondent**
STEWART WALSH
1025 VERMONT AVE NW, STE 1130
COGENCY GLOBAL INC.
WASHINGTON, DC 20005

**Assignee**
MORGAN STANLEY SENIOR FUNDING, INC., AS COLLATERAL AGENT
1300 THAMES STREET, 4TH FLOOR, THAMES STREET WHARF
BALTIMORE, MARYLAND 21231

### Assignment 3

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 050570/0413 | Jun 25, 2015 | Sep 30, 2019 | 2 | 8 |

**Conveyance**
MERGER AND CHANGE OF NAME (SEE DOCUMENT FOR DETAILS).

**Assignors**
HFN, INC.
HFN ILLINOIS, LLC

**Correspondent**
ROB SONESON
300 N LASALLE
KIRKLAND & ELLIS LLP
CHICAGO, IL 60654

**Assignee**
HFN, LLC
TWO CONCOURSE PARKWAY
SUITE 300
ATLANTA, GEORGIA 30328

## Assignment 2

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 027872/0244 | Mar 15, 2012 | Mar 15, 2012 | 2 | 3 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**
HANDSFREE NETWORKS, INC.

**Correspondent**
DAVID J. THIBODEAU, JR.
530 VIRGINIA ROAD, P.O. BOX 9133
HAMILTON, BROOK, SMITH &
REYNOLDS, P.C.
CONCORD, MA 01742-9133

**Assignee**
HFN, INC.
90 WASHINGTON STREET
NEWTON, MASSACHUSETTS 02458-2220

## Assignment 1

| Reel/frame | Execution date | Date recorded | Properties | Pages |
|---|---|---|---|---|
| 011153/0159 | Sep 25, 2000 | Oct 03, 2000 | 1 | 3 |

**Conveyance**
ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors**
MILLER, ALLAN A.

**Correspondent**
HAMILTON, BROOK, SMITH &
REYNOLDS, P.C.
DAVID J. THIBODEAU, JR.
TWO MILITIA DRIVE
LEXINGTON, MA 02421-4799

**Assignee**
HANDSFREE NETWORKS, INC.

90 WASHINGTON STREET
NEWTON, MASSACHUSETTS 02458

# PATENT ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

EPAS ID: PAT5745991

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | SECURITY INTEREST |

**CONVEYING PARTY DATA**

| Name | Execution Date |
|---|---|
| ZELIS PAYMENTS, LLC | 09/30/2019 |
| RED-CARD PAYMENT SYSTEMS, LLC | 09/30/2019 |
| HFN, LLC | 09/30/2019 |

**RECEIVING PARTY DATA**

| Name: | MORGAN STANLEY SENIOR FUNDING, INC., AS COLLATERAL AGENT |
|---|---|
| Street Address: | 1300 THAMES STREET, 4TH FLOOR, THAMES STREET WHARF |
| City: | BALTIMORE |
| State/Country: | MARYLAND |
| Postal Code: | 21231 |

**PROPERTY NUMBERS Total: 4**

| Property Type | Number |
|---|---|
| Patent Number: | 6742141 |
| Patent Number: | 7100085 |
| Application Number: | 10851690 |
| Application Number: | 14561173 |

**CORRESPONDENCE DATA**

**Fax Number:**

***Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.***

**Phone:** 800-494-5225
**Email:** ipteam@cogencyglobal.com
**Correspondent Name:** STEWART WALSH
**Address Line 1:** 1025 VERMONT AVE NW, STE 1130
**Address Line 2:** COGENCY GLOBAL INC.
**Address Line 4:** WASHINGTON, D.C. 20005

| ATTORNEY DOCKET NUMBER: | 1135417 PAT |
|---|---|
| NAME OF SUBMITTER: | JONATHAN LARSON |
| SIGNATURE: | /Jonathan Larson/ |
| DATE SIGNED: | 09/30/2019 |

PATENT

**Total Attachments: 6**

source=NY-#35658788-v1-EXECUTED_-_Patent_Security_Ageement#page4.tif
source=NY-#35658788-v1-EXECUTED_-_Patent_Security_Ageement#page5.tif
source=NY-#35658788-v1-EXECUTED_-_Patent_Security_Ageement#page6.tif
source=NY-#35658788-v1-EXECUTED_-_Patent_Security_Ageement#page7.tif
source=NY-#35658788-v1-EXECUTED_-_Patent_Security_Ageement#page8.tif
source=NY-#35658788-v1-EXECUTED_-_Patent_Security_Ageement#page9.tif

**PATENT**

GRANT OF
SECURITY INTEREST IN PATENT

This GRANT OF SECURITY INTEREST IN PATENT, dated as of September 30, 2019 (this "Agreement"), is made by HFN, LLC, an Illinois limited liability company, Zelis Payments, LLC, a Delaware limited liability company, and Red-Card Payment Systems, LLC, a Missouri limited liability company (each, a "Grantor" and collectively, the "Grantors"), in favor of Morgan Stanley Senior Funding, Inc., as the Collateral Agent for the benefit of the Secured Parties.

W I T N E S S E T H:

WHEREAS, pursuant to the Credit Agreement, dated as of September 30, 2019 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified, replaced or refinanced from time to time, the "Credit Agreement"), among ZELIS PAYMENTS INTERMEDIATE II, INC., a Delaware corporation ("Holdings I"), ZELIS COST MANAGEMENT INTERMEDIATE II, INC., a Delaware corporation ("Holdings II"), ZELIS PAYMENTS BUYER, INC., a Delaware corporation ("Borrower I"), ZELIS COST MANAGEMENT BUYER, INC., a Delaware corporation (the "Borrower Representative", and, together with Co-Borrower I, the "Borrowers"), the Lenders from time to time party thereto, Morgan Stanley Senior Funding, Inc., as the Administrative Agent, the Collateral Agent, a Swingline Lender and a Lender, and the other parties from time to time party thereto, the Lenders and Letter of Credit Issuers have severally agreed to make their respective loans and extensions of credit to Holdings I, Holdings II, the Borrowers and the Subsidiaries upon the terms and subject to the conditions set forth therein;

WHEREAS, in connection with the Credit Agreement, Holdings I, Holdings II, the Borrower and any Subsidiaries of the Borrowers that are or become a party thereto as Grantors, have executed and delivered the Security Agreement, dated as of September 30, 2019 in favor of the Collateral Agent (as amended, restated, amended and restated, supplemented or otherwise modified, replaced or refinanced from time to time, the "Security Agreement"), or a supplement thereto;

WHEREAS, pursuant to the Security Agreement, each Grantor has granted to the Collateral Agent, for the benefit of the Secured Parties, a lien on and security interest in all of its right, title and interest in, to and under all Intellectual Property, including the Patents, that are not Excluded Property; and

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, and in order to induce the Lenders, the Swingline Lender and the Letter of Credit Issuers to make their respective Extensions of Credit to Holdings I, Holdings II, the Borrowers and the Restricted Subsidiaries, as applicable, and to induce one or more Cash Management Banks, Bank Product Providers or Hedge Banks to enter into Secured Cash Management Agreements, Secured Bank Product Agreements or Secured Hedge Agreements, respectively, with Holdings I, Holdings II, the Borrowers and/or the Restricted Subsidiaries, each Grantor hereby agrees with the Collateral Agent, for the benefit of the Secured Parties, as follows:

1. Definitions. Unless otherwise defined herein, or the context otherwise requires, capitalized terms used in this Agreement, including its preamble and recitals, have the meanings given to them in the Security Agreement, or if not defined therein, in the Credit Agreement.

2. Grant of Security Interest. Subject to the terms of the Security Agreement, the Grantor hereby grants to the Collateral Agent, for the benefit of the Secured Parties, a Lien on and security interest in all of its right, title and interest in, to and under the following property owned by such Grantor or in which such Grantor has any right title or interest (collectively, the "Patent Collateral"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise)of the Obligations, but excluding the Excluded Property.

(i) the Patents listed on Schedule A hereto, (ii) all reissues, reexaminations, continuations, divisions, continuations-in-part, or extensions thereof, and the inventions, discoveries or designs disclosed or claimed therein, (iii) all rights, priorities and privileges related thereto, and (iv) all rights to sue at law or in equity for any infringement or other violation or impairment thereof, including the right to receive all Proceeds therefrom.

3.    Purpose.  This Agreement has been executed and delivered by Grantor for the purpose of recording the grant of security interest herein with the United States Patent and Trademark Office.

4.    Termination or Release.  Upon the termination of the Security Agreement or release of a Grantor in accordance with Section 6.4 thereof, the Collateral Agent shall, at the expense of such Grantor, execute, acknowledge, and deliver to the Grantors an instrument in writing in recordable form releasing the Security Interest in the Patent Collateral of such Grantor under this First Lien Grant of Security Interest in Patents.

5.    Acknowledgment.  The Grantor does hereby further acknowledge and affirm that the rights and remedies of the Secured Parties with respect to the security interest in the Patent Collateral granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which (including the remedies provided for therein) are incorporated by reference herein as if fully set forth herein.  In the event of any conflict between the terms of this Agreement and the terms of the Security Agreement, the terms of the Security Agreement shall govern.

6.    Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic transmission), and all of said counterparts taken together shall be deemed to be originals and shall constitute one and the same instrument.

7.    Governing Law.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

[Signature pages follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers or representatives thereunto duly authorized as of the day and year first above written.

**GRANTORS:**

**HFN, LLC**
**ZELIS PAYMENTS, LLC**

By: ______________________
Name: Douglas E. Klinger
Title: Chief Executive Officer

**RED-CARD PAYMENT SYSTEMS, LLC**

By: ______________________
Name: Eric J. Schaefer
Title: President

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers or representatives thereunto duly authorized as of the day and year first above written.

**GRANTORS:**

**HFN, LLC**
**ZELIS PAYMENTS, LLC**

By: ______________________
Name : Douglas E. Klinger
Title : Chief Executive Officer

**RED-CARD PAYMENT SYSTEMS, LLC**

By: ______________________
Name: Eric J. Schaefer
Title: President

**MORGAN STANLEY SENIOR FUNDING, INC.,**
as the Collateral Agent

By:______________________________
Name: Graham T. Robertson
Title: Authorized Signatory

[Grant of Security Interest in Patent]

**SCHEDULE A**

**U.S. Patent Registrations and Applications**

| Patent Title | Application Number | Filing Date | Registration Number | Issue Date | Owner of Record |
|---|---|---|---|---|---|
| System For Automated Problem Detection, Diagnosis, And Resolution In A Software Driven System | 09/568,390 | May 10, 2000 | 6,742,141 | May 25, 2004 | HFN, Inc. |
| System For Automated Problem Detection, Diagnosis, And Resolution In A Software Driven System | 10/851,690 | May 21, 2004 | 7,100,085 | August 29, 2006 | HFN, Inc. |
| Healthcare Transaction Facilitation Platform Apparatuses, Methods and Systems | 14/561,173 | December 4, 2014 | | | Zelis Payments, Inc. |
| Healthcare Provider Bill Validation and Payment | 16/019,816 | June 27, 2018 | | | Red-Card Payment Systems, LLC (Applicant) |

# EXHIBIT 32

The 2022 Payment Harmonization Index is here.
**Learn More →**

Resources / Zelis and RedCard to Combine in Landmark Healthcare Transaction

August 1, 2019

# Zelis and RedCard to Combine in Landmark Healthcare Transaction

Better Together

## Combination creates leading payments optimization platform with market-leading technology to price, pay and explain healthcare claims.

August 1, 2019 — Bedminster, NJ and St. Louis, MO — Zelis Healthcare ("Zelis") and RedCard Systems ("RedCard") today announced a definitive agreement to merge their respective organizations, forming the next generation leader in healthcare payments optimization. The combination of Zelis and RedCard will create the healthcare industry's first payments optimization platform with market-leading technology and solutions to price claims, pay claims and explain claims, all at enterprise scale on a claim-by-claim basis. The strategic combination of the two technology companies creates a differentiated leader with end-to-end capability across the healthcare payments ecosystem, encompassing claim cost management and payments solutions. Financial terms of the transaction were not disclosed.

The combined company will be led by the existing management teams of Zelis and RedCard, with Doug Klinger serving as Chief Executive Officer and Joe DiMartini and Eric Schaefer serving in senior executive roles. The company will maintain its existing key locations and teams in Bedminster, New Jersey; St. Louis, Missouri; Clearwater, Florida; Atlanta, Georgia; and Overland Park, Kansas.

By bringing together RedCard's payment data platform and Zelis' claim cost management and payment execution capabilities, the combined company is positioned to meaningfully advance the integrated solutions available to payers, providers and consumers. The combined company will drive efficiency and performance at the claim level, simplify the process of paying healthcare claims, and provide a comprehensive, fully-integrated platform to take a claim through the entire pre-payment to payment lifecycle. On a combined basis, Zelis and RedCard serve over 700 payer clients, including the top five national health plans, Blue Cross Blue Shield plans, regional health plans, TPAs and self-insured employers, and 600,000+ providers, delivering approximately $5 billion of claim savings, $50 billion of provider payments and more than 500 million payment data communications annually.

> "The key focus of this combination is to deliver deeper electronic penetration, best-in-class claim cost savings performance and a transformational billing and payments experience, all for the benefit of payers, providers and consumers," said Klinger, who currently serves as CEO of Zelis. "Zelis and RedCard have both been disrupting the industry status quo, and we are thrilled to join forces to

> bring leading-edge payment optimization technology and solutions to our clients and the market broadly."

> "The combined company's payment optimization solution combines the three critical activities along the payment value chain: the payment data platform or software 'brain' to manage and communicate payment data, a highly attractive payment network and payment execution technology, and proprietary processes and expertise to organize every step required to efficiently and effectively take a complete payment file from start to finish," added DiMartini, Chairman of RedCard. "RedCard has worked in partnership with Zelis for many years with many clients, and we are ecstatic to be formally joining forces to change the future of our industry."

The transaction is being supported by Parthenon Capital, a growth-oriented private equity firm and an existing investor in both Zelis and RedCard, and Bain Capital Private Equity and Bain Capital Ventures. Bain Capital brings deep experience across the healthcare, technology and B2B payments landscape and significant growth resources to its partner companies. The existing shareholders of Zelis and RedCard, including management and founding shareholders, will retain significant ownership positions in the new company.

The transaction is expected to close during the third quarter of 2019 and is subject to customary closing conditions and regulatory approvals.

## About Zelis

As a leading healthcare payments company, we price, explain, and pay for care on behalf of insurers and their members. Zelis was founded on a belief that there is a better way to determine the cost of a healthcare claim, manage payment-related data,

and make the payment because more affordable and transparent care is good for all of us. We partner with more than 700 payers, including the top-5 national health plans, Blues plans, regional health plans, TPAs and self-insured employers, millions of providers, and one hundred million members, enabling the healthcare industry to pay for care, with care. Zelis brings adaptive technology, a deeply ingrained service culture, and comprehensive solutions to harmonize the complete payment process. Follow us on LinkedIn to get the latest news.

## About RedCard

RedCard Systems is a leading provider of healthcare payments and communications optimization. RedCard's gateway technology drives effective communications between healthcare payers, providers and consumers, delivering mission critical claims, payments, benefits and individual financial responsibility information via secure communication modalities. RedCard has redefined the way that healthcare communications work, coordinating communication schedules and driving efficiencies within the healthcare payer and provider communication process, while delivering faster, more efficient and effective claims and payment outcomes.

## Media Contact

**Thuy-An Wilkins**
Director of Media Relations for Zelis
908.389.8756
thuy-an.wilkins[at]zelis.com

### Related resource:

**Better Together**

**Zelis and RedCard to Combine in Landmark Healthcare Transaction**

1/13/23, 4:29 PM Zelis and RedCard to Combine in Landmark Healthcare Transaction

Read more

Tags:

Acquisitions RedCard

Share:

Related Resources
New Research Reveals Consumer Frustrations with Healthcare Billing and Lack of Processes for Correcting Errors
Healthcare Financial Journey:
Zelis Acquires Payspan Strengthens New Zelis Advanced Payment Platform and Expands Market Presence

zelis.

5/7





**Solutions**

Network Solutions

Out-of-Network Solutions

Payment Integrity

Payments Optimization

Provider Solutions

**Company**

About Us

Leadership

Partnerships

Press

Careers

**Resources**

Blog

Case Studies

Playbooks

News

Harmonization Index

1/13/23, 4:29 PM Zelis and RedCard to Combine in Landmark Healthcare Transaction

HITRUST
CSF Certified

Great
Place
To
Work.
Certified

Inc.
5000

Privacy Policy

Terms of Use

© Zelis Healthcare

7/7

# EXHIBIT 33

WIKIPEDIA

# Kaseya VSA ransomware attack

On 2 July 2021, a number of managed service providers (MSPs) and their customers became victims of a ransomware attack perpetrated by the REvil group,[1] causing widespread downtime for over 1,000 companies.[2][3][4]

## Company

Kaseya Limited is an American software company founded in 2001. It develops software for managing networks, systems, and information technology infrastructure. Owned by Insight Partners, Kaseya is headquartered in Miami, Florida with branch locations across the US, Europe, and Asia Pacific.[5] Since its founding in 2000, it has acquired 13 companies, which have in most cases continued to operate as their own brands (under the "a Kaseya company" tagline), including Unitrends.

## Timeline and impact

Researchers of the Dutch Institute for Vulnerability Disclosure identified the first vulnerabilities in the software on April 1. They warned Kaseya and worked together with company experts to solve four of the seven reported vulnerabilities. Despite the efforts, Kaseya could not patch all the bugs in time.[6]

The source of the outbreak was identified within hours to be VSA (Virtual System Administrator),[1] a Remote monitoring and management software package developed by Kaseya. An authentication bypass vulnerability in the software allowed attackers to compromise VSA and distribute a malicious payload through hosts managed by the software,[7] amplifying the reach of the attack.[8] In response, the company shut down its VSA cloud and SaaS servers and issued a security advisory to any customers, including those with on-premises deployments of VSA.[9]

Initial reports of companies affected by the incident include Norwegian financial software developer Visma, who manages some systems for Swedish supermarket chain Coop.[10] The supermarket chain had to close down its 800 stores for almost a week, some in small villages without any other food shop. They did not pay ransom, but rebuilt their systems from scratch after waiting for an update from Kaseya.[11]

The REvil ransomware gang officially took credit for the attack and claimed to have encrypted more than one million systems during the incident. They initially asked for a $70 million ransom payment to release a universal decryptor to unlock all affected systems.[12] On July 5, Kaseya said that between 800 and 1,500 downstream businesses were impacted in the attack.[13]

Marcus Hutchins criticized the assessment that the impact of the Kaseya attack was larger than WannaCry, citing difficulties in measuring the exact impact.[14]

After a 9 July 2021 phone call between United States president Joe Biden and Russian president Vladimir Putin, Biden told the press, "I made it very clear to him that the United States expects when a ransomware operation is coming from his soil even though it's not sponsored by the state, we expect them to act if we give them enough information to act on who that is." Biden later added that the United States would take the group's servers down if Putin did not.[15][16]

On 13 July 2021, REvil websites and other infrastructure vanished from the internet.[17]

On 23 July 2021, Kaseya announced it had received a universal decryptor tool for the REvil-encrypted files from an unnamed "trusted third party" and was helping victims restore their files.[18]

On 8 November 2021, the United States Department of Justice unsealed indictments against Ukrainian national Yaroslav Vasinskyi and Russian national Yevgeniy Polyanin. Vasinskyi was charged with conducting ransomware attacks against multiple victims including Kaseya, and was arrested in Poland on 8 October. Polyanin was charged with conducting ransomware attacks against multiple victims including Texas businesses and government entities. The Department worked with the National Police of Ukraine for the charges, and also announced the seizure of $6.1 million tied to ransomware payments. If convicted on all charges, Vasinskyi faces a maximum penalty of 115 years in prison, and Polyanin 145 years in prison.[19]

## References

1. "Une cyberattaque contre une société américaine menace une multitude d'entreprises" (https://www.lemonde.fr/pixels/article/2021/07/03/une-cyberattaque-etendue-contre-une-entreprise-americaine-menace-une-multitude-d-entreprises_6086896_4408996.html). *Le Monde* (in French). 3 July 2021. Archived (https://web.archive.org/web/20211111092003/https://www.lemonde.fr/pixels/article/2021/07/03/une-cyberattaque-etendue-contre-une-entreprise-americaine-menace-une-multitude-d-entreprises_6086896_4408996.html) from the original on 11 November 2021.
2. Osborne, Charlie (2021-07-23). "The Kaseya ransomware attack: Everything we know so far" (https://www.zdnet.com/article/the-kaseya-ransomware-attack-everything-we-know-so-far/). *ZDNet*. Archived (https://web.archive.org/web/20210816092807/https://www.zdnet.com/article/updated-kaseya-ransomware-attack-faq-what-we-know-now/) from the original on 2021-08-16. Retrieved 2021-11-12.
3. Lily Hay Newman (2021-07-04). "How REvil Ransomware Took Out Thousands of Business at Once" (https://www.wired.com/story/revil-ransomware-supply-chain-technique/). *Wired*. Archived (https://web.archive.org/web/20211110083212/https://www.wired.com/story/revil-ransomware-supply-chain-technique/) from the original on 2021-11-10. Retrieved 2021-11-12.
4. McMillan, Robert (2021-07-04). "Ransomware Attack Affecting Likely Thousands of Targets Drags On" (https://www.wsj.com/articles/ransomware-group-behind-meat-supply-attack-threatens-hundreds-of-new-targets-11625285071). *Wall Street Journal*. ISSN 0099-9660 (https://www.worldcat.org/issn/0099-9660). Archived (https://web.archive.org/web/20210928164532/https://www.wsj.com/articles/ransomware-group-behind-meat-supply-attack-threatens-hundreds-of-new-targets-11625285071) from the original on 2021-09-28. Retrieved 2021-07-07.
5. Wile, Rob; Wilner, Michael (July 6, 2021). "One of Miami's oldest tech firms is at the center of a global ransomware computer hack" (https://www.miamiherald.com/news/business/article252592013.html). *Miami Herald*. Archived (https://web.archive.org/web/20211006094255/https://www.miamiherald.com/news/business/article252592013.html) from the original on October 6, 2021. Retrieved July 11, 2021.
6. "The Unfixed Flaw at the Heart of REvil's Ransomware Spree" (https://www.wired.com/story/revil-ransomware-kaseya-flaw-fix-disclosure-april/). *Wired*. July 8, 2021. Retrieved April 7, 2022.
7. Hammond, John. "Rapid Response: Mass MSP Ransomware Incident" (https://www.huntress.com/blog/rapid-response-kaseya-vsa-mass-msp-ransomware-incident#update-12). *Huntress*. Archived (https://web.archive.org/web/20211026120929/https://www.huntress.com/blog/rapid-response-kaseya-vsa-mass-msp-ransomware-incident) from the original on 2021-10-26. Retrieved 2021-07-24.

8. Gerrit De Vynck; Aaron Gregg; Rachel Lerman (July 6, 2021). "Ransomware attack struck between 800 and 1,500 businesses, says company at center of hack—Kaseya's software touches hundreds of thousands of firms, but company says vast majority were unaffected" (https://www.washingtonpost.com/business/2021/07/06/kaseya-ransomware-attack-victims/). *The Washington Post*. Retrieved July 6, 2021.
9. Giles, Martin (3 July 2021). "A New Wave Of Ransomware Has Been Sparked By A Cyberattack On Tech Provider Kaseya" (https://www.forbes.com/sites/martingiles/2021/07/03/ransomware-attacks-sparked-by-cyberattack-on-kaseya/). *Forbes*. Archived (https://web.archive.org/web/20210923062247/https://www.forbes.com/sites/martingiles/2021/07/03/ransomware-attacks-sparked-by-cyberattack-on-kaseya/) from the original on 23 September 2021.
10. Tidy, Joe (3 July 2021). "Swedish Coop supermarkets shut due to US ransomware cyber-attack" (https://www.bbc.co.uk/news/technology-57707530). *BBC News*. Archived (https://web.archive.org/web/20211005194143/https://www.bbc.com/news/technology-57707530) from the original on 5 October 2021.
11. Greig, Jonathan (July 26, 2021). "Kaseya denies paying ransom for decryptor, refuses comment on NDA" (https://web.archive.org/web/20211003205303/https://www.zdnet.com/article/kaseya-denies-paying-ransom-for-decryptor-refuses-comment-on-nda/). *ZDNet*. Archived from the original (https://www.zdnet.com/article/kaseya-denies-paying-ransom-for-decryptor-refuses-comment-on-nda/) on October 3, 2021. Retrieved November 12, 2021.
12. Tung, Liam (5 July 2021). "Kaseya ransomware attack: US launches investigation as gang demands giant $70 million payment" (https://www.zdnet.com/article/kaseya-ransomware-attack-us-launches-investigation-as-gang-demands-giant-70-million-payment/). *ZDNet*. Archived (https://web.archive.org/web/20211009105238/https://www.zdnet.com/article/kaseya-ransomware-attack-us-launches-investigation-as-gang-demands-giant-70-million-payment/) from the original on 9 October 2021.
13. Satter, Raphael (5 July 2021). "Up to 1,500 businesses affected by ransomware attack, U.S. firm's CEO says" (https://www.reuters.com/technology/hackers-demand-70-million-liberate-data-held-by-companies-hit-mass-cyberattack-2021-07-05/). *Reuters*. Archived (https://web.archive.org/web/20211111100411/https://www.reuters.com/technology/hackers-demand-70-million-liberate-data-held-by-companies-hit-mass-cyberattack-2021-07-05/) from the original on 11 November 2021.
14. Hutchins, Marcus. "Twitter" (https://twitter.com/malwaretechblog/status/1414641339786960901). *Twitter*. Retrieved 2021-07-13. "The reason some people think REvil was bigger than WannaCry is because WannaCry was so big that nobody was ever able to quantify it. The best metrics we have is unique IP addresses, but companies have 10s, 100s, or 1000s of machines behind a single IP due to NAT."
15. "Biden tells Putin Russia must crack down on cybercriminals" (https://apnews.com/article/joe-biden-europe-technology-government-and-politics-russia-df7ef73f02bcba61ad6e628aa95a9f84). *AP NEWS*. July 9, 2021.
16. Sanger, David E. (July 13, 2021). "Russia's most aggressive ransomware group disappeared. It's unclear who disabled them" (https://www.nytimes.com/2021/07/13/us/politics/russia-hacking-ransomware-revil.html). *The New York Times*.
17. Business, Brian Fung, Zachary Cohen and Geneva Sands, CNN (July 13, 2021). "Ransomware gang that hit meat supplier mysteriously vanishes from the internet" (https://www.cnn.com/2021/07/13/tech/revil-ransomware-disappears/index.html). *CNN*.
18. "Ransomware key to unlock customer data from REvil attack" (https://www.bbc.com/news/technology-57946117). *BBC News*. BBC. July 23, 2021. Retrieved July 23, 2021.

19. "Ukrainian Arrested and Charged with Ransomware Attack on Kaseya" (https://www.justice.gov/opa/pr/ukrainian-arrested-and-charged-ransomware-attack-kaseya). *United States Department of Justice*. November 8, 2021. Archived (https://web.archive.org/web/20211111153625/https://www.justice.gov/opa/pr/ukrainian-arrested-and-charged-ransomware-attack-kaseya) from the original on November 11, 2021. Retrieved November 12, 2021.

Retrieved from "https://en.wikipedia.org/w/index.php?title=Kaseya_VSA_ransomware_attack&oldid=1128499460"

**This page was last edited on 20 December 2022, at 12:53 (UTC).**

Text is available under the Creative Commons Attribution-ShareAlike License 3.0; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

# EXHIBIT 34

LAWFARE

CYBERSECURITY

# The Kaseya Ransomware Attack Is a Really Big Deal

By **Matt Tait** Monday, July 5, 2021, 5:39 PM

If you're not already paying attention to the Kaseya ransomware incident, you should be. It's likely the most important cybersecurity event of the year. Bigger than the Exchange hacks by China in January. Bigger than the Colonial Pipeline ransomware incident. And, yes, more important than the SolarWinds intrusions last year.

First, some background. Kaseya is a managed service provider; its customers use Kaseya to manage their company information technology (IT) infrastructure. As part of this task, Kaseya can deploy software to the systems under management, in a way that is broadly equivalent to a software provider deploying an automatic update to those machines. For those interested in more, Nick Weaver wrote a piece for Lawfare that walks through the background in depth.

Under normal circumstances, automatic software deployment, especially in the context of software updates, is a good thing. But here this feature was turned on its head. Russian-based criminal gang REvil hacked into Kaseya's management system and pushed REvil software to all of the systems under Kaseya's management. From there, the ransomware promptly disabled those computers and demanded a cryptocurrency payment of about $45,000 per system to set the machines free. As of writing, REvil claims that about a million total computers were affected and is offering a "bulk discount" of $70 million to unlock all affected systems in a single payment.

Although the direct impact is already enormous, to me, the direct impact is, in some sense, far less important than the issue of *how* the incident occurred, namely by subverting software delivery mechanisms as a means to install ransomware.

Supply chain attacks such as these are the proximate technical cause of many of cybersecurity's "greatest" hits, including NotPetya and SolarWinds. The NotPetya attack in June 2017 did about $10 billion or so of damage globally. The SolarWinds campaign led to the compromise of thousands of major organizations and dozens of federal agencies. NotPetya was delivered by a malicious update to Ukrainian accountancy software firm MeDoc, the SolarWinds malware by a malicious update to SolarWinds's IT management software.

If this is not yet enough to catch your attention, three further observations will.

First, supply chain compromises, such as these, are very often *indiscriminate*; everyone who installs a malicious update gets the malware. Even in cases where supply chain malware merely lays the groundwork for further subtargeting after the initial breach—as the SolarWinds malware did—the effect is disruptive to all recipients, whether subtargeted or not. Except in very rare cases, perpetrators behind supply chain attacks cannot control, predict or constrain the real-world consequences of subverting software supply chains—and this is especially true when they are used to install ransomware.

The second, and perhaps scariest, observation is that the software vendors used in malicious update compromises thus far have, in the grand scheme of things, been relatively small. MEDoc, SolarWinds and Kaseya are, of course, important to their respective customers, but none was a household name before their respective incidents. Far bigger software vendors exist. Some are central to the basic functioning of modern computing. A disruption to the supply chain of platform vendors like Microsoft, Apple or Google would have fallout at a scale that is literally unimaginable, with global disruption so vast that it cannot really be articulated without sounding insane or alarmist. But platform vendors are not the only large software developers. Hundreds of smaller companies exist on the periphery, each with enormous customer bases, including organizations like NVidia, Dell, Adobe and Mozilla; Linux and its various major distributions; the maintainers of core package managers used by huge numbers of software developers; large enterprise IT products; as well as any of the major games companies like Blizzard Activision or Valve. Most of these regularly push software to huge numbers of users and organizations at an operational scale that makes MEDoc, Kaseya and SolarWinds look like lightweights.

The final observation is that defensive remediation of ransomware deployed through automatic updates is pathological to the cybersecurity industry itself in a way that is qualitatively different from other categories of cybersecurity incidents.

To understand why, contrast the Kaseya breach with, say, a more "traditional" deployment of malware using zero day exploits against each affected target. Hackers who develop or have access to zero days have two natural obstacles to their mass use: the difficulty in reaching exposed systems and the risk of discovery. Once the zero day is discovered, its utility declines rapidly and sharply.

Ads by Google

Stop seeing this ad Why this ad?

These incident responders perform an intensive triage and remediation. They identify and restore affected systems, discover what was stolen, and put in place measures that will make future compromises less likely to occur—and less damaging when they do—for the affected systems and organizations.

Malware deployed automatically via the supply chain upends all of these dynamics pathologically. A malware operator with access to automatic software delivery infrastructure has no incentive to keep the infections small. Rather than infecting only a few targets at the top of its priority list, the hacker typically hacks all affected customers nearly simultaneously. Finding and reaching exposed systems isn't an obstacle here to their mass deployment either; the delivery mechanism "helpfully" routes the malware through to systems buried deep inside corporate networks, or hidden behind layers of traditional defenses.

Vendors can't respond in the normal way to supply chain malware either. The malware came from their own software delivery infrastructure, so remediation begins with them disabling their infrastructure to prevent further misuse and then turning inward to secure their own systems. In any case, patches are the wrong tool for remediation. Patches help defend systems that might be *vulnerable* to malware, but here customers are *already infected* with the malware. By the time the breach is discovered, it's already too late to fix via a patch.

As if this wasn't enough, malware-laden updates are also pathological to incident response. Since malicious updates affect enormous groups of systems simultaneously, they tend to saturate the capacity of the entire incident response industry overnight, overwhelming its ability to respond.

In short, software supply chain security breaches don't look like other categories of breaches. A lot of this comes down to the central conundrum of system security: It's not possible to defend the edges of a system without centralization so that defensive resources can be pooled. But this same centralization concentrates offensive action against a few single points of failure that, if breached, cause all of the edges to fail at once. And the more edges that central failure point controls, the more likely the collateral real-world consequences of *any* breach, but *especially* a ransomware breach, will be catastrophic and overwhelm the defensive cybersecurity industry's ability to respond.

Tackling this problem is no small task; it will need a great deal of resources and creativity across a large number of different domains, from the technical community through to the foreign policy community. And, to be fair, many of the options toward a safer infrastructure will likely require some large, and frankly unpopular, shaping up against some large entrenched interests to make progress.

But before researchers and policymakers can start to look for solutions, the first step is recognizing why supply chain compromise is fundamentally different from most other problems encountered day-to-day in cybersecurity, and one with a failure mode that can be unusually fast and large scale. Only then will the information security community be able to start tackling the problem with the scale and seriousness that it deserves.

**Topics: Cybersecurity**

Matt Tait is the Chief Operating Officer of Corellium. Previously he was CEO of Capital Alpha Security, a consultancy in the UK, worked at Google Project Zero, was a principal security consultant for iSEC Partners, and NGS Secure, and worked as an information security specialist for GCHQ.

**@pwnallthethings**

# EXHIBIT 35



## Cognitive automation that delivers superior digital device user experience.

Privacy & Cookies Policy



### Zero-code Automation

Our patented script-less, zero code architecture enables the combination of cognitive automation and centralized policy management for workplace devices.

### Predictive Self-Healing

Ability to predict and resolve issues before they happen and real-time analytics for automated workplace management, to improve business productivity and drive innovation.

### Proactive Remediation

Actionable alerts and notifications allow agents to be proactive in eliminating issues by triggering one-click resolutions silently on the end-user devices using an intuitive yet simple dashboard console.

### Automated ITSM

Embed next-gen technology within the service architecture by enforcing governance standards through automation, enabling stronger compliance and security.

### Insights & Analytics

Gain deep-dive visibility, analytics and manageability across your end-point infrastructure, and manage insights based on user groups and personas.

### Experience Scorecards

Measure individual user-experience by combining technical metrics and business drivers and get visibility & insights of your digital user experience across key areas.

## Solutions that work for everyone, in every industry.

Technology built on principles of tomorrow to offer tailor made solutions for any kind of business.

Privacy & Cookies Policy







## Relied on by service-desks, trusted by end-users and beloved by executives, everywhere.

**276M** Resolutions Performed

**4M** Software Installs

**453** Self-Heal Configurations

**93%** Automation Coverage



Enhance your digital device experience with AI-driven automated issue remediation.

Small Businesses

OEMs & Support Channels

Blog

Request a demo

Privacy Policy

Newsroom

เว็บแตกง่าย ok

Privacy & Cookies Policy

# EXHIBIT 36

202107.13
Off
0

**Kaseya Ransomware Attack: Does Negligence in Security Affect Liability?**

in Blogs, News, Security & Privacy

Kaseya, a large technology solutions company, recently reported that its on-premises VSA product was the "victim of a sophisticated cyberattack." (See generally, Kaseya's announcements here). Specifically, third-parties were able to access computer endpoints using Kaseya's VSA product and then deploy ransomware. According to its web site, Kaseya reported that only endpoints using VSA as an on-premise solution were exploited, affecting approximately 60 managed service providers and approximately 1,500 downstream users.

Julie Machal-Fulks, Partner at Scott & Scott, LLP recently published a blog explaining some of the challenges prospective litigants may face if they want to file a lawsuit against Kaseya. The terms that potential litigants will have to evaluate before filing a claim are contained in the reseller terms and conditions, which can be found here, and the End User License Agreement ("EULA"), which can be found here. There are a number of limitations and restrictions that will affect the viability of a potential claim, whether it is initiated by an MSP or an end user. If you are an MSP that has been affected by the Kaseya ransomware attacks, you should speak to an experienced attorney.

## Contract Claims

The most common claims Kaseya will likely be facing are breach of contract claims. In a typical breach of the contract claim, the parties' responsibilities will be governed by the EULA or the reseller terms and conditions, each of which contains a number of provisions favorable to Kaseya. Two particularly troublesome provisions are the limitation of liability and indemnification provisions.

Privacy & Cookies Policy

The indemnification provision requires managed services providers ("MSPs") to indemnify Kaseya against any downstream user claims. The indemnification provision reads as follows:

> 13.2 Licensee Indemnification. Licensee agrees to defend, indemnify, and hold harmless each of Kaseya, its affiliates and respective officers, employees, consultants, shareholders and representative from and against any and all claims, liabilities, damages, and/or costs (including attorneys' and expert witness fees, costs and other expenses) arising out of or related to: (a) any actual or alleged violation of this Agreement or applicable law, rule or regulation by Licensee or any person accessing or using the Software or services by or through Licensee; (b) any actual or alleged infringement or misappropriation by Licensee, or any person accessing or using the Software by or through Licensee, of any intellectual property or privacy or other right of any person or entity (except claims of infringement or misappropriation arising solely from use of the Software as provided under this Agreement); (c) any claims by any of Licensee Customers (except claims of infringement or misappropriation arising solely from use of the Software as provided under this Agreement), or arising out of or relating to Licensee's relationship with any of Licensee Customers; or (d) Customer Data.

Essentially, if Kaseya is held liable for damages incurred by an end user, it will likely seek reimbursement from the end user's MSP.

Equally troubling for managed service providers, is the limitations of liability provision, which restricts potential damages to a calculation of not more than two months or six months of the Licensee's most recent licensing fees, depending on the governing document For example, the EULA has the following provision:

> 15. **Limitation of Liability**. NOTWITHSTANDING ANYTHING ELSE IN THIS AGREEMENT OR OTHERWISE, AND EXCEPT FOR BODILY INJURY CAUSED BY GROSS NEGLIGENCE OR WILLFUL MISCONDUCT BY KASEYA'S EMPLOYEES, AND TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, KASEYA AND ITS SUPPLIERS AND LICENSORS SHALL NOT BE LIABLE OR OBLIGATED WITH RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT (INCLUDING WITHOUT LIMITATION INDEMNIFICATION OBLIGATIONS) OR UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY (I) FOR ANY AMOUNTS IN EXCESS IN THE AGGREGATE OF THE FEES PAID TO IT BY LICENSEE FOR THE SOFTWARE LICENSED HEREUNDER DURING THE SIX MONTH PERIOD PRIOR TO THE CAUSE OF ACTION, (II) FOR ANY COST OF PROCUREMENT OF SUBSTITUTE GOODS, TECHNOLOGY, SERVICES OR RIGHTS, OR (III) FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OF USE OR DATA, DAMAGE TO SYSTEMS OR EQUIPMENT, BUSINESS INTERRUPTION OR COST OF COVER) IN CONNECTION WITH OR ARISING OUT OF THE DELIVERY, PERFORMANCE OR USE OF THE SOFTWARE, DOCUMENTATION, ANY OTHER MATERIALS PROVIDED BY KASEYA OR OTHER SERVICES PERFORMED BY KASEYA, WHETHER ALLEGED AS A BREACH OF CONTRACT OR TORTIOUS CONDUCT, INCLUDING NEGLIGENCE AND STRICT LIABILITY, EVEN IF KASEYA HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES). YOU ACKNOWLEDGE AND AGREE THAT KASEYA WOULD NOT ENTER INTO THIS AGREEMENT UNLESS IT COULD RELY ON THE LIMITATIONS DESCRIBED IN THIS PARAGRAPH.

If any litigation is commenced against Kaseya for the ransomware attacks, the applicability and enforceability of the limitation of liability and indemnity provisions are likely to be key issues. The Kaseya contracts contain Florida choice of law provisions. Under Florida law, such provisions are enforceable if they are clear and unambiguous and the parties knew what they were contracting away.

Tort Liability Arising from Contracted Parties

Given the favorable provisions in the Kaseya contracts, any plaintiff will likely include claims for both negligence and gross negligence in connection with any litigation filed against Kaseya. Any such claims will face significant challenges.

Courts have traditionally disfavored the use of common law remedies such as tort claims arising from a breach of contract. However, public policy arguments have previously been successful in pursuing tort liability as long as it

Privacy & Cookies Policy

can be proven that the defendant owed a separate duty of care that could be separately actionable. *Jade Winds Ass'n, Inc. v. FirstService Residential Fla., Inc. (In re Jade Winds Ass'n, Inc.)*, CASE NO. 15-17570-BKC-RAM (Bankr. S.D. Fla. Mar. 22, 2019)

A plaintiff could argue that Kaseya had a duty of care to secure the user data and comply with several state and federal regulations in keeping that data safe. However, even if a tort claim against Kaseya survived, it is likely that any damages would be subject to the limitation of liability.

Gross Negligence

The key to proving gross negligence is establishing that Kaseya's conduct was so reckless or wantion in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct. See Florida's Statutes on Negligence.

Kaseya reported on its web site that the attack occurred on July 2, 2021, and it notified its customers shortly thereafter. It deployed a software tool for customers to determine whether their data had been breached and continued to provide updates on its web site and directly to licensees.

Kaseya indicated that the ransomware attack was a "sophisticated cyberattack" and its R&D team were working to identify and mitigate the vulnerability. In other words, Kaseya implied that it was unaware of the security vulnerability and therefore unable to prevent the attack. See Kaseya notice here.

Not long after the Kaseya breach was widely reported, former employees went to the public claiming that Kaseya was, in fact, warned about the vulnerability in its software prior to the hack. Ex-employees went on record with Bloomberg alleging that Kaseya did know about the vulnerability and failed to act. See Bloomberg article here.

If a plaintiff could prove that Kaseya was aware of the vulnerability in the VSA product and knowingly refused to provide a software update that could have prevented the data breach, a plaintiff might argue that it constitutes gross negligence. Establishing a gross negligence claim against Kaseya would be helpful to the arguments surrounding limitations of liability and indemnity. A court might also take Kaseya's prior data breaches in 2014 and 2018 into consideration. Florida law also provides for punitive damages in gross negligence cases which could significantly raise the stakes of the litigation.

If you were affected by the Kaseya ransomware attack, please contact Scott & Scott, LLP for a free consultation.

## Like this post?

Tweet

Save

Like 2

More sharing options



## About author



**Keli Johnson Swan**

Privacy & Cookies Policy

As an associate attorney at Scott & Scott, LLP, Keli is primarily focused on software licensing and copyright infringement matters. She advises clients in a variety of industries to ensure compliance with software licenses and develop strategies for maximizing the value of software licenses.

Privacy & Cookies Policy

# EXHIBIT 37



Markets →

| | | |
|---|---|---|
| DOW | 33,147.25 | 0.22% ▼ |
| S&P 500 | 3,839.50 | 0.25% ▼ |
| NASDAQ | 10,466.48 | 0.11% ▼ |

Fear & Greed Index →

Latest Market News →

Tesla delivered a record 1.3 million vehicles in 2022, but it still disappointed Wall Street

Elon Musk has lost a bigger fortune than anyone in history

Recession or soft landing? Five reasons to be cautiously optimistic about 2023

# Kaseya says up to 1,500 businesses compromised in massive ransomware attack

By Alex Marquardt, CNN Business

Updated 10:14 AM EDT, Tue July 6, 2021

Video Ad Feedback

Kaseya: The massive ransomware attack compromised up to 1,500 businesses

01:41 - Source: CNNBusiness

See More Videos

**(CNN Business)** — Software vendor Kaseya says that between 800 and 1,500 businesses have been compromised by the recent ransomware attack that has ricocheted around the world.

Kaseya said in a statement on Monday that approximately 50 of its direct customers were breached in the attack that began to unfold on Friday. But hundreds more companies were affected because many of Kaseya's customers provide IT services to small businesses such as restaurants and accounting firms.

"Our global teams are working around the clock to get our customers back up and running," Kaseya CEO Fred Voccola said in the statement. "We understand that every second they are shut down, it impacts their livelihood, which is why we're working feverishly to get this resolved."

Kaseya said that it has met with US government agencies including the FBI and the Cybersecurity and Infrastructure Security Agency (CISA). It said it had also engaged with the White House and cybersecurity firm FireEye Mandiant.

The White House on Sunday urged companies who believe their systems were compromised in the ransomware attack that targeted Kaseya to immediately report it to the Internet Crime Complaint Center.

Kaseya said that it had discussed "systems and network hardening requirements prior to service restoration" with the FBI and CISA. The company said that "a set of requirements" will be posted "to give our customers time to put these counter measures in place in anticipation of a return to service on July 6."

**RELATED ARTICLE**
Ransomware group demands $70 million for Kaseya attack

An analysis of the malicious software by the cybersecurity firm Emsisoft shows that it was created by REvil, a ransomware gang which is believed to operate out of Eastern Europe or Russia.

CNN reported earlier Monday that REvil has demanded a $70 million payment in Bitcoin for a decryptor tool to restore the businesses' data.

In an interview with Reuters on Monday, Voccola would not say whether Kaseya will pay the hackers. "No comment on anything to do with negotiating with terrorists in any way," he told Reuters.

Voccola also told Reuters he was not aware of any nationally important organizations being compromised in the attack. "We're not looking at massive critical infrastructure," he said. "That's not our business. We're not running AT&T's network or Verizon's 911 system. Nothing like that."

*— Brian Fung contributed to this report.*

**MORE FROM CNN BUSINESS**

Dubai just dropped a 30% tax on alcohol

# EXHIBIT 38

Admin
Selection: Site - NH-Bangalore (Change?)
Usage - Office 365
Sales (372)
Marketing (305)
Developement (272)
Management (261)
Printer Usage
Device Types by OS
Windows (972)
Mac (305)
Android (272)
Linux (061)
Device Utilization
Ben's Device
Alex's Device
Device Up Time
Average boot times
Boot time
OS loader
User logon
Notification Trend
Most Used Apps
Network Utilization Trend

# EXHIBIT 39



Office Address

## Nanoheal by HFN Inc.

514 East Timpanogos Circle,
Building G, Suite 2100
Orem, Utah 84097

### Contact Info

Phone: + 1 (855) 436 4621

Support: support@nanoheal.com

Sales : contact@nanoheal.com

**Leave a Message**

Your Name

Your Email

Your Subject

Your Message

Send Message

เว็บแตกง่าย ok

Privacy & Cookies Policy

# EXHIBIT 40



(https://www.fedex.com/en-us/home.html)

FedEx® Tracking

**UPDATED DELIVERY**

# Pending

Initially expected: Friday, 7/8/2022

**DELIVERY STATUS**

Delivery exception !

Get Status Updates

**TRACKING ID**

275208128793 

**FROM**
Concord, CA US

*Label Created*
7/6/2022 2:54 PM

**PACKAGE RECEIVED BY FEDEX**
PACHECO, CA
7/6/2022 3:21 PM

**DELIVERY EXCEPTION**
OREM, UT
7/15/2022 10:17 AM

**OUT FOR DELIVERY**
OREM, UT
7/8/2022 9:06 AM

**READY FOR PICKUP**
OREM, UT
7/18/2022 5:59 PM

**TO**
70 NORTH 1200 WEST
OREM, UT US 84057

*UPDATED DELIVERY*
Pending

*Initially expected*
7/8/2022

↓ View travel history

 (https://www.fedex.com/en-us/home.html)

Sign up for Status Updates to get updated as we have more information.

Unable to deliver shipment, returned to shipper
Recommended action: No action is required. The package is being returned to the shipper.

No scheduled delivery date available at this time.

Manage Delivery

## Shipment facts

### Shipment overview

**TRACKING NUMBER**

275208128793

**SHIP DATE**

7/6/22

**STANDARD TRANSIT**

7/8/22 before 4:30 pm

**UPDATED DELIVERY**

Pending

### Services

**SERVICE**

FedEx 2Day

**TERMS**

Shipper

**SPECIAL HANDLING SECTION**

Deliver Weekday

### Package details

**WEIGHT**

0.5 lbs / 0.23 kgs

(https://www.fedex.com/en-us/home.html)

**TOTAL SHIPMENT WEIGHT**

0.5 lbs / 0.23 kgs

**PACKAGING**

FedEx Envelope

↑ Back to top

## Travel history

**SORT BY DATE/TIME**
Ascending

**TIME ZONE**
Local Scan Time

Wednesday, 7/6/2022

- 12:54 PM
  **Picked up**
  **Tendered at FedEx Office**
  CONCORD, CA
- 2:54 PM
  **Shipment information sent to FedEx**
- 3:21 PM
  **Picked up**
  PACHECO, CA
- 8:30 PM
  **Left FedEx origin facility**
  PACHECO, CA
- 9:16 PM
  **Arrived at FedEx hub**
  OAKLAND, CA
- 9:31 PM
  **Shipment arriving On-Time**
  OAKLAND, CA

(https://www.fedex.com/en-us/home.html)

- Departed FedEx hub
  OAKLAND, CA

- 2:28 AM
  **Shipment arriving early**
  OAKLAND, CA

- 4:34 AM
  **At destination sort facility**
  SALT LAKE CITY, UT

- 8:04 AM
  **At local FedEx facility**
  OREM, UT

- 9:29 AM
  **At local FedEx facility**
  **Package not due for delivery**
  OREM, UT

- 9:45 AM
  **Shipment arriving On-Time**
  OREM, UT

- 9:59 AM
  **At local FedEx facility**
  OREM, UT

Friday, 7/8/2022

- 7:46 AM
  **At local FedEx facility**
  OREM, UT

- 9:06 AM
  **On FedEx vehicle for delivery**
  OREM, UT

- 1:03 PM
  **Operational Delay**
  **Incorrect address - Recipient moved**
  OREM, UT

- 6:44 PM
  **At local FedEx facility**
  OREM, UT

(https://www.fedex.com/en-us/home.html)

At local FedEx facility
OREM, UT

- 12:10 PM
  **Delay**
  **Package delayed**
  OREM, UT

Tuesday, 7/12/2022

- 5:59 PM
  **At local FedEx facility**
  OREM, UT

- 6:13 PM
  **Delay**
  **Package delayed**
  OREM, UT

Wednesday, 7/13/2022

- 11:21 AM
  **At local FedEx facility**
  OREM, UT

- 11:36 AM
  **Delay**
  **Package delayed**
  OREM, UT

Thursday, 7/14/2022

- 3:58 PM
  **At local FedEx facility**
  OREM, UT

- 4:14 PM
  **Delay**
  **Package delayed**
  OREM, UT

Friday, 7/15/2022

- 10:02 AM
  **At local FedEx facility**
  OREM, UT

- 10:17 AM
  **Delay**
  **Package delayed**
  OREM, UT

(https://www.fedex.com/en-us/home.html)

Ready for recipient pickup
Package available for pickup at: 70 NORTH 1200 WEST
OREM, UT

Thursday, 7/21/2022

4:19 PM
Returning package to shipper
Return tracking number 777454760819
OREM, UT

Back to top

**OUR COMPANY**

About FedEx(https://www.fedex.com/en-us/about.html)
Our Portfolio(https://www.fedex.com/en-us/about/company-structure.html)
Investor Relations(https://investors.fedex.com/home/default.aspx)
Careers(https://careers.fedex.com/fedex/)
FedEx Blog(https://www.fedex.com/en-us/blog.html)
Corporate Responsibility(https://www.fedex.com/en-us/about/corporate-social-responsibility.html)
Newsroom(https://newsroom.fedex.com/)
Contact Us(https://www.fedex.com/en-us/customer-support/contact-us.html)

**MORE FROM FEDEX**

FedEx Compatible(https://www.fedex.com/en-us/compatible.html)
FedEx Developer Portal(https://developer.fedex.com/api/en-us/home.html)
FedEx Logistics(https://www.fedex.com/en-us/logistics.html)
FedEx Cross Border(https://www.fedex.com/en-us/cross-border.html)
ShopRunner(https://www.fedex.com/en-us/shoprunner.html)

**LANGUAGE**

 Change Country/Territory(https://www.fedex.com/?location=home)

**FOLLOW FEDEX** (https://www.fedex.com/en-us/email.html) (Https://www.facebook.com/FedEx/)

(Https://twitter.com/fedex) (https://www.instagram.com/fedex/) (https://www.linkedin.com/company/fedex)

(https://www.fedex.com/en-us/home.html)

© FedEx 1995-2022

(https://www.fedex.com/en-us/sitemap.html) | (https://www.fedex.com/en-us/terms-of-use.html) | (https://www.fedex.com/en-us/trust-center.html)

# EXHIBIT 41

nanoheal orem utah
Nanoheal
5.0 ★★★★★ 2 reviews
Permanently closed
Directions
Save
Nearby
Send to phone
Share
514 Timpanogos Cir building g suite 2100, Orem, UT 84097
Located in: Canyon Park Tech Center
Permanently closed
nanoheal.com
(855) 436-4621
88F9+Q4 Orem, Utah

# EXHIBIT 42



Newsroom

### 5 Ways CBD Can Improve Your Daily Life

September 11, 2021

CBD by Cannabis Dispensary Toronto is becoming more and more popular each day, and for good reason. CBD has a host of benefits that can

Read More »

### Seed Group inks deal with Nanoheal to Usher in AI-Driven Digital Experience Businesses in UAE

June 15, 2021

Seed Group inks deal with Nanoheal to Usher in AI-Driven Digital Experience Businesses in UAE Utah, U.S.A | Dubai, U.A.E, 14 June 2021: Seed Group, a

Read More »

### TCS and Nanoheal to Provide Digital Workspace Automation for End-user Devices

February 19, 2019

TCS and Nanoheal to Provide Digital Workspace Automation for End-user Devices Tata Consultancy Services Partners with Nanoheal to Provide Self-healing End-user Device Management Solutions, Improving

Read More »

### Malwarebytes Announces Partnership with Bask, a Division of Nanoheal

December 13, 2018

Malwarebytes Announces Partnership with Bask, a Division of Nanoheal New partnership expands Bask tech support footprint in endpoint protection for consumers and small businesses.

Read More »

nanoheal
Resolutions within.
Enhance your digital device experience with AI driven automated issue remediation.
Solutions
Enterprises
Small Businesses
OEMs & Support Channels
Learn
Platform
Blog
Request a demo
Company
Contact Us
Privacy Policy
Newsroom

เว็บแตกง่าย ok

Privacy & Cookies Policy

CBD by Cannabis Dispensary Toronto is becoming more and more popular each day, and for good reason. CBD has a host of benefits that can improve your daily life. In this blog post, we will discuss five ways that CBD can make your life better. From reducing anxiety to improving sleep quality, CBD has something to offer everyone! Keep reading to learn more about how CBD can help you live a happier, healthier life.

Anyone who has ever experienced anxiety knows how debilitating it can be. CBD is a natural alternative to traditional anxiety medications, and research shows that it may be just as effective in reducing symptoms of anxiety. In fact, some studies suggest that CBD can reduce generalized social anxiety disorder (SAD) symptoms. Whether you're dealing with SAD or another type of anxiety, you should consider using CBD oil for relief from your symptoms.

If you struggle with insomnia or other sleep disorders, CBD might be able to help. When used regularly over time, research suggests that CBD can improve overall quality of sleep by reducing the amount of time spent awake during the night and increasing daytime wakefulness. If you have a hard time staying asleep at night or struggle to fall asleep, talk to your doctor about using CBD as a sleep aid.

CBD may be able to help manage chronic pain, particularly pain that is arthritis-related. Studies show that CBD can provide anti-inflammatory and analgesic effects when taken regularly over time. Additionally, research suggests that people who use CBD oil as part of their regular treatment regimen have less intense symptoms overall than those who don't use CBD oil.

As more and more people turn to CBD for its potential health benefits, researchers are studying how it can affect cardiovascular health in particular. Some studies show that taking high doses of CBD can lower blood pressure and even reduce the risk of stroke, making it a potentially beneficial supplement for people with heart disease or high blood pressure.

As research into CBD continues to grow, scientists are finding that this compound may have positive effects on neurological disorders such as Alzheimer's disease, Parkinson's disease, multiple sclerosis (MS), epilepsy, and more. While there is still a lot to learn about how exactly CBD can help manage these diseases, early studies indicate that it may play an important role in improving overall health and quality of life for sufferers.

Overall, CBD oil offers many potential benefits that make it worth considering as part of your daily routine. Whether you suffer from anxiety, sleep disorders, or chronic pain and other physical ailments, CBD may be able to help. Talk to your doctor today about using CBD oil as part of your treatment plan!

CBD has quickly become one of the most popular supplements on the market today. With a wide range of potential health benefits, including reducing anxiety, improving sleep quality, managing chronic pain, and more, it can be an effective tool for improving overall daily life. In this blog post, we will discuss five ways that CBD from Toronto Cannabis Dispensary can help you live a happier and healthier life. From reducing anxiety to preventing or managing neurological disorders, there are many ways that CBD can make a positive impact on your health and w

Privacy & Cookies Policy

share: f 🐦 ℗ in

NO COMMENTS

## Related Post

Malwarebytes Announces Partnership with Bask, a Di

Seed Group inks deal with Nanoheal to Usher in AI-

TCS and Nanoheal to Provide Digital Workspace Auto

Search

## Recent Posts

5 Ways CBD Can I
September 11, 2021

Seed Group inks deal wit
June 15, 2021

Top Technology Predictio
February 5, 2021

Helpdesk Automation Mark
January 15, 2021

How Fast is your IT Issu
December 18, 2020

เว็บแตกง่าย

Privacy & Cookies Policy

เว็บแตกง่าย ok

Privacy & Cookies Policy