FILED
2024 FEB 2
CLERK
U.S. DISTRICT COURT

Allan Miller
3385 Claudia Drive
Concord, CA  94519
650-468-7387
allan.miller@alumni.stanford.edu
Pro Se Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| ALLAN MILLER<br><br>       Plaintiff,<br><br>  vs.<br><br>HFN, INC., a Delaware Corporation, d/b/a as NANOHEAL BY HFN INC.,<br>KALAARI CAPITAL ADVISORS PRIVATE LIMITED, an Indian Company,<br>SRIDHAR SANTHANAM,<br>KUMAR SHIRALAGI, PAVAN VAISH, and VANI KOLA<br><br>Defendants. | Case Number: 2:23-cv-00733-CMR<br><br>**OPPOSITION TO DEFENDANT HFN INC.'S MOTION TO DISMISS** |

# TABLE OF CONTENTS

TABLE OF CONTENTS..........................................................................................................ii

TABLE OF AUTHORITIES ...............................................................................................iii

INTRODUCTION ................................................................................................................ 1

REWRITING HISTORY ..................................................................................................... 4

PIERCING THE CORPORATE VEIL ............................................................................... 5

HFN'S STATUS .................................................................................................................. 9

THE CONVERSION CLAIMS CAN BE MAINTAINED............................................... 10

THE FIDUCIARY DUTY CLAIMS CAN BE MAINTAINED..................................... 11

THE AIDING AND ABETTING CLAIMS CAN BE MAINTAINED.......................... 11

THE ESOP CLAIMS CAN BE MAINTAINED.............................................................. 11

THIS IS NOT A DERIVATIVE SUIT ............................................................................. 14

DEFENSE CITATIONS ARE INAPPOSITE ................................................................. 14

SUMMARY ....................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Transglobe Energy Corp.*, 35 F. Supp. 2d 1363 (M.D. Fla. 1999) .......................... 15

*Buttonwood Tree Value Partners, L.P. v. R.l Polk & Co.*, Civil Action No. 9250-VCG, 2014 Del.
   Ch. LEXIS 141 (Ch. Aug. 7, 2014) ...................................................................... 15

*Colman v. Colman*, 743 P.2d 782 (Utah Ct. App. 1987) ................................................ 6

*Colosimo v. Roman Catholic Bishop*, 2007 UT 25, 156 P.3d 806 (Sup.Ct.) ............................... 14

*d'Elia v. Rice Dev., Inc.*, 2006 UT App 416, 147 P.3d 515 ............................................ 11

*Miller v. HFN, Inc.*, No. 23-16130, 2023 U.S. App. LEXIS 29039 (9th Cir. Nov. 1, 2023) ......... 5

*Miller v. HFN, Inc.*, No. 23-cv-00533-VC, 2023 (N.D. Cal. filed Feb. 6, 2023) ..................... 4, 5

*Newport Steel Corp. v. Thompson*, 757 F. Supp. 1152 (D. Colo. 1990) ................................... 10

*Simons v. Park City RV Resort, LLC*, 2015 UT App 168, 354 P.3d 215 ................................... 6

*United States v. Abdush-Shakur*, Nos. 04-20132-JWL, 07-02519-JWL, 2008 U.S. Dist. LEXIS
   4871 (D. Kan. Jan. 22, 2008) ...................................................................... 4

*Vail Summit Resorts, Inc. v. Zip-Flyer, Ltd. Liab. Co.*, Civil Action No. 18-cv-01763-MEH, 2020
   U.S. Dist. LEXIS 111857 (D. Colo. June 25, 2020) .................................................. 8

**Statutes**

28 U.S.C. § 1404(a) .................................................................................. 5

28 U.S.C. § 1406(a) .................................................................................. 5

**Other Authorities**

Broussard, Meredith. *More than a glitch: Confronting race, gender, and ability bias in tech.* MIT
   Press, 2023 ........................................................................................ 13

*Minority Report* (2002), directed by Steven Spielberg ................................................ 13

## INTRODUCTION

Defendant HFN, Inc. ("HFN") has responded to the First Amended Complaint ("FAC") of Plaintiff Allan Miller ("Plaintiff") with a Motion to Dismiss ("MTD") for numerous causes. The MTD appears to encompass the actions of Sridhar Santhanam ("Santhanam") as well as Kalaari Capital Private Limited ("Kalaari"), Kumar Shiralagi ("Shiralagi"), Pavan Vaish ("Vaish"), and Vani Kola ("Kola") (collectively, "Defendants", and including Kalaari, Shiralagi, Vaish, and Kola, the "other Defendants").[1]

Tellingly, the MTD never attempts to make the case that the Defendants are innocent, which would be the simplest and most compelling defense. Instead, it focuses exclusively on the Plaintiff and his actions, repeating seven times that the Plaintiff is *pro se*, falsely attempting to portray him as engaging in "serial litigation" and "harassing" the Defendants, and attacking the minutiae of his pleadings, all in an apparent attempt to diminish him in the eyes of this Court. One explanation for this might be that the same counsel previously tried the defense of innocence, in the N. D. Cal. case that they cite extensively, with disastrous results when Santhanam and Shiralagi perjured themselves in three separate declarations that were logically inconsistent and easily falsified by information available to the Plaintiff.

This is nothing new. Exhibit 1 is a presentation that was formally presented to the Board of HFN, at least Santhanam and Shiralagi, on July 1, 2022, describing the very serious issues with the company. The company was "in crisis with upset employees, highly dissatisfied customers / partners and disgruntled investors, that [would] result in a continued loss of [the average rate of return], reputational damage and high liabilities, eventually forcing a shutdown." The laundry list of written complaints from customers on p. 6 was also communicated to the Board at least as early as March 8, 2022, when a major system integrator partner indicated that they were "very concerned about the [HFN] product design and the support." Another partner indicated that a "customer has

---

[1] A separate motion to dismiss the case against Shiralagi largely mirrors this MTD and is addressed in a separate Opposition by the Plaintiff.

started a process to impose a penalty for this incident and looking at legal action. The security team is questioning the security controls of the platform, the process that's driving the solution and its integrity. It is also claimed that the [HFN] code is exposed on the internet."

Things were even worse inside the company. P. 8 details that HFN had a "culture of intimidation, retribution, and castigation." This was championed by Santhanam, with "public displays of anger and outrage," "harassment through excessive messages and dictates for instant action," and special "ambitious metrics" and "high quotas" that only applied to the sales team. The toxic environment for employees was not even offset by other benefits: there were "no bonuses for employees in the last 2 years despite the high growth of the company" and "no stock options for any of the employees" except for Santhanam. If the employees wanted to protest this, well, there was a "lack of HR function and HR processes" that made it impossible. No wonder there was "high attrition" with the "sales person with the highest productivity leaving the company."

The Defendants have attempted to portray themselves as the victims of "serial litigation" by the Plaintiff, but this allegation rings hollow in light of the revelation on p. 2 that HFN has "excessive liability with a history of 3 lawsuits from shareholders, partners, and vendors." What the presentation does not discuss is that the partner/vendor lawsuits were a direct result of Santhanam refusing to pay for services rendered. There were also several employee complaints that were well on the way to becoming litigations but were averted in spite of Santhanam. To date, HFN's litigious track record has been costly, with over $600,000 spent on settlements and legal fees. To find the "serial litigator" in this case, the Court needs only look for the least common denominator.

What did the Board (and Kalaari, with its Board seats) do with this alarming information? Institute controls on the company? Try to hire some turnaround management talent? Bring in some management consulting? No. They either did nothing or supported Santhanam. More recently, they allowed Santhanam to take the actions in Exhibit 2, namely, adding two employees to the Board with no experience who would do exactly as directed by Santhanam, using them to try to

retroactively recover from egregious errors in the corporate formation, and then take them off the Board after one month. The disfunction at HFN continues, nothing has changed substantively, no reinvestment is made into the company, and the Defendants continue to siphon money out into their personal accounts using HFN as a shield.

With the entire focus of the MTD on procedural issues, the Defendants allege that (1) the Plaintiff is attempting to plead a derivative suit *pro se*, (2) HFN does not owe a fiduciary duty to the Plaintiff, (3) HFN cannot aid and abet breach of fiduciary duty, (4) the Plaintiff cannot plead conversion of assets to which he has no possessory right, (5) the Plaintiff is pleading a claim that has already been dismissed with prejudice in N. D. Cal., (6) the Plaintiff is pleading a claim that is time barred, (7) the Plaintiff is pleading a claim that is barred by a previous settlement agreement, and that (8) the Plaintiff's alleged derivative suit is not adequately pled.

These arguments are all either inapposite, inaccurate, or specious. HFN is a textbook example of a corporation that is acting as an alter ego for Santhanam and the other Defendants, and this Court can pierce the corporate veil in applying the claims to Santhanam and the other Defendants. The Plaintiff was clear in the FAC why this is not a derivative suit, and cannot be treated as one, and the claims against HFN as an alter ego cannot be a derivative suit. As an alter ego, HFN has a fiduciary duty to the Plaintiff through Santhanam and the other Defendants. The Plaintiff never pled any aiding and abetting claims against HFN. The Plaintiff has possessory rights to his ownership of HFN to the extent that they are being converted, and in the conversions where Santhanam and the other Defendants are using HFN as a corporate shield, the assets are being converted directly by Santhanam and the other Defendants. The Plaintiff is well aware of the nature of the dismissal in N. D. Cal. and has not pled any claim that has been dismissed with prejudice. The alleged time bar and settlement agreement restrictions make little sense since they require the Plaintiff to be able to see into the future.

Detailed descriptions and support of the adequacy of the Plaintiff's pleadings are presented in this Opposition. Since all of the procedural objections of the Defendants are either inapposite, inaccurate, or specious, the Court should deny the Defendants' MTD and allow the case to proceed.

## REWRITING HISTORY

The Defendants misstate a number of important facts regarding the history of this case, in an apparent attempt to bolster their argument and reduce the weight of the Plaintiff's allegations in the view of this Court. They begin by saying that the N. D. Cal. Case (*Miller v. HFN, Inc.*, No. 23-cv-00533-VC, 2023 (N.D. Cal. filed Feb. 6, 2023)) was partially dismissed with prejudice. Exhibit 3 is the final Order with highlights by the Plaintiff. The Defendants missed several key points in this Order:

1. The securities fraud claim is "dismissed with prejudice," but the rest of the claims are "dismissed" for lack of jurisdiction, with the Court indicating that the claims are more appropriate in a different venue. "[T]he … absence of a specific indication that the dismissal is 'with prejudice' indicate that the dismissal is 'without prejudice'" (*United States v. Abdush-Shakur*, Nos. 04-20132-JWL, 07-02519-JWL, 2008 U.S. Dist. LEXIS 4871, at *8 (D. Kan. Jan. 22, 2008)).

2. Only the "state law claims" are dismissed without prejudice; the Court is silent on the status of the Federal law claims based on the patents, which are adequately pled as "arising under" Federal patent law.[2] Similarly, the Court declines to comment on the jurisdiction of those claims, despite the fact that jurisdiction was adequately pled.[3]

3. The Court declined to comment on whether the ESOP claim was time barred, by indication that the Defendants' allegations were "probably" true. Without indicating that the "probability" is 100%; this is merely an idle comment and not a ruling.

The Defendants go on to say that the Plaintiff is "determined to harass [HFN] with serial litigation despite being repeatedly advised that his alleged claims are devoid of merit," apparently

---

[2] *Miller v. HFN, Inc.*, No. 23-cv-00533-VC, dkt. 32 ¶¶ 19, 74-87.
[3] *Miller v. HFN, Inc.*, No. 23-cv-00533-VC, dkt. 37 pp. 10-13.

not understanding the nature of dismissals and jurisdiction, or perhaps trying to prejudice this Court against the Plaintiff. Despite dismissing without prejudice for jurisdictional issues, the N. D. Cal. Court failed to heed the legislative intent of 28 U.S.C. § 1404(a) and 28 U.S.C. § 1406(a) by not transferring the case to this Court and thereby indicating that the Plaintiff should re-file in this Court.[4]

Given the irregular and prejudicial nature of the ruling by the N. D. Cal. Court, the Plaintiff appealed the decision to the Ninth Circuit Court of Appeals, outlining the specific grounds for appeal (not just a general appeal as the Defendants mis-characterize). *Miller v. HFN, Inc.*, No. 23-cv-00533-VC, dkt. 61, p. 2. However, upon finding additional significant information concerning the Defendants' fraudulent activities in Utah, the Plaintiff concluded that re-filing in this Court would be more appropriate, and therefore voluntarily and explicitly dismissed the appeal (not "abandoning" it as the Defendants mis-characterize). *Miller v. HFN, Inc.*, No. 23-16130, 2023 U.S. App. LEXIS 29039 (9th Cir. Nov. 1, 2023), dkt. 4, pp. 1-2.

The Defendants failed to describe their egregious behavior in front of the N. D. Cal. Court. Santhanam provided two separate declarations, both under penalty of perjury, that were logically inconsistent and contradictory.[5] *Miller v. HFN, Inc.*, No. 23-cv-00533-VC, dkts. 11-1, 33-1. After that, Shiralagi provided a declaration, under penalty of perjury, and the Plaintiff used information from anonymous sources to demonstrate that this declaration also contained numerous falsehoods *Miller v. HFN, Inc.*, No. 23-cv-00533-VC, dkt. 34-1; dkt. 45, pp. 1, 3-6.

## PIERCING THE CORPORATE VEIL

HFN is being used as a shield by Santhanam and the other Defendants for their activities. In particular HFN meets the tests for acting as an alter ego of Santhanam, as well as the rest of the

---

[4] This was prejudicial against the Plaintiff. Fortunately, no time bars were affected, but it did require another complex and expensive Hague Service on the Indian defendants. The Plaintiff would like to thank the Clerk's office for their friendly and helpful assistance in this matter.
[5] The second declaration was provided after the Plaintiff used information from public sources to demonstrate that the first declaration contained numerous falsehoods *Miller v. HFN, Inc.*, No. 23-cv-00533-VC, dkt. 37, pp. 1, 3-5.

Defendants. "To make a case for piercing the corporate veil, the plaintiff must demonstrate both parts of what has become known as the *Norman* test. The first part of the test, often called the 'formalities requirement,' requires the movant to show 'such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist.' In *Colman v. Colman*, 743 P.2d 782 (Utah Ct. App. 1987), we identified '[c]ertain factors which are deemed significant, although not conclusive, in determining whether [the formalities requirement] has been met.' These factors include (1) undercapitalization of a one-man corporation; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) siphoning of corporate funds by the dominant stockholder; (5) nonfunctioning of other officers or directors; (6) absence of corporate records; [and] (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders … 'The second part of the [*Norman*] test, often called the 'fairness requirement,' requires the movant to show that observance of the corporate form would sanction a fraud, promote injustice, or condone an inequitable result." *Simons v. Park City RV Resort, LLC*, 2015 UT App 168, ¶ 6, 354 P.3d 215 (internal citations, footnotes, and formatting omitted). As Miller has indicated in the FAC:

    **1. Santhanam is using the business structure as a façade for operations of the dominant stockholders.** HFN now has Santhanam as the sole Board member (Plaintiff was only able to discover this by being notified as seen in Exhibit 2), and any previous Board members acted only in a "rubber stamp" capacity (FAC ¶¶ 21-30, 59-65). Santhanam uses HFN to fund development in his personal ventures (FAC ¶¶ 51-58). Even when additional Board members are added, it is a sham, including only Board members whose sole source of income is at the whim of Santhanam, who report to Santhanam, and who have an extremely close personal relationship with Santhanam (FAC ¶¶ 63-69).

    **2. HFN fails to observe even the most basic corporate formalities.** Exhibit 2 is a notice that HFN sent to its stockholders in late October, 2023, with highlighting added by the Plaintiff. It reveals that during its formation, HFN failed to set the size of the Board multiple times before

changing the size of the Board to a number not encompassed by the corporate Charter, failed to correctly sign the Charter when filing it with the Secretary of State, failed to consent to the election of the Shiralagi to the Board, and failed to correctly issue shares to Vaish (Ex. 2 and FAC ¶¶ 63-65).

HFN has never had a single stockholder meeting outside of the disastrous fraudulent 2012 "meeting," (FAC ¶ 20). Even when Miller tried to request a stockholder meeting, HFN ignored the good faith attempt by Miller to comply with HFN's requirements (FAC ¶¶ 21-30). HFN keeps no minutes for Board meetings (FAC ¶ 60). HFN has essentially no Human Resources function (FAC ¶¶ 66-69). HFN has never provided financial reporting to stockholders (other than the fraudulent report in 2012) and rebuffs any attempt to find such information with a demand for a non-disclosure agreement and no follow-up (FAC ¶¶ 21-30).

HFN has failed to follow the Federal and IRS regulations for its ESOP since the inception of the plan. All of the ESOP distributions have been either direct grants or non-qualified options and have gone to non-employees or the highest paid employee of HFN (FAC ¶¶ 39-50).

**3. HFN has never paid a stockholder dividend.** Despite apparent profitability based on both private and publicly available information (see Ex. 1 and Ex. 4), HFN does not provide a stockholder dividend. HFN does not reinvest these profits into the company (FAC ¶¶ 70-99). Instead, the profits are used to fund the outside activities of Santhanam and the other Defendants (FAC ¶¶ 31-18, 51-58).

**4. Santhanam routinely siphons business funds as a dominant stockholder.** Santhanam uses HFN funds for personal travel and diverts funds to his own accounts and those of the other Defendants (FAC ¶¶ 31-18, 51-58).

**5. The other Board members and majority stockholders are essentially non-functional.** As previously described, the months leading up to July, 2022, Shiralagi was given the presentation in Exhibit 1 detailing the specific issues plaguing HFN. Kalaari was also aware of the issues through Shiralagi's position as a Managing Director at Kalaari. After being made aware of these

issues, Shiralagi and Kalaari took no action to remedy them. This is a continuing pattern of behavior over years, where Kalaari has filled its Board seats with members who intentionally ignore issues at the company and abandon their duties as Board members (FAC ¶¶ 21-99).

**6. HFN has an absence of business records.** HFN has no stockholder meeting minutes, since it has never had a single stockholder meeting outside of the disastrous fraudulent 2012 "meeting" (FAC ¶ 20). HFN keeps no minutes for Board meetings (FAC ¶ 60). HFN has essentially no Human Resources function (FAC ¶¶ 66-69). HFN provides no financial reporting to stockholders and rebuffs any attempt to find such information with a demand for a non-disclosure agreement and no follow-up (FAC ¶¶ 21-30); most likely these records simply do not exist.

The formalities requirement for piercing the corporate veil is met and exceeded by the above for HFN and all Defendants. As to the fairness requirement, allowing Santhanam to use HFN to continue to siphon money from the company through Zen into his personal accounts (and those of the other Defendants) while avoiding Utah and Federal taxes would sanction a fraud in the most direct way possible (FAC ¶¶ 31-34). Allowing all the Defendants to continue to use HFN to funnel resources and ownership into the Seed Group with the intent to snatch them away from the Plaintiff through a sham entity would not only be sanctioning a fraud but would also condone an inequitable result for the Plaintiff (FAC ¶¶ 35-38).

The Court can apply the doctrine of piercing the corporate veil in this case. In *Vail Summit Resorts, Inc. v. Zip-Flyer, Ltd. Liab. Co.*, Civil Action No. 18-cv-01763-MEH, 2020 U.S. Dist. LEXIS 111857 (D. Colo. June 25, 2020), the Court denied a motion to dismiss based on the argument that the plaintiff had not explicitly pled piercing the corporate veil as a separate cause of action. The Court found that piercing the corporate veil was a remedy rather than a cause of action, and agreed with the plaintiff in saying "a plaintiff will typically seek to amend a complaint and add allegations sufficient to pierce the corporate veil ***after*** discovery has commenced, but before trial.*" Id.*, at *6. The fact pattern of *Vail Summit Resorts* is quite similar to that of this case, and in this case, the Plaintiff has already provided substantial evidence for the alter ego theory prior to

any discovery. Here, the Plaintiff has pled nearly all of the *Colman* factors in detail.[6] Additionally, the Plaintiff has pled in numerous ways that HFN is an alter ego for Santhanam and all Defendants: "The Defendants … felt that they were now above the law and proceeded to use HFN resources for their own personal benefit" (FAC ¶ 2); "HFN's main motivation [for acquiring Bask was to] plunder Bask for cash and use the ill-gotten gains to pay for the personal activities of the Defendants" (FAC ¶ 4); "HFN and Zen then split up the [revenue from fake invoices to go] straight into the pockets of the Defendants" (FAC ¶ 5). The Defendants themselves point out numerous times that the Plaintiff pleads the activities of HFN as those of its alter egos, Santhanam and the other Defendants (MTD pp. 2, 6-10).

## HFN'S STATUS

At this time, the status of HFN as a Delaware corporation may be voidable, as evidenced by the notice provided by HFN in Exhibit 2. The status of HFN seems particularly tenuous given that the "Board" that was assembled to address the situation consisted only of Santhanam and two members whose sole source of income is at the whim of Santhanam, who report to Santhanam, and who have an extremely close personal relationship with Santhanam (FAC ¶¶ 63-69). Additionally, the two "Board members" only served for about a month, just long enough to take this one action. Neither of these "Board members" has any kind of outside corporate management experience, much less corporate governance experience. One of the "Board members" was an employee at Hewlett-Packard at the time of the events to which the Resolutions in the notice are directed and would therefore have no way to know the intent or reasoning behind the decisions taken at that time.

As demonstrated above, HFN is not functionally acting as a corporation, but is instead an alter ego of Santhanam, and to a large extent, the other Defendants.

---

[6] The Plaintiff also believes that HFN was intentionally undercapitalized initially through the cooperation of all Defendants, in order to pay off a hidden investor, but has not yet been able to procure sufficient direct evidence from the anonymous sources in order to definitively plead that fact to this Court.

As a result, the actions of HFN are not governed by Delaware corporate law. If any corporate law is to be applied in this case, it would be Utah law, where the Defendants committed the torts described by the claims of action. More appropriately, the claims of action against HFN apply directly to the Defendants.

### THE CONVERSION CLAIMS CAN BE MAINTAINED

The Defendants argue that the conversion claims cannot be maintained by the Plaintiff because the Plaintiff has no right to immediately possess HFN's assets, because stockholders do not own the assets of a corporation (MTD pp. 2, 9). In this case, HFN is not acting as a corporation, but is instead acting as an alter ego for the Defendants in various capacities in all three of the Zen conversion (FAC ¶¶ 31-34), the Seed conversion (FAC ¶¶ 35-38), and the salary and travel budget conversion (FAC ¶¶ 51-58). In all three cases, Santhanam is using HFN as thinly veiled disguise to grab cash out of the company coffers and transfer it into those of himself and the other Defendants. See also p. 9 of Exhibit 1, where the Seed conversion was called out to the HFN Board as "over $400K committed … in a binding contract for 3 years with no demonstrated market potential [and] … no comparable commitment made in the US and Europe." This highly irregular behavior, and the effective use of all three conversions to funnel money from HFN directly to Santhanam and the other Defendants, precludes the argument that these assets are somehow those of HFN. "Using the alter ego doctrine however, a court may pierce the corporate veil and hold an individual personally liable if recognizing a separate corporate status would work an injustice." *Newport Steel Corp. v. Thompson*, 757 F. Supp. 1152, 1156 (D. Colo. 1990).

The situation with the ESOP shares is even clearer. The Plaintiff owns an interest in the ESOP as a result of the 2015 settlement as described in the communication in Exhibit 5. Hence, the conversion of those shares from being ESOP options to outright grants for non-employees and highly paid employees is a conversion of assets to which the plaintiff owns possessory rights. Like the other conversions, this transfer is not done by HFN, but is instead done by Santhanam and the other Defendants, using HFN as a shield for their actions.

## THE FIDUCIARY DUTY CLAIMS CAN BE MAINTAINED

The Defendants argue that under Delaware law, HFN does not owe a fiduciary duty to the Plaintiff (MTD pp. 2, 7). Since the status of HFN as a Delaware corporation is in question as a result of actions admitted to by the Defendants themselves, this argument is not persuasive. More importantly, hiding behind the shield of the corporation is exactly the kind of behavior that piercing the corporate veil seeks to address. *d'Elia v. Rice Dev., Inc.*, 2006 UT App 416, 147 P.3d 515 addresses this in detail. In that case, the Court of Appeals ruled that Rice Inc. and Rice LLC were serving as alter egos for Mr. Rice, and hence "Mr. Rice is personally liable for those breaches of fiduciary duty committed by Rice Inc. and Rice LLC." *Id.*, ¶ 65, 147 P.3d 515. The fact pattern is similar to that of this case; since HFN is acting as an alter ego of Santhanam and the other Defendants, they directly owe a fiduciary duty to the Plaintiff.

Additionally, at least some of the fiduciary duty claims (those related to patents) arise under Federal patent law, not Delaware law (FAC ¶¶ 70-81, 333-373). The Defendants' arguments are inapposite here.

## THE AIDING AND ABETTING CLAIMS CAN BE MAINTAINED

The Defendants argue that HFN cannot aid and abet a breach of fiduciary duty, by virtue of its status as a corporation (MTD pp. 2, 8). The Plaintiff never pled Aiding and Abetting against HFN (FAC ¶¶ 121-137, 165-173, 193-209, 237-245, 315-319, 369-373), so the Defendants' argument is specious.

## THE ESOP CLAIMS CAN BE MAINTAINED

The Defendants argue that the ESOP claim was dismissed with prejudice in N. D. Cal. (MTD pp.3, 12-16). The N. D. Cal. Court dismissed the "securities fraud claim" for not being made with sufficient particularity and not supporting scienter (Ex. 3). The dismissal was **not** regarding the circumstances surrounding the abuse of the ESOP, but was instead around the technicalities of the Plaintiff's pleading of a securities tort. The N. D. Cal. Court even stopped short of ruling on some of the specific facts of the ESOP abuse, only opining that they **might** be

true. The pleading of the ESOP abuse in front of this Court is one of conversion, not securities fraud (FAC ¶¶ 39-50, 392-483). The Plaintiff is well aware that many of the abuses of the ESOP constitute crimes, but that only the State can pursue those. The Plaintiff is limited to the civil conversion causes of action.

In an attempt to work around the fact that the ESOP claim is different from the claim that was dismissed in N. D. Cal., the Defendants try to use the doctrines of claim preclusion and  issue preclusion to argue that they are the same (MTD pp. 12-16). However, their argument has one insurmountable flaw. Although the N. D. Cal. dismissal is ambiguous in several ways, it is absolutely clear in its wording that the dismissal is **not based on the merits** of the case but is instead based on the **details of the pleading** of the case. All discussion of the **merits** is only commentary citing probabilities. The pleading, relevant law, and damages model of a securities fraud is vastly different from those of a conversion, so none of the Defendants' arguments apply.

In one last effort to save the *res judica* argument, the Defendants then claim that the facts of the current conversion claim are the same as those in the N. D. Cal. case (MTD pp. 13-17). However, this ignores an important fact, namely, that in the meantime, **the Defendants have effectively admitted to the tort in writing**. After the Plaintiff brought the ESOP abuse to the attention of the Defendants in the N. D. Cal. case, Vaish (probably realizing that his ownership of the company was in jeopardy, and perhaps even a criminal violation), orchestrated his shares to be re-issued as an outright grant of common stock (Ex. 2, p. 6) in an attempt to "undo" the ESOP irregularities for his shares. This is a significant new factual development in the tort.

Realizing the weakness of all these arguments, the Defendants then try to bolster them with the same arguments that they used in the N. D. Cal. case, with the same flaws. The first argument is that the agreement signed by the Plaintiff in the 2015 settlement bars the Plaintiff from maintaining any claims against HFN (MTD pp. 17-19). However, the Defendants neglect to mention that the ESOP abuse started after the 2015 settlement, and that the settlement only bars damages that could have been alleged as of the date of the settlement. The Defendants are

attributing powers to the Plaintiff that are seen in the film *Minority Report*,[7] and the Plaintiff is sad to report that he has no such powers.

Next up, the Defendants argue that the ESOP was never represented as an option pool and that no representation of its use was made. Exhibit 5 shows a discussion (with highlighting by the Plaintiff) between the opposing counsel in the settlement, where HFN's counsel clearly represents that the shares in question are an **option pool** rather than a s**lush pool for granting shares outright**. The exhibits already in the FAC show that the ESOP was consistently referred to as an "option pool" or an "ESOP". The plain meaning of the term "ESOP" is Employee Stock Option Pool and is meant for **incentive stock options**.

Then the Defendants argue that Santhanam could not have been acting fraudulently since so much time passed between the creation of the ESOP and his own personal abuse of it (MTD pp. 20-21). This is inconsistent with the fact that fraud happens **when the ESOP is abused**, but more importantly, it is inconsistent with the fact that Santhanam gave himself **exactly the same 307,154 shares** from the ESOP that he had given up in the 2015 settlement. This number, 307,154, could not possibly be a coincidence, and it demonstrates the "scienter" and fraudulent intent that Santhanam had been planning all along.

The Defendants then wrap up with the argument that the ESOP claims are time barred, ignoring the fact that the burden of reporting is on HFN and postulating that the Plaintiff "could have requested and obtained the capitalization table in 2019" (MTD pp. 21-22). However, there is no need for this Court to deal in this past conditional tense of hypotheticals. The Plaintiff has already conducted this experiment and shown exactly what would have happened: HFN would have stonewalled, then demanded an inappropriate non-disclosure agreement, then stopped

---

[7] For those not familiar with the film or the Philip K. Dick story upon which it is based, Meridith Broussard has aptly characterized *Minority Report* in her book *More Than a Glitch* as a "predictive policing" fantasy in which "Tom Cruise plays a police officer who arrests people before they commit crimes, on the recommendation of some teenagers with precognition who are held captive in a swimming pool full of goo."

responding to good faith efforts to arrive at a mutually agreeable solution (FAC ¶¶ 20-30). The only way that any information was available to the Plaintiff about the ESOP was through anonymous informants,[8] and this did not become available until 2023, well within any statute of limitations.

## THIS IS NOT A DERIVATIVE SUIT

The Defendants keep repeating the mantra that the Plaintiff is trying to plead a derivative suit as a *pro se* plaintiff (MTD pp. 1, 3, 10, 11). The Plaintiff is well aware that he cannot represent the other HFN stockholders and that doing so would be criminally practicing law without a license. The FAC describes in detail why this cannot be a derivative suit, and why treating it as one would cause substantial injustice to the Plaintiff (FAC ¶ 100).

This also cannot be a derivative suit because HFN is acting as an alter ego for Santhanam and the rest of the Defendants, so the actions are effectively against individuals. There cannot be a derivative suit against individuals.

## DEFENSE CITATIONS ARE INAPPOSITE

The Defendants provide an impressive array of 62 citations for their arguments (MTD pp. iii-vii). However, it seems that their focus was on quantity over quality, and some of the references are not usable, are not relevant, or cite cases with extremely different fact patterns from the present case. As a representative sample:

*Colosimo v. Roman Catholic Bishop*, 2007 UT 25, 156 P.3d 806 (Sup.Ct.) is used to argue that the Plaintiff should have been more diligent in inquiring about the HFN capitalization table. In *Colosimo*, the plaintiffs were young boys that had been sexually abused by a Catholic priest. Comparing that fact pattern to this case is inappropriate, and frankly, rather horrifying. The Plaintiff was not sexually abused and has a somewhat different perspective on the diligence required.

---

[8] One definition of insanity is repeating the same action and expecting a different result. The Plaintiff is not insane.

*Buttonwood Tree Value Partners, L.P. v. R.l Polk & Co.*, Civil Action No. 9250-VCG, 2014 Del. Ch. LEXIS 141 (Ch. Aug. 7, 2014) is clearly marked "Notice: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL." This citation is not precedential.

*Anderson v. Transglobe Energy Corp.*, 35 F. Supp. 2d 1363 (M.D. Fla. 1999) is from the Eleventh Circuit, in the Middle District of Florida, rather than the Tenth Circuit of this Court.

The Plaintiff has tried to improve the efficiency of the Court by not forcing it to wade through a pile of citations with limited utility at best. Instead, the Plaintiff has focused on a smaller number of citations that are relevant and on point.

## SUMMARY

All of the arguments provided by the Defendants in their motion to dismiss this case are inapposite, inaccurate, or specious. The Court should deny the motion in its entirety so that the case can proceed to a just outcome for the Plaintiff.

Date: _____February 2, 2024_____     By: _____/s/ Allan A. Miller _____
                                                 Allan Miller
                                                 Plaintiff (Pro se)

# EXHIBIT 1

# Agenda

1. Past, Present and Crisis

2. Sales Pipeline & Performance

3. Customer Retention: Product & delivery

4. Employee and HR issues

5. Fiduciary responsibility, legal and PR issues

6. Summary

# Nanoheal was in crisis in Q3, Q4 2019

- Very low and rapidly declining cash balance
  - Average cash balance of under $450K
  - Projected to run out of cash in 3 months

- Rapidly declining ARR with significant loss of customers
  - Nanoheal's gross retention rates significantly below market average
  - Well-funded competition with strong brand ( NextThing, Lakeside), entrenched in most SI Partners with continued significant investment in sales, marketing and PR
  - Go to market focused mostly on small deals to middle managers mostly at Tier 2 / 3 SI partners and small customers with short durations of contracts.

- High legal liabilities, HR and governance issues
  - Excessive liability with a history of 3 lawsuits from shareholders, partners and vendors
  - Lack of governance (oversight/meetings/documentation), internal management and controls
  - Lack of senior people (or any people) in several key functions (marketing/PR, customer success, HR, finance)
  - High employee attrition
  - Lack of basic working infrastructure (CRM, HR portal, etc.)

# The crisis is more severe now

- No impending cash flow problem (unless existing deployments fail, leading to contract cancellations) with projected cash balance of over atleast $1.2M
  - Total additional payments of $1.4M + in the next few weeks: Negotiated an additional $550K of payment for Daimler bringing their total payments to $950K, $300K+ (PCCW), $250K (HSBC), $300 (Go Daddy)
  - Projections include additional hiring costs of $500K+ in the next 6 months and $750K+ in the next 9 months that can be avoided if receipts are delayed
- Signifiant continued loss of end customers (lost 28 out of 47 customers (60% of accounts) and 43% of the ARR in the last 3.25 years. Persistent and increasing negative feedback on product and delivery from SI partners leading to loss of credibility, reputation and severe potential liabilities
- Significant risk of contract cancellations with 74% of the current ARR at risk of being lost (including Daimler and newly won accounts) due to product / delivery issues and high dissatisfaction of partners / customers.
- Absence of people in several key areas such as marketing, PR, HR / recruting and so on, for long periods of time. Significant bandwidth crunch in existing teams.
- High employee attrition and low employee morale.

**Nanoheal has upset employees, highly dissatisfied customers / partners and disgruntled investors resuling in continued loss of ARR, reputational damage, high legal liabilities and potential shutdown.**

# Nanoheal has lost 60% of its customers and 43% of its ARR in the last 3.25 years with a 3 year gross retention rate of 35%



15 active customers — April 1, 2019

9 customers added

23 customers added

19 active customers — June 30, 2022

June 30, 2020

28 customers lost

**Gross Retention Ratio**

| Year | NRR |
| --- | --- |
| 19-20 | 63% |
| 20-21 | 82% |
| 21-22 | 61% |

Gross Retention Rate is defined as (opening ARR – churn) / (opening ARR) for a particular set of end customers

| | | | Amount in '000 | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | **S I Partner** | **Customer** | **FY 22-23** | **FY 21-22** | **FY 20-21** | **FY 19-20** | **Product / Delivery Issues** |
| 1 | Accenture | Dyson | 96 | | | | ✓ |
| 2 | Coforge | Channel 4 | 24 | | | | ✓ |
| 3 | Coforge | Virgin Atlantic | 48 | | | | ✓ |
| 4 | TCS | SAS | 96 | | | | ✓ |
| 5 | TCS | Accoustic | 36 | | | | ✓ |
| 6 | HCL infosystem | Mclaren | 162 | | | | ✓ |
| 7 | Coforge | Charity Share | | 8 | | | ✓ |
| 8 | Coforge | SCCC | | 42 | | | ✓ |
| 9 | One Support | Internal | | 29 | | | |
| 10 | HCL infosystem | Under Armor | | 65 | | | |
| 11 | JANA | JANA | | 73 | | | |
| 12 | Hexaware | Hexaware | | | 20 | | |
| 13 | Dell | PTS | | | 1 | | |
| 14 | Avira | Avira | | | 12 | | |
| 15 | Coforge | LH | | | 10 | | ✓ |
| 16 | TCS | TDC | | | 94 | | ✓ |
| 17 | TCS | Garrett Motion | | | 61 | | ✓ |
| 18 | TCS | Seadrill | | | 47 | | ✓ |
| 19 | CompuCom | Realogy | | | 97 | | ✓ |
| 20 | CompuCom | Florida Power | | | 180 | | ✓ |
| 21 | CompuCom | OOTS | | | 120 | | ✓ |
| 22 | IBM | BFIL | | | 15 | | ✓ |
| 23 | Resolve Laplink | Revenue wire/Sitel | | | | 74 | |
| 24 | Dell | PTS | | | | 149 | |
| 25 | Sitel | PTS | | | | 280 | |
| 26 | Coforge | SITA | | | | 8 | ✓ |
| 27 | Coforge | CISO | | | | 26 | ✓ |
| 28 | TCS | BONNEIR | | | | 10 | |
| | | **Total** | **$462** | **$218** | **$656** | **$547** | **$1,883** |

- Nanoheal has lost 28 customers out of 47 total customers in the last 3.25 years. That's a loss of 60% of the total customers and 43% of the ARR.

- 64% of customers lost (18 out of the 28) have highlighted issues with the Nanoheal product

- Nanoheal's gross (and net) retention rate for the last 12 months is at 61% compared to the industry average of 90% for gross and 100% for net retention.

- On a 3 year basis (Typical SaaS industry contract duration), Nanoheal has only 4 active customers out of the 15 customers from 3 years ago. The 3 year gross retention rate for Nanoheal is 35% compared to the industry average of over 90%

# Significant risk of losing atleast 74% of the current ARR due to product issues. No resulting pipeline from 18% of current ARR.

| | | Current Active Customers | | |
|---|---|---|---|---|
| | SI Partner | End Customer | ARR contribution | Product issues |
| 1 | PCCW | MHA | 168 | ✓ |
| 2 | PCCW | Others | 72 | ✓ |
| 3 | Coforge | Eurostar | 12 | ✓ |
| 4 | Coforge | SK Life | 4 | |
| 5 | OneSupport | External | 20 | |
| 6 | Pomeroy | Whirlpool | 123 | ✓ |
| 7 | TCS | ADM | 265 | ✓ |
| 8 | HCL | Dover | 17 | |
| 9 | HCL | Fronterra | 11 | |
| 10 | HCL | Rite Aid | 275 | |
| 11 | HCL | Thmpson Reuters | 71 | |
| 12 | HCL | SBD | 349 | |
| 13 | HCL | MKS | 63 | |
| 14 | Infosys | Toyota | 48 | ✓ |
| 15 | Infosys | Lanxess | 177 | ✓ |
| 16 | Infosys | Daimler | 2400 | ✓ |
| 17 | Infosys | LRQA | 53 | |
| 18 | Infosys | BCBS | 30 | |
| 19 | IBM | SKS | 258 | |
| | | Total ARR | $4,416 | |
| | | ARR at high risk | $3,265 | 74% |
| | | ARR with no pipeline | $810 | 18% |

- The average age of Nanoheal's end customers is 18 months Out of the 19 current active customers, 15 have been added in the last 18 months and they contribute 86% of the ARR.

- Nanoheal has already lost 7 out of the 23 customers added in the last 18 months.

- 8 out of the current 19 active accounts have documented product issues. That's means 73% of the current recurring revenue is at risk of being lost.

- 8 out of the current 19 accounts have no resulting pipeline for additional business from the SI partners.

- **Sales team is under constant pressure to generate business from new customers, due to low repeat business from existing SI partners and no upsell in existing customers due to continued loss of customers (typically 33% to 50% of the quota should come from existing relationships)**

**Nanoheal has no case study of material value creation across any of the 47 customers we have had so far**

# Persistent and increasing negative feedback from SI partners / customers on product and delivery. Several current accounts at risk of being lost.

There is a serious concern not only from the control and manageability of the platform........ The post incident action taken both in terms of time that it took to get the Nanoheal team on call or the claim by the Nanoheal team... has led to further questions.

- Coforge (May 12,2022)

The customer has started a process to impose a penalty for this incident and looking at the legal action. The security team is questioning the security controls of the platform, the process that's driving the solution and its integrity. It is also claimed that the Nanoheal code is exposed on the internet

- Coforge (May 20, 2022)

There are issues in most of the accounts........
- Ticket reduction is not effective. Autoheal is not getting configured. Value realization is an issue.
- Nanoheal delivery team should be more responsive to requests.
- Competition is doing a better job, implementations are not getting completed in specific timeframe.
- Nanoheal web console is slow. Reports is taking time. Switching between the tabs takes time.
 Please ensure to action on priority and close as soon as possible otherwise will have impact on new business and existing deliverables.

- Infosys (June 29, 2022)

Need to discuss Nanoheal capability and product stability. We have issues in most of accounts, but the Nanoheal team is not able to resolve....

- Infoyss (June 15, 2022)

Below are the challenges which we highlighted to Nanheal. Without fixing them we cannot move forward, **No matter how many custom used cases we build, we will not be in a position to show the output, since their Dashboard & reporting is pathetic.**

- Infosys Daimler team (June 6, 2022)

The situation on the ground and the momentum is far from commitment. We are utterly disappointed with the progress (on the product and the delivery).

- Infosys Daimler team (May 24, 2022)

Overall, we are very concerned about the Nanoheal product design and the support.

- HCL team (March 8, 2022)

The tool does not show any value in the environment and hence McLaren didn't see any reason to continue with it

- HCL (June 30, 2022)

# Consolidated feedback and observations from partners / customers on product and delivery. Lack of trust and confidence in the Nanoheal solution and the product / delivery teams

- Product does not work and does not deliver value: Self heal automations rarely work and do not get triggered resulting in no appreciable reduction in tickets. Even self help is ineffective. Have not been able to demonstrable value creation and ROI in any of the 47 customer accounts so far. No single case study.

- Product is unstable. Web console and reporting is very slow.

- Dashboard and reporting does not work in many cases. Significantly inferior to competition. Have not been able to build reporting capabilities requested by HCL for over 3 months (loss of atleast $1.5M of annual ARR)

- Perceived security risks with the platform (Coforge, McKinsey, Accenture)

- Delivery timelines are frequently delayed significantly. Competition considered much better in delivery timelines and project management

- Delivery team is very reactive. Poor project management.

- Product management is highly reactive instead of working on features and functionality that is 18 to 24 months out. No product roadmap ever shared with any of the SI partners or the sales team. No participation in any of the meetings with the customers for understanding pain points.

- No documentation of product updates and no effort to show updates creates concerns that there have been no updates

- No stable, scalable, user-friendly demo environment

# Very low employee and high attrition, HR issues

- Culture of unresponsiveness, silos and secrecy with minimal collaboration across groups and lack of transparency
  - Highly unresponsive culture (consistent and similar feedback from SI partners / customers). E-mails and calls from partners and sales team go unanswered for several days / weeks
  - Delivery and customer success refuse to participate in any of the sales meetings. Decline meeting invites and calls.
- Minimal reward and excessive risk
  - No bonus for employees in the last 2 years despite the high growth of the company
  - No stock options for any of the employees (considered standard in any tech company)
  - Very high quotas for sales people (16X total comp) when the market average is 5X total comp
- Culture of intimidation, retribution and castigation
  - Public displays of anger and outrage (Prerana, Scott, Akanksha)
  - Harassment through excessive messages and dictates for instant action
  - Sales people constantly grilled on their ambitious metrics and performance when no such metrics exist for any of the other groups. None of the other group metrics ever shares with sales
- Lack of HR function and HR processes
- High attrition and reputational damage (sales person with the highest productivity leaving the company)

# Lack of fiduciary responsibility, continued legal liabilities and PR issues

- Continued absence of people in key roles such as marketing and HR for long extended periods. Lack of recruiting function resulting in inability to fill sales roles.
  - Lack of a key marketing person for more than 1 year. No marketing team and no help in PR, branding, analyst relations. Lack of a relevant website and appropriate investment in analyst relations.
  - Absence of a senior HR person for over 2 years. No help in recruiting resulting in inability to schedule even basic interviews in sales and other functions. Several roles in sales, M&A, marketing are unfilled for extended periods. Bandwidth significantly stretched in the existing teams.
  - Absence of a proper head for Bask for an extended period leading to continued decline in ARR
- Ad-hoc decision making with no deliberation or discussion, or enormously extended timelines. Lack of due process, approvals and timelines.
  - Over $400K committed to the SEED group in the middle East in a binding contract for 3 years with no demonstrated market potential for the Middle East, with not even a brief discussion or due process. No comparable commitment made in the US and Europe (significantly larger geographies for IT spending)
  - Very long delays in decision making in multiple cases leading to negative business impact (took over 1 year to finalize the PR firm). Lack of any marketing people for very long periods.
- Continued excessive legal liabilities due to lawsuits resulting from security issues, non-performance of the product
- Significant reputational damage and PR nightmare due to upset partners / customers and employees that can be irreversible

# Summary

- Nanoheal is in  crisis with upset employees, highly dissatisfied customers / partners and disgruntled investors, that will result in continued loss of ARR, reputational damage and high liabilities, eventually forcing a shutdown.

- The current sales and go to market strategy continues to produce growth rates that are significantly above the market average, despite the absence of brand and lack of basic functions such as marketing, lead generation and recruiting

- The market opportunity is significant and there exists a tremendous opportunity for value and wealth creation. However, success will require a radicle and immediate transformation.

# EXHIBIT 2

## Notice of Ratification of Defective Corporate Acts

October **26th**, 2023

Dear stockholder of HFN, Inc.:

Notice (this "**Notice**") is hereby given that (i) on October 9, 2023, the Board of Directors (the "**Board**") of HFN, Inc., a Delaware corporation (the "**Corporation**"), ratified the defective corporate acts (as defined in Section 204(h) of the Delaware General Corporation Law (the "**DGCL**")) identified in the Board resolutions attached hereto as Exhibit A (the "**Board Resolutions**") pursuant to, and in accordance with, Section 204 of the DGCL, (ii) on October 25, 2023, the requisite stockholders of the Corporation approved the ratification of the defective corporate acts required to be approved by such stockholders as provided in the stockholder resolutions attached hereto as Exhibit B (the "**Stockholder Resolutions**") pursuant to, and in accordance with, Section 204 of the DGCL, (iii) on August 25, 2023, the requisite stockholders of the Corporation elected Divya Choorimule to the Board to serve as a Common Director (as defined in the Amended and Restated Certificate of Incorporation of the Corporation) and (iv) on September 8, 2023, the requisite stockholders of the Corporation elected Ruby Jha to the Board to serve as the Mutual Director (as defined in the Amended and Restated Certificate of Incorporation of the Corporation). The purpose of the ratification of such defective corporate acts is to confirm that such defective corporate acts are no longer deemed to be void or voidable as a result of the failures of authorization (as defined in Section 204(h) of the DGCL) identified in the Board Resolutions and the Stockholder Resolutions and that such effect be deemed retroactive to the time of such defective corporate acts in accordance with Section 204(f) of the DGCL.

This Notice is being sent to (i) each holder of valid and putative stock, whether voting or nonvoting, as of the date the Board adopted the Board Resolutions approving such defective corporate acts at the address of such holder as it appears or most recently appeared, as appropriate, on the records of the Corporation in accordance with Section 204(g) of the DGCL, and (ii) the holders of record of valid stock and putative stock, whether voting or nonvoting, as of the time of the defective corporate acts, other than holders whose identities or addresses cannot be determined from the records of the Corporation in accordance with Section 204(g) of the DGCL. This Notice is being sent to each non-consenting stockholder to provide each such stockholder notice of the approval of the defective corporate acts as provided in the Stockholder Resolutions and of the elections of the above named individuals to the Board by non-unanimous written consent in accordance with Section 228(e) of the DGCL.

Any claim that the defective corporate acts ratified in the Board Resolutions and Stockholder Resolutions are void or voidable due to the failures of authorization, or that the Delaware Court of Chancery should declare in its discretion that a ratification in accordance with Section 204 of the DGCL not be effective or be effective only on certain conditions, must be brought within 120 days from the later of the validation effective time (as defined in Section 204(h) of the DGCL) or the date of this Notice.

**HFN, Inc.**,
a Delaware corporation

By: _____
Name:  **Sridhar Santhanam**
Title:   **CEO**

## **EXHIBIT A**

Board Resolutions

[Attached]

# UNANIMOUS WRITTEN CONSENT
## OF THE
## BOARD OF DIRECTORS
## OF
## HFN, INC.

October 9th, 2023

The undersigned, being all of the members of the Board of Directors (the "Board") of HFN, Inc., a Delaware corporation (the "Corporation"), acting pursuant to Section 141(f) of the Delaware General Corporation Law (the "DGCL"), hereby consent (this "Consent") in writing to the adoption of the following resolutions with the same force and effect as if duly adopted at a meeting of the Board called for such purpose:

**Ratification of Matters Related to January 2012 Incorporator Written Consent**

**WHEREAS**, on January 11, 2012 (the "Incorporator Consent Date"), the sole incorporator of the Corporation (the "Incorporator") adopted by written consent (the "Incorporator Consent") resolutions (i) electing Alessandro Donnini as the sole director of the Board (the "First Election") and (ii) adopting the Corporation's Bylaws (the "Bylaws Adoption");

**WHEREAS**, the Board is concerned that the First Election and the Bylaws Adoption are void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because, with respect to the First Election, the Incorporator failed to set the size of the Board at one (1) in accordance with Sections 108 and 141 of the DGCL and, with respect to the First Election and the Bylaws Adoption, the Corporation cannot locate a copy of the Incorporator Consent executed in accordance with Section 108 of the DGCL in its books and records (the "Incorporator Consent Failure of Authorization");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act;

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act in respect of the election of the initial board of directors of the corporation pursuant to Section 108 of the DGCL shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(2) of the DGCL, a majority of the persons who, at the

time the resolutions required by Section 204(b)(2) of the DGCL are adopted, are exercising the powers of directors under claim and color of an election or appointment as such may adopt resolutions stating (i) the name of the person or persons who first took action in the name of the corporation as the initial board of directors of the corporation; (ii) the earlier of the date on which such persons first took such action or were purported to have been elected as the initial board of directors; and (iii) that the ratification of the election of such person or persons as the initial board of directors is approved; and

**WHEREAS**, the Board has determined to ratify the First Election and the Bylaws Adoption as of the Incorporator Consent Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the First Election and the Bylaws Adoption.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the First Election and the Bylaws Adoption as of the Incorporator Consent Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the Bylaws Adoption; and be it further

**RESOLVED**, that the date of the defective corporate act is the Incorporator Consent Date; and be it further

**RESOLVED**, that the nature of the failure of authorization with respect to the defective corporate act to be ratified is the Incorporator Consent Failure of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the Bylaws Adoption as of the Incorporator Consent Date in all respects; and be it further

**RESOLVED**, that the name of the person who first took action in the name of the Corporation as the initial Board is Alessandro Donnini; and be it further

**RESOLVED**, that the earlier of the date on which Alessandro Donnini first took such action or was purported to have been elected as the initial Board is the Incorporator Consent Date; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the First Election as of the Incorporator Consent Date in all respects.

**Ratification of Matters Related to January 2012 Written Consent**

**WHEREAS**, on January 14, 2012 (the "January Board Consent Date"), the Board adopted by written consent resolutions electing Sridhar Santhanam to the Board (the "Second Election");

**WHEREAS**, the Board is concerned that the Second Election is void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because the Board failed to expand the size of the Board from one (1) to two (2) to create a vacancy on the Board in

2

accordance with the Corporation's Bylaws and Section 141 of the DGCL (the "January Board Consent Failure of Authorization");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act; and

**WHEREAS**, the Board has determined to ratify the Second Election as of the January Board Consent Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the Second Election.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the Second Election as of the January Board Consent Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the Second Election; and be it further

**RESOLVED**, that the date of the defective corporate act is the January Board Consent Date; and be it further

**RESOLVED**, that the nature of the failure of authorization with respect to the defective corporate act to be ratified is the January Board Consent Failure of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the Second Election as of the January Board Consent Date in all respects.

### Ratification of Matters Related to the Adoption of the A&R Charter

**WHEREAS**, on March 1, 2012 (the "Charter Adoption Date"), the Board adopted by written consent resolutions approving the Corporation's Amended and Restated Certificate of Incorporation (the "A&R Charter");

**WHEREAS**, on the Charter Adoption Date, the requisite stockholders of the Corporation adopted by written consent resolutions approving the A&R Charter;

**WHEREAS**, on March 15, 2012 (the "Charter Filing Date"), the Corporation filed the A&R Charter with the Secretary of State of the State of Delaware (the "Secretary of State");

3

**WHEREAS**, the Board is concerned that the filing of the A&R Charter with the Secretary of State on the Charter Filing Date is void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because (i) the Board failed to declare the A&R Charter advisable in accordance with Section 242 of the DGCL and (ii) each stockholder's signature did not bear the date of such stockholder's signature as required by Section 228 of the DGCL (as Section 228 of the DGCL existed as of the Charter Adoption Date and the Charter Filing Date) (collectively, the "A&R Charter Failures of Authorization");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act; and

**WHEREAS**, the Board has determined to ratify the filing of the A&R Charter with the Secretary of State as of the Charter Filing Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the A&R Charter.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the filing of the A&R Charter with the Secretary of State as of the Charter Filing Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the filing of the A&R Charter with the Secretary of State; and be it further

**RESOLVED**, that the date of the defective corporate act is the Charter Filing Date; and be it further

**RESOLVED**, that the natures of the failures of authorization with respect to the defective corporate act to be ratified are the A&R Charter Failures of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the filing of the A&R Charter with the Secretary of State as of the Charter Filing Date in all respects; and be it further

**RESOLVED**, that the Board hereby authorizes the officers of the Corporation (the "Authorized Officers") to submit the ratification of the filing of the A&R Charter with the Secretary of State to the stockholders of the Corporation for approval in accordance with the applicable provisions of Section 204 of the DGCL.

**Ratification of Matters Related to June 2012 Written Consent**

**WHEREAS**, on June 1, 2012 (the "June Consent Date"), certain stockholders of the Corporation adopted by written consent resolutions electing Kumar Shiralagi to the Board as a Preferred Director (as defined in the A&R Charter) (the "Third Election");

**WHEREAS**, the Board is concerned that the Third Election is void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because the holders of the Corporation's Series A Preferred Stock, par value $0.0001 per share, failed to consent to the Third Election in accordance with the A&R Charter (the "June Consent Failure of Authorization");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act; and

**WHEREAS**, the Board has determined to ratify the Third Election as of the June Consent Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the Third Election.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the Third Election as of the June Consent Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the Third Election; and be it further

**RESOLVED**, that the date of the defective corporate act is the June Consent Date; and be it further

**RESOLVED**, that the nature of the failure of authorization with respect to the defective corporate act to be ratified is the June Consent Failure of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the Third Election as of the June Consent Date in all respects; and be it further

**RESOLVED**, that the Board hereby authorizes the Authorized Officers to submit the ratification of the Third Election to the stockholders of the Corporation for approval in accordance with the applicable provisions of Section 204 of the DGCL.

**Ratification of Past Issuance**

**WHEREAS**, on July 27, 2022 (the "Past Issuance Date"), the Corporation issued 250,000 shares of common stock, par value $0.0001 per share, of the Corporation ("Common Stock") to Pavan Vaish (the "Past Issuance");

**WHEREAS**, the Board is concerned that the Past Issuance is void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because the Corporation cannot locate a copy of the resolutions of the Board authorizing the Past Issuance in its books and records (the "Past Issuance Failure of Authorization");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act; and

**WHEREAS**, the Board has determined to ratify the Past Issuance as of the Past Issuance Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the Past Issuance.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the Past Issuance as of the Past Issuance Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the Past Issuance; and be it further

**RESOLVED**, that the date of the defective corporate act is the Past Issuance Date; and be it further

**RESOLVED**, that the defective corporate act involved the issuance of 250,000 shares of Common Stock on the Past Issuance Date which may constitute "putative stock" (as defined in Section 204(h) of the DGCL); and be it further

**RESOLVED**, that the nature of the failure of authorization with respect to the defective corporate act to be ratified is the Past Issuance Failure of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the Past Issuance as of the Past Issuance Date in all respects.

**Board Size**

**WHEREAS**, each of Divya Choorimule and Ruby Jha have indicated that they intend to resign as directors; and

**WHEREAS**, in connection with such resignations, the Board desires to reduce the size of the Board from five (5) to one (1).

**NOW, THEREFORE, BE IT RESOLVED**, that, effective as of immediately following the resignations of Divya Choorimule and Ruby Jha as directors, the size of the Board be, and it hereby is, reduced from five (5) to one (1); and be it further

**RESOLVED**, that, in connection with the foregoing, the Corporation hereby waives any provisions in that certain Voting Agreement, dated as of February 29, 2012, by and among the Corporation and the other parties thereto with respect to the size of the Board.

**General Authority**

**RESOLVED**, that the Authorized Officers are hereby authorized and empowered to provide prompt notice of the ratification of the defective corporate acts pursuant to the foregoing resolutions to (i) all holders of valid stock and putative stock, whether voting or nonvoting, as of the date of the adoption of these resolutions, in accordance with Section 204(g) of the DGCL and (ii) holders of record of valid stock and putative stock, whether voting or nonvoting, as of the time of each defective corporate act, other than holders whose identities or addresses cannot be determined from the records of the Corporation, in accordance with Section 204(g) of the DGCL; and be it further

**RESOLVED**, that the Authorized Officers be, and each of them acting singly hereby is, authorized and empowered to take any and all actions, and to execute and deliver any and all documents, agreements, certificates and instruments, in the name and on behalf of the Corporation, as they or any of them deem necessary or advisable in order to carry out the purposes and intent of, and to consummate any and all of the transactions contemplated by, the foregoing resolutions, the taking of such actions, or the execution and delivery of any such documents, agreements, certificates and instruments, to be conclusive evidence of such Authorized Officer's determination and authority to act for or on behalf of the Corporation; and be it further

**RESOLVED**, that all acts and things heretofore done by any director, officer or any agent of the Corporation, on or prior to the date hereof, in connection with the transactions contemplated by the foregoing resolutions be, and the same hereby are, in all respects ratified, confirmed, approved and adopted as acts on behalf of the Corporation; and be it further

**RESOLVED**, that this Consent may be executed in multiple counterparts (including by electronic transmission or facsimile), and each such counterpart shall be considered an original and, when taken together, all such counterparts shall be deemed one document.

*[Signature Page Follows]*

7

**IN WITNESS WHEREOF**, the undersigned, constituting all of the members of the Board, have executed this Consent as of the date first set forth above.

_____
Sridhar Santhanam

_____
Divya Choorimule

_____
Ruby Jha

[Signature Page – Unanimous Written Consent of the Board of Directors of
HFN, Inc. – Ratification]

## **EXHIBIT B**

Stockholder Resolutions

[Attached]

**HFN, INC.**

**WRITTEN CONSENT**

**IN LIEU OF SPECIAL MEETING OF STOCKHOLDERS**

_____October 25_____, 2023

    **THE UNDERSIGNED**, being the holders of the requisite shares of capital stock of HFN, Inc., a Delaware corporation (the "Corporation"), in accordance with the authority contained in the Delaware General Corporation Law (the "DGCL") and the Bylaws of the Corporation (the "Bylaws"), hereby consent to the adoption of the following resolutions with the same force and effect as if such resolutions were duly adopted at a meeting of the stockholders of the Corporation that was held in accordance with the DGCL, the Bylaws and the Amended and Restated Certificate of Incorporation of the Corporation (the "Charter"), and at which a quorum was present and acting throughout:

**Ratification of Defective Corporate Acts**

    **WHEREAS**, pursuant to a unanimous written consent, dated October 9th, 2023 and attached hereto as Exhibit A (the "Board Resolutions"), the Board of Directors of the Corporation (the "Board") ratified the defective corporate acts identified in the Board Resolutions for all purposes of the DGCL, including Section 204 thereof; and

    **WHEREAS**, as further set forth in the Board Resolutions, the authorized officers of the Corporation submitted the ratification of (i) the filing of the A&R Charter (as defined in the Board Resolutions) with the Secretary of State of the State of Delaware and (ii) the Third Election (as defined in the Board Resolutions), in each case, to the stockholders of the Corporation for approval in accordance with the applicable provisions of Section 204 of the DGCL (collectively, the "Ratification").

    **NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Ratification be, and it hereby is, authorized, adopted and approved in all respects.

**IN WITNESS WHEREOF,** the undersigned have executed this Written Consent in Lieu of Special Meeting of Stockholders as of the date first written above.

KALAARI CAPITAL PARTNERS II, LLC

By: _____

Name: **Resmah Choomka**

Title: Director

_____

Sridhar Santhanam

## **EXHIBIT A**

Board Resolutions

[Attached]

# UNANIMOUS WRITTEN CONSENT
## OF THE
## BOARD OF DIRECTORS
## OF
## HFN, INC.

October 9th, 2023

The undersigned, being all of the members of the Board of Directors (the "Board") of HFN, Inc., a Delaware corporation (the "Corporation"), acting pursuant to Section 141(f) of the Delaware General Corporation Law (the "DGCL"), hereby consent (this "Consent") in writing to the adoption of the following resolutions with the same force and effect as if duly adopted at a meeting of the Board called for such purpose:

**Ratification of Matters Related to January 2012 Incorporator Written Consent**

**WHEREAS**, on January 11, 2012 (the "Incorporator Consent Date"), the sole incorporator of the Corporation (the "Incorporator") adopted by written consent (the "Incorporator Consent") resolutions (i) electing Alessandro Donnini as the sole director of the Board (the "First Election") and (ii) adopting the Corporation's Bylaws (the "Bylaws Adoption");

**WHEREAS**, the Board is concerned that the First Election and the Bylaws Adoption are void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because, with respect to the First Election, the Incorporator failed to set the size of the Board at one (1) in accordance with Sections 108 and 141 of the DGCL and, with respect to the First Election and the Bylaws Adoption, the Corporation cannot locate a copy of the Incorporator Consent executed in accordance with Section 108 of the DGCL in its books and records (the "Incorporator Consent Failure of Authorization");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act;

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act in respect of the election of the initial board of directors of the corporation pursuant to Section 108 of the DGCL shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(2) of the DGCL, a majority of the persons who, at the

time the resolutions required by Section 204(b)(2) of the DGCL are adopted, are exercising the powers of directors under claim and color of an election or appointment as such may adopt resolutions stating (i) the name of the person or persons who first took action in the name of the corporation as the initial board of directors of the corporation; (ii) the earlier of the date on which such persons first took such action or were purported to have been elected as the initial board of directors; and (iii) that the ratification of the election of such person or persons as the initial board of directors is approved; and

**WHEREAS**, the Board has determined to ratify the First Election and the Bylaws Adoption as of the Incorporator Consent Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the First Election and the Bylaws Adoption.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the First Election and the Bylaws Adoption as of the Incorporator Consent Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the Bylaws Adoption; and be it further

**RESOLVED**, that the date of the defective corporate act is the Incorporator Consent Date; and be it further

**RESOLVED**, that the nature of the failure of authorization with respect to the defective corporate act to be ratified is the Incorporator Consent Failure of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the Bylaws Adoption as of the Incorporator Consent Date in all respects; and be it further

**RESOLVED**, that the name of the person who first took action in the name of the Corporation as the initial Board is Alessandro Donnini; and be it further

**RESOLVED**, that the earlier of the date on which Alessandro Donnini first took such action or was purported to have been elected as the initial Board is the Incorporator Consent Date; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the First Election as of the Incorporator Consent Date in all respects.

**Ratification of Matters Related to January 2012 Written Consent**

**WHEREAS**, on January 14, 2012 (the "January Board Consent Date"), the Board adopted by written consent resolutions electing Sridhar Santhanam to the Board (the "Second Election");

**WHEREAS**, the Board is concerned that the Second Election is void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because the Board failed to expand the size of the Board from one (1) to two (2) to create a vacancy on the Board in

2

accordance with the Corporation's Bylaws and Section 141 of the DGCL (the "January Board Consent Failure of Authorization");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act; and

**WHEREAS**, the Board has determined to ratify the Second Election as of the January Board Consent Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the Second Election.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the Second Election as of the January Board Consent Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the Second Election; and be it further

**RESOLVED**, that the date of the defective corporate act is the January Board Consent Date; and be it further

**RESOLVED**, that the nature of the failure of authorization with respect to the defective corporate act to be ratified is the January Board Consent Failure of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the Second Election as of the January Board Consent Date in all respects.

## Ratification of Matters Related to the Adoption of the A&R Charter

**WHEREAS**, on March 1, 2012 (the "Charter Adoption Date"), the Board adopted by written consent resolutions approving the Corporation's Amended and Restated Certificate of Incorporation (the "A&R Charter");

**WHEREAS**, on the Charter Adoption Date, the requisite stockholders of the Corporation adopted by written consent resolutions approving the A&R Charter;

**WHEREAS**, on March 15, 2012 (the "Charter Filing Date"), the Corporation filed the A&R Charter with the Secretary of State of the State of Delaware (the "Secretary of State");

**WHEREAS**, the Board is concerned that the filing of the A&R Charter with the Secretary of State on the Charter Filing Date is void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because (i) the Board failed to declare the A&R Charter advisable in accordance with Section 242 of the DGCL and (ii) each stockholder's signature did not bear the date of such stockholder's signature as required by Section 228 of the DGCL (as Section 228 of the DGCL existed as of the Charter Adoption Date and the Charter Filing Date) (collectively, the "A&R Charter Failures of Authorization");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act; and

**WHEREAS**, the Board has determined to ratify the filing of the A&R Charter with the Secretary of State as of the Charter Filing Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the A&R Charter.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the filing of the A&R Charter with the Secretary of State as of the Charter Filing Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the filing of the A&R Charter with the Secretary of State; and be it further

**RESOLVED**, that the date of the defective corporate act is the Charter Filing Date; and be it further

**RESOLVED**, that the natures of the failures of authorization with respect to the defective corporate act to be ratified are the A&R Charter Failures of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the filing of the A&R Charter with the Secretary of State as of the Charter Filing Date in all respects; and be it further

**RESOLVED**, that the Board hereby authorizes the officers of the Corporation (the "Authorized Officers") to submit the ratification of the filing of the A&R Charter with the Secretary of State to the stockholders of the Corporation for approval in accordance with the applicable provisions of Section 204 of the DGCL.

**Ratification of Matters Related to June 2012 Written Consent**

**WHEREAS**, on June 1, 2012 (the "June Consent Date"), certain stockholders of the Corporation adopted by written consent resolutions electing Kumar Shiralagi to the Board as a Preferred Director (as defined in the A&R Charter) (the "Third Election");

**WHEREAS**, the Board is concerned that the Third Election is void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because the holders of the Corporation's Series A Preferred Stock, par value $0.0001 per share, failed to consent to the Third Election in accordance with the A&R Charter (the "June Consent Failure of Authorization");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act; and

**WHEREAS**, the Board has determined to ratify the Third Election as of the June Consent Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the Third Election.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the Third Election as of the June Consent Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the Third Election; and be it further

**RESOLVED**, that the date of the defective corporate act is the June Consent Date; and be it further

**RESOLVED**, that the nature of the failure of authorization with respect to the defective corporate act to be ratified is the June Consent Failure of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the Third Election as of the June Consent Date in all respects; and be it further

**RESOLVED**, that the Board hereby authorizes the Authorized Officers to submit the ratification of the Third Election to the stockholders of the Corporation for approval in accordance with the applicable provisions of Section 204 of the DGCL.

**Ratification of Past Issuance**

 **WHEREAS**, on July 27, 2022 (the "Past Issuance Date"), the Corporation issued 250,000 shares of common stock, par value $0.0001 per share, of the Corporation ("Common Stock") to Pavan Vaish (the "Past Issuance");

 **WHEREAS**, the Board is concerned that the Past Issuance is void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because the Corporation cannot locate a copy of the resolutions of the Board authorizing the Past Issuance in its books and records (the "Past Issuance Failure of Authorization");

 **WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act; and

 **WHEREAS**, the Board has determined to ratify the Past Issuance as of the Past Issuance Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the Past Issuance.

 **NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the Past Issuance as of the Past Issuance Date; and be it further

 **RESOLVED**, that the defective corporate act to be ratified hereby is the Past Issuance; and be it further

 **RESOLVED**, that the date of the defective corporate act is the Past Issuance Date; and be it further

 **RESOLVED**, that the defective corporate act involved the issuance of 250,000 shares of Common Stock on the Past Issuance Date which may constitute "putative stock" (as defined in Section 204(h) of the DGCL); and be it further

 **RESOLVED**, that the nature of the failure of authorization with respect to the defective corporate act to be ratified is the Past Issuance Failure of Authorization; and be it further

 **RESOLVED**, that the Board hereby approves the ratification of the Past Issuance as of the Past Issuance Date in all respects.

6

## Board Size

**WHEREAS**, each of Divya Choorimule and Ruby Jha have indicated that they intend to resign as directors; and

**WHEREAS**, in connection with such resignations, the Board desires to reduce the size of the Board from five (5) to one (1).

**NOW, THEREFORE, BE IT RESOLVED**, that, effective as of immediately following the resignations of Divya Choorimule and Ruby Jha as directors, the size of the Board be, and it hereby is, reduced from five (5) to one (1); and be it further

**RESOLVED**, that, in connection with the foregoing, the Corporation hereby waives any provisions in that certain Voting Agreement, dated as of February 29, 2012, by and among the Corporation and the other parties thereto with respect to the size of the Board.

## General Authority

**RESOLVED**, that the Authorized Officers are hereby authorized and empowered to provide prompt notice of the ratification of the defective corporate acts pursuant to the foregoing resolutions to (i) all holders of valid stock and putative stock, whether voting or nonvoting, as of the date of the adoption of these resolutions, in accordance with Section 204(g) of the DGCL and (ii) holders of record of valid stock and putative stock, whether voting or nonvoting, as of the time of each defective corporate act, other than holders whose identities or addresses cannot be determined from the records of the Corporation, in accordance with Section 204(g) of the DGCL; and be it further

**RESOLVED**, that the Authorized Officers be, and each of them acting singly hereby is, authorized and empowered to take any and all actions, and to execute and deliver any and all documents, agreements, certificates and instruments, in the name and on behalf of the Corporation, as they or any of them deem necessary or advisable in order to carry out the purposes and intent of, and to consummate any and all of the transactions contemplated by, the foregoing resolutions, the taking of such actions, or the execution and delivery of any such documents, agreements, certificates and instruments, to be conclusive evidence of such Authorized Officer's determination and authority to act for or on behalf of the Corporation; and be it further

**RESOLVED**, that all acts and things heretofore done by any director, officer or any agent of the Corporation, on or prior to the date hereof, in connection with the transactions contemplated by the foregoing resolutions be, and the same hereby are, in all respects ratified, confirmed, approved and adopted as acts on behalf of the Corporation; and be it further

**RESOLVED**, that this Consent may be executed in multiple counterparts (including by electronic transmission or facsimile), and each such counterpart shall be considered an original and, when taken together, all such counterparts shall be deemed one document.

[*Signature Page Follows*]

7

**IN WITNESS WHEREOF**, the undersigned, constituting all of the members of the Board, have executed this Consent as of the date first set forth above.

Sridhar Santhanam

Divya Choorimule

Ruby Jha

# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLAN MILLER,<br><br>            Plaintiff,<br><br>      v.<br><br>HFN, INC., et al.,<br><br>            Defendants. | Case No.  23-cv-00533-VC<br><br>**ORDER GRANTING MOTIONS TO DISMISS AND DENYING MOTIONS FOR JURISDICTIONAL DISCOVERY AND FOR ALTERNATIVE SERVICE**<br><br>Re: Dkt. Nos. 33, 34, 36, 48 |

HFN's and Shiralagi's motions to dismiss are granted. This order assumes the reader's familiarity with the factual allegations, the relevant law, and the parties' arguments.

Miller's initial complaint was dismissed because it came nowhere close to alleging HFN's minimum contacts with California and because it failed to adequately state a securities fraud claim, in light of which the Court declined to exercise pendent personal jurisdiction over the state law claims. *See* Dkt. No. 29. The First Amended Complaint does not rectify these deficiencies. Miller expands on his allegations regarding HFN's relationships with certain California entities—namely GoDaddy—but even if these relationships constituted purposeful direction, they bear no relation to Miller's claims. *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1023 (9th Cir. 2017). The complaint contains no allegations whatsoever regarding Shiralagi's California connections.

As for the securities fraud claim, the new allegations regarding the defendants' purported misrepresentations during settlement discussions in 2015 still fall well short of the heightened pleading requirements of Rule 9. Miller alleges that years after the settlement was entered, the defendants allocated shares from the employee stock option pool in ways they had promised not

to at the time of settlement. Even if Miller's claim were not barred by the settlement agreement or the 5-year statute of repose, and it probably is, these allegations are not made with sufficient particularity, nor do they come close to supporting an inference of scienter given the lengthy separation in time. No other allegations in the complaint—such as those pertaining to corporate mismanagement—support a securities fraud claim.

Because any further amendment would be futile, the securities fraud claim is dismissed with prejudice, and the state law claims are dismissed for lack of jurisdiction without leave to amend. Dismissal is as to all defendants, because it is obvious that Miller cannot obtain relief even as to those defendants who have not yet appeared. *See Omar v. Sea-Land Service, Inc.*, 813 F.2d 986, 991 (9th Cir. 1987). Miller's motion for alternative service is therefore denied, as is his motion for limited jurisdictional discovery—Miller has not provided an adequate basis to believe that the discovery he seeks would establish personal jurisdiction over the defendants.

A separate judgment will follow. The Clerk of Court is directed to close the case.

**IT IS SO ORDERED.**

Dated: August 16, 2023

_____
VINCE CHHABRIA
United States District Judge

# EXHIBIT 4

 K

About       Explore       People Search       Premium

Find companies                                      Login       Sign up

# Nanoheal
## Lehi, UT

[nanoheal.com](nanoheal.com)

Revenue: $22,575,000
Employees: 118

Claim this company


**Last Updated**
06/14/2023

**Industry**
Software Company


**Category**
Computer software

**Location**
Lehi, UT

You can add this company to your prospects to get

---

Summary                                      Edit

 **Nanoheal**
Founded in 1935

### Description

Nanoheal (by HFN, Inc.) is geared to make autonomic computing a reality. Our proactive tech support platform has already changed the tech support cycle from reactive to proactive. Our customers are actively reducing support costs and fuelling their de...

### Strengths

Nanoheal has a strong market share in their industry

Demonstrating revenue growth that is faster than the industry average

The number of employees is growing faster than the industry average

Since Nanoheal was founded, the company has grown faster than the industry average

### Weaknesses

Revenue generated per employee is less than the industry average

updates

# Competitors



### Knoa Software, Inc.
Founded in 1987



### Liongard, Inc.
Founded in 2013



### DemandBridge
Founded in 1975



### G5
Founded in 2012



### Optanix
Founded in 1984



### Jifflenow
Founded in 2006

Variance of revenue growth is more than the industry average

Web traffic rankings are worse than the industry average

Annual Revenue                                                Edit

Nanoheal's annual revenue

## $22,575,000

Based on Kona Equity data

Revenue per employee
$191,314

Variance of revenue growth
4.77

Annual revenue growth since founding
$1,040,260

Revenue growth rate from first known quarter to current
469.7%



## Employee Count

Edit

### 118 employees

Employee growth rate from first known quarter to current
490.5%



G Score - 4

G1    Revenue is greater than the industry median.

G3    Revenue growth rate from the first known quarter to current is higher than the industry average.

G4    Employee growth rate from the first known quarter to current is higher than the industry average.

G6    Annual revenue growth since founding is higher than the industry average.

Web Analysis

Rank
1.54 M

Page views per visitor
2.0

Daily time
4:56

Location                                                                                                          Edit

3400 Ashton Blvd.
Lehi, UT  84043

Unlock unlimited leads

Get access to millions of contacts, companies, emails, and more!

Nanoheal | Sized Up III More Revenue Profile 1

Continue to Kona Equity Premium

## Key Information

Edit

Name: **Nanoheal**

Category: **Computer software**

Industry: **Software Company**

#Business Services General    # Software Development & Design

# Business Services    # Software

SIC: **73; 737**

NAICS: **541511; 5182**

Disclaimer: These numbers are estimates and any other company information is based off our proprietary algorithms and by no means should be accepted as 100% factual. Kona Equity is in no way affiliated with Nanoheal.

## See similar companies

By City       By State

Lehi

Small Software Company in Lehi

Mid-size Software Company in Lehi

Computer software in Lehi

Small Computer software in Lehi

Mid-size Computer software in Lehi

UT

Small companies in UT

Computer software in UT

Small Computer software in UT

Mid-size Computer software in UT

Small Software Company in UT

Mid-size Software Company in UT

## By Category

Computer software

Small Computer software

Mid-size Computer software

## By Industry

Software Company

Small Software Company

Mid-size Software Company

Computer software and Software Company

## Firmographic data

G Score of 4

Founded in 1935

SIC: 73

SIC: 737

NAICS: 541511

NAICS: 5182

#Business Services General

#Software Development & Design

#Business Services

#Software

Frequently Asked Questions

Where is Nanoheal located?                                          v

What is Nanoheal's official website?                                v

What is Nanoheal's revenue?                                         v

What is Nanoheal's SIC code?                                        v

2/2/24, 1:08 AM                        Nanoheal Sized Multinational Revenue PageEquity

What is Nanoheal's NAICS code?                                                                    ∨

How many employees does Nanoheal's have?                                                         ∨

What industry does Nanoheal belong to?                                                           ∨

Next step

Save Nanoheal to your prospects

Explore other companies in the Computer software category

Explore other companies in the Software Company industry

Explore other companies in Lehi

Explore other companies in UT

Visitors review

Kona Equity                         Explore popular industries

2023

Privacy Policy

About

Premium

Contact us

Computer Software

Automotive

Hospital & Health Care

Construction

Manufacturer

Financial Services

# EXHIBIT 5

**Subject:** Fwd: HandsFree

**Date:** Friday, August 7, 2015 at 2:54:23 PM Pacific Daylight Time

**From:** Timothy Cornell

**To:** Allan Miller

**CC:** Pat Dolan

**Attachments:** image001.png

Begin forwarded message:

> **From:** "Lovett, Robert B." <rlovett@cooley.com>
> **Date:** August 7, 2015 at 3:26:40 PM EDT
> **To:** "pdolan@pkdllp.com" <pdolan@pkdllp.com>
> **Cc:** Timothy Cornell <timothycornell5@gmail.com>
> **Subject: RE: HandsFree**
>
> Pat/Tim – Please see my follow up below concerning the open issues.
>
> ---
>
> **From:** Lovett, Robert B.
> **Sent:** Thursday, August 06, 2015 11:55 AM
> **To:** 'pdolan@pkdllp.com'
> **Cc:** Timothy Cornell
> **Subject:** RE: HandsFree
>
> Pat – Further to our conversation this morning, the following is my thinking response to your comments below, and I will await further instructions and response from HFN and its Indian counsel, which is another way of saying that the client needs to authorize this but I wanted you to know my comments to try and move things along.   My comments are in brackets [RBL:….]
>
> I will send a separate response to your other email re settlement agreement
>
> Bob,
>
> Thanks for sending the documents along.  Here are the issues we need to discuss in the settlement documents we have gotten so far:
>
> 1.  Remedies.  On 7/31 We proposed the following language:
>
> **Remedies** .  In addition to any remedy that may be available at law or in equity to any Party hereto in the event of any breach hereof, in the event Defendants establish in a court of competent jurisdiction that Plaintiffs committed a material breach of this Settlement Agreement, Plaintiffs shall refund the settlement amount to HFN, Inc.  In the event Plaintiffs  establish in a court of competent jurisdiction that Defendants committed a material breach of this Settlement Agreement, Plaintiffs may, at their option, pursue damages for breach of the same and/or may rescind the settlement, return the monies paid and the shares obtained, and may re-file the Lawsuit and the Defendants shall not raise the Statute of Limitations as a defense, except to the extent such a defense existed at the time

of the original filing of the Lawsuit.

[RBL:  I would suggest we strike the remedies section altogether.   Whatever remedies or causes of action that exist as of the time of an accused breach can be dealt with at that time.  Let me know what you think about that]

[RBL: 8/7:  Got your response to #1.  We agree to strike it.]

2.  Stock ownership.  Your settlement offer was for 2 percent "of the company." The documents appear to be taking some of that back by limiting the plaintiffs to 2 percent of issued stock.  If the chart Elizabeth sent yesterday reflects the current state of ownership, the plaintiffs should get 2 percent of 16,666,000, or 333,260 shares, irrespective of whether the outstanding shares are owned by the company or other shareholders. [RBL:  I think this is a valid point, but we might have ships passing on the logic being applied.   HFN counted all issued and outstanding shares, whether vested or not, but did not include the option pool.   In other words your clients are being granted 2% of issued and outstanding.  The options may never be relevant to the calculation because they may never be awarded or converted into shares.   Thus, if you include the pool in the calculation of the 2% grant with immediate vesting, then your clients will own more than 2% upon the transfer.  All of that said I will run your concern by the company].

[RBL 8/7:  I was surprised by the reaction on this one because, as I understand it, the number of shares offered is 2% of the issued and outstanding shares, but does not include the option pool. Apparently your clients took that as a haircut on the offer, which was not intended.  The rationale is explained above, which mathematically and in respect of one's entitlement as to share ownership squares with what was intended.   In any event I've discussed this with the client and I've been authorized to increase the number of shares included to be tendered to plaintiffs  by 26,135.  As I understand it, you want 2% of 14,049,500 + 2,616,500.  This is the issued and outstanding plus the option pool.  Since the option pool consists of options that likely won't ever issue, it would not have been correct to include the pool in a calculation resuling in a grant of fully vested shares.   In any event, the difference between the 2% calculation we performed and the calculation you performed is 52,270.   The proposal is to bump your clients by half of the difference.  I don't think this increase is warranted, but is designed to address your concerns.

3.  Notice.  Under the shareholders' rights agreement, the plaintiffs would have no right to receive notice of any sale of assets or other material change in the company. Rather than going through the ordeal of getting the documents redrafted to provide notice rights, an easier workaround would be to write into the settlement agreement a requirement on the part of Santhanam and Donnini that they are personally required to provide notice to the plaintiffs of any sale or proposed sale of the Company's assets, as well as the issuance of 5% or more of total company shares (existing or new). [RBL: I don't have a problem with this in principle.  The only issue is whether your clients would be treated differently than other <5% shareholders, and whether that creates any issue now or whenever a future hypothetical transaction may occur.   That said, I will find out what my client thinks]

**[RBL 8/7:  This probably is ok, but Sridhar can only have this obligation so long as he's employed by the company it seems to me.   Your thoughts?]**

4.  $10K purchase price—The draft references a $10K purchase price.  We need

clarification. [RBL:  This was suggested by HFN's Indian counsel to make sure the share transfer was enforceable under Indian law.   We discussed this on the phone so let me go back and see if this can be eliminated , or at least to  modify it in some way that addresses.

[RBL 8/7:  Indian counsel tells us that this is needed, as it relates to Indian banking law.   Seems like a detail we should be able to address in some fashion to satisfy our respective clients]

Thanks for your time this morning.


Let me know a good time and we will call to discuss these.

Patrick J. Dolan
Perry, Krumsiek & Dolan
210 Union Wharf, Boston, MA 02109
Phone: (617) 720 – 4300 l  Facsimile: (617) 720 – 4310
pdolan@pkdllp.com
www.pkdllp.com

<image001.png>


IRS CIRCULAR 230 NOTICE
In compliance with IRS requirements, we inform you that any U.S. tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of avoiding tax penalties or in connection with marketing or promotional materials.

STATEMENT OF CONFIDENTIALITY:
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited.

---

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

<u>Certificate of Service</u>

I certify that Plaintiff Allan Miller:

1.  has registered for Email Filing and Electronic Notification pursuant to DUCivR 5-1(b)(1)(A);

2.  has verified that the above document meets the requirements outlined in DUCivR 5-1(b)(1)(A);

3.  has filed this document electronically through email to utdecf_clerk@utd.uscourts.gov; and

4.  has served all non-ECF parties by an acceptable means pursuant to DUCivR 5-1(b)(1)(A)(ii)(g).

Accordingly, the document will be served upon all ECF parties through the Court's ECF system.


Date: _____February 2, 2024_____     Signature: _____/s/ Allan A. Miller_____

Printed name: _____Allan A. Miller_____