FILED
2024 APR 16
CLERK
U.S. DISTRICT COURT

Allan Miller
3385 Claudia Drive
Concord, CA  94519
650-468-7387
allan.miller@alumni.stanford.edu
Pro Se Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| ALLAN MILLER<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>HFN, INC., a Delaware Corporation, d/b/a as NANOHEAL BY HFN INC.,<br>KALAARI CAPITAL ADVISORS PRIVATE LIMITED, an Indian Company,<br>SRIDHAR SANTHANAM,<br>KUMAR SHIRALAGI, PAVAN VAISH,<br>and VANI KOLA<br><br>Defendants. | Case Number: 2:23-cv-00733-CMR<br><br><br>**OPPOSITION TO DEFENDANTS KALAARI CAPITAL ADVISORS PRIVATE LIMITED, SRIDHAR SANTHANAM, PAVAN VAISH, AND VANI KOLA'S MOTION TO EXTEND TIME** |

# SUMMARY

Defendants Kalaari Capital Advisors Private Limited ("Kalaari"), Sridhar Santhanam ("Santhanam"), Pavan Vaish ("Vaish"), and Vani Kola ("Kola") (collectively, the "Unserved Defendants") have filed a Motion to Extend Time ("Motion") before this Court, requesting an Order to move their deadline to respond to the Plaintiff Allan Miller's ("Plaintiff") First Amended Complaint (dkt. 13, "FAC") until 21 days after the Court enters its Orders on the pending Motions to Dismiss (dkts. 15 and 16, collectively "MTDs") by Defendants HFN, Inc. ("HFN") and Kumar Shiralagi ("Shiralagi").

The Unserved Defendants have represented, through their counsel ("Counsel"), that they will not contest the service of process in India in exchange for this extension of time. See Exhibit 1.

However, at this time, **the Unserved Defendants have not yet been served**. Therefore, there is nothing to contest, there are no deadlines to extend, and the Unserved Defendants are not yet required to respond and are not yet active in the case. There is no action this Court can take. The Unserved Defendants say that the Motion is being made pursuant to Fed. R. Civ. P. 6(b)(1)(A) and Utah Loc. Civ. R. 7-1(a)(2)(A) (Motion, p. 4), but both of those Rules contain provisions that are not met.

The Plaintiff has initiated the lengthy process[1] of serving the Unserved Defendants through the procedure established by the Hague Service Convention (the "Hague Service"). The only alternatives available to this are for the Unserved Defendants to waive service; or for Counsel to indicate that they are authorized to accept service for the Unserved Defendants, and for the Plaintiff to then serve process on Counsel. In a March 14, 2024 conversation with Counsel, the Plaintiff offered both of these options, but Counsel declined. As a result, there is no action the Plaintiff (or this Court) can take.

---

[1] With the extremely gracious and much appreciated assistance of the Court's administrative staff.

## THE UNSERVED DEFENDANTS HAVE NOT BEEN SERVED

The law governing Hague Service has not changed much since *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 108 S. Ct. 2104 (1988). Referring to the Convention's language indicating "[t]he present Convention shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad," the Court ruled that "[t]his language is mandatory" (*Id.* at 2018) and went on to say that when a "forum's internal law require[s] transmittal of documents for service abroad, … the Convention provide[s] the exclusive means of valid service." (*Id.* at 2111)

One alternative to Hague Service is provided under Fed. R. Civ. P. Rule 4(h)(B)(1), "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process." In the litigation previously pursued by the Plaintiff, Counsel indicated that "Matthew Ladner and William Taylor, attorneys for Troutman Pepper Hamilton Sanders LLP in Los Angeles and Boston offices, represent all defendants in connection with this action. Mr. Taylor affirms he is not authorized to accept or waive service on behalf of any defendant." *Miller v. HFN, Inc.*, No. 23-cv-00533-VC, (N.D. Cal. May 10, 2023), dkt. 36-2, ¶ 6 (the "Previous Litigation"). During a telephone conversation with Counsel on March 14, 2024, the Plaintiff explored the option of Counsel accepting service, but Counsel declined.

Another alternative to Hague Service is provided under Fed. R. Civ. P. Rule 4(d)(1), where "[t]he plaintiff may notify such a defendant that an action has been commenced and request that the defendant waive service of a summons." As already noted, in the Previous Litigation, Counsel indicated that they were "not authorized to … waive service" (*Id.* at ¶ 6). In the same telephone conversation of March 14, 2024, the Plaintiff explored the option of having the Unserved Defendants waive service, but Counsel also declined this option.

## TIMING OF HAGUE SERVICE

Hague Service is not a speedy process. Service in India is expected to take about one year from submission to return of proof.[2] The Previous Litigation provides some measure of what can be expected, since it involves the same defendants. In that case, the Clerk of Court initiated the process on May 8, 2023 (dkt. 36-2 ¶ 3). The Central Indian government responded that the service was being dispatched on July 3, 2023 (dkts. 38-40). One of the summons (Vaish) was returned unexecuted by the Local Indian government on August 18, 2023, and was missing the report on why the summons was unexecuted (dkt. 60).

In the present case, the Clerk initiated the process on January 17, 2024 (dkt. 22 of this case), and received a response from the Central Indian government between February 28 and March 4, 2024 (dkts. 33-36). If a similar timeline is to be expected, then service on the Unserved Defendants will not happen until sometime in May 2024, or at the very earliest, late April 2024, nearly two months after the Unserved Defendants filed their Motion.

The Unserved Defendants admit that the entire basis for their Motion is hypothetical, "assuming, for the sake of argument, that any service attempt was effective," and indicate that the Motion is being made pursuant to Fed. R. Civ. P. 6(b)(1)(A) and Utah Loc. Civ. R. 7-1(a)(2)(A) (Motion, p. 4). Fed. R. Civ. P. 6(b)(1) specifies that the Court may extend time "**when an act may or must be done within a specified time**." There is currently no act that may or must be done within a specified time. Similarly, Utah Loc. Civ. R. 7-1(a)(2)(A) concerns whether the Motion needs Facts and Supporting Authority, but nonetheless specifies that the "motion is made **before the current deadline expires**." There is no current deadline.

In their Motion, the Unserved Defendants indicate that they "are aware that there have been several service attempts this month in India." This information was not disclosed by Counsel to the Plaintiff during the aforementioned telephone call, and the Plaintiff only learned it reading the

---

[2] See, for example, "How to Serve Process in India" at
https://www.haguelawblog.com/2017/05/serve-process-india/

Motion. Intentionally avoiding service of summons (for example, being aware of service attempts and not responding) is a crime in India under the Indian Penal Code 1860, §§ 172-173.

## MISREPRESENTATIONS BY THE UNSERVED DEFENDANTS

The Motion contains several misrepresentations by the Unserved Defendants.

The Motion indicates that the "Plaintiff has not filed any Proofs of Service for the International Defendants, nor any other document indicating that service has been effectuated" (Motion, p. 2), implying that the Plaintiff has somehow been negligent in his efforts to serve the Unserved Defendants. The Plaintiff is well aware that service has not been effectuated and is patiently waiting for the Indian government to do so. In fact, the Unserved Defendants seem to be pressing forward as though they had been served. After the Motion was filed, the Plaintiff was surprised to see that the Unserved Defendants were sent Magistrate consent forms and replied (dkts. 39-42). The Plaintiff contacted the administrative staff concerning this action and learned that the staff was merely responding to the fact that Counsel had independently modified the docket to indicate that the Unserved Defendants were now active in the case and represented by Counsel. The Plaintiff believes that this modification was made in error.

The Motion also contains an indignant note that "Plaintiff refused the proposal without explanation" (Motion, p. 3) and that "Plaintiff's unexplained rejection is not well-taken, especially where HFN and Shiralagi previously granted his request for a stipulated extension of his deadline to oppose the Dismissal Motions" (Motion, p. 3, footnote 2). The Plaintiff's rejection is not unexplained; as described above, the Plaintiff discussed waiving service or accepting service with Counsel, but both were rejected by Counsel, not by the Plaintiff. After some additional research, the Plaintiff did not see any way to proceed. Additionally, comparing the two motions is comparing apples to oranges: in the case of the stipulated extension, the Plaintiff had an existing deadline to extend. In this Motion, the extension is being requested on a deadline that does not exist on a response to an action that has not yet happened and is not likely for some time. The Plaintiff has

always maintained a congenial and professional relationship with Counsel and will continue to be reasonable about scheduling modifications for existing deadlines.

The Motion inaccurately indicates that in the Previous Litigation the District Court "grant[ed] HFN's and Shiralagi's motions to dismiss, and also *sua sponte* dismiss[ed] the actions as to all unserved defendants" (Motion, p. 3, footnote 1). In fact, the only dismissal with prejudice was for the securities-related counts, which are not part of the current case. All of the other counts other than the patent-related counts were dismissed without prejudice for jurisdiction, which is why the case is presently in this Court. The patent-related counts were never addressed (and never dismissed), and those must be heard in a District Court. Once again, the reference to the dismissal in the Previous Litigation is an apples-to-oranges comparison.

## JUDICIAL INEFFICIENCY

The Unserved Defendants argue that granting the Motion will improve the "economy" and "efficiency" of the Court in this case. In fact, granting this Motion would have the opposite effect.

First, it is self-evident that asking the Court to rule on a deadline that does not exist and may never exist is a waste of the Court's time. The most efficient way to advance the case is to see the timing and manner of the service of the Unserved Defendants, and act accordingly. The Unserved Defendants fail to mention that in the Previous Litigation, the Plaintiff stipulated to an extension of the deadline for the response for defendant Kumar Shiralagi until the amended complaint had been filed (Previous Litigation, dkt. 31). In that case, there was an existing deadline and the motion made sense and improved the judicial efficiency of the case.

Second, the significant irregularities in the October 26, 2023 notice from HFN (FAC ¶¶ 63-64) have resulted in a parallel litigation in the Delaware Chancery Court, *Allen Miller* [sic] *v. HFN, Inc.*, No. 2024-0185-LWW, (Del. Ct. Ch. Feb. 28, 2024) (the "Delaware Litigation"). See Exhibit 2 and Exhibit 3. It seems likely that the discovery and progress in the Delaware Litigation can have an effect on the relevant facts in the current case. Judicial efficiency will be improved by allowing the Hague Service to complete and addressing the situation at the time.

## THE MOTIONS TO DISMISS ARE STILL PENDING

The Unserved Defendants base their justification for the Motion largely on their presumption that the Court will grant the MTDs (Motion at pp. 4-6), which is quite a patronizing attitude toward the actions of this Court. They justify this by rehashing the same arguments that they presented in their reply (dkts. 30 and 31, the "Reply") to the Platintiff's opposition of the MTDs, with little or no change. However, all of these arguments fail in the light of case law and academic review.

One argument is that the Plaintiff cannot pierce the corporate veil and treat HFN as an alter ego of the Unserved Defendants, apparently based on their inability to find case law supporting this, and the assertion that piercing the corporate veil is "typically" used to shift liability from a corporation to its controlling shareholder. This is a gross over-simplification of piercing the corporate veil. Piercing is an equitable remedy that the Court can apply at its discretion to overcome the efforts of an actor to hide behind the façade of a corporation to avoid scrutiny and liability. "[C]ourts pierce the corporate veil as a tool of statutory application, in the sense that piercing the corporate veil is done in order to bring corporate actors' behavior into conformity with a particular statutory scheme." [3] The Plaintiff is not shifting liability; instead, he is asking the court to recognize the reality that the Unserved Defendants are simply using HFN as a sham to operate their illicit activities and to consider that HFN and the Unserved Defendants are equivalent with respect to the counts of action.

Another argument is that this is a derivative shareholder suit, and the Plaintiff is not able to bring the suit as a *pro se* Plaintiff. *Stoner v. Ford*, Civil No. 74-311., 1974 U.S. Dist. LEXIS 11427 (N.D. Okla. Dec. 24, 1974) has a similar fact pattern to the current case, with a stockholder piercing the corporate veil and bring charges directly against the corporate directors rather than as

---

[3] Jonathan Macey & Joshua Mitts, *Finding Order in the Morass: The Three Real Justifications for Piercing the Corporate Veil*, 100 CORNELL L. REV. 99 (2014). Excerpt in Exhibit 4; full text available at: https://scholarship.law.columbia.edu/faculty_scholarship/2784

a derivative suit. There, the Court found that "practically all authorities agree that under some circumstances in a particular case the corporation may be disregarded as an intermediate between the ultimate person or persons or corporation and the adverse party; and should be disregarded in the interest of justice in such cases as fraud" (*Id.* at *14), which is the same interpretation the Plaintiff seeks. The Court went on to note that "[i]f the wrong is not against the corporation, but against the stockholders individually, the action for redress must be brought by the stockholder individually and cannot be maintained by the corporation itself or by the stockholders on its behalf" (*Id.* at *11). It is particularly relevant that "Plaintiff brings this suit in his own name as an individual and has declined to bring it as a derivative action. The acts which Plaintiff sets out as actionable wrongs in his complaint are: the taking of a secret profit on the sale of the subject property to Valley Park …" (*Id.* at *10). The Court **overruled the Defendants' Motions to Dismiss**, and the result should be the same here.

Still another argument is that the Plaintiff is incorrectly pleading "virtually identical" and "boilerplate" claims against all of the Unserved Defendants. *Griggs v. Vanguard Grp., Inc.*, No. CIV-17-1187-SLP, 2021 U.S. Dist. LEXIS 256527 (W.D. Okla. Feb. 5, 2021) is illustrative here as a case where the plaintiff used a single term to refer to multiple defendants, the defendants moved to dismiss with a similar logic as the Unserved Defendants here, and the Court held that "where the plaintiff used the collective term "defendants" in asserting a malicious prosecution claim against four defendants, Rule 8(a)(2) does not require the plaintiff to allege detail on how two of those defendants acted in concert to prosecute the plaintiff" (*Id.* at *7, citing *Birdsong v. Unified Gov't of Kan. City*, No. 13-2090-JAR-TJJ, 2014 U.S. Dist. LEXIS 73095, 2014 WL 2216904, at *5 (D. Kan. May 29, 2014) ).

## CONCLUSION

The Unserved Defendants have presented the Court with a request for relief from a deadline that does not exist yet, attempted to tie it to a future event whose timing cannot be predicted, and tried to bring the Unserved Defendants into the case using dubious means before they have been

properly served. The Court should deny the Motion in its entirety and remove the Unserved Defendants from the case pending their service.


Date: _____April 16, 2024_____        By: _____/s/ Allan A. Miller _____ ____
                                                                            Allan Miller
                                                                            Plaintiff (Pro se)

# EXHIBIT 1



Allan Miller <allan.miller@alumni.stanford.edu>

---

## Utah Litigation

**Taylor, William M.** <William.Taylor@troutman.com>                                Tue, Mar 12, 2024 at 6:53 PM
To: Allan Miller <allan.miller@alumni.stanford.edu>
Cc: "Ladner, Matthew" <Matthew.Ladner@troutman.com>, "Marigoni, Nathan R." <Nathan.Marigoni@troutman.com>

Good evening Mr. Miller:

I write regarding the Utah litigation. My understanding is that you are attempting to serve Sridhar Santhanam, Pavan Vaish, and Kalaari in India.

My thought is that disagreements over the propriety of service is not a great use of the parties' time and efforts. Moreover, there is likely to be substantial overlap between the positions taken by HFN and Kumar Shiralagi in their motions to dismiss, and the positions that Sridhar Santhanam, Pavan Vaish, and Kalaari will take in this litigation.

I therefore make the following proposal: Sridhar Santhanam, Pavan Vaish, and Kalaari will not contest the service of process in India. In return, you will grant those defendants an extension to respond until 21 days after the Court rules on the motions to dismiss on behalf of HFN and Kumar Shiralagi.

We expect that the Court will appreciate how this proposal will lessen the burdens on the parties, as well as the Court itself.

Please let us know if you agree to this proposal.

Regards,

Will

**William M. Taylor**
**Partner**
Direct: 617.204.5186
william.taylor@troutman.com

**troutman pepper**
High Street Tower
125 High Street
19th Floor
Boston, MA 02110

Troutman Pepper is a 2021 Mansfield Certified Plus Firm

☐ · · · · · · · · · · · · · · · · · · · · · · · · · · · ☐

---

This e-mail (and any attachments) from a law firm may contain legally privileged and confidential information solely for the intended recipient. If you received this message in error, please notify the sender and delete it. Any unauthorized reading, distribution, copying, or other use of this e-mail (and attachments) is strictly prohibited. We have taken precautions to minimize the risk of transmitting computer viruses, but you should scan attachments for viruses and other malicious threats; we are not liable for any loss or damage caused by viruses.

# EXHIBIT 2

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| **ALLAN MILLER,**<br> Plaintiff<br><br> v.<br><br> **HFN, INC.**, a Delaware Corporation,<br> d/b/a NANOHEAL BY HFN INC.,<br> Defendant. | C. A. No. |

## VERIFIED COMPLAINT

Plaintiff Allan Miller ("Plaintiff" or "Miller"), for his Verified Complaint against Defendant HFN, Inc., a Delaware Corporation d/b/a Nanoheal by HFN, Inc. ("HFN"), hereby alleges:

### NATURE OF THE ACTION

1.      By this action, Plaintiff seeks to prevent HFN from improperly taking a number of actions pursuant to Sections 204 and 205 of the Delaware General Corporate Law ("DGCL").

### PARTIES

2.      Plaintiff Allan Miller is a US citizen and individual residing in Concord, California, and is a minority stockholder in HFN.

3.      Defendant HFN is a Delaware corporation with a principal place of business located in Orem, Utah.

## BACKGROUND

### I. HFN's Notice of Ratification of Defective Corporate Acts

4.      On October 26, 2023, HFN sent a "Notice of Ratification of Defective Corporate Acts" (the "Notice") to its stockholders via email. See Exhibit 1 (with highlights by Plaintiff). In summary, this notice indicates that HFN has adopted resolutions (the "Resolutions") on October 9, 2023 under DGCL Sections 204 and 205 to remedy the following defective corporate acts:

a.      Failing to set the size of the Board to one before electing Alessandro Donnini as the sole director on January 11, 2012; the putative reason for the defect being that the record of the decision cannot be found (Ex. 1 p. A1),

b.      Failing to set the size of the Board to two to create a vacancy on the Board on January 14, 2012; no putative reason is given for the defect (Ex. 1 pp. A2-A3),

c.      Failing to properly file the A&R Charter with the Secretary of State on March 15, 2012; no putative reason is given for the defect (Ex. 1 p. A4),

d.      Failing to date the signatures of the stockholders when filing the A&R Charter with the Secretary of State on March 15, 2012; no putative reason is given for the defect (Ex. 1 p. A4),

e.      Electing Kumar Shiralagi ("Shiralagi") to the Board without the requisite consent by the stockholders on June 1, 2012; no putative reason is given for the defect (Ex. 1 p. A5), and

f.      Retroactively (with a "Past Issuance") issuing 250,000 shares of common stock to Pavan Vaish ("Vaish") without the Board authorizing the action on July 27, 2022; the putative reason for the defect being that the record of the resolution issuing the shares cannot be found (Ex. 1 p. A6).

5.      The Resolutions were adopted by Board members Sridhar Santhanam ("Santhanam"), Ruby Jha ("Jha"), and Divya Choorimule ("Choorimule").

6.      Jha was elected to the Board on September 8, 2023, 31 days before adopting the Resolutions (Ex. 1, p. 1), and resigned from the Board on October 9, 2023, immediately after adopting the Resolutions (Ex. 1, p. A7).

7.      Choorimule was elected to the Board on August 25, 2023, 45 days before adopting the Resolutions (Ex. 1, p. 1), and resigned from the Board on October 9, 2023, immediately after adopting the Resolutions (Ex. 1, p. A7).

8.      Concurrent with the resignations of Jha and Choorimule, the size of the Board was reduced to one, with Santhanam serving as the sole Board member (Ex. 1, p. A7).

## II. HFN's Litigation History

9.    In 2014, through an anonymous informant, HFN's minority stockholders became aware of a trail of documentation on the company's activities in 2012 to defraud them by selectively withholding information to reduce the apparent value of the company in a transaction primarily designed to transfer an outsized share of ownership to the management and a new investor, NEA-IUVP. The stockholders filed suit on June 2, 2014; see *Miller et al. v. Donnini et al., D Mass 1:14-cv-12337-NMG dkt. 1* (the "Massachusetts Litigation"). Following the response and reply to the complaint by both sides, the Court sustained multiple counts against the defendants, including violations of § 10(b) and § 20(a) of the Exchange Act, Rule 10b-5 of the SEC, breach of fiduciary duty, and fraud. The case was poised for discovery, but once the depth and nature of the evidence of the plaintiffs was exposed, the defendants rapidly progressed toward a settlement, and dismissal with prejudice, between the minority shareholders and HFN. Note that all of the fraudulent activity by HFN was concurrent with the defective acts in ¶¶ 4a-4e above.

10.    In a similar fashion, in 2022, through several anonymous informants, the Plaintiff became aware of another litany of fraudulent activity by HFN's Board and management and filed suit on February 6, 2023; see *Miller v. HFN, Inc., ND Cal 3:23-cv-00533-VC dkt. 1* (the "California Litigation").

11.     The California Court dismissed the case without prejudice for jurisdictional reasons, so the Plaintiff re-filed on October 16, 2023 in Utah where HFN purports to have a headquarters and is licensed to do business; see *Miller v. HFN, D Utah 2:23-cv-00733-CMR dkt. 1* (the "Utah Litigation"). In addition to the original counts in the California Litigation, further information from anonymous sources uncovered a scheme by Santhanam to siphon money out of HFN directly into the accounts of the defendants in the case. This case is currently in litigation.

12.     HFN's Board meeting on October 9 described in ¶ 4 above took place while HFN was in active litigation. The Plaintiff appealed the case to the Ninth Circuit Court of Appeals (the "CA9 Appeal") on August 24, 2023, and voluntarily dismissed the appeal on October 20, 2023 after discovering the additional counts of action and deciding to pursue the Utah Litigation. The HFN Board was aware of the active CA9 Appeal while adopting the Resolutions.

13.     The Notice to stockholders was sent on October 26, as described in ¶ 4 above, while HFN was active in the Utah Litigation. As described in ¶ 11 above, the Utah Litigation was filed 10 days prior to the date of the Notice and was served on HFN and Shiralagi before the Notice was sent. HFN was aware of the Utah Litigation and its relevance to the Notice but chose not to describe it in the Notice.

14.     HFN has a history of a repeated pattern of being sued for its misdeeds. In addition to the Massachusetts Litigation, the California Litigation, and the Utah

Litigation, HFN has been sued in at least *My Fast PC LLC v. HFN Inc, Utah Dist - Provo, case 180400767* filed May 11, 2018, where HFN decided to stop paying My Fast PC for its subscriber base, and also stopped servicing the customers; and *TPark Three LLC v. HFN Inc, Utah Dist - Provo, case 180401030* filed June 22, 2018, where HFN decided to stop paying rent on the building housing its headquarters (collectively, the "Utah State Litigations"). HFN was forced to settle for a sizable amount in both cases. HFN has also settled with several other entities pre-litigation.

### III.   Vaish's stock issuance and HFN's Employee Stock Option pool

15.   HFN's Employee Stock Option Plan ("ESOP") was a significant component of the 2015 settlement negotiations. Exhibit 2 was provided by HFN during the settlement negotiations, and showed a large pool of 2,616,500 shares, comprising over 15% of the shares of the company, for the ESOP.

16.   The 2015 plaintiffs were aware that an ESOP is a key component to attract talent to a high-tech company, so a compromise was reached enabling the settlement by treating half the ESOP pool as outstanding shares in computing the settlement. Exhibit 3 shows the computation that was used for the settlement, indicating that only 1,308,250 of the option shares were used to compute the 2% total. (Note that there is a rounding error in Exhibit 3; the settlement was for 307,154 shares rather than 307,155.) The 307,154 shares were provided from Santhanam's

6,560,000 shares as agreed to, leaving Santhanam with 6,252,846 shares after the settlement. The ESOP pool was 2,616,500 shares.

17.    HFN provided no further information on its activity with the shares for the next seven years, and also did not provide a current capitalization table to the Plaintiff upon request, despite the requirement to do so under the DGCL. In 2022, the Plaintiff was able to see, through anonymous informants, the capitalization tables for HFN in December 2019 (Exhibit 4) and June 2021 (Exhibit 5).

18.    Upon seeing these capitalization tables, the Plaintiff realized that the ESOP was not being used to attract talent to the company with options but was instead being used to dole out grants to company insiders.

19.    In December 2019, the ESOP option pool was 2,166,500, having been reduced by 450,000 shares from its 2015 value. 200,000 of those shares were an "Equity Award" for Ganesh Krishnan and 250,000 of the shares were an "Equity Award" for Vaish. Santhanam's shares stood at 6,252,846, consistent with the 2015 settlement.

20.    At some time between August 2015 and December 2019, HFN allocated 250,000 shares from the ESOP to Vaish, who has never been an employee of HFN.

21.    In June 2021, as late as six years after HFN's representation of the option pool as an ESOP, not a single employee other than Santhanam ever received

even one share from the ESOP option pool. Santhanam is the most highly compensated employee of HFN. 26 USC § 410(b)(1)-(2) requires an ESOP to benefit at least 70% of the employees of the company who are not highly compensated. The ESOP at HFN benefits only non-employees and the most highly compensated employee and does not meet the 70 percent requirement mandated by law.

**IV.    Jha's and Choorimule's Backgrounds**

22.    Jha's résumé is presented in Exhibit 6. Jha has never previously held an executive position or a board seat in any company; in fact, she has not held any upper-level management position at HFN or any other company.

23.    Santhanam has full control and active operational involvement in numerous other outside companies, and HFN freely provides the services of Jha to these companies on HFN company time, as well as the HFN travel budget, for Santhanam and Jha to visit and manage these side operations. Jha mentions her only other experience in her résumé as her involvement in Acris. These outside companies include, but are not limited to, Aavaasa Builders, an Indian construction firm; Acris Technologies, an Indian Information Technology And Services company; Blue Sphere Ventures, an Indian investment firm; Iris Animation, an Indian film and video animation company; and Velo Digital, a Burbank, California corporation and digital marketing firm representing film personalities and managing concert logistics.

Additional details about these companies and Jha's involvement in them can be found in the Utah Litigation, dkt. 13 (Amended Complaint), ¶¶ 51-56.

24.     Jha is currently an HFN employee, so her only source of income is highly dependent on Santhanam, making it unlikely that she would ever jeopardize her salary by disagreeing with any directive from Santhanam. In addition, she works directly under Santhanam and has an extremely close personal relationship with him, making such a disagreement even less likely.

25.     Jha's only act as a Director during her 31-day tenure was to adopt the Resolutions described in ¶ 4, and then reduce the size of the Board to one.

26.     Choorimule's résumé is presented in Exhibit 7. Choorimule has never previously held an executive position or a board seat in any company; in fact, she has not held any upper-level management position at HFN or any other company.

27.     Choorimule also has an active role in Santhanam's companies described in ¶ 23 above, and HFN freely provides the services of Choorimule to these companies on HFN company time, as well as the HFN travel budget, for Santhanam and Choorimule to visit and manage these side operations.

28.     Choorimule is currently an HFN employee, so her only source of income is highly dependent on Santhanam, making it unlikely that she would ever jeopardize her salary by disagreeing with any directive from Santhanam. In addition,

she works directly under Santhanam and has an extremely close personal relationship with him, making such a disagreement even less likely.

29.     Choorimule's only act as a Director during her 45-day tenure was to adopt the Resolutions described in ¶ 4, and then reduce the size of the Board to one.

30.     Choorimule was an employee at Hewlett Packard in 2012 during the time of the events addressed in ¶¶ 4a-4e, so she has no way to know what happened relative to those events or what any sentiment or reasoning behind them might have been.

31.     As a result, the Resolutions described in ¶ 4 were effectively adopted by Santhanam, acting as a sole Board member.

**V. HFN is Acting as an Alter Ego for Santhanam and Others**

32.     HFN is being used as a shield by Santhanam and others for their activities. In particular, HFN meets the tests for acting as an alter ego of Santhanam, as well as others:

a.     Santhanam is using the business structure as a façade for operations of the dominant stockholders.

b.     HFN fails to observe even the most basic corporate formalities.

c.     HFN has never had a single stockholder meeting outside of the disastrous fraudulent 2012 "meeting."

      d.     HFN has failed to follow the Federal and IRS regulations for its ESOP since the inception of the plan.

      e.     HFN has never paid a stockholder dividend.

      f.     Santhanam routinely siphons business funds as a dominant stockholder.

      g.     The other Board members and majority stockholders are essentially non-functional.

      h.     HFN has an absence of business records.

33.     Additional details about HFN's role as an alter ego can be found in the Utah Litigation, dkts. 26-27, pp. 5-9.

## VI.   HFN's Mismanagement

34.     Exhibit 8 is a presentation that was formally presented to the Board of HFN, at least Santhanam and Shiralagi, on July 1, 2022, describing the very serious issues with the company. The company was "in crisis with upset employees, highly dissatisfied customers / partners and disgruntled investors, that [would] result in a continued loss of [the average rate of return], reputational damage and high liabilities, eventually forcing a shutdown." The laundry list of written complaints from customers on p. 6 was also communicated to the Board at least as early as March 8, 2022, when a major system integrator partner indicated that they were "very concerned about the [HFN] product design and the support." Another partner

indicated that a "customer has started a process to impose a penalty for this incident and looking at legal action. The security team is questioning the security controls of the platform, the process that's driving the solution and its integrity. It is also claimed that the [HFN] code is exposed on the internet."

35.    Things were even worse inside the company. P. 8 details that HFN had a "culture of intimidation, retribution, and castigation." This was championed by Santhanam, with "public displays of anger and outrage," "harassment through excessive messages and dictates for instant action," and special "ambitious metrics" and "high quotas" that only applied to the sales team. The toxic environment for employees was not even offset by other benefits: there were "no bonuses for employees in the last 2 years despite the high growth of the company" and "no stock options for any of the employees" except for Santhanam. If the employees wanted to protest this, well, there was a "lack of HR function and HR processes" that made it impossible. No wonder there was "high attrition" with the "sales person with the highest productivity leaving the company."

## HFN CANNOT CORRECT ITS DEFECTIVE ACTS

## I.  Vaish's Grant is Not an Act That Can be Corrected

36.    As evidenced in ¶¶ 15-21 above, Vaish's grant was a direct grant from the HFN ESOP sometime between August 2015 and December 2019. The Resolutions described in ¶ 4 do not correct this act. Instead, they purport to correct

an act that supposedly happened after the fact and whose documentation, less than 2 years old, has mysteriously disappeared. DGCL §§ 204-205 explicitly exclude "back-dating" an action, both in statute and the legislative notes of the 147th General Assembly where the bill was introduced, as well as in ensuing case law such as *In re Numoda Corp. S'holders Litig., 2015 Del. Ch. LEXIS 30 (Ch. Jan. 30, 2015)*. The action described in ¶ 4f is a thinly disguised attempt to "redo" the share allocation in a different, legitimate manner.

37.     Tellingly, the Board resolution of ¶ 4f to "correct" Vaish's share allocation only appeared after the Plaintiff called out the abuse of the ESOP pool for allocating shares in direct grants to non-employees and insiders, in the California Litigation and the Utah Litigation. It seems that any beneficiary of these grants would now have a legitimate concern about the validity of their ownership of HFN.

## II. Jha and Choorimule are not Valid Board Members for These Actions

38.     Although Jha and Choorimule were technically elected to the Board of HFN to pass the Resolutions, the 147th General Assembly made it quite clear that the intent of DGCL §§ 204-205 was that "[d]efective corporate acts, even if ratified under this section, are subject to traditional fiduciary and equitable review."

39.     Even a cursory review by this Court of the facts evidenced in ¶¶ 22-30 above makes it clear that the actions of Jha and Choorimule were done with neither fiduciary responsibility nor equitable intent. Neither has the ordinary qualifications

to be a Board member, and they were put in place for one month to do the bidding of Santhanam. This was not the action of a Board of Directors, but instead was a single person acting unchecked. Perhaps the Resolutions meet the **letter** of the law, but certainly not the **spirit and intent** of the law.

## III.    The Resolutions Sound of Fraud

40.    The preponderance of circumstances surrounding HFN's Resolutions described in ¶ 4 have the characteristics of a fraudulent action. This is apparent from the descriptions given above, but to highlight some of the more egregious issues:

a.    All the actions other than Vaish's grant involve events that took place **over 11 years ago**, yet HFN suddenly feels a need to correct them now that an active litigation is resurfacing events around that time.

b.    There is conveniently an abundance of lost documents, and even some undated documents, regarding all these events. It appears that HFN does not even meet the extremely low bar of documenting Board meetings and keeping minutes, a truly minimal function of any corporation.

c.    There are not just one or two defective acts needing correction, but **six**, with **five** of them being related to the initial incorporation of HFN. It appears that HFN did more things wrong than right during its incorporation, which is commensurate with the findings and outcome of the Massachusetts Litigation.

d.      Two of the Board members involved in adopting the Resolutions were newly added to the Board for one month, for the express purpose of voting for the Resolutions at the behest of Santhanam. These were not legitimate Board resolutions passed by a legitimate Board vote. The HFN Board was effectively acting as an alter ego of Santhanam in adopting the Resolutions.

## IV.    This Complaint is Timely Filed

41.    Plaintiff filed this complaint as a petition on February 23, 2024, within 120 days of the date of HFN's Notice to stockholders. See Exhibit 9. However, due to some administrative issues with the filing that the Plaintiff has worked with the Court administration to correct, the Plaintiff was required to re-file again on February 26, February 27, and February 28. The Plaintiff has diligently pursued the filing. The only changes from the original filing are modifications required to recast Miller from a Petitioner to a Plaintiff and HFN from a non-party to a Defendant, the case title and filing date on every relevant document, the contents of ¶¶ 2-3 and this ¶ 41, updates to the Supplemental Information Sheet, and clarifications in the Letter to the Court.

## V. This Court Should Not Set Precedent by Accepting These Actions

42.    As the above paragraphs reveal, HFN is mismanaged and has a persistent pattern of serving the needs and wants of Santhanam and others, including

his close associates such as Vaish, at the expense of other shareholders, investors, and employees. In fact, this rises to the level of HFN acting as an alter ego for Santhanam and others.

43.    By allowing HFN to proceed with these actions, this Court would effectively send the signal that any misbehavior by a Delaware corporation can be papered over, years after the fact, with no repercussions, simply by commanding a few employees to vote for some actions under §§ 204-205. The Plaintiff believes that this is not the intent of this Court, the statute, or the Legislative Assembly.

## RELIEF REQUESTED

### I.  Deny HFN's Petition or Void the Board Resolutions

44.    The Plaintiff is unable to find a case in this Court for HFN's petition corresponding to its Notice to stockholders described in ¶ 4. If such a petition exists or is later filed by HFN, the Plaintiff seeks an order of this Court to deny it. If such a petition does not exist and is not later filed, the Plaintiff seeks an order of this Court to void and reverse the Board Resolutions described in ¶ 4.

### II. Alternatively Stay the Actions in the Resolutions Pending the Utah Litigation

45.    Since the actions proposed in the Resolutions described in ¶ 4 will directly affect the active Utah Litigation currently pending in the United States District Court in the District of Utah, if this Court decides not to provide the relief

requested by the Plaintiff in ¶ 44, the Plaintiff seeks an order of this Court to stay the actions in the Resolutions pending the outcome of the litigation in Utah.

### III.   Void the Allocation of Stock to Vaish

46.   The Plaintiff seeks an order of this Court to void and reverse the direct grant of stock to Vaish from the ESOP pool, as well as voiding the action of the "Past Issuance" described in ¶ 4f to allocate stock to Vaish through other means.

### IV.   Void the Incorporation of HFN

47.   Since there were so many procedural flaws in the 2012 incorporation of HFN, the Plaintiff seeks an order of this Court to void and rescind that incorporation and return the structure of the company to its pre-2012 state.

### COUNT I

48.   Plaintiff incorporates the allegations of each of the foregoing paragraphs as if fully set forth herein.

49.   This Court is authorized to review and rule on any petition or action taken by HFN pursuant to DGCL § 204 and DGCL § 205.

50.   Plaintiff has no adequate remedy at law.

51.   The Plaintiff will suffer significant and irreparable harm absent granting of the relief requested here.

52.   For the reasons stated herein, granting the requested relief would be fair and equitable and would carry out the intent of all interested constituencies.

WHEREFORE, Plaintiff requests that the Court enter an order:

a.      denying any existing or later filed petition by HFN requesting the actions described pursuant to DGCL § 204 and/or DGCL § 205;

b.      if no such petition is presented by HFN, voiding and reversing the Board actions described pursuant to DGCL § 204 and/or DGCL § 205;

c.      in the alternative to (a) and (b), staying the actions pending the outcome of *Miller v. HFN, D Utah 2:23-cv-00733-CMR*;

d.      voiding and reversing the direct grant of stock to Vaish from the ESOP pool, and denying any action of "Past Issuance" to allocate stock to Vaish through other means;

e.      voiding and rescinding the incorporation of HFN and returning the structure of the company to its pre-2012 state;

f.      awarding Plaintiff his reasonable costs and expenses incurred in connection with this action, including reasonable attorneys' fees; and

g.      granting such other relief as the Court may deem just and proper.

DATED:   __February 28, 2024____        SIGNATURE: ___*/s/ Allan A. Miller*_____
                                        Allan A. Miller
                                        3385 Claudia Drive
                                        Concord, CA  94519
                                        650-468-7387
                                        *Pro se* Plaintiff

# EXHIBIT 3

For Delaware Litigation, case 2024-0185-LWW:

# EXHIBIT 1

**Notice of Ratification of Defective Corporate Acts**

October **26th**, 2023

Dear stockholder of HFN, Inc.:

Notice (this "**Notice**") is hereby given that (i) on October 9, 2023, the Board of Directors (the "**Board**") of HFN, Inc., a Delaware corporation (the "**Corporation**"), ratified the defective corporate acts (as defined in Section 204(h) of the Delaware General Corporation Law (the "**DGCL**")) identified in the Board resolutions attached hereto as <u>Exhibit A</u> (the "**Board Resolutions**") pursuant to, and in accordance with, Section 204 of the DGCL, (ii) on October 25, 2023, the requisite stockholders of the Corporation approved the ratification of the defective corporate acts required to be approved by such stockholders as provided in the stockholder resolutions attached hereto as <u>Exhibit B</u> (the "**Stockholder Resolutions**") pursuant to, and in accordance with, Section 204 of the DGCL, (iii) on August 25, 2023, the requisite stockholders of the Corporation elected Divya Choorimule to the Board to serve as a Common Director (as defined in the Amended and Restated Certificate of Incorporation of the Corporation) and (iv) on September 8, 2023, the requisite stockholders of the Corporation elected Ruby Jha to the Board to serve as the Mutual Director (as defined in the Amended and Restated Certificate of Incorporation of the Corporation).  The purpose of the ratification of such defective corporate acts is to confirm that such defective corporate acts are no longer deemed to be void or voidable as a result of the failures of authorization (as defined in Section 204(h) of the DGCL) identified in the Board Resolutions and the Stockholder Resolutions and that such effect be deemed retroactive to the time of such defective corporate acts in accordance with Section 204(f) of the DGCL.

This Notice is being sent to (i) each holder of valid and putative stock, whether voting or nonvoting, as of the date the Board adopted the Board Resolutions approving such defective corporate acts at the address of such holder as it appears or most recently appeared, as appropriate, on the records of the Corporation in accordance with Section 204(g) of the DGCL, and (ii) the holders of record of valid stock and putative stock, whether voting or nonvoting, as of the time of the defective corporate acts, other than holders whose identities or addresses cannot be determined from the records of the Corporation in accordance with Section 204(g) of the DGCL. This Notice is being sent to each non-consenting stockholder to provide each such stockholder notice of the approval of the defective corporate acts as provided in the Stockholder Resolutions and of the elections of the above named individuals to the Board by non-unanimous written consent in accordance with Section 228(e) of the DGCL.

Any claim that the defective corporate acts ratified in the Board Resolutions and Stockholder Resolutions are void or voidable due to the failures of authorization, or that the Delaware Court of Chancery should declare in its discretion that a ratification in accordance with Section 204 of the DGCL not be effective or be effective only on certain conditions, must be brought within 120 days from the later of the validation effective time (as defined in Section 204(h) of the DGCL) or the date of this Notice.

**HFN, Inc.**,
a Delaware corporation

By: _____
Name:  **Sridhar Santhanam**
Title:   **CEO**

# **EXHIBIT A**

Board Resolutions

[Attached]

# UNANIMOUS WRITTEN CONSENT
## OF THE
## BOARD OF DIRECTORS
## OF
## HFN, INC.

October 9th, 2023

The undersigned, being all of the members of the Board of Directors (the "Board") of HFN, Inc., a Delaware corporation (the "Corporation"), acting pursuant to Section 141(f) of the Delaware General Corporation Law (the "DGCL"), hereby consent (this "Consent") in writing to the adoption of the following resolutions with the same force and effect as if duly adopted at a meeting of the Board called for such purpose:

**Ratification of Matters Related to January 2012 Incorporator Written Consent**

**WHEREAS**, on January 11, 2012 (the "Incorporator Consent Date"), the sole incorporator of the Corporation (the "Incorporator") adopted by written consent (the "Incorporator Consent") resolutions (i) electing Alessandro Donnini as the sole director of the Board (the "First Election") and (ii) adopting the Corporation's Bylaws (the "Bylaws Adoption");

**WHEREAS**, the Board is concerned that the First Election and the Bylaws Adoption are void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because, with respect to the First Election, the Incorporator failed to set the size of the Board at one (1) in accordance with Sections 108 and 141 of the DGCL and, with respect to the First Election and the Bylaws Adoption, the Corporation cannot locate a copy of the Incorporator Consent executed in accordance with Section 108 of the DGCL in its books and records (the "Incorporator Consent Failure of Authorization");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act;

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act in respect of the election of the initial board of directors of the corporation pursuant to Section 108 of the DGCL shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(2) of the DGCL, a majority of the persons who, at the

time the resolutions required by Section 204(b)(2) of the DGCL are adopted, are exercising the powers of directors under claim and color of an election or appointment as such may adopt resolutions stating (i) the name of the person or persons who first took action in the name of the corporation as the initial board of directors of the corporation; (ii) the earlier of the date on which such persons first took such action or were purported to have been elected as the initial board of directors; and (iii) that the ratification of the election of such person or persons as the initial board of directors is approved; and

**WHEREAS**, the Board has determined to ratify the First Election and the Bylaws Adoption as of the Incorporator Consent Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the First Election and the Bylaws Adoption.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the First Election and the Bylaws Adoption as of the Incorporator Consent Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the Bylaws Adoption; and be it further

**RESOLVED**, that the date of the defective corporate act is the Incorporator Consent Date; and be it further

**RESOLVED**, that the nature of the failure of authorization with respect to the defective corporate act to be ratified is the Incorporator Consent Failure of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the Bylaws Adoption as of the Incorporator Consent Date in all respects; and be it further

**RESOLVED**, that the name of the person who first took action in the name of the Corporation as the initial Board is Alessandro Donnini; and be it further

**RESOLVED**, that the earlier of the date on which Alessandro Donnini first took such action or was purported to have been elected as the initial Board is the Incorporator Consent Date; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the First Election as of the Incorporator Consent Date in all respects.

**Ratification of Matters Related to January 2012 Written Consent**

**WHEREAS**, on January 14, 2012 (the "January Board Consent Date"), the Board adopted by written consent resolutions electing Sridhar Santhanam to the Board (the "Second Election");

**WHEREAS**, the Board is concerned that the Second Election is void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because the Board failed to expand the size of the Board from one (1) to two (2) to create a vacancy on the Board in

accordance with the Corporation's Bylaws and Section 141 of the DGCL (the "January Board Consent Failure of Authorization");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act; and

**WHEREAS**, the Board has determined to ratify the Second Election as of the January Board Consent Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the Second Election.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the Second Election as of the January Board Consent Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the Second Election; and be it further

**RESOLVED**, that the date of the defective corporate act is the January Board Consent Date; and be it further

**RESOLVED**, that the nature of the failure of authorization with respect to the defective corporate act to be ratified is the January Board Consent Failure of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the Second Election as of the January Board Consent Date in all respects.

### Ratification of Matters Related to the Adoption of the A&R Charter

**WHEREAS**, on March 1, 2012 (the "Charter Adoption Date"), the Board adopted by written consent resolutions approving the Corporation's Amended and Restated Certificate of Incorporation (the "A&R Charter");

**WHEREAS**, on the Charter Adoption Date, the requisite stockholders of the Corporation adopted by written consent resolutions approving the A&R Charter;

**WHEREAS**, on March 15, 2012 (the "Charter Filing Date"), the Corporation filed the A&R Charter with the Secretary of State of the State of Delaware (the "Secretary of State");

**WHEREAS**, the Board is concerned that the filing of the A&R Charter with the Secretary of State on the Charter Filing Date is void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because (i) the Board failed to declare the A&R Charter advisable in accordance with Section 242 of the DGCL and (ii) each stockholder's signature did not bear the date of such stockholder's signature as required by Section 228 of the DGCL (as Section 228 of the DGCL existed as of the Charter Adoption Date and the Charter Filing Date) (collectively, the "A&R Charter Failures of Authorization");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act; and

**WHEREAS**, the Board has determined to ratify the filing of the A&R Charter with the Secretary of State as of the Charter Filing Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the A&R Charter.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the filing of the A&R Charter with the Secretary of State as of the Charter Filing Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the filing of the A&R Charter with the Secretary of State; and be it further

**RESOLVED**, that the date of the defective corporate act is the Charter Filing Date; and be it further

**RESOLVED**, that the natures of the failures of authorization with respect to the defective corporate act to be ratified are the A&R Charter Failures of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the filing of the A&R Charter with the Secretary of State as of the Charter Filing Date in all respects; and be it further

**RESOLVED**, that the Board hereby authorizes the officers of the Corporation (the "Authorized Officers") to submit the ratification of the filing of the A&R Charter with the Secretary of State to the stockholders of the Corporation for approval in accordance with the applicable provisions of Section 204 of the DGCL.

**Ratification of Matters Related to June 2012 Written Consent**

**WHEREAS**, on June 1, 2012 (the "June Consent Date"), certain stockholders of the Corporation adopted by written consent resolutions electing Kumar Shiralagi to the Board as a Preferred Director (as defined in the A&R Charter) (the "Third Election");

**WHEREAS**, the Board is concerned that the Third Election is void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because the holders of the Corporation's Series A Preferred Stock, par value $0.0001 per share, failed to consent to the Third Election in accordance with the A&R Charter (the "June Consent Failure of Authorization");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act; and

**WHEREAS**, the Board has determined to ratify the Third Election as of the June Consent Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the Third Election.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the Third Election as of the June Consent Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the Third Election; and be it further

**RESOLVED**, that the date of the defective corporate act is the June Consent Date; and be it further

**RESOLVED**, that the nature of the failure of authorization with respect to the defective corporate act to be ratified is the June Consent Failure of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the Third Election as of the June Consent Date in all respects; and be it further

**RESOLVED**, that the Board hereby authorizes the Authorized Officers to submit the ratification of the Third Election to the stockholders of the Corporation for approval in accordance with the applicable provisions of Section 204 of the DGCL.

**Ratification of Past Issuance**

  **WHEREAS**, on July 27, 2022 (the "Past Issuance Date"), the Corporation issued 250,000 shares of common stock, par value $0.0001 per share, of the Corporation ("Common Stock") to Pavan Vaish (the "Past Issuance");

  **WHEREAS**, the Board is concerned that the Past Issuance is void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because the Corporation cannot locate a copy of the resolutions of the Board authorizing the Past Issuance in its books and records (the "Past Issuance Failure of Authorization");

  **WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act; and

  **WHEREAS**, the Board has determined to ratify the Past Issuance as of the Past Issuance Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the Past Issuance.

  **NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the Past Issuance as of the Past Issuance Date; and be it further

  **RESOLVED**, that the defective corporate act to be ratified hereby is the Past Issuance; and be it further

  **RESOLVED**, that the date of the defective corporate act is the Past Issuance Date; and be it further

  **RESOLVED**, that the defective corporate act involved the issuance of 250,000 shares of Common Stock on the Past Issuance Date which may constitute "putative stock" (as defined in Section 204(h) of the DGCL); and be it further

  **RESOLVED**, that the nature of the failure of authorization with respect to the defective corporate act to be ratified is the Past Issuance Failure of Authorization; and be it further

  **RESOLVED**, that the Board hereby approves the ratification of the Past Issuance as of the Past Issuance Date in all respects.

**Board Size**

**WHEREAS**, each of Divya Choorimule and Ruby Jha have indicated that they intend to resign as directors; and

**WHEREAS**, in connection with such resignations, the Board desires to reduce the size of the Board from five (5) to one (1).

**NOW, THEREFORE, BE IT RESOLVED**, that, effective as of immediately following the resignations of Divya Choorimule and Ruby Jha as directors, the size of the Board be, and it hereby is, reduced from five (5) to one (1); and be it further

**RESOLVED**, that, in connection with the foregoing, the Corporation hereby waives any provisions in that certain Voting Agreement, dated as of February 29, 2012, by and among the Corporation and the other parties thereto with respect to the size of the Board.

**General Authority**

**RESOLVED**, that the Authorized Officers are hereby authorized and empowered to provide prompt notice of the ratification of the defective corporate acts pursuant to the foregoing resolutions to (i) all holders of valid stock and putative stock, whether voting or nonvoting, as of the date of the adoption of these resolutions, in accordance with Section 204(g) of the DGCL and (ii) holders of record of valid stock and putative stock, whether voting or nonvoting, as of the time of each defective corporate act, other than holders whose identities or addresses cannot be determined from the records of the Corporation, in accordance with Section 204(g) of the DGCL; and be it further

**RESOLVED**, that the Authorized Officers be, and each of them acting singly hereby is, authorized and empowered to take any and all actions, and to execute and deliver any and all documents, agreements, certificates and instruments, in the name and on behalf of the Corporation, as they or any of them deem necessary or advisable in order to carry out the purposes and intent of, and to consummate any and all of the transactions contemplated by, the foregoing resolutions, the taking of such actions, or the execution and delivery of any such documents, agreements, certificates and instruments, to be conclusive evidence of such Authorized Officer's determination and authority to act for or on behalf of the Corporation; and be it further

**RESOLVED**, that all acts and things heretofore done by any director, officer or any agent of the Corporation, on or prior to the date hereof, in connection with the transactions contemplated by the foregoing resolutions be, and the same hereby are, in all respects ratified, confirmed, approved and adopted as acts on behalf of the Corporation; and be it further

**RESOLVED**, that this Consent may be executed in multiple counterparts (including by electronic transmission or facsimile), and each such counterpart shall be considered an original and, when taken together, all such counterparts shall be deemed one document.

*[Signature Page Follows]*

7

**IN WITNESS WHEREOF**, the undersigned, constituting all of the members of the Board, have executed this Consent as of the date first set forth above.

Sridhar Santhanam

Divya Choorimule

Ruby Jha

## **EXHIBIT B**

Stockholder Resolutions

[Attached]

# HFN, INC.

# WRITTEN CONSENT

# IN LIEU OF SPECIAL MEETING OF STOCKHOLDERS

<u>  October 25  </u>, 2023

**THE UNDERSIGNED**, being the holders of the requisite shares of capital stock of HFN, Inc., a Delaware corporation (the "<u>Corporation</u>"), in accordance with the authority contained in the Delaware General Corporation Law (the "<u>DGCL</u>") and the Bylaws of the Corporation (the "<u>Bylaws</u>"), hereby consent to the adoption of the following resolutions with the same force and effect as if such resolutions were duly adopted at a meeting of the stockholders of the Corporation that was held in accordance with the DGCL, the Bylaws and the Amended and Restated Certificate of Incorporation of the Corporation (the "<u>Charter</u>"), and at which a quorum was present and acting throughout:

## <u>Ratification of Defective Corporate Acts</u>

**WHEREAS**, pursuant to a unanimous written consent, dated October 9th, 2023 and attached hereto as <u>Exhibit A</u> (the "<u>Board Resolutions</u>"), the Board of Directors of the Corporation (the "<u>Board</u>") ratified the defective corporate acts identified in the Board Resolutions for all purposes of the DGCL, including Section 204 thereof; and

**WHEREAS**, as further set forth in the Board Resolutions, the authorized officers of the Corporation submitted the ratification of (i) the filing of the A&R Charter (as defined in the Board Resolutions) with the Secretary of State of the State of Delaware and (ii) the Third Election (as defined in the Board Resolutions), in each case, to the stockholders of the Corporation for approval in accordance with the applicable provisions of Section 204 of the DGCL (collectively, the "<u>Ratification</u>").

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Ratification be, and it hereby is, authorized, adopted and approved in all respects.

**IN WITNESS WHEREOF,** the undersigned have executed this Written Consent in Lieu of Special Meeting of Stockholders as of the date first written above.

KALAARI CAPITAL PARTNERS II, LLC

By: _____

Name: **Resmah Choomka**

Title: Director

_____

Sridhar Santhanam

# **EXHIBIT A**

Board Resolutions

[Attached]

**UNANIMOUS WRITTEN CONSENT**
**OF THE**
**BOARD OF DIRECTORS**
**OF**
**HFN, INC.**

October 9th, 2023

The undersigned, being all of the members of the Board of Directors (the "<u>Board</u>") of HFN, Inc., a Delaware corporation (the "<u>Corporation</u>"), acting pursuant to Section 141(f) of the Delaware General Corporation Law (the "<u>DGCL</u>"), hereby consent (this "<u>Consent</u>") in writing to the adoption of the following resolutions with the same force and effect as if duly adopted at a meeting of the Board called for such purpose:

**<u>Ratification of Matters Related to January 2012 Incorporator Written Consent</u>**

**WHEREAS**, on January 11, 2012 (the "<u>Incorporator Consent Date</u>"), the sole incorporator of the Corporation (the "<u>Incorporator</u>") adopted by written consent (the "<u>Incorporator Consent</u>") resolutions (i) electing Alessandro Donnini as the sole director of the Board (the "<u>First Election</u>") and (ii) adopting the Corporation's Bylaws (the "<u>Bylaws Adoption</u>");

**WHEREAS**, the Board is concerned that the First Election and the Bylaws Adoption are void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because, with respect to the First Election, the Incorporator failed to set the size of the Board at one (1) in accordance with Sections 108 and 141 of the DGCL and, with respect to the First Election and the Bylaws Adoption, the Corporation cannot locate a copy of the Incorporator Consent executed in accordance with Section 108 of the DGCL in its books and records (the "<u>Incorporator Consent Failure of Authorization</u>");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act;

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act in respect of the election of the initial board of directors of the corporation pursuant to Section 108 of the DGCL shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(2) of the DGCL, a majority of the persons who, at the

time the resolutions required by Section 204(b)(2) of the DGCL are adopted, are exercising the powers of directors under claim and color of an election or appointment as such may adopt resolutions stating (i) the name of the person or persons who first took action in the name of the corporation as the initial board of directors of the corporation; (ii) the earlier of the date on which such persons first took such action or were purported to have been elected as the initial board of directors; and (iii) that the ratification of the election of such person or persons as the initial board of directors is approved; and

**WHEREAS**, the Board has determined to ratify the First Election and the Bylaws Adoption as of the Incorporator Consent Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the First Election and the Bylaws Adoption.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the First Election and the Bylaws Adoption as of the Incorporator Consent Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the Bylaws Adoption; and be it further

**RESOLVED**, that the date of the defective corporate act is the Incorporator Consent Date; and be it further

**RESOLVED**, that the nature of the failure of authorization with respect to the defective corporate act to be ratified is the Incorporator Consent Failure of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the Bylaws Adoption as of the Incorporator Consent Date in all respects; and be it further

**RESOLVED**, that the name of the person who first took action in the name of the Corporation as the initial Board is Alessandro Donnini; and be it further

**RESOLVED**, that the earlier of the date on which Alessandro Donnini first took such action or was purported to have been elected as the initial Board is the Incorporator Consent Date; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the First Election as of the Incorporator Consent Date in all respects.

### Ratification of Matters Related to January 2012 Written Consent

**WHEREAS**, on January 14, 2012 (the "January Board Consent Date"), the Board adopted by written consent resolutions electing Sridhar Santhanam to the Board (the "Second Election");

**WHEREAS**, the Board is concerned that the Second Election is void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because the Board failed to expand the size of the Board from one (1) to two (2) to create a vacancy on the Board in

accordance with the Corporation's Bylaws and Section 141 of the DGCL (the "January Board Consent Failure of Authorization");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act; and

**WHEREAS**, the Board has determined to ratify the Second Election as of the January Board Consent Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the Second Election.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the Second Election as of the January Board Consent Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the Second Election; and be it further

**RESOLVED**, that the date of the defective corporate act is the January Board Consent Date; and be it further

**RESOLVED**, that the nature of the failure of authorization with respect to the defective corporate act to be ratified is the January Board Consent Failure of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the Second Election as of the January Board Consent Date in all respects.

## Ratification of Matters Related to the Adoption of the A&R Charter

**WHEREAS**, on March 1, 2012 (the "Charter Adoption Date"), the Board adopted by written consent resolutions approving the Corporation's Amended and Restated Certificate of Incorporation (the "A&R Charter");

**WHEREAS**, on the Charter Adoption Date, the requisite stockholders of the Corporation adopted by written consent resolutions approving the A&R Charter;

**WHEREAS**, on March 15, 2012 (the "Charter Filing Date"), the Corporation filed the A&R Charter with the Secretary of State of the State of Delaware (the "Secretary of State");

3

**WHEREAS**, the Board is concerned that the filing of the A&R Charter with the Secretary of State on the Charter Filing Date is void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because (i) the Board failed to declare the A&R Charter advisable in accordance with Section 242 of the DGCL and (ii) each stockholder's signature did not bear the date of such stockholder's signature as required by Section 228 of the DGCL (as Section 228 of the DGCL existed as of the Charter Adoption Date and the Charter Filing Date) (collectively, the "A&R Charter Failures of Authorization");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act; and

**WHEREAS**, the Board has determined to ratify the filing of the A&R Charter with the Secretary of State as of the Charter Filing Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the A&R Charter.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the filing of the A&R Charter with the Secretary of State as of the Charter Filing Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the filing of the A&R Charter with the Secretary of State; and be it further

**RESOLVED**, that the date of the defective corporate act is the Charter Filing Date; and be it further

**RESOLVED**, that the natures of the failures of authorization with respect to the defective corporate act to be ratified are the A&R Charter Failures of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the filing of the A&R Charter with the Secretary of State as of the Charter Filing Date in all respects; and be it further

**RESOLVED**, that the Board hereby authorizes the officers of the Corporation (the "Authorized Officers") to submit the ratification of the filing of the A&R Charter with the Secretary of State to the stockholders of the Corporation for approval in accordance with the applicable provisions of Section 204 of the DGCL.

**Ratification of Matters Related to June 2012 Written Consent**

**WHEREAS**, on June 1, 2012 (the "June Consent Date"), certain stockholders of the Corporation adopted by written consent resolutions electing Kumar Shiralagi to the Board as a Preferred Director (as defined in the A&R Charter) (the "Third Election");

**WHEREAS**, the Board is concerned that the Third Election is void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because the holders of the Corporation's Series A Preferred Stock, par value $0.0001 per share, failed to consent to the Third Election in accordance with the A&R Charter (the "June Consent Failure of Authorization");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act; and

**WHEREAS**, the Board has determined to ratify the Third Election as of the June Consent Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the Third Election.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the Third Election as of the June Consent Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the Third Election; and be it further

**RESOLVED**, that the date of the defective corporate act is the June Consent Date; and be it further

**RESOLVED**, that the nature of the failure of authorization with respect to the defective corporate act to be ratified is the June Consent Failure of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the Third Election as of the June Consent Date in all respects; and be it further

**RESOLVED**, that the Board hereby authorizes the Authorized Officers to submit the ratification of the Third Election to the stockholders of the Corporation for approval in accordance with the applicable provisions of Section 204 of the DGCL.

**Ratification of Past Issuance**

**WHEREAS**, on July 27, 2022 (the "Past Issuance Date"), the Corporation issued 250,000 shares of common stock, par value $0.0001 per share, of the Corporation ("Common Stock") to Pavan Vaish (the "Past Issuance");

**WHEREAS**, the Board is concerned that the Past Issuance is void or voidable by reason of a "failure of authorization" (as defined in Section 204(h) of the DGCL) because the Corporation cannot locate a copy of the resolutions of the Board authorizing the Past Issuance in its books and records (the "Past Issuance Failure of Authorization");

**WHEREAS**, Section 204 of the DGCL provides that no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in Section 204 of the DGCL or validated by the Court of Chancery of the State of Delaware in a proceeding brought under Section 205 of the DGCL, and in order to ratify such a defective corporate act pursuant to Section 204(b)(1) of the DGCL, the board of directors of a corporation shall adopt resolutions stating (i) the defective corporate act to be ratified, (ii) the date of the defective corporate act, (iii) if such defective corporate act involved the issuance of shares of putative stock, the number and type of shares of putative stock issued and the date or dates upon which such putative shares were purported to have been issued, (iv) the nature of the failure of authorization in respect of the defective corporate act to be ratified and (v) that the board of directors of a corporation approves the ratification of the defective corporate act; and

**WHEREAS**, the Board has determined to ratify the Past Issuance as of the Past Issuance Date, pursuant to and in accordance with Section 204 of the DGCL, in order to avoid any uncertainty related to the validity of the Past Issuance.

**NOW**, **THEREFORE**, **BE IT RESOLVED**, that the Board hereby determines to ratify, for all purposes of the DGCL and Section 204 thereof, the Past Issuance as of the Past Issuance Date; and be it further

**RESOLVED**, that the defective corporate act to be ratified hereby is the Past Issuance; and be it further

**RESOLVED**, that the date of the defective corporate act is the Past Issuance Date; and be it further

**RESOLVED**, that the defective corporate act involved the issuance of 250,000 shares of Common Stock on the Past Issuance Date which may constitute "putative stock" (as defined in Section 204(h) of the DGCL); and be it further

**RESOLVED**, that the nature of the failure of authorization with respect to the defective corporate act to be ratified is the Past Issuance Failure of Authorization; and be it further

**RESOLVED**, that the Board hereby approves the ratification of the Past Issuance as of the Past Issuance Date in all respects.

## Board Size

**WHEREAS**, each of Divya Choorimule and Ruby Jha have indicated that they intend to resign as directors; and

**WHEREAS**, in connection with such resignations, the Board desires to reduce the size of the Board from five (5) to one (1).

**NOW, THEREFORE, BE IT RESOLVED**, that, effective as of immediately following the resignations of Divya Choorimule and Ruby Jha as directors, the size of the Board be, and it hereby is, reduced from five (5) to one (1); and be it further

**RESOLVED**, that, in connection with the foregoing, the Corporation hereby waives any provisions in that certain Voting Agreement, dated as of February 29, 2012, by and among the Corporation and the other parties thereto with respect to the size of the Board.

## General Authority

**RESOLVED**, that the Authorized Officers are hereby authorized and empowered to provide prompt notice of the ratification of the defective corporate acts pursuant to the foregoing resolutions to (i) all holders of valid stock and putative stock, whether voting or nonvoting, as of the date of the adoption of these resolutions, in accordance with Section 204(g) of the DGCL and (ii) holders of record of valid stock and putative stock, whether voting or nonvoting, as of the time of each defective corporate act, other than holders whose identities or addresses cannot be determined from the records of the Corporation, in accordance with Section 204(g) of the DGCL; and be it further

**RESOLVED**, that the Authorized Officers be, and each of them acting singly hereby is, authorized and empowered to take any and all actions, and to execute and deliver any and all documents, agreements, certificates and instruments, in the name and on behalf of the Corporation, as they or any of them deem necessary or advisable in order to carry out the purposes and intent of, and to consummate any and all of the transactions contemplated by, the foregoing resolutions, the taking of such actions, or the execution and delivery of any such documents, agreements, certificates and instruments, to be conclusive evidence of such Authorized Officer's determination and authority to act for or on behalf of the Corporation; and be it further

**RESOLVED**, that all acts and things heretofore done by any director, officer or any agent of the Corporation, on or prior to the date hereof, in connection with the transactions contemplated by the foregoing resolutions be, and the same hereby are, in all respects ratified, confirmed, approved and adopted as acts on behalf of the Corporation; and be it further

**RESOLVED**, that this Consent may be executed in multiple counterparts (including by electronic transmission or facsimile), and each such counterpart shall be considered an original and, when taken together, all such counterparts shall be deemed one document.

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, the undersigned, constituting all of the members of the Board, have executed this Consent as of the date first set forth above.

_____
Sridhar Santhanam

_____
Divya Choorimule

_____
Ruby Jha

For Delaware Litigation, case 2024-0185-LWW:

# EXHIBIT 2

EXHIBIT G

ANTICIPATED POST CLOSING CAP TABLE

|     | Name of Parties | No. of Shares in the Company (Common or Preferred) | Percentage Shareholding (%) |
|-----|-----------------|------------------------------------------------------|------------------------------|
| 1   | Sridhar Santhanam | 6,560,000 Common | 39.3616 % |
| 2   | Alessandro Donnini | 823,500 Common | 4.9412 % |
| 3   | Allan Miller | 1976 Common | 0.0119 % |
| 4   | Max Kupchik | 151 Common | 0.0009 % |
| 5   | William Harding | 27 Common | 0.0002 % |
| 6   | Dennis Callagy | 83 Common | 0.0005 % |
| 7   | State Street Bank | 81 Common | 0.0005 % |
| 8   | Richard Gabriel | 59 Common | 0.0004 % |
| 9   | Scott Noone | 50 Common | 0.0003 % |
| 10  | Gene Robinson | 36 Common | 0.0002 % |
| 11  | John Murgo | 36 Common | 0.0002 % |
| 12  | Victoria Silioutina | 21 Common | 0.0001 % |
| 13  | Eric Brown | 19 Common | 0.0001 % |
| 14  | Yongyue (Cora) Sun | 15 Common | 0.0001 % |
| 15  | Geoff Meek | 3 Common | 0.0000 % |
| 16  | ESOP | 2,61,6500 Common | 15.6996 % |
| 17  | IndoUS Venture Partners II, LLC | 6,666,000 Preferred | 40% |
|     | Total | 1,66,66,000 | 100% |

For Delaware Litigation, case 2024-0185-LWW:

# EXHIBIT 3

| Name | 2012 shares | Settlement | Adjusted |
|---|---|---|---|
| Settlement | | 307,155 | |
| | | | |
| Allan Miller | 10,000 | 228,080 | 230,247 |
| Max Kupchik | 764 | 17,425 | 17,425 |
| William Harding | 741 | 16,901 | 16,901 |
| Dennis Callagy | 421 | 9,602 | 9,602 |
| State Street Bank | 410 | 9,351 | 9,351 |
| Richard Gabriel | 300 | 6,842 | 6,842 |
| Scott Noone | 252 | 5,748 | 5,748 |
| Gene Robinson | 180 | 4,105 | 4,105 |
| John Murgo | 180 | 4,105 | 4,105 |
| Victoria Silioutina | 108 | 2,463 | 2,463 |
| Eric Brown | 95 | 2,167 | 0 |
| Geoff Meek | 16 | 365 | 365 |
| | | | |
| Total | 13,467 | 307,155 | 307,155 |
| | | | |
| | | | |
| | | | |
| Santhanam | 6,560,000 | | |
| Donnini | 823,500 | | |
| Kalaari | 6,666,000 | | |
| Half of options | 1,308,250 | Options: | 2,616,500 |
| Total | 15,357,750 | | |
| 2% of total | 307,155 | | |

For Delaware Litigation, case 2024-0185-LWW:

# EXHIBIT 4

## HFN Inc Cap table (December, 2019)

| Name | Shares | % |
|---|---|---|
| Alessandro Donnini | 823,500 | 4.94% |
| Allan Miller | 230,247 | 1.38% |
| Dennis Callagy | 9,602 | 0.06% |
| Gene Robinson | 4,105 | 0.02% |
| Geoffry Meek | 365 | 0.00% |
| Victoria Dudin Silioutina | 2,463 | 0.01% |
| John Murgo | 4,105 | 0.02% |
| Kalaari Capital Partners II, LLC | 6,666,000 | 40.00% |
| Max Kupchik | 17,425 | 0.10% |
| Richard Gabriel | 6,842 | 0.04% |
| Scott Noone | 5,748 | 0.03% |
| Sridhar Santhanam | 6,252,846 | 37.52% |
| State Street Bank & Trust Comp | 9,351 | 0.06% |
| William Harding | 16,901 | 0.10% |
| | | |
| **Equity Awards** | | |
| Ganesh Krishnan | 200,000 | 1.20% |
| Pavan Vaish | 250,000 | 1.50% |
| | | |
| **Stock Option** | | |
| Stock Option Plan | 2,166,500 | 13.00% |
| | | |
| **Total** | **16,666,000** | **100.00%** |

For Delaware Litigation, case 2024-0185-LWW:

# EXHIBIT 5

**HFN Inc. Cap table June 2021**

| Name | Shares | % |
|---|---|---|
| Alessandro Donnini | 823,500 | 4.94% |
| Allan Miller | 230,247 | 1.38% |
| Dennis Callagy | 9,602 | 0.06% |
| Gene Robinson | 4,105 | 0.02% |
| Geoffry Meek | 365 | 0.00% |
| Victoria Dudin Silioutina | 2,463 | 0.01% |
| John Murgo | 4,105 | 0.02% |
| Kalaari Capital Partners II, LLC | 6,666,000 | 40.00% |
| Max Kupchik | 17,425 | 0.10% |
| Richard Gabriel | 6,842 | 0.04% |
| Scott Noone | 5,748 | 0.03% |
| Sridhar Santhanam | 6,560,000 | 39.36% |
| State Street Bank & Trust Comp | 9,351 | 0.06% |
| William Harding | 16,901 | 0.10% |
|  |  |  |
| **Equity Awards** |  |  |
| Ganesh Krishnan | 200,000 | 1.20% |
| Pavan Vaish | 250,000 | 1.50% |
|  |  |  |
| **Stock Option** |  |  |
| Stock Option Plan | 1,859,346 | 11.16% |
|  |  |  |
| **Total** | **16,666,000** | **100.00%** |

For Delaware Litigation, case 2024-0185-LWW:

# EXHIBIT 6

Contact

www.linkedin.com/in/ruby-
jha-0636b34 (LinkedIn)

# Ruby Jha

HFN IT Services Pvt.Ltd
Bengaluru, Karnataka, India

## Experience

Acris Technologies Pvt.Limited
Project Manager

————

## Education

PSG College of Arts and Science
 · (1996 - 1999)

For Delaware Litigation, case 2024-0185-LWW:

# EXHIBIT 7

## Contact

www.linkedin.com/in/divya-ch-a90345137 (LinkedIn)

## Top Skills

Leadership
Engineering Management
Requirements Analysis

## Languages

English (Native or Bilingual)
Kannada (Full Professional)
Hindi (Native or Bilingual)
Malayalam (Native or Bilingual)

## Certifications

Advanced Product Management: Vision, Strategy & Metrics

## Publications

Error Proofing Mechanism to Ensure the Correctness of Rotary Pump Timing Using a Barcoding System

Implementing a Barcoding System to Error Proof Number Punching In an Engine Assembly Line

Implementing a Barcoding System to Error Proof Oil Dispensing System in the Engine Assembly Line

Seeding and Fertilization Using an Automated Robot

# Divya Ch
Product Manager
Bengaluru, Karnataka, India

## Summary

Product Manager | User Interaction, Experience & Interface Design

------

## Experience

### Nanoheal
9 years 2 months

Product Manager
August 2015 - Present (8 years 3 months)
Bengaluru Area, India

Sales and Marketing Management Trainee
September 2014 - August 2015 (1 year)
Bengaluru, Karnataka

### VARUN BEVERAGES LIMITED
Marketing Intern
July 2013 - August 2013 (2 months)
Goa, India

• Conducted market study about the market reach and effectiveness of ad campaigns for Pepsi co in Goa.
• Devised a new model that resulted in 15% increase in sale and ad effectiveness (in North Goa) in the quarter of October - December 2013

### HP
Service Delivery Consultant
September 2011 - August 2012 (1 year)
Bengaluru, Karnataka

• Assistance with international client queries and coordination of routine activities, Vendor follow ups and coordinating with the onshore engineers to resolve hardware failures, basic networking tasks like port allocations etc
• Development and presentation of Service Levels reports & employee performance reports
• Part of HR & PR initiatives

## Education

Dayananda Sagar College of Engineering, BANGALORE
Master of Technology - MTech, Engineering/Industrial
Management · (2012 - 2014)

KVG College of Engineering
Bachelor's Degree in Engineering, Electrical, Electronics and Communications
Engineering · (2007 - 2011)

For Delaware Litigation, case 2024-0185-LWW:

# EXHIBIT 8

# Agenda

1. Past, Present and Crisis

2. Sales Pipeline & Performance

3. Customer Retention: Product & delivery

4. Employee and HR issues

5. Fiduciary responsibility, legal and PR issues

6. Summary

# Nanoheal was in crisis in Q3, Q4 2019

- Very low and rapidly declining cash balance
  - Average cash balance of under $450K
  - Projected to run out of cash in 3 months

- Rapidly declining ARR with significant loss of customers
  - Nanoheal's gross retention rates significantly below market average
  - Well-funded competition with strong brand ( NextThing, Lakeside), entrenched in most SI Partners with continued significant investment in sales, marketing and PR
  - Go to market focused mostly on small deals to middle managers mostly at Tier 2 / 3 SI partners and small customers with short durations of contracts.

- High legal liabilities, HR and governance issues
  - Excessive liability with a history of 3 lawsuits from shareholders, partners and vendors
  - Lack of governance (oversight/meetings/documentation), internal management and controls
  - Lack of senior people (or any people) in several key functions (marketing/PR, customer success, HR, finance)
  - High employee attrition
  - Lack of basic working infrastructure (CRM, HR portal, etc.)

# Nanoheal has lost 60% of its customers and 43% of its ARR in the last 3.25 years with a 3 year gross retention rate of 35%



15 active customers

9 customers added

23 customers added

19 active customers

April 1, 2019

June 30, 2020

June 30, 2022

28 customers lost

**Gross Retention Ratio**

| Year | NRR |
|---|---|
| 19-20 | 63% |
| 20-21 | 82% |
| 21-22 | 61% |

Gross Retention Rate is defined as (opening ARR – churn) / (opening ARR) for a particular set of end customers

- Nanoheal has lost 28 customers out of 47 total customers in the last 3.25 years. That's a loss of 60% of the total customers and 43% of the ARR.

- 64% of customers lost (18 out of the 28) have highlighted issues with the Nanoheal product

- Nanoheal's gross (and net) retention rate for the last 12 months is at 61% compared to the industry average of 90% for gross and 100% for net retention.

- On a 3 year basis (Typical SaaS industry contract duration), Nanoheal has only 4 active customers out of the 15 customers from 3 years ago. The 3 year gross retention rate for Nanoheal is 35% compared to the industry average of over 90%

| | | | Amount in '000 | | | | |
|---|---|---|---|---|---|---|---|
| | **S I Partner** | **Customer** | **FY 22-23** | **FY 21-22** | **FY 20-21** | **FY 19-20** | **Product / Delivery Issues** |
| 1 | Accenture | Dyson | 96 | | | | ✓ |
| 2 | Coforge | Channel 4 | 24 | | | | ✓ |
| 3 | Coforge | Virgin Atlantic | 48 | | | | ✓ |
| 4 | TCS | SAS | 96 | | | | ✓ |
| 5 | TCS | Accoustic | 36 | | | | ✓ |
| 6 | HCL infosystem | Mclaren | 162 | | | 🖐 | ✓ |
| 7 | Coforge | Charity Share | | 8 | | | ✓ |
| 8 | Coforge | SCCC | | 42 | | | ✓ |
| 9 | One Support | Internal | | 29 | | | |
| 10 | HCL infosystem | Under Armor | | 65 | | | |
| 11 | JANA | JANA | | 73 | | | |
| 12 | Hexaware | Hexaware | | | 20 | | |
| 13 | Dell | PTS | | | 1 | | |
| 14 | Avira | Avira | | | 12 | | |
| 15 | Coforge | LH | | | 10 | | ✓ |
| 16 | TCS | TDC | | | 94 | | ✓ |
| 17 | TCS | Garrett Motion | | | 61 | | ✓ |
| 18 | TCS | Seadrill | | | 47 | | ✓ |
| 19 | CompuCom | Realogy | | | 97 | | ✓ |
| 20 | CompuCom | Florida Power | | | 180 | | ✓ |
| 21 | CompuCom | OOTS | | | 120 | | ✓ |
| 22 | IBM | BFIL | | | 15 | | ✓ |
| 23 | Resolve Laplink | Revenue wire/Sitel | | | | 74 | |
| 24 | Dell | PTS | | | | 149 | |
| 25 | Sitel | PTS | | | | 280 | |
| 26 | Coforge | SITA | | | | 8 | ✓ |
| 27 | Coforge | CISO | | | | 26 | ✓ |
| 28 | TCS | BONNEIR | | | | 10 | |
| | | **Total** | **$462** | **$218** | **$656** | **$547** | **$1,883** |

# Significant risk of losing atleast 74% of the current ARR due to product issues. No resulting pipeline from 18% of current ARR.

| | SI Partner | End Customer | Current Active Customers | | |
|---|---|---|---|---|---|
| | | | ARR contribution | Product issues | |
| 1 | PCCW | MHA | 168 | ✓ | |
| 2 | PCCW | Others | 72 | ✓ | |
| 3 | Coforge | Eurostar | 12 | ✓ | |
| 4 | Coforge | SK Life | 4 | | |
| 5 | OneSupport | External | 20 | | |
| 6 | Pomeroy | Whirlpool | 123 | ✓ | |
| 7 | TCS | ADM | 265 | ✓ | |
| 8 | HCL | Dover | 17 | | |
| 9 | HCL | Fronterra | 11 | | |
| 10 | HCL | Rite Aid | 275 | | |
| 11 | HCL | Thmpson Reuters | 71 | | |
| 12 | HCL | SBD | 349 | | |
| 13 | HCL | MKS | 63 | | |
| 14 | Infosys | Toyota | 48 | ✓ | |
| 15 | Infosys | Lanxess | 177 | ✓ | |
| 16 | Infosys | Daimler | 2400 | ✓ | |
| 17 | Infosys | LRQA | 53 | | |
| 18 | Infosys | BCBS | 30 | | |
| 19 | IBM | SKS | 258 | | |
| | | Total ARR | $4,416 | | |
| | | ARR at high risk | $3,265 | 74% | |
| | | ARR with no pipeline | $810 | 18% | |

- The average age of Nanoheal's end customers is 18 months Out of the 19 current active customers, 15 have been added in the last 18 months and they contribute 86% of the ARR.

- Nanoheal has already lost 7 out of the 23 customers added in the last 18 months.

- 8 out of the current 19 active accounts have documented product issues. That's means 73% of the current recurring revenue is at risk of being lost.

- 8 out of the current 19 accounts have no resulting pipeline for additional business from the SI partners.

- **Sales team is under constant pressure to generate business from new customers, due to low repeat business from existing SI partners and no upsell in existing customers due to continued loss of customers (typically 33% to 50% of the quota should come from existing relationships)**

**Nanoheal has no case study of material value creation across any of the 47 customers we have had so far**

# Persistent and increasing negative feedback from SI partners / customers on product and delivery. Several current accounts at risk of being lost.

There is a serious concern not only from the control and manageability of the platform but on the overall security of the platform........ The post incident action taken both in terms of time that it took to get the Nanoheal team on call or the claim by the Nanoheal team... has led to further questions.

- Coforge (May 12, 2022)

The customer has started a process to impose a penalty for this incident and looking at the legal action. The security team is questioning the security controls of the platform, the process that's driving the solution and its integrity. It is also claimed that the Nanoheal code is exposed on the internet

- Coforge (May 20, 2022)

There are issues in most of the accounts........

- Ticket reduction is not effective. Autoheal is not getting configured. Value realization is an issue.
- Nanoheal delivery team should be more responsive to requests.
- Competition is doing a better job, implementations are not getting completed in specific timeframe.
- Nanoheal web console is slow. Reports is taking time. Switching between the tabs takes time.

Please ensure to action on priority and close as soon as possible otherwise will have impact on new business and existing deliverables.

- Infosys (June 29, 2022)

Need to discuss Nanoheal capability and product stability. We have issues in most of accounts, but the Nanoheal team is not able to resolve....

- Infoyss (June 15, 2022)

Below are the challenges which we highlighted to Nanheal. Without fixing them we cannot move forward, **No matter how many custom used cases we build, we will not be in a position to show the output, since their Dashboard & reporting is pathetic.**

- Infosys Daimler team (June 6, 2022)

The situation on the ground and the momentum is far from commitment. We are utterly disappointed with the progress (on the product and the delivery).

- Infosys Daimler team (May 24, 2022)

Overall, we are very concerned about the Nanoheal product design and the support.

- HCL team (March 8, 2022)

The tool does not show any value in the environment and hence McLaren didn't see any reason to continue with it

- HCL (June 30, 2022)

# Consolidated feedback and observations from partners / customers on product and delivery. Lack of trust and confidence in the Nanoheal solution and the product / delivery teams

- Product does not work and does not deliver value: Self heal automations rarely work and do not get triggered resulting in no appreciable reduction in tickets. Even self help is ineffective. Have not been able to demonstrable value creation and ROI in any of the 47 customer accounts so far. No single case study.

- Product is unstable. Web console and reporting is very slow.

- Dashboard and reporting does not work in many cases. Significantly inferior to competition. Have not been able to build reporting capabilities requested by HCL for over 3 months (loss of atleast $1.5M of annual ARR)

- Perceived security risks with the platform (Coforge, McKinsey, Accenture)

- Delivery timelines are frequently delayed significantly. Competition considered much better in delivery timelines and project management

- Delivery team is very reactive. Poor project management.

- Product management is highly reactive instead of working on features and functionality that is 18 to 24 months out. No product roadmap ever shared with any of the SI partners or the sales team. No participation in any of the meetings with the customers for understanding pain points.

- No documentation of product updates and no effort to show updates creates concerns that there have been no updates

- No stable, scalable, user-friendly demo environment

# Very low employee and high attrition, HR issues

- Culture of unresponsiveness, silos and secrecy with minimal collaboration across groups and lack of transparency
  - Highly unresponsive culture (consistent and similar feedback from SI partners / customers). E-mails and calls from partners and sales team go unanswered for several days / weeks
  - Delivery and customer success refuse to participate in any of the sales meetings. Decline meeting invites and calls.
- Minimal reward and excessive risk
  - No bonus for employees in the last 2 years despite the high growth of the company
  - No stock options for any of the employees (considered standard in any tech company)
  - Very high quotas for sales people (16X total comp) when the market average is 5X total comp
- Culture of intimidation, retribution and castigation
  - Public displays of anger and outrage (Prerana, Scott, Akanksha)
  - Harassment through excessive messages and dictates for instant action
  - Sales people constantly grilled on their ambitious metrics and performance when no such metrics exist for any of the other groups. None of the other group metrics ever shares with sales
- Lack of HR function and HR processes
- High attrition and reputational damage (sales person with the highest productivity leaving the company)

# Lack of fiduciary responsibility, continued legal liabilities and PR issues

- Continued absence of people in key roles such as marketing and HR for long extended periods. Lack of recruiting function resulting in inability to fill sales roles.
  - Lack of a key marketing person for more than 1 year. No marketing team and no help in PR, branding, analyst relations. Lack of a relevant website and appropriate investment in analyst relations.
  - Absence of a senior HR person for over 2 years. No help in recruiting resulting in inability to schedule even basic interviews in sales and other functions. Several roles in sales, M&A, marketing are unfilled for extended periods. Bandwidth significantly stretched in the existing teams.
  - Absence of a proper head for Bask for an extended period leading to continued decline in ARR

- Ad-hoc decision making with no deliberation or discussion, or enormously extended timelines. Lack of due process, approvals and timelines.
  - Over $400K committed to the SEED group in the middle East in a binding contract for 3 years with no demonstrated market potential for the Middle East, with not even a brief discussion or due process. No comparable commitment made in the US and Europe (significantly larger geographies for IT spending)
  - Very long delays in decision making in multiple cases leading to negative business impact (took over 1 year to finalize the PR firm). Lack of any marketing people for very long periods.

- Continued excessive legal liabilities due to lawsuits resulting from security issues, non-performance of the product

- Significant reputational damage and PR nightmare due to upset partners / customers and employees that can be irreversible

# Summary

- Nanoheal is in crisis with upset employees, highly dissatisfied customers / partners and disgruntled investors, that will result in continued loss of ARR, reputational damage and high liabilities, eventually forcing a shutdown.

- The current sales and go to market strategy continues to produce growth rates that are significantly above the market average, despite the absence of brand and lack of basic functions such as marketing, lead generation and recruiting

- The market opportunity is significant and there exists a tremendous opportunity for value and wealth creation. However, success will require a radicle and immediate transformation.

# The crisis is more severe now

- No impending cash flow problem (unless existing deployments fail, leading to contract cancellations) with projected cash balance of over atleast $1.2M
  - Total additional payments of $1.4M + in the next few weeks: Negotiated an additional $550K of payment for Daimler bringing their total payments to $950K, $300K+ (PCCW), $250K (HSBC), $300 (Go Daddy)
  - Projections include additional hiring costs of $500K+ in the next 6 months and $750K+ in the next 9 months that can be avoided if receipts are delayed
- Signifiant continued loss of end customers (lost 28 out of 47 customers (60% of accounts) and 43% of the ARR in the last 3.25 years. Persistent and increasing negative feedback on product and delivery from SI partners leading to loss of credibility, reputation and severe potential liabilities
- Significant risk of contract cancellations with 74% of the current ARR at risk of being lost (including Daimler and newly won accounts) due to product / delivery issues and high dissatisfaction of partners / customers.
- Absence of people in several key areas such as marketing, PR, HR / recruting and so on, for long periods of time. Significant bandwidth crunch in existing teams.
- High employee attrition and low employee morale.

**Nanoheal has upset employees, highly dissatisfied customers / partners and disgruntled investors resuling in continued loss of ARR, reputational damage, high legal liabilities and potential shutdown.**

For Delaware Litigation, case 2024-0185-LWW:

# **EXHIBIT 9**

# File & ServeXpress Transaction Receipt

## ✅ You have successfully submitted your transaction!

**File & ServeXpress Transaction ID:** 72133242
**Submitted by:** Allan Miller, (SRI)-Miller, Allan
**Authorized by:** Allan Miller, (SRI)-Miller, Allan
**Authorize and file on:** Feb 23 2024 5:08PM EST  [ℹ]

---

**Court:** DE Court of Chancery Civil Action
**Case Class:** Civil Action
**Case Type:** Petition For Review
**Case Name:** Allan Miller

---

**Transaction Option:** Originating Event
**Billing Reference:** AAM-DEL-01
**Note to Clerk:** File and Serve Express did not allow filing without a Respondent. This is supposed to be a Petition to the Court with no respondent. I apologize for the mis-labeling. Thank you.

---

### Documents List

| 4 Document(s) |
|---|

| Originating Document, 18 Pages | |
|---|---|

| Document Type: | Access: | Statutory Fee: | Linked: |
|---|---|---|---|
| Petition - Originating (previously filed as a CM) | Public | $261.25 | |

| Document title: |
|---|
| Allan Miller |

| Attached Document, 48 Pages | |
|---|---|

| Document Type: | Access: | Statutory Fee: | Linked: |
|---|---|---|---|
| Exhibits | Public | $1.25 | |

| Document title: |
|---|
| Allan Miller - Exhibits |

| Attached Document, 2 Pages | |
|---|---|

| Document Type: | Access: | Statutory Fee: | Linked: |
|---|---|---|---|
| Affidavit | Public | $1.25 | |

| Document title: |
|---|
| Verification to Petition |

| Attached Document, 2 Pages | |
|---|---|

| Document Type: | Access: | Statutory Fee: | Linked: |
|---|---|---|---|
| Affidavit | Public | $1.25 | |

| Document title: |
|---|
| Pro Se E-filing Affidavit |

Close All

⊟ **Sending Parties (1)**

| Party | Party Type | Attorney | Firm | Attorney Type |
|---|---|---|---|---|
| Miller, Allan (pending) | Petitioner | Miller, Allan | (SRI)-Miller, Allan | Pro Se |

⊟ **Case Parties**

| Party | Party Type | Attorney | Firm | Attorney Type |
|---|---|---|---|---|
| HFN, Inc. | Respondent | No Answer on File | Firm TBD | N/A |

| Miller, Allan | Petitioner | Miller, Allan | (SRI)-Miller, Allan | Pro Se |

Close

---

**About File & ServeXpress** | **Resource Center** | **FAQs** | **Terms & Conditions** | **Privacy**

© 2024 File & ServeXpress, LLC. All rights reserved.

**Client Support**

☎ 1-888-529-7587

✉ support@fileandserve.com

💬 Chat Online

# EXHIBIT 4

pierced in order to achieve discrete, specific policy objectives. As such, our task is to discover and articulate what those policy objectives are. Our taxonomy consists of the list of the policy objectives that justify ignoring the corporate form. In the case of piercing, one reason that confusion and incoherence reigns is that the corporate veil is pierced in order to accomplish three separate and largely unrelated, albeit legitimate, policy objectives.

The entire universe of piercing cases can be explained as judicial efforts to remedy one of the following three problems. While some of these problems previously have been identified, this is the first Article to identify all of the economic and policy problems that piercing attempts to ameliorate. It is the first to present a taxonomy that can explain all of the decisions in this area and that can be used methodologically to evaluate the quality of piercing decisions.

First, courts pierce the corporate veil as a tool of statutory application, in the sense that piercing the corporate veil is done in order to bring corporate actors' behavior into conformity with a particular statutory scheme, such as social security or state unemployment compensation schemes. For example, as explained in detail below, sometimes the court will ignore the corporate form in order to accomplish the specific legislative goal of a government benefit program that distinguishes between owners and employees. And of course, sometimes the court will respect the corporate form where doing so is necessary to reach a result that is consistent with a particular state or federal statutory scheme.

Second, courts also pierce in order to remedy what appears to be fraudulent conduct that does not satisfy the strict elements of common law fraud. Specifically, courts pierce as a remedy for "constructive fraud" in the contractual context. Simply put, if a court becomes convinced that a shareholder or other equity investor has, by words or actions, led a counterparty to a contract to believe that an obligation is a personal liability rather than (or in addition to) a corporate debt, then courts sometimes will use a piercing theory to impose liability on the individual shareholder rather than a fraud theory. As one court famously has observed, "[f]raud or *something like it* is required" to pierce the corporate veil whether under federal, Delaware, or Oklahoma common law.[4]

The third ground on which courts pierce the corporate veil that we identify is the promotion of what we term accepted "bankruptcy values." In particular, courts will disregard the corporate form in order to prevent fraudulent conveyances and preferential transfers. The

---

[4] Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 268 (D. Del. 1989) (emphasis added).

Certificate of Service

I certify that Plaintiff Allan Miller:

1.  has registered for Email Filing and Electronic Notification pursuant to DUCivR 5-1(b)(1)(A);

2.  has verified that the above document meets the requirements outlined in DUCivR 5-1(b)(1)(A);

3.  has filed this document electronically through email to utdecf_clerk@utd.uscourts.gov; and

4.  has served all non-ECF parties by an acceptable means pursuant to DUCivR 5-1(b)(1)(A)(ii)(g).

Accordingly, the document will be served upon all ECF parties through the Court's ECF system.


Date: _____April 16, 2024_____        Signature: _____/s/ Allan A. Miller_____

Printed name: _____Allan A. Miller_____